1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    GLENN CORNWELL, JR.,                  No. 2:06-cv-00705 TLN-KJN

12                  Petitioner,             **DEATH PENALTY CASE**

13         v.

14    WARDEN, San Quentin State Prison,     FINDINGS & RECOMMENDATIONS

15                  Respondent.

16

17           Petitioner is a state prisoner under sentence of death.  He seeks relief pursuant to 28

18    U.S.C. § 2254.  The parties briefed the application of 28 U.S.C. § 2254(d) to each claim in the

19    amended petition.  After careful consideration of the parties' briefs and the state court record, this

20    court concludes that petitioner has satisfied the requirements of section 2254(d) for claim 3; has

21    shown that claim 19 is ripe for adjudication; has failed to exhaust aspects of claim 27; has shown

22    that consideration of aspects of claim 34 should be deferred; and has failed to satisfy the

23    requirements of section 2254(d) for the remaining claims in the amended petition.  Accordingly,

24    this court recommends that these federal proceedings continue on claim 3 in the amended

25    petition.  This court also recommends that claim 19 be dismissed without prejudice to its renewal

26    after an execution date is set and that aspects of claim 27 be dismissed as unexhausted.  In

27    addition, this court recommends that consideration of aspects of claim 34 be deferred until the

28    court addresses any procedural default issues.  Finally, this court recommends that the remaining

1

claims in the amended petition be denied.

BACKGROUND FACTS[1]

I.   <u>Guilt Phase Evidence</u>

The principal participants in the narrative of petitioner's crime are petitioner; his girlfriend, Juanita Washington; his friend, Roland Johnson; his acquaintance, security guard Michael Johnson (no relative of Roland's); Kimberly Scott, owner of Cashland, a check-cashing business in Sacramento; and William Reagan, the victim, who assisted Kimberly Scott in her business and also was romantically involved with her.  Several identification witnesses testified, and other witnesses testified on various points.  The principal defense witnesses testified concerning the issue of identification, including possible deficiencies in the eyewitness identification evidence proffered by the prosecution.  One witness provided petitioner with an alibi.

The setting of the crime was the sidewalk in front of Cashland.  The business was located on 16th Street between F and G Streets in Sacramento.  There was an alley next to the business, and beyond the alley was an empty lot that served as a parking lot.  Also nearby, in the general vicinity, was a supermarket located at 23d and F Streets.

The crime was committed at approximately 1:30 p.m. on June 1, 1993.  The evidence against petitioner, however, reflected preparatory activity on his part beginning on the previous day, May 31, 1993, when he borrowed an automobile, a brown Toyota, belonging to Juanita Washington, his girlfriend.  Petitioner drove this automobile to the home of his friend, Roland Johnson, a drug dealer.  Petitioner asked Johnson for the loan of a handgun, explaining he needed the weapon "to try to make a move on something," and that he had "eyes,"— statements Johnson interpreted as an announcement that petitioner planned a robbery and that he had an accomplice who was an insider at the scene of the robbery.  Roland Johnson supplied petitioner with a loaded .357 magnum revolver and observed petitioner drive away in Washington's Toyota.

---

[1] This overview of the facts is derived from the California Supreme Court's recitation of the evidence presented at trial and from the court's independent review of the state court record.  <u>See</u> <u>People v. Cornwell</u>, 37 Cal. 4th 50, 59-66 (2005).

2

According to Washington, petitioner departed for work at 7:00 a.m. on June 1, 1993, driving her Toyota. Washington's vehicle was parked on the 600 block of 17th Street on that date and was ticketed by a city parking enforcement officer at that location at 3:52 p.m., the ticket noting that the vehicle's tires had been marked at approximately 1:00 p.m. on that date and that the vehicle had exceeded a two-hour parking limit.

William Reagan generally assisted at Cashland by delivering checks to the business's bank and returning with cash. He performed this task successfully on the morning of June 1, 1993, but his second run of the day ended in his death. He departed from Cashland at 12:30 p.m. and withdrew $9,500 in cash from the bank at approximately 1:00 p.m. The withdrawal consisted of $4,000 in $100 bills, $1,500 in $50 bills, and $4,000 in $20 bills. He was killed on his return as he walked from his automobile, which was parked behind Cashland, through the alley to the front of the establishment. It was noted at the trial that the first day of the month ordinarily was a busy one for Cashland.

The prosecution theorized that the insider whom petitioner mentioned to Roland Johnson was Michael Johnson, a man with whom petitioner was acquainted and who was employed as a uniformed security guard at Cashland. Michael Johnson generally worked only on the first day of the month and occasionally accompanied other employees on their bank runs. Usually he was armed, but on the day of the crime he was not. During Reagan's second bank run on June 1, 1993, Michael Johnson remained at Cashland and was observed pacing back and forth and looking out the front windows of the business.

At approximately 1:30 p.m. on June 1, 1993, Reagan was walking from the alley to the Cashland business carrying his briefcase, his usual means of transporting the business's cash. A man whom five witnesses identified as petitioner approached him from behind and attempted to wrest the briefcase from his grasp. (Robert Blair's observations were made from a vantage point across the street from Cashland; Maria Ramos's from the passenger side of an automobile stopped on 16th Street directly in front of Cashland; Frances Rivers's from an automobile idling in the alley adjacent to Cashland, and again from the automobile as it crossed the parking lot behind Cashland; Susan Erickson's through a window inside Cashland; and Cassandra

3

Henderson's from directly in front of Cashland.)  When Reagan resisted, petitioner produced a weapon and ordered him to drop the briefcase.  When Reagan did not comply, petitioner fired the weapon.  Reagan fell to the ground, the briefcase still in his grasp.  Petitioner fired a second time, striking Reagan's neck, took the briefcase, and ran down the alley next to Cashland, waving the revolver over his head as if signaling.  Petitioner ran to the rear of Cashland and into the empty lot behind it.  Frances Rivers, one of the persons who observed the shooting, drove away from Cashland after the incident and circled back through the lot.  There she came face-to-face with petitioner, whom she recognized as the shooter, and witnessed him run away, accompanied by another man.

Witnesses who were inside Cashland at the time heard someone yell, "they're fighting," then heard gunfire, and crouched on the floor.  Scott, the owner of Cashland, heard someone yell, "it's Bill."  She ran outside and found Reagan lying on his back on the sidewalk, bleeding from his neck.  She could see that he was dying.  He was killed by a gunshot wound to his neck that was consistent with the impact by a bullet fired from a .357 magnum positioned against his neck.  His face and his left hand displayed gunpowder stippling such as would be present if a firearm had been fired at him at short range, but missed.  At the scene of the crime, police investigators discovered a bullet and a bullet casing from a .357 magnum revolver.

There was evidence petitioner was at a supermarket located a few blocks from Cashland at 23d and F Streets at 2:15 p.m. on June 1, 1993.  A police search of petitioner's bedroom produced a receipt from the supermarket bearing this date and time.  At some time between 2:30 and 3:00 p.m. on the day of the crimes, petitioner arrived at an auto dismantling business and purchased a used white Camaro, paying for the automobile, which cost $1,400, with $20 bills.  The purchase was finalized at 3:39 p.m.  Petitioner was accompanied by another man who was not identified, but who may have been an accomplice.

Between 3:30 and 4:00 p.m. on June 1, 1993, petitioner arrived in the Camaro at Roland Johnson's home.  According to Johnson, petitioner appeared frightened and agitated.  He stated that he had used Johnson's weapon but could not return it because he no longer possessed it.  Petitioner paid Johnson $500 in $20 bills for the firearm and for other favors.  Petitioner reported

he had committed a robbery and had been forced to "smoke" the victim. Johnson gave this testimony after receiving certain benefits from law enforcement authorities related to his August 1993 imprisonment for a parole violation. Johnson claimed he began to suffer from a guilty conscience concerning the murder petitioner had committed and feared the consequences of his own part in lending petitioner the murder weapon. Johnson contacted law enforcement authorities and supplied them with the foregoing information and, in return for testifying, he received an eight-month reduction of his term of imprisonment for the parole violation as well as immunity from prosecution for any act connected with the charged crimes.

Juanita Washington testified concerning events that took place later on the day of the fatal shooting, June 1, 1993. She reported that petitioner returned to their home at 5:15 p.m. rather than at his usual hour of 4:00 p.m. He arrived in a white Camaro she had not seen previously, explaining that his supervisor at work had purchased the automobile for him and that petitioner would make periodic payments. Washington was concerned because of "the money situation that we were in." Washington observed a briefcase in the trunk of the Camaro. Petitioner informed her that he had left her Toyota downtown because he had worked in the neighborhood that day. He drove her to the vehicle's location on the 600 block of 17th Street, where, as noted previously, it had been ticketed.

Petitioner's supervisor at his place of employment testified, denying having purchased the Camaro. Another employee, a record keeper, added that petitioner failed to report for work on June 1, 1993. Petitioner, although he was employed at the time of the crime, had $1.20 in his bank account as of May 21, 1993, had passed three checks with insufficient funds in May 1993, and had at least one overdue bill.

The defense presented on behalf of petitioner was one of mistaken identity and alibi. Although, as noted previously, five prosecution witnesses positively identified petitioner as the perpetrator, four other witnesses who stood in front of or near Cashland and witnessed the crime testified at trial that petitioner was *not* the shooter. (These defense witnesses included: Alicia McKee, who had stood immediately in front of Cashland; her sister, Sharlean McKee, who had stood approximately four feet from the victim as he was shot; Marvin Napoleon, whose

observations were made from a position 15 feet from the shooting; and Alice Sanchez, who was standing with Napoleon 15 feet from the shooting.) Two of these witnesses, Alicia and Sharlean McKee, had identified someone other than petitioner at a live lineup, whereas two others, Marvin Napoleon and Alice Sanchez, had been unable to make a positive identification at the live lineup. An additional defense witness, Robert Young, a teller at Cashland, had identified someone at the live lineup other than petitioner as the perpetrator, but at trial Young testified he was unable to say whether or not petitioner was involved.

The prosecution impeached these witnesses to varying degrees. For example, Alicia McKee previously testified she was not certain whether petitioner was the assailant. Sharlean McKee testified the defense investigator had shown her a photograph of petitioner and informed her he was not responsible for the shooting. Marvin Napoleon was a heavy drinker who conceded he had focused on the weapon, not the face of the assailant, during the crime. Alice Sanchez, also a heavy drinker, noted the defense investigator had shown her a photograph of petitioner, commenting that petitioner was innocent.

The defense also introduced evidence establishing that one of the prosecution's identification witnesses, Susan Erickson, was being treated for heroin addiction, was taking methadone at the time of the crime, and was awaiting trial on a robbery charge at the time of her testimony. In addition, the defense investigator testified that when he showed Erickson a photo lineup that did not include petitioner's photograph, she selected someone other than petitioner as the shooter. Erickson qualified her identification with the comment that the man in the photograph merely resembled the shooter. The investigator also denied informing identification witnesses that petitioner was innocent.

The defense also offered the expert opinion testimony of Dr. Geoffrey Loftus, a professor of psychology and an expert in eyewitness identification. Dr. Loftus explained that human memory does not operate as a mechanical recording device but instead is constructed from various sources, including information learned after an incident. Loftus asserted that stressful

////

////

6

events that occur quickly often are not recalled accurately, especially after the passage of considerable time. He discussed the impact of race on eyewitness identification[2] and further explained that a weapon generally becomes the focus of any observation of a crime.

In addition, petitioner produced an alibi witness, Billy Mackey, a person with three prior felony convictions, who testified that he had spent the day of June 1, 1993, from 8:00 or 8:30 a.m. until after 2:00 p.m. with petitioner at the auto dismantling shop where petitioner acquired the Camaro, at a restaurant, and at the witness's home. According to Mackey, petitioner did not have an automobile in his possession during this period. Mackey did not testify at petitioner's first trial, although he was aware of the legal proceedings, but came forward two weeks prior to the retrial.[3]

Michael Johnson, the Cashland security guard, testified that he was barely acquainted with petitioner and was not involved in any plan to rob Reagan.

II.     Penalty Phase Evidence

By stipulation, the prosecution presented evidence that in February 1985, petitioner was convicted of eight robberies. These eight offenses occurred as separate incidents during a four-month period in 1983. On each occasion, petitioner robbed an employee of a commercial establishment at gunpoint. There were no injuries, although in some instances petitioner either displayed a firearm or threatened the victims with a firearm. Petitioner was sentenced to prison for these crimes and was released on parole on September 24, 1992, less than a year preceding the murder in the present case. It was stipulated that petitioner's convictions rendered it illegal for him to be in possession of a firearm at the time of the murder.

---

[2] The court placed on the record its observations concerning the ethnic identity of certain witnesses, stating that prosecution witnesses Blair, Ramos, and Erickson were White and that prosecution witnesses Rivers and Henderson were African-American. The court stated that defense witnesses Johnson and Young were African-American, that defense witnesses Sanchez and Napoleon were either Native American or Hispanic, and that defense witnesses Alison and Sharlean McKee were White. The record also reflects that petitioner is African-American and that the murder victim, William Reagan, was White. Cornwell, 37 Cal. 4th at 63 n.2.

[3] As noted below, petitioner's first trial resulted in a hung jury/mistrial.

The sole witness to testify for the prosecution at the penalty phase was Robin Reagan, one of the murder victim's five children. She offered brief testimony describing the victim's admirable qualities, the shock she had suffered at the moment she learned of his death, and the sad impact of his absence on his children and grandchildren.

Petitioner testified on his own behalf at the penalty phase. He explained that his father had left the family when petitioner was six years of age. Petitioner described a generally happy childhood in a close-knit family. In June 1973, petitioner joined the United States Navy. He did not see combat during his service, but traveled extensively. After three years of active service, petitioner served in a Navy Reserve unit. Upon his honorable discharge in 1979, he was able to find civil service employment, although he did not stay long at various positions. During his reserve service and extending until 1981, petitioner suffered from depression. During his employment with the United States Postal Service, petitioner suffered a mental health crisis. He was diagnosed as suffering from bipolar disorder and was hospitalized on more than one occasion. Petitioner testified that various medications, including lithium, haldol, prolixin, and thorazine were prescribed for him.

According to petitioner, he suffered continuing stress from his employment, his difficult romantic relationship, and the absence of his family. He conceded that he "probably" committed the eight robberies referred to in the stipulation. He acknowledged his conduct had been "terrible, terrible." He declared that he had not been motivated by the need for money but by his enjoyment of the role of an outlaw, asserting he had given away some the proceeds of the eight robberies. He stated he was not taking his prescribed medication at the time of the robberies. Petitioner testified he worked while imprisoned for the robbery convictions and also when he was on parole. In June 1993, he had temporary employment as a clerical worker, was employed by a company called Bell Carter Distributing, and also refurbished and sold used motorcycles. Petitioner did not believe he was suffering from a mental disease at the time of the murder, and did not want to take the psychotropic medication prescribed for him because of its negative side effects, including mental confusion. Petitioner testified he had no current relationship with the members of his family, including his daughter, who was then 20 years of age.

On cross-examination, petitioner stated that his recollection of the eight stipulated robberies was impaired. He testified he had been accused of robberies, was tried for sixteen of them, and convicted of eight. He also conceded that he recalled that—at a minimum—he at least had displayed a firearm during each of the eight robberies and, by implication, having threatened his robbery victims with death in the event they failed to comply with his demands.

Petitioner married Carolyn Cornwell on June 3, 1993 (two days after Reagan was murdered). She testified that she and petitioner had a happy relationship and that he worked full time five or six days a week.

Deputy Sheriff Raymond Roberts testified that petitioner had served as a trustee during his incarceration pending trial and had performed diligently.

Creadell[4] Polee, Jr., petitioner's older brother, testified that petitioner had been a studious, athletic youth and never was in trouble as a child. He testified that schizophrenia is "quite common" in the family, that (in his opinion) petitioner had exhibited signs of the disease, and that, when Polee last had seen petitioner in 1982, petitioner exhibited signs of stress and communicated in a rapid, stuttery form of speech.

James Esten, formerly an administrative employee for the California Department of Corrections, described the various levels of confinement within the prison system, the unlikelihood that a prisoner serving a sentence of life without possibility of parole would be housed in any but the most restrictive custody (which Esten described), and the circumstance that such prisoners never can be and never have been paroled. When petitioner arrived at the prison, he had been taking lithium, Mellaril, and Elavil, and Esten explained that during petitioner's incarceration for robbery, his behavior was good and he was a valuable worker. Esten predicted that petitioner would make an excellent prisoner, could assist correctional officers in pacifying other inmates, and again would be a valuable worker.

Dr. Shawn Johnston, a clinical psychologist, reviewed petitioner's medical records and also met with petitioner in order to perform a psychological evaluation. Dr. Johnston concluded

---

[4] The California Supreme Court misspelled Creadell's name as "Crendell."

9

that petitioner suffered from bipolar disorder, as petitioner had since the late 1970s. Dr. Johnston noted that petitioner had been prescribed medication for this condition on a number of occasions.

Dr. Johnston testified that petitioner's record demonstrated that he had exhibited periods of agitation, pressured speech, "flights of ideas," and paranoid delusions—symptoms that are characteristic of bipolar disorder. Dr. Johnston described the manic phase of the disease, noting that afflicted persons feel wonderful, enjoying superabundant energy. At the same time, persons in the manic phase of the disease engage in reckless behavior and suffer from memory disorders. Psychological tests performed by Dr. Johnston on petitioner disclosed likely learning disabilities, psychoneurological deficits or brain damage, confused thinking, agitation, and indications of mania and schizophrenia.

Dr. Johnston explained that bipolar disorder impairs the subject's judgment and, during extreme manic phases, may deprive the subject of the ability to know right from wrong. On cross-examination, he conceded that a person diagnosed with bipolar disorder ordinarily is able to distinguish right from wrong. Dr. Johnston also noted that on the Minnesota Multiphasic Personality Inventory, petitioner scored in the third highest range in psychopathic deviance, a score outside the normal range, but the witness predicted that petitioner would function well in a highly structured environment such as prison.

PROCEDURAL HISTORY

A second amended complaint was filed in January 1994 charging petitioner with (1) first degree murder of William Reagan on June 1, 1993; (2) robbery of William Reagan on June 1, 1993; and (3) unlawful possession of a firearm. (1CT[5] 111-13.) In connection with the first degree murder and robbery offenses, it was alleged petitioner personally used a firearm and that the offenses were serious felonies. (Id. at 111-12.) A robbery-murder special circumstance was also alleged. (Id. at 111.) In addition, the information alleged that petitioner had suffered a prior serious felony conviction and had served a separate prison term for robbery. (Id. at 113.)

---

[5] "RT" refers to the reporter's transcript of the trial proceedings. "CT" refers to the state court clerk's transcript. The number preceding "RT" or "CT" refers to the volume. Respondent previously lodged these transcripts with the court on April 19, 2010. (ECF No. 43.)

Petitioner's first trial began on February 28, 1994.  (2 CT 447.)  The jury was unable to reach a verdict at the conclusion of the guilt phase of the trial, and the court declared a mistrial on April 6, 1994.  (3 CT 811.)

Jury selection in the second trial began on October 5, 1994.  (3 CT 878.)  On October 27, the jury returned a guilty verdict on the murder and robbery charges and found the robbery-murder special-circumstance allegation and firearm-use allegations to be true.  (4 CT 933-34, 937.)  Petitioner waived jury trial as to count three, and the court found petitioner guilty of unlawful possession of a firearm and found true the prior conviction and prior prison term allegations.  (Id. at 937, 989.)  After the verdict, petitioner moved to discharge his attorney under People v. Marsden, 2 Cal. 3d 118 (1970).  (4 CT 989.)  The motion was denied.  (Id. at 989.)

On November 7, 1994, the penalty phase began.  (Id. at 1009.)  On November 9, the jury returned a death verdict.  (Id. at 1024.)

On August 18, 2005, the California Supreme Court affirmed the judgment on appeal. People v. Cornwell, 37 Cal. 4th 50 (2005).[6]  The United States Supreme Court denied certiorari review in 2006.  Cornwell v. California, 546 U.S. 1216 (2006).

On July 2, 2004, while the state appeal was pending, petitioner filed his first state habeas petition in the California Supreme Court.  (LD Nos. 10-15.)  On June 24, 2009, the California Supreme Court summarily denied all claims in the petition on the merits, except for claim 11, which the court denied as premature without prejudice to renewal after an execution date is set, and denied many claims on procedural grounds as well.  (LD No. 18.)

While the state habeas petition was pending, petitioner initiated this federal habeas action by filing a motion to proceed in forma pauperis and a motion for appointment of counsel on

---

[6] In 2009, the California Supreme Court disapproved one aspect of its decision in Cornwell.  In People v. Doolin, 45 Cal. 4th 390, 421 & n.22 (2009), the court disapproved its earlier cases, including its decision in Cornwell, which analyzed an attorney conflict of interest claim under the California constitution using a different standard than that articulated by the United States Supreme Court.  Because this court reviews only the California Supreme Court's decision on petitioner's federal law claims, the decision in Doolin is not relevant to the federal habeas analysis in the present case.

March 31, 2006.  (ECF No. 1.)  On April 6, 2006, this court appointed the Office of the Federal

Public Defender to represent petitioner, pending approval of substitute counsel.  (ECF No. 3.)  A.

Richard Ellis was substituted as counsel for petitioner on November 7, 2006.  (ECF No. 6.)  Mr.

Ellis filed a protective petition for writ of habeas corpus in this court on February 22, 2007 (ECF

No. 15).

On May 7, 2007, state-appointed counsel, Robert H. Derham, with assistance from Mr.

Ellis, filed a "supplemental" state habeas petition.  (Lodged Docs. 20, 21.)  This court stayed the

federal proceedings to allow petitioner to exhaust his new claims in state court.  (ECF Nos. 22 &

29.)  However, the California Supreme Court specifically denied petitioner the right to

supplement the existing state petition.  (ECF No. 76-1 at 6.)  Instead, that court considered the

"supplemental" state petition to be a "new original habeas corpus petition" and assigned it a

separate case number ("second state petition").  (Id.)  The California Supreme Court denied the

second state petition on February 10, 2010.  (LD No. 23.)  The court denied all claims on the

merits and also denied most, but not all, of the claims on various procedural grounds.  (Id.)

The federal stay was lifted on April 29, 2010.  (ECF No. 45.)  On February 8, 2011,

petitioner filed an amended federal petition.  (ECF Nos. 52-62.)

In May 2011, respondent filed a motion to dismiss.  (ECF No. 68.)  Respondent argued

that fourteen claims or subclaims were procedurally barred, five were barred by the statute of

limitations, and twelve were unexhausted.  (ECF Nos. 68 & 84.)  Petitioner filed his opposition to

the motion to dismiss in August 2011.  (ECF No. 76.)  On September 29, 2011, respondent filed

an unopposed request for a deferred ruling on the procedural default issues.  (ECF No. 79.)  The

request was granted.  (ECF No. 80.)  A hearing on the exhaustion and statute of limitations issues

was held in October 2011.  (ECF No. 83.)  On December 15, 2011, this court determined that

petitioner's amended petition was timely and that certain claims were unexhausted.  (ECF Nos.

84 & 85.)  It also determined that it would resolve the satisfaction of 28 U.S.C. § 2254(d) before

considering the procedural default issues.  (ECF Nos. 84, 85 & 90.)  Petitioner filed a notice of

/////

/////

abandonment of all unexhausted claims. (ECF No. 89.) On February 1, 2012, this court dismissed the unexhausted claims abandoned by petitioner.[7] (ECF No. 90.) The parties have briefed the application of section 2254(d) to all claims in the petition. (ECF Nos. 103, 106 & 114.)

APPLICATION OF 28 U.S.C. § 2254(d)

I. <u>Legal Standards</u>

Title 28 U.S.C. § 2254 confers upon a federal district court the jurisdiction to consider a petition for writ of habeas corpus challenging a state court conviction. A writ of habeas corpus is available under section 2254 only on the basis of some transgression of federal law binding on the state courts. <u>See</u> <u>Peltier v. Wright</u>, 15 F.3d 860, 861 (9th Cir. 1994); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985). A federal writ is not available for alleged error in the interpretation or application of state law. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000); <u>Middleton</u>, 768 F.2d at 1085.

Where a state court resolves a federal constitutional claim on the merits, the petitioner in federal court may not succeed on that claim absent a showing that the state court resolution of the claim was contrary to law or unreasonable. 28 U.S.C. § 2254(d). Congress adopted this standard when it revised the habeas statutes in 1996 as part of the Anti-terrorism and Effective Death Penalty Act (the "AEDPA"). To meet the standards, a petitioner must establish that the state court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Section 2254(d) is a gateway. If a petitioner satisfies either subsection (1) or (2) for a claim, then the federal court considers that claim de novo. <u>See</u> <u>Panetti v. Quarterman</u>,

---

[7] The court dismissed claims 2(g)-(n), 21(E), and any new factual allegations of claim 21(J). (ECF Nos. 89 & 90.)

551 U.S. 930, 953 (2007) (when section 2254(d) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires"); Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008).

In 2011, the Supreme Court elucidated the section 2254(d) standards. First, the Court made clear that, when making the determination that a state court decision was contrary to law or unreasonable, a federal court may not consider evidence which was not before the state court. Cullen v. Pinholster, 563 U.S. 170, 180-82 (2011). Second, the Court "tightened" section 2254(d)'s rule of deference:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, 562 U.S. 86, 103 (2011); see also Amado v. Gonzalez, 758 F.3d 1119, 1131-32 (9th Cir. 2014). Thus, federal habeas relief is precluded if "'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 562 U.S. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). This objective standard of reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d). See Hibbler v. Benedetti, 693 F.3d 1140, 1146-47 (9th Cir. 2012). The federal court must engage in the deferential review even where the state court has not provided a reasoned decision. Harrington, 562 U.S. at 99-100.

In the present case, some of petitioner's claims were raised, and rejected, in the California Supreme Court's reasoned decision on appeal. However, some were raised in his state habeas petitions, which were summarily denied. A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012) (the presumption that the denial is based on the merits, rather than on procedural grounds, may be overcome if it is not "plausible"). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Harrington, 562 U.S. at 98. The federal court "must determine what arguments or theories . . . could have supported . . . the state court's decision; and then it must ask whether it is possible fairminded

14

jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Harrington, 562 U.S. at 98).

When reviewing the California Supreme Court's summary denial of a petition, this court must consider that

> the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that "the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief." It appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also "review the record of the trial ... to assess the merits of the petitioner's claims."

Pinholster, 563 U.S. at 188 n.12 (quoting In re Clark, 5 Cal. 4th 750, 770 (1993), and citing People v. Duvall, 9 Cal. 4th 464, 474 (1995)).[8] Accordingly, the absence of a prima facie case is the determination that this court must review under section 2254(d). See Nunes v. Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003). Respondent argues that this conclusion is incorrect. According to respondent, the "only relevant question before a federal court is whether 'there was no reasonable basis for the state court to deny relief.'" (ECF No. 106 at 15 (quoting Harrington, 562 U.S. at 98)). Respondent's argument ignores the fact that the Supreme Court described

---

[8] Respondent argues that the California Supreme Court accepts as true only petitioner's statements that are backed by a proffer of "admissible evidence." (ECF No. 106 at 14.) Respondent cites only two cases from California Courts of Appeal and one California Supreme Court case from the 19th Century in support of this argument. The California Supreme Court's 20th and 21st Century descriptions of the support required for allegations in a habeas petition do not mention a requirement of "admissible" evidence. See In re Martinez, 46 Cal. 4th 945, 955-56 (2009) (at pleading stage, petitioner should state facts "fully and with particularity" and include "copies of reasonably available documentary evidence"); In re Hawthorne, 35 Cal. 4th 40, 48 (2005) (same); In re Sassounian, 9 Cal. 4th 535, 547, 549-51 & nn.12-15 (1995) (to carry his "burden of allegation" petitioner must state "specific facts which, if established, entitle him to . . . relief"). Requiring a well-plead petition supported only by reasonably available evidence makes sense under the California scheme for considering habeas petitions. In California, a petitioner first carries a pleading burden. If the state court determines the petitioner has established a prima facie case for relief, the court will issue an order to show cause. Only then must petitioner prove the factual allegations made in the petition. See Sassounian, 9 Cal. 4th at 546; Duvall, 9 Cal. 4th at 475.

review under section 2254(d)(1) as "focus[ing] on what a state court knew and did." Pinholster, 563 U.S. at 182. The Court then considered the reasonableness of the California Supreme Court's summary denial of an ineffective assistance of counsel claim in terms of the petitioner's failure to make a prima facie showing of ineffective assistance of counsel. The Court held that petitioner Pinholster "has not shown that the California Supreme Court's decision that he could not demonstrate deficient performance by his trial counsel necessarily involved an unreasonable application of federal law." Id. at 190.[9] It is quite clear that the Court is considering what the state court in fact decided—that petitioner had failed to establish that "he could" prove his claim, in other words, that petitioner had failed to make a prima facie showing that he was entitled to relief.

A petitioner establishes a prima facie case of a constitutional violation if his assertions are sufficient to support the claim. Nunes, 350 F.3d at 1054-55. The question is whether the petitioner has demonstrated that "he ha[s] sufficient evidence for a reasonable fact finder to conclude" that he has proved his claim. Id. In other words, a holding that petitioner has not made out a prima facie case amounts to a holding that no reasonable factfinder could find in petitioner's favor. Id. at 1055. If this court finds petitioner has unarguably presented a prima facie case for relief on a claim, the state court's summary rejection of that claim would be unreasonable. Id.

Under subsection (d)(1), a state court decision is "contrary to . . . clearly established Federal law" if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). A state court decision is an "unreasonable application" of clearly established federal law if "the state court correctly identifies the governing legal principle . . . but

---

[9] Respondent argues that the Pinholster dissent, but not the majority, framed the issue as review of the California Supreme Court's finding that petitioner had not established a prima facie case. (ECF No. 106 at 17.) Respondent ignores the portion of the majority's opinion quoted here in the text that shows the majority framed the issue in terms of the California Supreme Court's denial of a prima facie case. Respondent further ignores the fact that the majority did not reject the dissent's explicit statement that the question to be considered was the reasonableness of the state court's determination that petitioner had not stated a claim.

unreasonably applies it to the facts of the particular case." Bell v. Cone, 535 U.S. 685, 694 (2002) (citing Williams v. Taylor, 529 U.S. 362, 407-08 (2000)).  "Clearly established Federal law" is found in the United States Supreme Court's "applicable holdings." Carey v. Musladin, 549 U.S. 70, 74 (2006).  It refers to "'holdings, as opposed to the dicta, of [the Supreme Court's] decisions' at the time the state court decides the matter." Cannedy v. Adams, 706 F.3d 1148, 1157 (9th Cir. 2013) (quoting Stanley v. Schriro, 598 F.3d 612, 617 (9th Cir. 2010)), amended on other grounds, 733 F.3d 794 (9th Cir. 2013).  "'[C]ircuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37, 48-49 (2012) (per curiam)).  Nor may circuit precedent be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue.  Carey, 549 U.S. at 77.

There are two ways a petitioner may satisfy subsection (d)(2).  Hibbler, 693 F.3d at 1146.  He may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way."  Id. (citing Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), abrogated on other grounds by Murray v. Schriro, 745 F.3d 984, 1000 (9th Cir. 2014)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014) (if a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process is deficient and the state court opinion is not entitled to deference), cert. denied, 135 S. Ct. 710 (2014).  The standard for determining whether the state court's fact finding process is insufficient requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding

17

process was adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not automatically render its fact finding process unreasonable. Id. at 1147. Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes, 350 F.3d at 1055).

The Ninth Circuit explained in Hibbler that federal standards for determining when an evidentiary hearing is mandatory are a useful guide to determining the reasonableness of the state court's refusal to hold a hearing:

> A state court's decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question. See Earp, 431 F.3d at 1170 (noting that a state court is not required to hold an evidentiary hearing when it is possible to resolve the factual question "based on 'documentary testimony and evidence in the record'" (citation omitted)); Perez v. Rosario, 459 F.3d 943, 950 (9th Cir. 2006) (holding that it is reasonable for a state court to resolve a disputed factual question without an evidentiary hearing when the petitioner's allegations are "incredible in light of the record, or . . . when the record already before the court is said to establish a fact conclusively"). The ultimate issue is whether the state's factfinding procedures were reasonable; this is a fact-bound and case-specific inquiry.

> Because AEDPA does not provide any specific guidance on what sort of procedural deficiencies will render a state court's fact-finding unreasonable, we have sometimes turned for guidance to cases considering a similar issue in a different context: when a federal district court considering a habeas petition must or should conduct an evidentiary hearing. See Earp, 431 F.3d at 1166-67, 1169-70 (looking to Townsend v. Sain, 372 U.S. 293, 313 (1963), which governs when a federal district court reviewing a habeas petition de novo must grant an evidentiary hearing, in determining whether the state court decision was based on an unreasonable determination of the facts). In this context, the Supreme Court has recently clarified that, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Landrigan, 550 U.S. at 474. More specifically, "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. "'[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.'" Id. (quoting Totten v. Merkle, 137 F.3d 1172, 1176 (9th

18

Cir. 1998)).

While this framework for determining when a district court errs in failing to conduct an evidentiary hearing provides useful guidance, it is useful only by analogy and does not answer conclusively whether the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). . . . Unlike our review of a district court's determination that an evidentiary hearing is unnecessary, which is for abuse of discretion, see Landrigan, 550 U.S. at 474-75, we may not "second-guess a state court's fact-finding process" unless we determine "that the state court was not merely wrong, but actually unreasonable." Taylor, 366 F.3d at 999. Nevertheless, the rules governing when a district court must grant an evidentiary hearing are informative: if a district court would be within its discretion in denying an evidentiary hearing, a state court's similar decision is probably not objectively unreasonable.

Accordingly, in considering a petitioner's argument that the state court's failure to hold an evidentiary hearing rendered its factual findings unreasonable, we may first consider whether a similarly situated district court would have been required to hold an evidentiary hearing. See Earp, 431 F.3d at 1167. We begin with the rule that no such hearing is required "[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief." Landrigan, 550 U.S. at 474; see also Perez, 459 F.3d at 950; see also Lambert, 393 F.3d at 965-66 (holding that an evidentiary hearing is not a prerequisite to an adjudication on the merits triggering AEDPA deference). The ultimate question, however, is whether an appellate court would be unreasonable in holding that an evidentiary hearing was not necessary in light of the state court record. Taylor, 366 F.3d at 1000.

693 F.3d at 1147-48.

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court may review the merits of the claim de novo. See Frantz, 533 F.3d at 737. For the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding. See Pinholster, 563 U.S. at 185-86.

For the reasons set forth below, this court finds that claim 3 survives section 2254(d) review.

////

////

II.     Petitioner's Challenges to the Application of 28 U.S.C. § 2254(d)

        A.  Supremacy Clause

        Petitioner argues that a California rule which requires a petitioner to make a higher showing in his pleadings than is required by federal law, thereby frustrates the enforcement of federal law and violates the Supremacy Clause.  Petitioner relies primarily on Supreme Court statements in a 1950 case that a "federal right cannot be defeated by the forms of local practice." Brown v. W. Ry. of Alabama, 338 U.S. 294, 296 (1949).  In Brown, the Court examined a Georgia law that required a state court considering a demurrer to construe the complaint's allegations "most strongly against the pleader."  Id. at 295.  The Supreme Court held that it would not defer to this state court practice when considering whether the complainant had made a prima facie showing of the violation of a federal law.  "[W]e cannot accept as final a state court's interpretation of allegations in a complaint asserting it."  Id. at 296.  Petitioner also relies on more recent cases in which the Supreme Court ruled that state procedures that are inconsistent with the goals of the federal law basis for the claim are preempted by federal law.  See Felder v. Casey, 487 U.S. 131, 138 (1988) (state notice-of-claim provision conflicts with objectives of section 1983; court recognizes risk that enforcement of the provision would produce different outcomes in section 1983 claims depending on whether they were asserted in state or federal court).

        Petitioner contends that in a California habeas proceeding, California law recognizes a presumption that the state court conviction is accurate.  He relies upon statements by the California Supreme Court that "[f]or purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; defendant thus must undertake the burden of overturning them."  Duvall, 9 Cal. 4th at 474 (quoting People v. Gonzalez, 51 Cal. 3d 1179, 1260 (1990), superseded by statute on another ground as stated in In re Steele, 32 Cal. 4th 682, 690 (2004)) (emphasis in original).  According to petitioner, the state court's reliance upon this presumption creates a burden on petitioner's federal claims that runs afoul of the Supreme Court's concerns in Brown.

        For several reasons, petitioner's Supremacy Clause argument is without merit.  First, petitioner's argument ignores well-established precepts about the nature of collateral review.  His

20

argument that state law burdens his federal claims ignores the fact that had he raised those claims in a federal collateral proceeding they would have been subject to a similar bias in favor of preserving the finality of the judgment.[10]  In United States v. Frady, 456 U.S. 152 (1982), the Court considered whether the "plain error" standard applicable on direct appeal to excuse a procedural default should be applied to a claim for relief under 28 U.S.C. § 2255.  In recognizing "the existence of a final judgment perfected by appeal," the Court held that once a defendant's direct review proceedings have concluded, "we are entitled to presume he stands fairly and finally convicted."  Frady, 456 U.S. at 164.  The Court in Frady "reaffirm[ed] the well-settled principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal."  Id. at 166.  See also Barefoot v. Estelle, 463 U.S. 880, 887-88 (1983) ("When the process of direct review—which, if a federal question is involved, includes the right to petition this Court for a writ of certiorari—comes to an end, a presumption of finality and legality attaches to the conviction and sentence."), superseded on other grounds by 28 U.S.C. § 2253(c)(2); United States v. Johnson, 988 F.2d 941, 945 (9th Cir. 1993) (same).

The Supreme Court further recognized "the distinction between direct and collateral review," in Brecht v. Abrahamson, 507 U.S. 619 (1993).  In Brecht, the Court discussed the "extraordinary remedy" of habeas corpus and concluded that the beyond-a-reasonable-doubt harmless error standard used on direct review should not be used when determining the impact of a constitutional error raised in a habeas proceeding.  507 U.S. at 633-39.  While Brecht involved claims raised under 28 U.S.C. § 2254, the Brecht harmless error standard has been applied to claims raised under section 2255 as well.  See United States v. Montalvo, 331 F.3d 1052, 1058 (9th Cir. 2003); Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003).  The Court's motivations in Brecht involve "'considerations underlying our habeas jurisprudence' that apply equally to collateral attacks on both federal and state convictions—considerations such as the

---

[10] Just as in state court, a petitioner challenging a federal court criminal conviction with a claim that requires the development of facts outside the trial record must bring that claim in a habeas petition.  See United States v. Houtchens, 926 F.2d 824, 828 (9th Cir. 1991).

1    different purposes of direct and collateral review and the importance of finality in criminal

2    convictions." Montalvo, 331 F.3d at 1058 (quoting Brecht, 507 U.S. at 633).

3         Because federal law similarly looks to habeas corpus as a challenge to a presumptively

4    final and correct judgment, it cannot be said that the California Supreme Court's possible

5    application of a presumption, as stated in Duvall, amounted to a state-created impingement on a

6    federal right.[11]

7         Petitioner's claims are further unsupported by the authority he cites. In Brown, the Court

8    held it would not defer to state court rules in construing the pleadings. This court is not being

9    asked to construe petitioner's claims under any state law standard. Rather, this court looks to

10   federal, not state law, to determine whether petitioner has established a prima facie case for relief.

11   If he has, this court looks again to only federal law to determine whether there were any

12   reasonable bases for the California Supreme Court's denial of petitioner's claims. The concerns

13   raised in Brown are inapplicable here.

14        B.  Article III

15        Petitioner also argues that if the AEDPA requires deference to "novel state-court rules for

16   applying the Constitution," then it violates Article III of the United States Constitution by

17   encroaching upon the federal courts' role as the final arbiters of federal law. (ECF No. 103 at

18   500.) This argument relies upon the same false distinction between state and federal review

19   discussed above, and thus also fails for the reasons discussed above.

20        C.  Suspension Clause

21        Petitioner's Suspension Clause argument rests on the same incorrect underpinning.

22        Moreover, a law acts to suspend the writ of habeas corpus in violation of the Constitution

23   only where it explicitly bars habeas review. Denmore v. Kim, 538 U.S. 510, 517 (2003). In fact,

24   the Ninth Circuit Court of Appeals has considered, and rejected, the argument petitioner makes

25

26   _____
     [11] Of course, petitioner's argument assumes the California Supreme Court applied such a
     presumption. Because the court's decision is a summary, it is not possible to know to what extent
27   it did so, if at all.

28

here. In <u>Crater v. Galaza</u>, 491 F.3d 1119 (9th Cir. 2007), the court considered whether the deference due a state court under 28 U.S.C. § 2254(d)(1) constituted a suspension of the writ. The court held it did not. First, a suspension of the writ of habeas corpus occurs only when Congress "clearly and unambiguously" removes all federal habeas corpus jurisdiction. <u>Crater</u>, 491 F.3d at 1124 n.5. The AEDPA does not repeal federal habeas jurisdiction. The court in <u>Crater</u> also rejected an argument that section 2254(d)(1) "effectively suspends the writ." <u>Id.</u> at 1124-25. The court pointed out that altering the standards for granting habeas relief is not the same thing as suspending the privilege of the writ. <u>Id.</u> at 1125-26 (citing <u>Felker v. Turpin</u>, 518 U.S. 651 (1996)). It is worth noting that, in connection with this argument, petitioner never mentions <u>Denmore</u>, <u>Felker</u>, or <u>Crater</u> in his briefing. Instead, petitioner relies exclusively on <u>Boumediene v. Bush</u>, 553 U.S. 723 (2008), in which the Court struck down a statute denying some aliens access to the habeas remedy. Petitioner has made no comprehensible argument that the AEDPA suspends the writ of habeas corpus.

D. <u>Separation of Powers</u>

Petitioner argues that application of section 2254(d) violates the separation of powers doctrine by limiting judicial review of federal habeas cases. Although the Supreme Court has not directly addressed the constitutionality of section 2254(d), the Ninth Circuit has done so in <u>Crater</u>, 491 F.3d 1119. In <u>Crater</u>, the Ninth Circuit specifically determined that AEDPA did not offend separation of powers because section 2254(d) "does not instruct courts to discern or deny a constitutional violation. Instead, it simply sets additional standards for granting relief . . . where a petitioner has already received an adjudication of his federal claims by another court of competent jurisdiction. The Constitution does not forbid congress from establishing such standards . . . ." <u>Id.</u> at 1127. As this court is bound by the Ninth Circuit's holding, this court rejects petitioner's argument that section 2254 is unconstitutional.

E. <u>Liberty Interest</u>

Under California law, if a habeas petitioner pleads "sufficient facts that, if true, would entitle him to relief," then the court will issue an order to show cause requiring a response from the state. <u>Duvall</u>, 9 Cal. 4th at 475. Issuance of an order to show cause triggers rights to conduct

fact-finding in support of claims in the petition.  Id. at 475-77.  Petitioner creatively asserts that this rule creates a liberty interest in the state habeas procedures.  That assertion cannot form the basis of a due process argument.  "[A]n expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause."  Olim v. Wakinekona, 461 U.S. 238, 250 n.12 (1983); Elliott v. Martinez, 675 F.3d 1241, 1245-46 (10th Cir. 2012).

F.  Fairmindedness of California Supreme Court

Petitioner argues the court should consider evidence "that may rebut the presumption of fairminded state adjudication."  (ECF No. 103 at 502.)  From the outset, however, petitioner's argument suffers a basic problem—the premise from which petitioner appears to launch his fairmindedness challenge is unsupported.  Petitioner seems to claim that the fairmindedness of the state court is a precondition to AEDPA deference.  Case law does not support petitioner's suggestion that this court may take evidence regarding the state court's alleged bias against death penalty cases.

In Harrington, the Court described the standard for determining whether a state court's decision was reasonable under 28 U.S.C. § 2254(d).  One iteration of that standard is as follows:  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  562 U.S. at 101.  Nothing about this standard of federal court review gives this court license to examine possible bias by the state court.

Petitioner's argument appears to derive from the California Supreme Court's lack of explanation for its habeas decision.  However, this court is required to defer to that unexplained decision just as it would an explained one.  The Supreme Court's opinion in Harrington makes very clear that deference is due the state court's decision regardless of whether or not the state court provided reasons for its merits ruling.  Id. at 98-101.  The Court also rejected any recognition of the "theoretical possibility that members of the California Supreme Court may not have agreed on the reasons for denying the petition."  Id. at 100.  The Court noted that it had previously recognized the possibility that a single rationale for a state court decision may be not only "undiscoverable" but "nonexistent."  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803

(1991)).  The fact that a single rationale may be nonexistent did not mean the state court decision was therefore invalid or otherwise not subject to deference under section 2254(d).  See id.  The Court specifically refused to engage in speculation about the state court's decision-making process.

Further, to the extent petitioner relies upon the statement in Pinholster that this court must consider what the state court "knew and did," as set out in Harrington, that inquiry requires this court to consider what evidence was before the state court and look at the state court's rules for considering claims.  Nothing requires this court to speculate about or investigate the state court's internal processes.  In fact, Harrington makes clear that this court must consider any possible bases for the state court's merits determination.  562 U.S. at 102 (federal court must examine what "arguments or theories . . . could have supported the state court's decision").  A petitioner satisfies section 2254(d) by showing there is "no reasonable basis" for the state court's decision.  Pinholster, 563 U.S. at 188 (quoting Harrington, 562 U.S. at 98).

G.  General Constitutional Challenge

Regarding petitioner's more general constitutional challenge to the AEDPA, since its enactment in 1996, the AEDPA has consistently been held to be constitutional.   In Crater, 491 F.3d 1119, the Ninth Circuit reviewed the cases upholding the AEDPA against various constitutional challenges and concluded that the statute did not violate the separation of powers nor was it an unconstitutional subordination of the federal courts to the state courts.  Id. at 1129.  The Ninth Circuit also considered other constitutional questions about the AEDPA before rejecting all of them:

> The constitutional foundations of § 2254(d)(1) is solidified by the Supreme Court's repeated application of the statute.  Although the Court has not squarely addressed its constitutional validity, for the past eleven years the Court has consistently applied AEDPA's standard of review to appellate habeas petitions. . . .  We consider the Court's longstanding application of the rules set forth in AEDPA to be strong evidence of the Act's constitutionality. . . .

> The settled law of this circuit also confirms this conclusion.  In Duhaime v. Ducharme, 200 F.3d 597 (9th Cir. 2000), we explained that "our cases . . . implicitly reject the argument that § 2254's rule directing us to look to the Supreme Court law when deciding habeas petitions is unconstitutional under stare decisis principles

and Article III, and that such an application runs counter to congressional intent and would disrupt judicial efficiency" and ruled that "§ 2254(d)(1) does not suffer from any Article III constitutional infirmities." We recently recognized that Duhaime is the law of this circuit. See Irons v. Carey, 479 F.3d 658, 665 n.5 (2007). Although Duhaime offered only a cursory analysis of the constitutionality of § 2254(d)(1), its holding binds us today.

Crater, 491 F.3d at 1129 (citations and footnote omitted); see Green v. White, 223 F.3d 1001 (9th Cir. 2000) (AEDPA's one-year statute of limitations is not an unconstitutional violation of Suspension Clause). This court is bound by the Ninth Circuit's holdings that the AEDPA is constitutional.

H. Miscellaneous Other Arguments

Petitioner also argues that the California Supreme Court regularly adjudicates ineffective assistance of counsel claims contrary to the dictates of Strickland v. Washington, 466 U.S. 668 (1984). Unlike the other arguments in this portion of his brief, this argument does not challenge the applicability of section 2254(d). Rather, it is part of petitioner's challenge to the California Supreme Court's denial of his ineffective assistance of counsel claims. Accordingly, the argument is addressed below in the discussions of petitioner's ineffective assistance of counsel claims.

I. Request for Discovery and Evidentiary Hearing Regarding 28 U.S.C. § 2254 (d) Challenges

Here and there in his arguments regarding the application of section 2254(d) generally, petitioner mentions that discovery and an evidentiary hearing are necessary. Petitioner provides very few descriptions of what that fact-finding might be and almost no legal justification for it. The few requests this court ferreted out include general requests to present evidence regarding trial counsel's ineffective assistance of counsel and the Sacramento County District Attorney's office use of impermissible racial criteria in the decision to bring the death penalty against petitioner. Petitioner's requests for discovery and an evidentiary hearing are denied because they are not specific, not legally justified, and/or not reasonable.

////

III.     Application of 28 U.S.C. § 2254(d) to Petitioner's Claims

The court discusses petitioner's claims in the order in which they have been briefed by the parties.

A.     Petitioner's Actual Innocence – Claim 1

Petitioner first argues that he is actually innocent, claiming (1) no physical or forensic evidence linked him to the crime; (2) eyewitnesses testified that he was not the shooter; (3) eyewitnesses who identified him as the shooter were equivocal and their testimony was flawed and contradictory; (4) the prosecution's main witness, Roland Johnson, was unreliable and perjured himself; and (5) he had an alibi.

Petitioner raised this claim in his first state habeas petition, and the California Supreme Court summarily rejected the claim on the merits and found it untimely.  (LD 10 & 18.)

As the respondent notes, the Supreme Court has not yet recognized actual innocence as grounds for habeas relief absent an independent constitutional violation in the underlying state criminal proceedings.  Herrera v. Collins, 506 U.S. 390, 400-01 (1993); see House v. Bell, 547 U.S. 518, 555 (2006) (declining to resolve the open question of whether freestanding actual innocence claims are possible).  In Herrera, the Court explained that its body of "habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  Id. at 404; see Schlup v. Delo, 513 U.S. 298, 313-15 (1995) (distinguishing procedural claims of innocence from substantive claims of innocence, and holding that a claim of actual innocence may be raised to avoid a procedural bar to consideration of the merits of a petitioner's constitutional claims).  "'Federal courts are not forums in which to relitigate state trials.'"  Herrera, 506 U.S. at 401 (citing Barefoot, 463 U.S. at 887).  The Supreme Court has assumed, without deciding, "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."  Id. at 417.  The threshold showing for such an assumed right would necessarily be extraordinarily high.  Id.; House, 547 U.S. at 555.

Because the Supreme Court has not decided whether freestanding innocence claims are possible, the California Supreme Court's denial of petitioner's claim cannot be contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

Even assuming the Supreme Court has recognized a freestanding claim of actual innocence, the petitioner must demonstrate that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt.'" House, 547 U.S. at 537 (quoting Schlup, 513 U.S. at 327); see McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324. The new evidence must be reliable, and the reviewing court "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." Id. at 332.

Given these high standards, even if petitioner's freestanding actual innocence claim were cognizable, it is meritless. First, petitioner has not presented any newly discovered evidence establishing his innocence. All the evidence petitioner claims supports his actual innocence was presented at his trial and rejected by the jury. Petitioner simply reasserts his trial defense and reargues that the prosecution's evidence was not credible. Furthermore, although the evidence may cast doubt on petitioner's guilt, petitioner has not persuaded this court "that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Perkins, 133 S. Ct. at 1928.

B. Ineffective Assistance of Counsel at the Guilt Phase – Claim 2

In subclaims 2(a)-(f),[12] petitioner argues ineffective assistance of counsel at the guilt phase for counsel's failure to (1) investigate and present evidence that would have impeached key prosecution witness Roland Johnson's credibility and discredited his testimony; (2) expose the inadequacy of the police investigation; and (3) present evidence of petitioner's financial well-

---

[12] Claims 2(g)-(n) have been dismissed as unexhausted. (ECF Nos. 84, 85 & 90.)

being.  These claims were raised in petitioner's first state habeas petition (LD 10 at 17-32) and were summarily denied on the merits and as untimely by the California Supreme Court (LD 18).

### 1.  Legal Standards

"The Sixth Amendment right to counsel in a criminal trial includes 'the right to the effective assistance of counsel.'"  Summerlin v. Schriro, 427 F.3d 623, 629 (9th Cir. 2005) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)).  "This right extends to 'all critical stages of the criminal process,' including capital sentencing."  Id. (citations omitted).  The Sixth Amendment standard for analyzing an ineffective assistance of counsel claim is well established.  To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his trial counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 687-88.

#### a.  Deficient Performance

Under the first prong of the Strickland test, a petitioner must show that counsel's conduct failed to meet an objective standard of reasonableness.  Id. at 687.  There is "a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  Harrington, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 689).  Petitioner must rebut this presumption by demonstrating that his counsel's performance was unreasonable under prevailing professional norms and was not the product of "sound trial strategy."  Strickland, 466 U.S. at 688-89.  Judicial scrutiny of counsel's performance is "highly deferential," and thus the court must evaluate counsel's conduct from her perspective at the time it occurred, without the benefit of hindsight.  Id. at 689.

When determining whether counsel's conduct was a reasonable strategy, courts may not "indulge in 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions."  Harrington, 562 U.S. at 109.  Courts may, however, consider objectively reasonable bases for counsel's actions.  Id.  The limitation on that inquiry is whether those bases "contradict" the record of counsel's actions.  Id.  "Strickland . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of

mind." Id. at 109-10 (citing Strickland, 466 U.S. at 688). The federal court is not required to divine counsel's thinking to determine whether counsel's conduct was reasonable.

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Wiggins v. Smith, 539 U.S. 510, 521 (2003) (quoting Strickland, 466 U.S. at 688). However, "general principles have emerged regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective standard of reasonableness' by which [a court must] assess attorney performance, particularly with respect to the duty to investigate." Summerlin, 427 F.3d at 629. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. However,

> strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment.

Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 690-91); see also Thomas v. Chappell, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"); Reynoso v. Giurbino, 462 F.3d 1099, 1112-15 (9th Cir. 2006) (counsel's failure to cross-examine witnesses about their knowledge of reward money cannot be considered strategic where counsel did not investigate this avenue of impeachment); Jennings v. Woodford, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of alibi defense and rejection of mental health defense not reasonable strategy where counsel failed to investigate possible mental defenses).

When determining whether the state court's application of the Strickland standard was reasonable, the federal court must be "doubly" deferential. Harrington, 562 U.S. at 105. The "standard for judging counsel's representation is a most deferential one" and the reasonableness standards of section 2254(d) are also "highly deferential." Id. Further, because the Strickland

30

rule is a "general" one, courts have "more leeway . . . in reaching outcomes in case-by-case determinations" and the "range of reasonable applications is substantial." Id. at 101, 105; Premo v. Moore, 562 U.S. 115, 122-23 (2011). As the Court described in Harrington, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." 562 U.S. at 105.

### b. Prejudice

The second part of the Strickland test requires a petitioner to show that counsel's conduct prejudiced him. Strickland, 466 U.S. at 691-92. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. The errors should be considered cumulatively to assess prejudice. Id. at 695, 696; Silva v. Woodford, 279 F.3d 825, 834 (9th Cir. 2002). A reasonable probability is one "'sufficient to undermine confidence in the outcome.'" Summerlin, 427 F.3d at 640 (quoting Strickland, 466 U.S. at 693). "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" Harrington, 562 U.S. at 111-12 (quoting Strickland, 466 U.S. at 693). "The likelihood of a different result must be substantial, not just conceivable." Id. at 112.

### 2. General Challenges to California Supreme Court's Application of Strickland

In his arguments regarding each of his ineffective assistance of counsel claims, petitioner raises challenges to the California Supreme Court's application of the well-established standards of Strickland. Those challenges are addressed, and rejected, herein.

### a. Failure to Consider Cumulative Effect of Errors[13]

Petitioner argues that the California Supreme Court's "practice of diluting a petitioner's prejudice evidence across distinct court-created subclaims" increased petitioner's "pleading

---

[13] Petitioner advances this same argument in connection with Claim 3(h)—the cumulative effect of counsel's errors at the penalty phase. (ECF No. 103 at 248-49.)

burden in violation of the Supremacy Clause" and "was contrary to, or involved an unreasonable application of[,] Strickland's totality-of-the-evidence rule." (ECF No. 103 at 100, 248-49.) Petitioner appears to assert that, because the California Supreme Court provided no explanation as why it denied his ineffective assistance of counsel claims, it must be presumed that the court inappropriately parsed the prejudice analysis of the ineffective claims. Petitioner argues that the California Supreme Court failed to consider the effect of the misconduct cumulatively in violation of federal law requiring the evaluation of the materiality of undisclosed evidence collectively. See Kyles v. Whitley, 514 U.S. 419, 436 (1995). Petitioner claims this parsing is the California Supreme Court's practice. He relies for that statement on just one comment in just one case that indicated the California Supreme Court had, in that case, divided one of the petitioner's claims into subparts and then applied timeliness standards to each subpart, rather than to the claim as a whole. In re Robbins, 18 Cal. 4th 770, 820-21 (1998) (Kennard, J., dissenting). Petitioner presents nothing to show the California Supreme Court regularly engages in this practice when considering the merits of a habeas petitioner's claims. In fact, the California Supreme Court has cited Kyles appropriately. See In re Miranda, 43 Cal. 4th 541, 580 (2008) ("[T]he prosecution's disclosure obligation turns on the collective effect of all suppressed evidence favorable to the defense, not on the effect of such evidence considered item by item."). Petitioner provides insufficient reason to believe the California Supreme Court, in this case, engaged in a practice that was contrary to federal law.

### b. Inappropriate Prejudice Standard

Petitioner next argues that the California Supreme Court applied an incorrect test for determining prejudice by using the United States Supreme Court's decision in Lockhart v. Fretwell, 506 U.S. 364 (1993), to modify the Strickland standard. In Fretwell, the Court was confronted with a unique situation. There was no question that Mr. Fretwell's trial attorney acted unreasonably in failing to object to an aggravating factor used to determine Fretwell's penalty. Id. at 369 n.1. The issue was whether that failure prejudiced the petitioner. At the time of trial, the answer to that question was "yes." Id. at 367. The Court of Appeals for the Eighth Circuit had ruled the use of that aggravating factor unconstitutional. Id. However, later, after the

32

petitioner sought federal habeas relief, the Court of Appeals overruled its decision and held that the use of that aggravating factor did not violate the federal constitution.  Id.  Therefore, if the prejudice inquiry was considered as of the time the federal courts rendered their habeas decisions, the answer would have been "no," the petitioner was not prejudiced by his attorney's failure to object.  Recognizing that strict application of the Strickland standard would result in "an error in [the petitioner's] favor," the Court looked beyond Strickland's outcome determinative standard and considered whether the failure to object rendered the defendant's trial "unreliable or the proceeding fundamentally unfair."  Fretwell, 506 U.S. at 372.  It held that the result of Fretwell's sentencing proceeding "was neither unfair nor unreliable."  Id. at 371.  Accordingly, the Court found Fretwell suffered no prejudice.

In April 2000, the United States Supreme Court held that a state court erred in finding that the Court's decision in Fretwell modified the Strickland standards.  Williams v. Taylor, 529 U.S. 362, 391-98 (2000).  The Court recognized that there may be limited situations in which "it would be unjust to characterize the likelihood of a different outcome as legitimate 'prejudice.'"  Id. at 391-92.  The Court characterized cases such as Fretwell as involving an unreasonable action of a trial attorney that did "not deprive the defendant of any substantive or procedural right to which the law entitles him."  Id. at 393 n.17.  The Court concluded that the state court holding that Fretwell modified Strickland "was contrary to, or involved an unreasonable application of, clearly established Federal law."  Id. at 399.

Petitioner argues that "the most likely explanation for the California Supreme Court's decision" here is that the California Supreme Court incorrectly applied the Fretwell prejudice standard after the Supreme Court's decision in Williams.  (ECF No. 103 at 99, 128.)  The California Supreme Court's decisions on petitioner's ineffective assistance of counsel claims were rendered in 2009 and 2010, well after the 2000 decision in Williams.  However, both before and after the decision in Williams, the California Supreme Court frequently looked solely to Strickland as the standard for determining prejudice.  The following is only a small sample of the California Supreme Court's cases with appropriate citation to Strickland:  People v. Alexander, 49 Cal. 4th 846, 888 (2010); People v. Gamache, 48 Cal. 4th 347, 382-83 (2010); People v.

Friend, 47 Cal. 4th 1, 46-47 (2009); Cornwell, 37 Cal. 4th. at 77-78; People v. Hester, 22 Cal. 4th 290, 297 (2000); People v. Riel, 22 Cal. 4th 1153, 1175-77 (2000); People v. Smithey, 20 Cal. 4th 936, 986-87, 1012 (1999); People v. Welch, 20 Cal. 4th 701, 743 (1999); People v. Hart, 20 Cal. 4th 546, 624, 632, 634 (1999); People v. Ochoa, 19 Cal. 4th 353, 445-46 (1998); In re Gay, 19 Cal. 4th 771, 827 (1998); People v. Musselwhite, 17 Cal. 4th 1216, 1260 (1998). Included in this list is the California Supreme Court's decision on petitioner's direct appeal. In its reasoned decision, the court relied upon the appropriate Strickland prejudice standard. Cornwell, 37 Cal. 4th. at 77-78.

When determining whether a state court's decision was contrary to, or an unreasonable application of, federal law, this court must "presum[e] that state courts know and follow the law." Woodford v. Visciotti, 537 U.S. 19, 24 (2002). Of course, petitioner may rebut this presumption, but he has not done so. Rather, in many more cases (than not) decided before and at the time of the California Supreme Court decision in this case, the California Supreme Court cited and/or applied the correct prejudice standard. The state court decision is entitled to the benefit of any doubt. Visciotti, 537 U.S. at 24. Petitioner's showing is insufficient to convince this court that the California Supreme Court likely applied an incorrect prejudice standard to petitioner's claims.

### 3. Claims based on Roland Johnson's Veracity and Credibility – Claims 2(a)-(c)

Petitioner argues that attorney William Lyons, petitioner's lead trial attorney who conducted the guilt phase defense, was constitutionally ineffective because he failed to investigate and present evidence to challenge Roland Johnson's veracity and impeach his credibility. This court finds that petitioner has failed to satisfy the requirements of 28 U.S.C. § 2254(d) for these arguments.

#### a. Evidence at Trial

Roland Johnson was a key prosecution witness. He testified that he "grew up" with petitioner and had known him "[m]ost of [his] life since high school," "[t]wenty, twenty-five, thirty years" at the time of trial.[14] (11 RT 4238.) In a January 1994 interview with the District

---

[14] In Johnson's initial police interview, he also stated that he grew up with petitioner in the Oak
(continued)

34

Attorney's investigator, Johnson stated that "when they were teen-agers . . . they referred to [petitioner] as 'The Chameleon.'" (LD 15 at 1027.) Johnson then provided critical testimony against petitioner. According to Johnson, on the day before the crime, petitioner drove Juanita Washington's brown Toyota to Johnson's home. (11 RT at 4240-42.) Petitioner asked Johnson for the loan of a handgun, explaining he needed the weapon "to try to make a move on something" and that he had "eyes,"— statements Johnson interpreted as an announcement that petitioner planned a robbery and that he had an accomplice who was an insider at the scene of the robbery. (Id. at 4241-44.) Johnson supplied petitioner with a loaded .357 magnum revolver, which was the same caliber as the cartridges found at the crime scene and which resembled the gun described by witnesses. (Id. at 4241-42.) Johnson also testified that petitioner admitted that he had committed the robbery and murder. (Id. at 4250-51.)

The evidence at trial further established that the crime was committed at approximately 1:30 p.m. on June 1, 1993. There was evidence that petitioner was at a supermarket located a few blocks from Cashland at 23d and F Streets at 2:15 p.m. on that day. A police search of petitioner's bedroom produced a receipt from the supermarket bearing this date and time. Sometime between 2:30 and 3:00 p.m. on the same day, petitioner arrived at Pick-N-Pull and purchased a used white Camaro. The purchase was finalized at 3:39 p.m. Cornwell, 37 Cal. 4th at 59-61.

Roland Johnson testified that petitioner arrived at his house on June 1, 1993, between 3:00 p.m. and 4:00 p.m. (11 RT 4250.) According to Johnson, he and petitioner went for a forty-five minute ride in the Camaro and then washed it. (Id. at 4260.) After petitioner left, Johnson went inside to watch the five o'clock news, which was when he heard that a robbery and homicide had in fact occurred that day. (Id. at 4256.)

Juanita Washington testified that petitioner arrived at her house at about 5:15 p.m. on June 1, 1993. (Id. at 4045.)

---

Park neighborhood of Sacramento. (LD 15 at 1045-46.) In the first trial, Johnson testified that he knew petitioner "since childhood" and that they grew up in the same neighborhood. (5 RT 2180.)

To establish that petitioner had time to commit the crime, drive to Pick-N-Pull, drive to Roland Johnson's house, and then to arrive at Juanita Washington's house by 5:15 p.m. on that same day, the prosecution introduced evidence of the distances and driving times between those locations. Specifically, the parties stipulated to the distances and driving times from Cashland to Pick-N-Pull, from Pick-N-Pull to Roland Johnson's residence, and from Johnson's residence to Juanita Washington's residence. The stipulations are as follows:

- On Friday, March 11, 1994, between 2:00 p.m. and 2:21 p.m., Sacramento Police Department Detective Tom Lee drove from 22nd and F Street in downtown Sacramento to the Pick-N-Pull auto wrecking business at 3435 Sunrise Boulevard, taking what he believed to be the most direct route. He proceeded eastbound on F Street to H Street and 29th, where he entered Highway 80 southbound until he reached Highway 50 eastbound. He then drove on Highway 50, exiting at Sunrise Boulevard and drove south on Sunrise Boulevard until he reached the address of 3435 Sunrise Boulevard.

- The driving distance for the above described route was 16.9 miles. Traveling with the flow of traffic he was going between 60 and 65 miles per hour on the freeway, 35 miles per hour on F Street, and 50 miles an hour on Sunrise Boulevard. It took him 21 minutes to drive the distance.

- On Monday, March 14, 1994, between 9:50 a.m. and 10:15 a.m., Detective Lee drove from Pick-N-Pull to the area of Arden Way and Boxwood Street. Once again, he drove the most direct route, traveling northbound on Sunrise Boulevard to Interstate 50 west, then at the freeway interchange heading north on Business 80 to Arden. He then drove westbound on Arden Way until he reached the intersection of Arden and Boxwood.

- The distance for this second trip was 19.8 miles. It took him 25 minutes to drive the entire route, again traveling with the flow of traffic which was about 60 to 65 miles per hour on the freeway, and 35 to 40 miles per hour on Arden Way.

- On Monday, March 14, 1994, between 10:15 a.m. and 10:27 a.m., Detective Lee

also drove from the area of Arden Way and Boxwood to the vicinity of 43rd Street and Broadway.

- Traveling 60 to 65 miles per hour and about 35 miles per hour on Arden Way and on Broadway, he covered the 6.9 miles in 12 minutes.

(12 RT 4373-75.)  The court advised the jury that counsel had entered into these stipulations and that no further evidence would be offered on these points.  (Id. at 4375.)  The court then instructed the jury that it "must regard each [stipulation] as having been conclusively proved." (Id.)

### b. How Long Roland Johnson and Petitioner Knew Each Other– Claim 2(a)

#### i. Additional Background

During a Marsden hearing, petitioner raised the issue of Lyons's failure to impeach Johnson's testimony regarding growing up with petitioner.  Lyons explained that he interviewed Johnson, but that Johnson was not cooperative, and therefore, the only information the defense had regarding the relationship between petitioner and Johnson was from petitioner, who indicated that he and Johnson had known each other for "some time."  (Marsden Motion RT 5025.)  Lyons stated that he did not explore whether petitioner and Johnson had been in school together because he determined that there was other material with which to impeach Johnson.  (Id.)  Later, during a hearing on petitioner's motion to stay sentence, in which petitioner alleged ineffective assistance of counsel, the issue of Lyons's failure to investigate the length of time Johnson and petitioner knew each other again was raised.  The trial court, in denying petitioner's motion, found that Lyons's failure to investigate the length of time Johnson and petitioner knew each other amounted to deficient performance:

> [P]robably the most dramatic but the most clear lie would have been to prove, it could be done, that Mr. Johnson was not telling the truth when he said he's known [petitioner] since high school.  On the other hand, we don't have a complete description of what he meant by that since he was not specifically asked whether you went to high school together or knew you right after high school.  Those are matters that could be explained on cross-examination.  Should have been explored on cross-examination to show he was not truthful in part of his direct-examination testimony.
>
> . . . .

37

> [T]he length of time that [petitioner] knew Mr. Johnson is a
> relevant factor to this that goes beyond just the argument of [the
> prosecutor] that the most important thing was they knew each other
> at all. The length of time people know each other would tend to
> cause the jury to understand why someone did or did not trust them
> with things such as loaning a gun or requesting (sic) a murder to
> them in terms of how well these two individuals knew each other is
> relevant.
>
> On the other hand, that's just a matter of degree, because it's not
> disputed by [petitioner] that they knew each other fairly well. He
> admits they were arrested together once before. Mr. Johnson was
> guilty of the crime and [petitioner] was not guilty of the crime, so
> they did have a fairly close relationship even by [petitioner's] own
> theory, and that, of course, is less in some degree how important
> their relationship went back many years instead of many months.
>
> It would, though, have added to this case and [petitioner's] position
> to have known that the witness was knowingly lying about
> something. At all. And it's true that the prosecution, while they
> did not rely heavily upon Mr. Johnson's testimony, both as
> indicated in the type of closing argument made and the fairly short
> length of direct examination made, cross-examination, in fact,
> exceeded direct examination, nevertheless the witness was called by
> the prosecution and did offer some supportive value to their theory
> of the case.
>
> . . . Mr. Lyons' failure to investigate this high school connection is
> without any justification in terms of any tactical decision-making,
> and . . . in the view of the information made easily available by
> [petitioner] . . . there is no sufficient excuse for not having
> investigated that.
>
> Therefore, on that particular regard Mr. Lyons' performance does
> fall below that required by a reasonably sufficient attorney.

(16 RT 5724-26.)

The trial court concluded, however, that Lyons's deficient performance in failing to

examine Johnson about his false statements was not, "standing alone," sufficient to show

petitioner was prejudiced. (16 RT 5726.) The court found that Johnson

> was impeached on so many other factors including his very
> demeanor on the stand . . . . Mr. Johnson did not come across as a
> particularly honest individual, impeached by his prior record, as
> well as his dealing drugs and his immunity, the deal he got from
> him and his friend.
>
> This would have been one additional factor that . . . would not have
> affected a jury very much about Mr. Johnson. Mr. Johnson was
> already in a position where he was unlikely to play a major role in
> the jurors' evaluation of this case. They clearly could not have
> based a verdict on the things Mr. Johnson had to say because he

38

1  was impeached in all the other ways that Mr. Lyons did
2  demonstrate in his cross-examination.

3  (Id.)

4      ii.  Evidence Presented to the California Supreme Court

5      Petitioner argued that Johnson's testimony that he "grew up" with petitioner was false,

6  explaining that while Johnson grew up in Sacramento, petitioner lived in Los Angeles until he

7  joined the Navy in 1973 and did not move to Sacramento until 1978, living there until he was

8  arrested and then incarcerated from 1984 to the fall of 1992.  (LD 10 at 20.)  Petitioner presented

9  the declaration of James Taylor to demonstrate that Johnson falsely testified that he grew up with

10  petitioner.  Taylor's declaration states as follows:  he was forty-five years old in 1995; he grew up

11  in the Oak Park area of Sacramento; he met petitioner in 1978 at Sacramento City College; he

12  knew most people in the Oak Park area; petitioner was from Los Angeles, not Sacramento; he had

13  never heard anyone in the Oak Park area called "The Chameleon"; he knew petitioner was not a

14  member of the "Bloods" street gang; and he knew Roland Johnson dealt drugs in the area of 16th

15  and F Streets in downtown Sacramento, "or was dealing at that location during the spring and

16  summer of 1993, near Cashland."  (5 CT 1205.)

17      Petitioner argued that reasonably competent counsel would have introduced this evidence

18  to impeach Roland Johnson's credibility.  Petitioner urged that, although attorney Lyons "knew

19  (or should have known)" that petitioner grew up in Los Angles and did not move to Sacramento

20  until 1978, Lyons never challenged Johnson's testimony that he "grew up" with petitioner.  (LD

21  10 at 21.)  Petitioner further argued to the court that:

22          Roland Johnson was the crucial prosecution witness.  His false
           testimony that he 'grew up' with Petitioner undermines his entire
23          testimony—to claim he knew Petitioner from childhood is no small
           mistake and simply cannot be explained.  An error of such scale
24          raises the possibility that Johnson is either delusional, and therefore
           wholly unworthy of belief, or a pathological liar, and therefore
25          wholly unworthy of belief.

26  (LD 17 at 8.)

27  ////

28  ////

39

1          iii.    Merits of Claim

2          Petitioner argues that Roland Johnson's statement that he "grew up" with petitioner was

3    an obvious lie and "[e]xposure of this falsehood would have seriously undermined Johnson's

4    credibility." (ECF No. 103 at 75.)  While it appears that Lyons could have easily cross-examined

5    Johnson about those statements to expose that he was lying, and while that may have been a more

6    reasonable use of those false statements, the question at this point is whether the California

7    Supreme Court could have reasonably decided Lyons's decision was a strategic one.  Moreover,

8    there is a strong presumption that counsel acted for tactical reasons rather than through sheer

9    neglect.  Pinholster, 563 U.S. at 191.  The reviewing court therefore must not simply give counsel

10   the benefit of the doubt, but instead must affirmatively entertain the range of possible reasons

11   counsel may have had for proceeding as he did.  Id. at 196.  Given the multiple layers of

12   deference due counsel's decision, this court finds the California Supreme Court could have

13   reasonably found Lyons acted reasonably regarding Johnson's statements.  As Lyons explained in

14   the trial court, he knew that petitioner and Johnson knew each other for "some time" and "fairly

15   well," and thus chose to impeach (and, indeed, did impeach) Johnson in other, more significant

16   areas.  As such, Lyons's decision to forego further impeachment on this issue was arguably not

17   deficient.

18          Nonetheless, even assuming that Lyons's treatment of the issue was deficient, petitioner

19   fails to establish prejudice.  As respondent points out, Lyons attacked Johnson's credibility on

20   subjects more significant than how long Johnson and petitioner had known each other.  On direct

21   examination, Johnson testified that he had prior convictions for second degree burglary,

22   possession of methamphetamine for sale, and possession of a gun.  (11 RT 4238-39.)  Johnson

23   stated that he was testifying under an immunity agreement in connection with this case.  (Id. at

24   4239-40.)  Johnson further testified that, while in prison for possession of cocaine, his cell-mate

25   (Aaron Grey) wrote, and Johnson signed, a letter to the authorities indicating that Johnson had

26   information about the Cashland robbery/murder.  (Id. at 4240.)   Johnson testified that he sent the

27   letter because he felt some implication in the crime because he gave petitioner the gun.  (Id.)  On

28   cross-examination, Lyons questioned Johnson about his immunity agreement and the letter to the

1   authorities that Grey wrote.  (Id. at 4247-50.)  Specifically, Lyons questioned Johnson why—if

2   his conscience really was bothering him "all along" from June 1, 1993—he did not contact the

3   authorities until he was incarcerated.  (Id. at 4250-52.)  Lyons also highlighted Johnson's

4   conflicting testimony about how and when on June 1, 1993, he learned about the Cashland

5   murder robbery/murder:  during the first trial, Johnson indicated that he learned about this

6   information from the 5:00 p.m. news; and in the second trial, Johnson testified that petitioner told

7   him before the 5:00 p.m. news, around 3:30-4:00 p.m.  (Id. at 4250-60.)  In addition, Lyons

8   elicited testimony that in exchange for Johnson's testimony, and in addition to his immunity in

9   this case, Johnson's sentence in another case was reduced.  (Id. at 4260-62.)  On re-direct

10  examination, Johnson testified that he had never committed a robbery, but had shot someone and

11  was never arrested or convicted for that shooting.  (Id. at 4266-67.)  On re-cross examination,

12  Lyons questioned Johnson further about that shooting and elicited testimony that Johnson had

13  been taking Lithium and other drugs for a chemical imbalance and had been smoking marijuana

14  at the time of the Cashland crime.  (Id. at 4274-75.)  During his closing argument, Lyons focused

15  extensively on Johnson's lack of credibility, including instances where he lied on the witness

16  stand.  (13 RT 4849-56.)

17          Lyons thoroughly impeached Johnson's credibility with the immunity agreement and

18  sentence reduction and established that Johnson supplied the gun to petitioner.  In addition, the

19  jury heard testimony that Johnson had prior felonies and shot someone but never was prosecuted

20  for that shooting.  Indeed, the trial court observed that Johnson "was impeached on so many other

21  factors including his very demeanor on the stand" and that he "did not come across as a

22  particularly honest individual, impeached by his prior record, as well as his dealing drugs and his

23  immunity, the deal he got from him and his friend."  (16 RT 5726.)  The trial court was in the best

24  position to gauge the demeanor and credibility of the witnesses.  This court finds that there is not

25  a reasonable probability that had Lyons questioned Johnson on how long he had known

26  petitioner, the result of the proceeding would have been different.  Accordingly, the California

27  ////

28  ////

41

Supreme Court could have reasonably found that Lyons's actions regarding Johnson's claim that he grew up with petitioner did not constitute ineffective assistance of counsel.[15]

### c. Failure to Present Evidence from Aaron Grey – Claim 2(b)

Petitioner claims that Aaron Grey, who was Roland Johnson's cellmate, could have provided crucial testimony that would have cast doubt on Roland Johnson's testimony and impeached Johnson's credibility.

#### i. Background

In a letter to the District Attorney's investigative unit dated July 15, 1993, Aaron Grey stated that he believed he knew "the person who murdered and robbed that man on June 1, 1993." (5 CT 1241.) He said that the person who loaned the shooter the gun, Roland Johnson, now "wants to tell his story." (Id.) The police interviewed Grey on July 21, 1993. (5 CT 1233-37; 4 CT 1191; LD 15 at 1139-45.) Grey told the detectives that he urged Roland Johnson into revealing his knowledge of the homicide because "he felt that Johnson had no knowledge that the homicide was going to occur." (4 CT 1191.) Grey told the police the witness composite "looked very similar to the description of the suspect," Glenn "Cromwell," although had trouble recalling the suspect's last name. (5 CT 1234.) According to Grey, Glenn "Cromwell" was a "shotcaller"[16] in prison, an "Oak Park Blood," and from the Oak Park neighborhood in Sacramento; Grey and Johnson went to "Sac High" with Glenn "Cromwell"; Grey and Glenn

---

[15] Petitioner also argues that Lyons "missed other opportunities to discredit" Johnson by failing to present the testimony of Johnson's ex-girlfriend and ex-wife. (ECF No. 103 at 75.) He then points to the declaration of Johnson's ex-girlfriend, Kathryn Hermann, which states that she and Johnson attended high school together in Sacramento and Johnson was known to do "a lot of crazy things" (LD 11, Ex. 1 at 28); and an unsigned declaration of Johnson's ex-wife, Mary Jane Johnson, which states that Johnson grew up in Sacramento, had been diagnosed with bipolar manic depressive schizophrenia, and that she never heard of petitioner (id. at 35-36). The unsigned declaration does not constitute competent evidence. See 28 U.S.C. § 1746 (requiring declarations to be sworn or signed under penalty of perjury). Further, this evidence does not establish how long petitioner and Johnson knew each other and is merely cumulative of testimony elicited at trial that Johnson grew up in Sacramento and suffers from mental illness. Thus, this court finds that even had these witnesses testified, the result of the proceeding would not have been different.

[16] Grey explained that a "shotcaller" is "one of the head guys." (LD 15 at 1139.)

"Cromwell" were in the same grade; and Glenn "Cromwell" had been "busted" for robberies and was known by the name "Chameleon." (LD 15 at 1139-40, 1142-44, 1145; 5 CT 1233-37.) Grey did not testify at trial.

        ii.    <u>Evidence Presented to the California Supreme Court</u>

Petitioner presented the California Supreme Court with Grey's affidavit from 2002. Based on the affidavit, petitioner urged that Grey would have testified to "crucial information" that the person Johnson claimed committed the Cashland robbery/murder was someone Grey and Johnson grew up with, and not petitioner. Grey's 2002 affidavit states as follows:

> When Roland first told me about the murder at the check-cashing store, he kept trying to get me to remember a Glenn Cornwell that we knew in Oak Park. I remember him saying, "This is the guy we grew up with." At first, I couldn't remember any Glenn Cornwell but then Roland reminded me of the Glenn that we knew from Oak Park, who was arrested for robbery and sent to juvenile hall when we were kids. I was just going into the tenth grade when that happened. I remember it because somebody around our age getting arrested was a pretty big deal back then. Roland told me that this was the same Glenn who was involved in the check-cashing murder.

> . . . . Roland told me that his last name was Cornwell and I remember thinking that the names sounded familiar, though I thought the Glenn that committed the robbery was something like Cromwell.

> The Glenn I knew seemed like he was older than I was because he hung out with a more mature crowd. He was a light-skinned black and was taller than me. I'm now 5 feet, 10 inches. Glenn was medium built, with very close-cut hair.

> I'd see Glenn in the Oak Park area. . . . I knew Glenn during the period when I was in about the ninth and tenth grade. I didn't see him after the tenth grade because he was sent to juvenile hall for the robbery. I never saw him again after that.

> Glenn never talked about being from Los Angeles. I'm also from Los Angeles. I don't remember him having any brothers or sisters.

> I wasn't a real close friend of Glenn's but I liked him. I really only saw him a few times. He played on our neighborhood football team a couple of times in Oak Park. I remember that my mom wouldn't let me hang out with Glenn because he was hanging out in a faster crowd.

> The Glenn that I knew didn't have any nicknames that I was aware of.

> I remember Glenn as always being generous. He was never violent or a bully.
>
> A few weeks after I wrote the letter for Roland, I was in prison in Solano and saw a newspaper that mentioned Glenn Cornwell being involved in the check-cashing store murder. I remember that when I saw that name, it didn't set right. I'm pretty sure that the Glenn we knew in Oak Park was called Glenn Cromwell, not Cornwell. I remember thinking that we must have been pronouncing the name wrong, or something. I also remember that there was another family who had a last name close to that and I thought that Glenn was part of that family. I can't remember what that name was.

(LD 11, Ex. 1 at 21-23.)

Petitioner also contends that the following statements from Grey's affidavit demonstrate that he would have provided important testimony that Johnson was the actual murderer:

> Roland put me up to writing a letter to the District Attorney about the check-cashing store murder. The purpose was to try to get information from them to see what the cops already knew regarding the murder. I didn't want to write the letter and Roland talked to me about it four different times before I finally agreed to it. He was crying, saying that he didn't want to get the death penalty or life in prison.
>
> Roland always maintained that he was not at the scene of the robbery/murder, but certain things he said . . . feel like maybe he was more involved than he let on. Roland seemed to know a lot about certain things, like where the car was going to be parked, and where the man carrying the money was going to be walking. There was just something funny about the fact that he knew so much about it, yet claimed that he wasn't there.
>
> After I wrote the letter, the detectives came to talk to me about it. When I came back to the cell and told Roland about the interview, he got all nervous and anxious. At first, he said that he didn't want anything to do with talking to the detectives, then he finally decided to talk to them. When Roland came back from his interview with them, he said that they promised him immunity. He seemed relieved.

(Id. at 20-21.)

During the habeas investigation, Grey was shown petitioner's 1977 driver's license photograph. (Id. at 24-25.) Grey said that he did not recognize "this man" and that the photograph "does not look like the Glenn that [he] knew from Oakpark." (Id.) Grey also reiterated that the last name of the Glenn he knew was "Cromwell," not "Cornwell." (Id. at 25.) Although defense investigators spoke to Grey, the defense never asked him to testify. (Id. at 23.)

44

iii.    Merits of Claim

As an initial matter, the defense did investigate Grey by interviewing him, but they decided not to call him as a witness.  Thus, any argument that Lyons was deficient for failing to investigate Grey as a potential witness is without merit.  Moreover, there is a strong presumption that counsel acted for tactical reasons rather than through sheer neglect.  Pinholster, 563 U.S. at 191.  The reviewing court therefore must not simply give counsel the benefit of the doubt but instead must affirmatively entertain the range of possible reasons counsel may have had for proceeding as he did.  Id. at 196.  The California Supreme Court could have reasonably decided Lyons's decision not to call Grey as a witness at trial was a strategic one.  Indeed, there is no evidence that Grey would have provided favorable testimony for the defense at the time of trial as Grey's initial statements supported Roland Johnson's testimony.

Even assuming that Grey would have testified at trial consistent with the statements he made many years later in his 2002 declaration, it is unclear from those statements whether petitioner and "Glenn Cromwell" were the same person.  However, whether Roland Johnson and/or Grey knew petitioner as "Cromwell" or "Cornwell," or whether Grey knew petitioner or not, does not alter the fact that Johnson positively identified petitioner at trial as the person who borrowed his gun.  (11 RT 4237-38, 4240.)

Further, Grey's statements in his 2002 declaration would not have provided evidence that Johnson was the actual murderer.  Grey's statement that, although Johnson maintained he was not at the scene of the murder, he seemed to know a lot about it, was not inconsistent with the evidence that Johnson knew about the robbery and murder because petitioner borrowed Johnson's gun and made comments to Johnson about the crime.

Even if Grey's 2002 statements could be viewed as beneficial evidence for petitioner, any decision not to use this evidence was not deficient given that the 2002 statements contradicted the statements that Grey made to the authorities when he was initially interviewed.  Although many years after the fact Grey claimed that he did not want to write the letter for Johnson, Grey initially told the detectives that he encouraged Johnson to reveal his knowledge of the homicide because it was the right thing to do.  Although Grey's 2002 statements imply that Johnson may have been

involved with the robbery and murder, Grey initially told the detectives that he felt Johnson had no knowledge that the homicide was going to occur. Further, although in his 2002 statement Grey claimed that the Glenn he knew was never violent or a bully and did not have any nicknames Grey could recall, in his initial police interview, Grey stated that Glenn "Cromwell" was a "shotcaller" in prison, an "Oak Park Blood," had been arrested for robberies, and was known by the nickname "Chameleon." Had Grey testified at trial consistent with his 2002 affidavit, he could have been impeached with his prior inconsistent statements. A counsel's decision not to call a witness whose credibility is vulnerable to significant attack is arguably strategic and not deficient.

The California Supreme Court would not have been unreasonable in rejecting petitioner's construction of the evidence and in finding Lyons was not unreasonable for failing to call Grey as a witness at trial, especially in light of the other evidence establishing petitioner's guilt, including eyewitness identifications and circumstantial evidence placing petitioner in the area of crime when the crime was committed.

### d. Stipulation to Driving Times – Claim 2(c)

Petitioner argues that Lyons was ineffective for stipulating to driving times because he missed an opportunity to reveal the inconsistencies and falsehoods in Roland Johnson's testimony. Petitioner asserts that the driving time between Pick-N-Pull and Johnson's house on the day and time petitioner allegedly drove it is far greater than the stipulation indicates because the police detective drove the route in mid-morning, when traffic would be light, instead of the late afternoon, when traffic would be heavier.

### i. Evidence Presented to the California Supreme Court

In support of his argument, petitioner presented to the California Supreme Court the declaration of an investigator who stated that, shortly after the trial, he drove from Pick-N-Pull to Johnson's house, and that it took him forty-one minutes and thirty seconds, noting that the "commute traffic on Business 80 caused the most delay." (5 CT 1294; LD 10 at 27.) Petitioner also argued that, on the day and time petitioner allegedly drove from Pick-N-Pull to Johnson's house, the traffic "was slow and congested" because of an accident on Business 80 at 4:42 p.m.

46

(LD 10 at 27.)  He presented a California Highway Patrol Collisions Report from June 1, 1993, which indicated a collision occurred at 4:42 p.m. on Route 51 (not Route 80, as petitioner suggests) (LD 15, Ex. 5 at 1152), and a collision occurred at 3:55 p.m. on Route 50, but in the opposite direction one would be traveling from Pick-N-Pull to Roland Johnson's house (LD 15, Ex. 5 at 1153).  Petitioner urged that this evidence demonstrates that Johnson's testimony that he saw petitioner no later than 4:00 p.m. on June 1, 1993, was "implausible, if not impossible."  (LD 10 at 27.)  Thus, petitioner argues, "by stipulating to irrelevant and misleading evidence, the defense once again missed an opportunity to reveal the inconsistencies and falsehoods in Roland Johnson's testimony."  (Id. at 28.)

ii.    Merits of Claim

Petitioner does not dispute the distances between the locations, nor does he dispute the time it took the police detective to travel the distances.  Petitioner also does not dispute the evidence establishing the driving distance and time from the Cashland area to Pick-N-Pull.  Rather, petitioner disputes the driving time between Pick-N-Pull and Roland Johnson's house and the driving time between Johnson's house and Juanita Washington's house because the police detective drove the routes in mid-morning, which did not accurately reflect petitioner's driving times in the afternoon rush-hour traffic.  Petitioner concludes that had Lyons not stipulated to, but presented his own evidence of, driving times, he could have discredited Johnson's testimony regarding when petitioner arrived at Johnson's house on the day of the crime and could have shown petitioner had an alibi.  (ECF No. 103 at 83.)

The California Supreme Court would not have been unreasonable in rejecting petitioner's construction of the evidence and in finding Lyons was not deficient for entering into the stipulation regarding driving times and distances.  First, although petitioner disputes the time it would have taken for him to leave Johnson's house and arrive at Juanita Washington's home by 5:15 p.m., his evidence shows that his investigator drove almost the same distance in the same amount of time (7.8 miles, 12.5 minutes).  (5 CT 1201.)  Second, petitioner's investigator drove from the Pick 'N' Pull to Johnson's house in 41.5 minutes (id.), as compared to the stipulated driving time of 25 minutes (12 RT 4373-75).  However, petitioner's investigator could not have

driven exactly the same route as the police detective because the detective's route was 19.8 miles (id.) and the investigator's route was 21.6 miles (5 CT 1201). Petitioner does not present evidence as to how the routes differed and how the different routes would have affected the differing driving times. In any event, review of the record reflects that Lyons wanted the jury to focus on what petitioner was doing at 1:30 p.m. on the day of the crime and not what he was doing thereafter. Indeed, during closing argument, Lyons argued that petitioner's activities after 2:00 p.m. on that day did not matter; rather, what mattered was what petitioner was doing at 1:30 p.m. on that day:

> Was [petitioner] doing a robbery-murder, or was he out at Pick-N-Pull with his friend, Mr. Billy Mackey, doing what McKee [sic] has described? That's the questions you have to describe. Not whether or not I have to call a witness to tell you well, yeah, he was here at 2:00 o'clock or he was there at 3:00 o'clock. It doesn't mean anything in this case.

(13 RT 4863.)

This court concludes that Lyons's decision to enter into stipulations regarding driving distances and times was clearly strategic. Such tactical decisions are presumed reasonable, see Harrington, 562 U.S. at 106-08; Pinholster, 563 U.S. at 191, 196, and petitioner has failed to overcome this presumption. In addition, the California Supreme Court would not have been unreasonable in finding that there was not a reasonable probability that disputing the driving time and distance between the Pick 'N' Pull and Johnson's residence would have resulted in a different trial outcome. As set forth above, petitioner's evidence shows it took his investigator only 16.5 more minutes to drive this route than the time reflected in the stipulation. This difference is not so significant so as to impeach Johnson's credibility. Petitioner argues that, because he could not have left the Pick 'N' Pull before 3:39 p.m., such evidence would have shown that petitioner could not have arrived at Johnson's house between 3:30 and 4:00 p.m., driven around with Johnson for 45 minutes, and then left Johnson's home before Johnson watched the 5 o'clock news (as Johnson testified). Petitioner's detective's driving time, however, also showed that petitioner could not have arrived at Johnson's house until after 4:00 p.m. Therefore, it appears that Johnson

was incorrect regarding the time petitioner arrived at his house and/or the time Johnson watched the evening news. Regardless, stipulating to the drive time did not change the fact that there was enough time for petitioner to commit the Cashland robbery/murder at 1:35 p.m., make a purchase at the Lucky's store at 2:15 p.m., purchase a car at 3:39 p.m., and arrive at Johnson's house before the 5 o'clock news ended. Moreover, because Lyons impeached Johnson's credibility on more significant issues, the fact that Lyons did not present evidence to show that Johnson could not have been completely accurate about the time petitioner was at his house after the Cashland robbery/murder does not establish that, but for this alleged failure of counsel, petitioner would have had a more favorable outcome.

### 4. Other Allegations of Ineffective Assistance of Counsel at the Guilt Phase

#### a. Failure to Expose the Inadequacy of the Police Investigation Regarding Other Suspects – Claims 2(d) & 2(f)

Petitioner next claims Lyons was ineffective for failing to inform the jury that Cashland had been burglarized the night before the robbery/murder and that "several other suspects existed and that the police investigation into these subjects was abandoned once Roland Johnson identified Petitioner as the perpetrator." (ECF No. 103 at 86, 92.)

##### i. Evidence Presented to the California Supreme Court

Petitioner argues that Lyons deprived the jury of evidence that would have been helpful to the defense of "disputed identity." In support of his argument, petitioner presented the following police investigation reports to the California Supreme Court:

- Cashland was burglarized the night before the robbery by a person or persons who gained entry using the secret access code of Cashland employee Ralph Clouse. Approximately $8,000 was stolen. No one was apprehended or charged with this crime. (LD 15 at 1111-13.)

- On the evening of June 1, 1993, just hours after the shooting, the police interviewed Curtis Glenn, who, earlier that day, around 1:30 p.m., was in the alley next to Cashland. Glenn heard two shots and then saw two black men running

49

down the alley away from Cashland.  One man held a maroon briefcase in his hand.  That man was in his mid-twenties and had a medium complexion, no facial hair, and shoulder-length curled hair; he was 5'6" or 5'7" and about 160 pounds.  The other man was younger, about seventeen years old, 5'5" or 5'6", "fat," with a very dark complexion and no facial hair.  Police noted that Glenn appeared to have been drinking, and Glenn admitted that he had five to six beers before the interview.  The police decided to continue the interview when Glenn was "more sober and lucid," but a follow-up interview never occurred.  (Id. at 1040-42.)

- On June 25, 1993, Domenick Bryant informed the police that one week earlier, he was riding in a car with his friend "D Boy," who Bryant described as a black male, seventeen years old, 5'7", medium build, and "dark complected."  Bryant said he and "D Boy" had given a ride to a black male named "Raheim," who was a friend of "D Boy."  Raheim explained that he could not be seen in public because he was wanted for the "murder of the Cashland robbery."  Raheim offered to pay D Boy $5.00 for the ride and produced a large wad of paper money from his back pocket.  Raheim was 5'9", 185 pounds, had a large build, a dark complexion, short curly hair, and a full beard.  Bryant stated that he did not know how to get in touch with "D Boy" but provided his address.  (Id. at 1114.)

- Roland Johnson claimed that petitioner told him that a "fat youngster" was involved in the crime.  Johnson had seen the "fat youngster" on Memorial Day weekend, just before or after the "fat youngster" had committed a carjacking.  Johnson described the "fat youngster" as a black male in his twenties, 5'7", with a "chubby build," curly or "curled" hair, and a dark complexion.  (Id. at 1022-23.)

- The police determined that the "fat youngster" was H.B.  The police interviewed H.B. in county jail, where he was waiting charges for robbery and assault.  H.B. admitted to the carjacking and shooting on Memorial Day weekend but denied involvement in the Cashland robbery and murder.  H.B.'s hair was "curled on top" and "braided at the back."  (Id. at 1115-17.)

50

1          ii.    Merits of Claims

2          This court finds the California Supreme Court could have reasonably found that Lyons's

3   failure to attack or expose the inadequate police investigation into alternative suspects was not

4   deficient performance.

5          First, petitioner argues that counsel should have informed the jury that Cashland was

6   burglarized the night before the robbery and that the police investigation into this burglary was

7   inadequate.  Nobody was apprehended or charged in connection with the burglary.  It is unclear,

8   however, how this evidence would have assisted petitioner's defense.  There was no evidence

9   linking the prior burglary to the robbery/murder and no evidence that a person other than

10  petitioner committed both crimes.  Without such evidence, highlighting evidence related to the

11  prior Cashland burglary arguably could have led the jury to find that the burglary and

12  robbery/murder were connected and that petitioner committed both crimes.  In light of this

13  inherent risk, and given the multiple layers of deference due trial counsel's decision, this court

14  finds that the California Supreme Court could have found Lyons acted reasonably in not

15  presenting evidence regarding the prior burglary of Cashland, including the police investigation

16  into that burglary.

17         Petitioner next claims that Lyons was ineffective for failing to inform the jury that the

18  police never followed-up with their initial interview of Curtis Glenn.  Again, it is unclear how this

19  information would have assisted petitioner's defense.  Glenn's description of a person with

20  shoulder length hair did not match any other eye witness description, and the interviewing

21  detectives noted in their report that Glenn had been drinking.  This court finds that the California

22  Supreme Court could have found Lyons acted reasonably in failing to attack the police's failure to

23  follow-up with Glenn, who did not appear credible and who could not assist their investigation,

24  especially in light of the evidence they discovered linking petitioner to the robbery/murder.

25         This court also finds that Lyons was not ineffective for failing to inform the jury that the

26  police never interviewed "Raheim."  Petitioner contends that Bryant's description of "Raheim"

27  was "fairly close" to the description of the man Glenn saw running through the alley with a

28  maroon brief case.  As respondent notes, petitioner overstates the similarities between Glenn's

description of the man with the maroon briefcase and Bryant's description of "Raheim." While Glenn described the man carrying the briefcase as having a medium complexion, "shoulder length curl, 5'6-5'7, 160 lbs, with no facial hair" (LD 15 at 1042), Bryant described "Raheim" as having a dark complexion, short curly hair, 5'9, 185 pounds, and having a full beard (id. at 1114). In light of the contrasting descriptions, and the fact that the information was not exculpatory, this court finds that the California Supreme Court could have reasonably decided that Lyons's failure to inform the jury that the police failed to interview "Raheim" was not deficient or prejudicial.

Finally, petitioner argues that counsel failed to inform the jury that the police never showed two of the eyewitnesses a photo of H.B. for identification even though Roland Johnson told the police that petitioner had told him that "a fat youngster" was also involved in the crime, and Johnson described the "fat youngster," who he had seen carjack someone over Memorial Day weekend, as "a male Black in his twenties with curly dark Geri curled hair and dark complexion, 5'7, with a chubby build." (LD 15 at 1022.) The police learned that H.B. was the "fat youngster" and later interviewed him, who admitted committing a carjacking during Memorial Day weekend, but denied any involvement in the Cashland robbery/murder. (Id. at 1116.) H.B. also stated that he did not recognize petitioner from a photograph shown to him. (Id.) This evidence suggests either H.B. was petitioner's accomplice in the Cashland robbery/homicide or he was not involved at all. Thus, it is unclear how this evidence would have assisted petitioner's defense. It was not exculpatory, and there was no other evidence linking H.B. to the crime. This court finds that the California Supreme Court could have reasonably decided that Lyons's failure to inform the jury that the police failed to show two of the eyewitnesses a photo of H.B. was not deficient or prejudicial in light of the overwhelming evidence linking petitioner to the crime.[17]

b. Failure to Present Evidence of Petitioner's Financial Well-Being – Claim 2(e)

Petitioner contends that Lyons failed to investigate and present evidence of petitioner's financial well-being.

---

[17] According to defense investigator Charles Pacheco, "it was difficult finding many of the witnesses because they were transients." (LD 11, Ex. 1 at 67-69 (October 16, 2002 Decl. of C. Pacheco).)

i.     Evidence at Trial

The prosecution presented evidence concerning petitioner's depleted bank balance in May 1993, and his limited income in the weeks before the commission of the crime.  Specifically, evidence was introduced that three of petitioner's checks had been returned to his bank for insufficient funds during the month of May and two checks were returned for insufficient funds in June 1993.  (11 RT 4101, 4103.)  Evidence was admitted that petitioner's bank account contained $1.20 on May 21, 1993, and that petitioner deposited $100 on May 28 and $300 on June 3, 1993.  (Id. at 4102-03.)  Respondent claims that the inference was that petitioner did not have over a thousand dollars in cash to purchase an automobile.  (ECF No. 106 at 33.)   Lyons rebutted the evidence by showing that petitioner was an independent contractor for Bell Carter Distributing and that he received a total of $1,493.75 from May 4 through June 5, and $1,353.87 from June 8 through July 17, after the Cashland robbery/murder.  (11 RT 4205-08, 4210-11.)

ii.     Evidence Presented to the California Supreme Court

Petitioner argued that Lyons failed to investigate and introduce evidence showing that, in addition to his regular job, petitioner worked a variety of odd jobs for which he was paid cash and regularly purchased and refurbished automobiles and motorcycles in poor condition and then resold them for a profit.  Petitioner submitted the following declarations in support of his argument that evidence of petitioner's additional income or financial well-being was readily available to Lyons and should have been introduced at trial:

- Declaration of James Willard Taylor:  "I know that [petitioner], up until the time of his arrest in July of 1993, was employed at 2 or more jobs, made good money, and was living his life in a responsible manner."  Taylor was not contacted by Lyons, and he did not testify at trial.  (5 CT 1205-06.)
- Declaration of Terri Keeney, Branch Manager of Olsten Staffing Services: petitioner was employed by Olsten Staffing Services on "various temporary assignments."  Petitioner also worked on a remodeling project at Keeney's house during the end of April and early May 1993.  He worked "long weekend hours" (ten to twelve hours per day) for a period of two to three weeks and was paid "at

53

the rate of $10.00 per hour cash at the end of each day worked."  (Id. at 1202.)

- Declaration of Steve Webb: petitioner purchased a motorcycle from him on June 14, 1993,[18] for $500 cash.  (Id. at 1203.)

- Declaration of Tanya D. Dragoo:  petitioner bounced three checks in May 1993 because of bank error.  (Id. at 1285-86.)

   iii.   Merits of Claim

The California Supreme Court would not have been unreasonable in finding that Lyons's performance with respect to evidence of petitioner's financial well-being was not deficient.

As an initial matter, petitioner did not present any evidence to the California Supreme Court showing that he actually purchased and refurbished automobiles or motorcycles or how much profit he made from that endeavor.  Petitioner only presented a declaration from Webb stating that petitioner purchased a motorcycle from him two weeks after the Cashland robbery/murder.  The only other evidence in the record concerning the purchasing and reselling of motorcycles came from petitioner's own statements during the penalty phase of trial.  (14 RT 5132-33.)  Petitioner's statements, however, did not indicate that he resold refurbished motorcycles on a regular basis or that he had earned any such income between May 1993 and his arrest.  Indeed, Lyons informed the court during the Marsden motion hearing that the defense "followed up with each and every person" who petitioner claimed "could testify that he had additional income," but "there was just no other evidence available to us from any witness that could show that they had firsthand knowledge of earnings by [petitioner]  . . . any time during the time frame . . . from April to the end of July besides what the Court heard in open court." (Marsden Motion RT 5021.)  Lyons further explained that he talked to theses witnesses "and they were not percipient witnesses to any income or monies earned by [petitioner], except for what the Court heard in terms of testimony from the people [who] testified from the stand."  (Id.)  Attorney

_____

[18] The declaration states 1995 instead of 1993.  Review of the declaration as a whole, however, clarifies that the reference to 1995 instead of 1993 was a typo.  Namely, Webb's declaration reflects that on June 3, 1993, petitioner offered to pay an additional $20.00 if Webb would "hold" the motorcycle for two weeks until petitioner "had the money"; that Webb held the motorcycle; and that on June 14 petitioner purchased the motorcycle. (5 CT 1203.)

King, who handled the penalty phase of trial, also informed the court that the defense was unable to locate any witnesses that would testify to such matters. (11 RT 4326.) In light of the paucity of evidence regarding petitioner's resale of refurbished motorcycles or automobiles, trial counsel's decision not to present evidence that petitioner spent an additional $500 shortly after the Cashland robbery/murder on a motorcycle was reasonable.

Petitioner also asserts that counsel should have presented evidence of additional income he received from Teri Keeney in May 1993. However, according to petitioner's own representations, he may have received, at best, $600-$720, and he could have received as little as $400. In light of the small amount of money petitioner may have earned (and the difficulty verifying it), it was reasonable for counsel not to introduce the evidence.

Similarly, whether petitioner bounced three checks due to bank error was insignificant. The evidence demonstrates that petitioner had $1.20 in his bank account on May 21, 1993; that he purchased a vehicle for $1,500 in cash a few hours after the Cashland robbery/murder; and that he then deposited $300 into his bank account on June 3, 1993. The fact that the bank debited petitioner's account by $200, in error, on May 28, does not change the fact that he had no money in his account during the relevant time period. Juanita Washington confirmed that petitioner was struggling financially when she testified that she was worried about their financial situation and concerned that petitioner had just bought a new car. (11 RT 4046-47.)

This court finds that Petitioner has failed to overcome the presumption that counsel's decision not to introduce additional evidence of petitioner's financial well-being was strategic.

C. Ineffective Assistance of Counsel at the Penalty Phase – Claim 3

Petitioner alleges counsel was ineffective for failing to investigate and present "readily available and compelling" mitigating evidence at the penalty phase. (ECF No. 103 at 120.) Petitioner asserts that reasonably competent counsel "would have realized that a thorough investigation of [petitioner's] background and family history, including . . . his medical, mental health, academic and social and psycho social history, was essential to the adequate preparation of the penalty phase." (Id. at 119-20.) This claim involves multiple sub-claims: (a) trial counsel unreasonably failed to retain and supervise appropriate investigators and other staff to conduct an

adequate and timely investigation; (b) trial counsel failed to investigate and present readily available and substantially mitigating social history evidence; (c) trial counsel unreasonably failed to investigate, develop, and present mitigating evidence regarding petitioner's mental state at the time of the 1983 prior convictions, and at the time of the 1993 offense to rebut the prosecution's case in aggravation; (d) trial counsel failed to present adequate evidence and argument, and failed to object to or rebut the prosecutor's arguments, so the jury never learned about substantial mitigating evidence regarding the 1983 and 1993 offenses and/or understood the mitigating value of the evidence that was presented; (e) trial counsel unreasonably failed to rebut the prosecutor's argument that because petitioner was not insane at the time of the 1983 and 1993 crimes, there was no mitigation; (f) trial counsel failed wholly or adequately to present evidence, to object, and to rebut the prosecutor's argument that petitioner's background and childhood were irrelevant to the penalty phase determination; (g) trial counsel inadequately failed to consult with, prepare, and present testimony from penalty phase experts; and (h) cumulative effect of counsel's errors at the penalty phase. Petitioner raised these claims in his first state habeas petition, and the California Supreme Court summarily rejected them on the merits. (LD 10, 18.) Because the subclaims are interrelated, this court will address them together. As set out below, this court finds petitioner has established a clear prima facie case of ineffective assistance of counsel during the penalty phase on the grounds asserted in claim 3 and can find no reason the California Supreme Court could have held otherwise.

1. Legal Standards

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his trial counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 687-88.

As described above in the section on guilt phase ineffective assistance of counsel, the Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Wiggins, 539 U.S. at 521 (quoting

Strickland, 466 U.S. at 688).  However, "general principles have emerged regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective standard of reasonableness' by which [a court must] assess attorney performance, particularly with respect to the duty to investigate."  Summerlin, 427 F.3d at 629.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690.  However,

> "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment."

Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 690-91).

With respect to counsel's role in presenting penalty phase mitigating evidence, "[t]he duty to investigate is critically important."  Summerlin, 427 F.3d at 630.  Counsel should attempt to discover "'*all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'"  Wiggins, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") 11.4.1(c), p. 93 (1989)) (emphasis in original); see also Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir. 1999) ("It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase.").  Where "'indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued."  Lambright v. Schriro, 490 F.3d 1103, 1117 (9th Cir. 2007) (quoting Stankewitz v. Woodford, 365 F.3d 706, 719-720 (2004)); see also Summerlin, 427 F.3d at 632 (counsel ineffective for failing to obtain readily available mental health evidence when he had been told by defendant's prior attorney that defendant may be mentally ill); Stankewitz, 365 F.3d at 719-22 (counsel ineffective for failing to thoroughly investigate defendant's childhood, history of drug abuse, and mental health problems notwithstanding the fact that he was on notice that such an investigation might yield mitigating evidence); Mayfield v. Woodford, 270 F.3d 915, 927-28 (9th Cir. 2001) (counsel ineffective for

failing to consult appropriate medical experts or collect relevant records after "his investigator's limited efforts revealed evidence of diabetes and substance abuse," and for failing to explain to the jury the relevance of the evidence that was presented). Of course, if counsel conducted a reasonable investigation, and nothing put counsel on notice of the existence of certain evidence, counsel cannot be faulted for failing to locate and present it. Babbitt v. Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998). In addition, "a lawyer may make reasonable decisions that render particular investigations unnecessary." Id.

Mitigating evidence counsel should consider includes "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." Wiggins, 539 U.S. at 524 (citing ABA Guidelines 11.8.6, p. 133 (1988)) (emphasis omitted). Counsel has a "'duty to investigate and present mitigating evidence of [any] mental impairment.'" Summerlin, 427 F.3d at 630 (quoting Bean v. Calderon, 163 F.3d 1073, 1080 (9th Cir. 1998)). Furthermore, in preparation for the penalty phase, "counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health." Caro v. Woodford, 280 F.3d 1247, 1254 (9th Cir. 2002). This is a distinctly different duty than counsel's obligations with respect to mental health experts at the guilt phase. Courts have held counsel had no duty to provide a guilt phase mental health expert with background materials absent a specific request from the expert. Compare Hendricks v. Calderon, 70 F.3d 1032, 1038-39 (9th Cir. 1995) (requiring counsel to "second-guess their experts . . . would effectively eliminate the legitimate role experts play in guiding and narrowing an attorney's investigation") with Wallace v. Stewart, 184 F.3d 1112, 1117 (9th Cir. 1999) (attorney may render ineffective assistance at penalty phase for failing to investigate and adequately prepare expert witness). "The defendant's history of drug and alcohol abuse should also be investigated." Summerlin, 427 F.3d at 630 (citing Jennings v. Woodford, 290 F.3d 1006, 1016-17 (9th Cir. 2002)). In addition to investigating the mitigating evidence, "[c]ounsel also has an obligation to present and explain to the jury all available mitigating evidence," unless counsel has a strategic reason for omitting it. Wiggins, 539 U.S. at 533; Hamilton v. Ayers, 583 F.3d 1100, 1113 (9th Cir. 2009) (citing Correll v. Ryan, 539

58

F.3d 938, 946 (9th Cir. 2008)); see also Stankewitz v. Wong, 698 F.3d 1163, 1172 (9th Cir. 2012) (citing Hamilton, 583 F.3d at 1113).

When determining prejudice from penalty phase error, the court must reweigh the aggravating evidence presented, the mitigating evidence that was, and should have been, presented, and any potential rebuttal to the newly presented mitigating evidence to determine whether there is a "reasonable probability that *at least one juror* would have struck a different balance." Wiggins, 539 U.S. at 537 (emphasis added).

## 2. Background Facts

### a. Penalty Phase Evidence Presented at Trial

Both the prosecution and defense penalty phase cases were brief. The prosecution presented just one witness and the defense presented six witnesses, and the entire proceeding, including argument and jury instructions, spanned two days. (See 14 RT.) Much of the evidence introduced at the penalty phase is set forth above in the above Background Section, but for ease of reference, it will be repeated here.[19]

#### i. Prosecution Case

By stipulation, the prosecution presented evidence that in February 1985, petitioner was convicted of eight robberies. These eight offenses occurred as separate incidents during a four-month period in 1983. On each occasion, petitioner robbed an employee of a commercial establishment at gunpoint. There were no injuries, although in some instances petitioner either displayed a firearm or threatened the victims with a firearm. Petitioner was sentenced to prison for these crimes and was released on parole on September 24, 1992, less than a year preceding the murder in the present case. It was stipulated that petitioner's convictions rendered it illegal for him to be in possession of a firearm at the time of the murder.

////

_____

[19] This background of the penalty phase evidence is derived from the California Supreme Court's recitation of the evidence presented at trial and from the court's independent review of the state court record. See Cornwell, 37 Cal. 4th at 63-66.

59

The sole witness to testify for the prosecution at the penalty phase was Robin Reagan, one of the murder victim's five children. She offered brief testimony describing the victim's admirable qualities, the shock she had suffered at the moment she learned of his death, and the sad impact of his absence on his children and grandchildren.

In his closing argument, the prosecutor focused on petitioner's choices to commit crimes:

> [A]s I mentioned in the guilt phase, it's not about what makes one person a criminal or . . . makes another person lead a productive life.
>
> This is debated throughout universities, colleges every day, and nobody really has an answer to that. It's too late for that question here. So we're not going to talk about why [petitioner] committed this crime in the sense of his background or his childhood. Based on what we've heard over a couple of days, there's nothing in his childhood that would really indicate that he would end up where he is.
>
> But that's not why we're here. . . .

(14 RT 5237.)[20]

The prosecutor told the jury that petitioner had "a lot choices" and that he made a choice "that was devastating to the Reagans and to Mr. Reagan himself, obviously." (Id. at 5244-46.) The prosecutor further insisted that the crime was "not an act of desperation of a needy person," stressing that "[n]ot by any stretch could it be argued that [petitioner] was desperate and downtrodden." (Id. at 5243-44.) He reminded the jury that petitioner had "a lot of things going for him"; it "was not as if he was homeless" since he was living in a home with Juanita Washington, who let him use her car "whenever he wanted"; he "was doing fine in his employment" and "making money"; and he "had his health, he had relative youth [he was in his late thirties], he had a lot going for him." (Id. at 5244.) The prosecutor urged that the crime was "an act of opportunity, and act of greed, . . . an evil act. . . a vicious act." (Id.) It was a situation where petitioner "wanted more than he was entitled to and he wasn't willing to work for it." (Id. at 5244-45.) He argued that petitioner is "a man who had something to offer, who had an

---

[20] Petitioner argues that the prosecutor's statements were improper. The discussion on prosecutorial misconduct is discussed below in Claim 27.

opportunity to do the right thing and he deliberately made a choice not to do it ," just like he chose to quit all his jobs, leave the Navy, and drop out of high school. (Id. at 5256-57.)

With respect to petitioner's prior criminal convictions, the prosecutor commented:

> [Petitioner's] descent, so-to-speak, into criminal activity or depravity, where he got today was not some kind of inevitable slide like you might hear about or expect. And it was a ladder that was full of opportunity that he knew well. He had a lot of opportunities. And he took it one step at a time starting in '83. This was a ladder that he descended one rung at a time.

(Id. 5248.)

And, with respect to the instant crimes, the prosecutor emphasized that petitioner was not suffering from any "mental defect or disturbance" and was not acting "bizarre or insane" or in a manner consistent with mania; rather, petitioner acted with a plan and "knew exactly what he was doing." (Id. at 5251-52.) The prosecutor impressed upon the jury not to allow their sympathies to interfere with deciding the penalty of death and argued that petitioner especially was not deserving of sympathy. The prosecutor then identified people deserving of the jury's sympathy: Arthur Ashe for contracting AIDS from a blood transfusion and a juvenile from New York who was beaten and then "lit on fire" because he refused to buy crack cocaine from a dealer. (Id. at 5254-55.)

ii.   Defense Case

Lyons, the lead appointed defense counsel, did not actively participate in the penalty phase of the trial; rather, he designated sole responsibility of the penalty phase to attorney King. King argued all the penalty phase motions in limine, examined all the witnesses in the penalty trial, and delivered the closing argument in the penalty trial. On the first day of the penalty phase trial, King informed the court that he was having "some witness problems." (Id. at 5101.) King explained that, in addition to petitioner, he intended to call three additional family members, who had not yet arrived from Los Angeles, but were expected to arrive by airplane. (Id. at 5101-03.) As discussed below, only one family member testified at the penalty phase trial.

King presented six witnesses, including petitioner. In addition to petitioner's own testimony, King presented testimony regarding petitioner's background through only one of

61

petitioner's family members, petitioner's older brother Creadell Polee, Jr.  That background was described as follows.

Petitioner testified that his father had left the family when petitioner was six years of age. Petitioner described a generally happy childhood in a close-knit family.  In June 1973, petitioner joined the United States Navy.  He did not see combat during his service, but traveled extensively.  After three years of active service, petitioner served in a Navy Reserve unit.  Upon his honorable discharge in 1979, he was able to find civil service employment, although he did not stay long at various positions.  During his reserve service and extending until 1981, petitioner suffered from depression.  During his employment with the United States Postal Service, petitioner suffered a mental health crisis.  He was diagnosed as suffering from bipolar disorder and was hospitalized on more than one occasion.  Petitioner testified that various medications, including lithium, haldol, prolixin, and thorazine were prescribed for him.

According to petitioner, he suffered continuing stress from his employment, his difficult romantic relationship, and the absence of his family.  He conceded that he "probably" committed the eight robberies referred to in the stipulation.  He acknowledged his conduct had been "terrible, terrible."  He declared he had not been motivated by the need for money, but by his enjoyment of the role of an outlaw, asserting he had given away some of the proceeds of the eight robberies. He stated he was not taking his prescribed medication at the time of the robberies.  Petitioner testified he worked while imprisoned for the robbery convictions and also when he was on parole. In June 1993, he had temporary employment as a clerical worker, was employed by a company called Bell Carter Distributing, and also refurbished and sold used motorcycles.  Petitioner did not believe he was suffering from a mental disease at the time of the murder, and did not want to take the psychotropic medication prescribed for him because of its negative side effects, including mental confusion.  Petitioner testified he had no current relationship with the members of his family, including his daughter, who was then twenty years of age.

On cross-examination, petitioner stated that his recollection of the eight stipulated robberies was impaired.  He testified he had been accused of robberies, was tried for sixteen of them, and convicted of eight.  He also conceded that he recalled that—at a minimum—he at least

had displayed a firearm during each of the eight robberies and, by implication, having threatened his robbery victims with death in the event they failed to comply with his demands.

Creadell Polee, Jr. testified that petitioner had been a studious, athletic youth and never was in trouble as a child. He testified that schizophrenia is "quite common" in the family, that (in his opinion) petitioner had exhibited signs of the disease, and that, when Polee last had seen petitioner in 1982, petitioner exhibited signs of stress and communicated in a rapid, stuttery form of speech.

Carolyn Cornwell, who married petitioner on June 3, 1993 (two days after the Cashland robbery/homicide), also testified for the defense. She testified that she and petitioner had a happy relationship and that he worked full time five or six days a week. Deputy Sheriff Raymond Roberts testified that petitioner had served as a trustee during his incarceration pending trial and had performed diligently.

James Esten, formerly an administrative employee for the California Department of Corrections, described the various levels of confinement within the prison system, the unlikelihood that a prisoner serving a sentence of life without possibility of parole would be housed in any but the most restrictive custody (which Esten described), and the circumstance that such prisoners never can be and never have been paroled. When petitioner arrived at the prison, he had been taking lithium, Mellaril, and Elavil, and Esten explained that during petitioner's incarceration for robbery, his behavior was good and he was a valuable worker. Esten predicted that petitioner would make an excellent prisoner, could assist correctional officers in pacifying other inmates, and again would be a valuable worker.

Dr. Shawn Johnston, a clinical psychologist, reviewed petitioner's medical records and also met with petitioner in order to perform a psychological evaluation. Dr. Johnston concluded that petitioner suffered from bipolar disorder, as petitioner had since the late 1970s. Dr. Johnston noted that petitioner had been prescribed medication for this condition on a number of occasions.

Dr. Johnston testified that petitioner's record demonstrated that he had exhibited periods of agitation, pressured speech, "flights of ideas," and paranoid delusions—symptoms that are characteristic of bipolar disorder. Dr. Johnston described the manic phase of the disease, noting

that afflicted persons feel wonderful, enjoying superabundant energy. At the same time, persons in the manic phase of the disease engage in reckless behavior and suffer from memory disorders. Psychological tests performed by Dr. Johnston on petitioner disclosed a likely learning disability, psychoneurological deficits or brain damage, confused thinking, agitation, and indications of mania and schizophrenia.

Dr. Johnston explained that bipolar disorder impairs the subject's judgment and, during extreme manic phases, may deprive the subject of the ability to know right from wrong. On cross-examination, he conceded that a person diagnosed with bipolar disorder ordinarily is able to distinguish right from wrong. Dr. Johnston also noted that on the Minnesota Multiphasic Personality Inventory, petitioner scored in the third highest range in psychopathic deviance, a score outside the normal range, but the witness predicted that petitioner would function well in a highly structured environment such as prison.

During closing argument, King argued that petitioner's mental disease was a mitigating factor. King stated that this crime and petitioner's eight prior felony convictions occurred while petitioner was in a manic phase when "judgment is impaired" (14 RT at 5262):

> In fact, if you look at the pattern of [petitioner's] life, he left high school early so he could go to the Navy. He left the Navy early so that he could get a job. He took a lot of tests, he worked for the Mint. And then he gets this great job with the post Office which he gives up for some job with the Mint.
>
> I submit to you the characteristics inherent in this bipolar disorder which manifests itself in manic depressive cycles that [petitioner's] life outside of the structured environment of the Navy, prison, and the jail where he does not have adequate supervision to ensure that these episodes are not identified and treated will result in the type of behavior . . . that you have in front of you today.

(Id. at 5262-63.)

King urged that petitioner was "deserving of [the jury's] sympathy," pointing out that, although petitioner is not Arthur Ashe, "there's not the degree of cruelty in this crime as in the crime of the New York child that [the prosecutor] told you about, where he was beaten horribly and then burned." (Id. at 5264-65.)

1    b. Evidence Presented on Habeas

2        i. Evidence of Petitioner's Background and Family and Social History

3        Petitioner presented the California Supreme Court with the following evidence regarding

4    his background and his family and social history:  (a) March 12, 2003 declaration of Esther

5    Battey, a friend of petitioner's maternal grandmother, Annie McGowan (LD 11, Ex. 1 at 1-3); (b)

6    May 20, 2004 declaration of petitioner's long-term girlfriend, Debra Booker Smith (id. at 4-7); (c)

7    March 21, 2003 declaration of Deborah Daniels, who dated petitioner's step-brother, Kenny Polee

8    (id. at 8-9); (d) May 2, 2003 declaration of petitioner's sister, Earlene Edgar (id. at 10-17); (e)

9    October 18, 2002 declaration of petitioner's neighbor, Donzell Finister; (f) March 13, 2003

10   declaration of Rosie Haynes, wife of petitioner's brother Creadell Polee, Jr. (id. at 26-27); (g)

11   December 1, 2003 declaration of petitioner's cousin, Anthony Hogan (id. at 29-33); (h) May 4,

12   2004 declaration of Judy Silva, wife of petitioner's brother Cedric McGowan (id. at 34); (i)

13   March 20, 2003 declaration of petitioner's niece, Hasani Martinez (id. at 41-49); (j) March 13,

14   2003 declaration of petitioner's aunt, Beatrice McGowan (id. at 50-54); (k) March 13, 2003

15   declaration of petitioner's brother, Cedric McGowan (id. at 55-61); (l) March 12, 2003

16   declaration of petitioner's cousin, Tommy Morrison (id. at 62-64); (m) March 12, 2003

17   declaration of petitioner's aunt, Virginia Morrison (id. at 65-66); (n) March 12, 2003 declaration

18   of petitioner's cousin, Renard Polee (id. at 73-75); (o) April 15, 2003 declaration of Dan

19   Rollinskendell, son of petitioner's long-term girlfriend Debra Booker Smith (id. at 76-77); (p)

20   May 4, 2004 declaration of Sylvia Spencer, petitioner's professor at Sacramento City College (id.

21   at 119-22); (q) June 23, 2004 declaration of clinical psychologist, Dr. Myla Young, Ph. D. (id. at

22   124E-L); (r) petitioner's Naval Service Records (id. at 147-218); (s) records from petitioner's

23   1983 robberies (LD 13, Ex. 2 at 533-84); (t) social history records of family members, including:

24   birth, death and marriage certificates; and social security, social services, medical, school,

25   criminal and employment records (LD 13, Ex. 3, at 674-881A); and (u) publications regarding the

26   conditions in the Compton and Watts neighborhoods during petitioner's childhood, including the

27   Watts riots (LD 14, Ex. 4 at 882-1018).

28   ////

The evidence describes the following background.  Petitioner was born to Malissa McGowan in 1956 in Los Angeles.  Petitioner's biological father was Glenn Cornwell, Sr.  Between 1946 and 1956, Malissa had five children with four different men.  Glenn Sr. was the only father who ever lived at home with petitioner and his family.  Malissa was sixteen years old when she had her first child, Dorothy Cornwell, on August 20, 1946.  Glenn Sr. was Dorothy's father.  Dorothy was petitioner's only full sibling.  Malissa had her second child, Creadell Polee Jr., on April 8, 1948, with Creadell Polee, Sr.  On April 9, 1950, Malissa had her third child, Earlene Edgar, with Earl Edgar.  On June 11, 1953, Malissa had her fourth child, Cedric Morris, with James Morris.

In September 1955, Malissa married Glen Cornwell Sr., and the following August petitioner was born.  The marriage of Malissa and Glenn Sr. was brief and violent.  They constantly fought and argued, and Glenn Sr. frequently attacked and abused Malissa, including hitting her with a hammer.  Glenn Sr. was "very violent and abusive," which "frightened [petitioner] very much" and caused him to stutter when he was two or three years old.  (LD 11, Ex. 1 at 10.)  Malissa's older children—Dorothy, Earlene and Creadell Jr.— tried to protect her by biting Glenn Sr. on the ankles or hitting him with pots and pans.  They often called their uncle, Edward McGowan, Jr., who had been a boxer, to help defend Malissa against Glenn Sr.

In April 1957, after less than two years of marriage, Malissa and Glenn Sr. separated and Malissa filed for divorce, citing "extreme cruelty" and requesting a restraining order.  (LD 13 at 675.)  Malissa did not pursue the matter, however, and the relationship continued in some form for another year or two.  They separated again in May 1959.  On December 4, 1959, Glenn Sr. attacked Malissa on the street, choking her and hitting her with a lug wrench, and then later that day, went to her house and attacked her again with a lug wrench.

On December 15, 1959, Malissa refiled for divorce and requested a restraining order, again citing "extreme cruelty."  (Id. at 676-84.)  Malissa and Glenn Sr. had no community property; Malissa requested custody of Dorothy, age 13 and Glenn, age 3, as well as support for the children and herself; Malissa's earnings the prior year were $350 and she planned to start working again soon in her same occupation; and Malissa's monthly income was $369 and Glenn

66

Sr.'s was $400. Malissa was awarded custody of Dorothy and petitioner and $25 per week in child support, but there is no indication Glenn Sr. ever paid any child support. The divorce was finalized in 1963 after Glenn Sr. failed to answer the divorce complaint. Dorothy hated her father and felt the family was better off when he left. Glenn Sr. played no part in petitioner's life after the early 1960s.

In 1954, Malissa had begun working as a nurse's attendant for the County of Los Angeles. Around 1961, Malissa bought a small one-story house at 1502 E. 126th Street in Compton. It had two small bedrooms, a small kitchen, and a garage. In one bedroom, Glenn and Cedric shared a bed and Earlene had her own bed. Dorothy, who did not approve of Malissa's lifestyle (discussed below), stayed mainly with her maternal grandmother Annie McGowan in the projects.

Sometime during the early 1960s, Malissa began a long-term relationship with Gerry Cowings, a woman who lived across the street. At that time, Malissa and Glenn Sr. were still married, and, at one point, Glenn Sr. attacked Malissa with a hammer because he was angry about her relationship with Gerry. Gerry was a widow and six years older than Malissa. Malissa and Gerry both drank heavily. Gerry ultimately died of complications from liver disease and pancreatitis caused by alcoholism. She was a bus driver for twenty years for the Los Angeles County School District and later owned a barbershop and beauty salon. By petitioner's family's standards, Gerry was financially well off.

Malissa spent the majority of the time at Gerry's house. When Malissa came home from work, she parked in Gerry's driveway and stayed at her house for several hours. Malissa may have visited her children briefly, but then returned to Gerry's house to spend the night. None of the children liked Gerry: she was mean and treated the children like "slaves on a plantation." (LD 11, Ex. 1 at 59.) Gerry tried to molest Earlene and later molested Earlene's daughter, Hasani Martinez (petitioner's niece). Gerry also may have molested Dorothy, as Dorothy was sexually traumatized as she grew up. Malissa got angry at Gerry when she found her "bothering" her children in that way, but did not end the relationship or otherwise protect her children from Gerry. When Malissa did take action, it was often violent or inappropriate. For example, once when Gerry "did something" to petitioner as a child, Malissa shot Gerry, who then had to go to the

hospital.  (LD 11 at 12.)

Gerry was known around the neighborhood as a sexually provocative woman.  On the weekends, she sat on a chair in her front yard, with her dress hitched up above her knees, and enjoyed the stares from men, women, and children.  If she was attracted to a woman who passed by, she called out and invited the woman into her home.  Gerry's provocative behavior was strange for that time and place, and none of Malissa's children would talk about it.  Earlene discovered her mother was a lesbian when another girl in her neighborhood told her.  Earlene felt deeply ashamed and never got over that shame.

Malissa devoted her free time and money to Gerry, and Gerry wanted Malissa all to herself.  The children competed with Gerry for Malissa's attention, and the children usually lost.  The children felt deeply hurt by Gerry's treatment of them, her monopolization of Malissa, and Malissa's rejection of them, but these topics were never discussed.  Some of petitioner's siblings fantasized about revenge on Gerry for her cruelty.  Dorothy tried to burn down Gerry's house, but only got as far as pouring gasoline in the doorway and on the side of Gerry's house before Earlene was able to stop her.

Although Malissa viewed herself as the sole supporter of her children, she either was unavailable, unable or uninterested in providing for them.  Because Malissa was not around, petitioner was left in the care of his older siblings.  Petitioner's older sisters were responsible for the housework, of which very little got done.  The house was filthy and chaotic: the dishes were always piled up and dirty; the dirty clothing was thrown in a heap in the garage; Cedric kept pigeons in the backyard, which, along with the dogs, often invaded the house; and the backyard was overgrown like a "jungle."  (LD 11, Ex. 1 at 62.)  The times Malissa was present, her parenting was capricious and sometimes violent.  Earlene recalls:

> Sometimes when [Malissa] was drunk she would come into my room in the middle of the night and ask me about school.  I remember one time when I was about 9 years old she came into my room and began yelling and striking me.  I forced her back into the den and then I went to my grandmother's house.

(LD 11, Ex. 1 at 11.)  Malissa and her sister would whip the children with switches, belts, and extension cords, but Malissa was "tougher" in her whippings, because she administered more

severe and indiscriminate whippings to every child, not just the perceived transgressor. (LD 11, Ex. 1 at 31.) Malissa whipped the children frequently: petitioner's cousin, Anthony Hogan, recalls Malissa whipping him, Cedric, and petitioner "every other day on average." (LD 11, Ex. 1 at 30.) Malissa used a leather belt and hit as hard as she could until the child started to cry, and then she would hit the child four or five more times to "make sure [the child] got the message." (LD 11, Ex. 1 at 30.) She struck the children on the legs and arms, and on the face, if she could. Attempts to escape were futile. If a child tried to escape, the child was whipped on the back. The children were whipped for talking about Gerry in a negative way or for some perceived minor mistake, such as not closing the back door, not taking out the trash, or not clearing off the stove after cooking.

As petitioner grew up, Malissa became increasingly physically limited by a series of injuries, a bad back, obesity, and arthritis. Although family members at trial recalled family camping and fishing trips, to the extent these events occurred, they primarily benefitted petitioner's older siblings, because by 1962, Malissa was frequently disabled. In 1962, she missed about one month of work because of disability resulting from industrial injuries and other illnesses. In 1963, she fell on the floor after catching her shoe in her desk chair and missed 61 days of work. She later reported that the pain from that injury never ceased: she had to give up dancing, could no longer shop, bend, make beds, mop or lift, and never engaged in physical activities. She was an alcoholic, and when she returned home in the evenings after work, she focused primarily on "dulling her pain." (LD 13, Ex. 3 at 711). In 1964, Malissa missed 108 days of work, and in 1965, she missed 52 days of work. Although Malissa blamed her industrial accidents for her pain and limitations, an examining orthopedic surgeon found her condition in 1965 only "slight to moderate" in severity and recommended that she lose weight and take anti-inflammatory medication. (Id. at 694.)

Malissa's absence and neglect created a house that "was like a shell, it didn't have the spirit of love. It was a cold house, there was emptiness inside. There was a stoniness in the house—loveless and cold." (LD 11, Ex. 1 at 11.) Petitioner and his siblings "lived in rough places with hurtful people around them"; "they got hurt"; and "they had breakdowns, and

69

struggled with themselves." (<u>Id.</u> at 53-54.)

In Malissa's absence, petitioner was either on his own or taken care of by an older sibling (Dorothy, Earlene or Cedric) or his maternal grandmother, Annie McGowan. These caretakers, however, were not psychologically or emotionally equipped to meet petitioner's needs. Dorothy, petitioner's only full sibling, was ten years older than petitioner and was "controlling, manipulative, and prone to violent outbursts." (<u>Id.</u> at 26.) She often was involved in verbal and physical altercations with people around her, including relatives. She was physically large and very intimidating. Even Malissa and Gerry were afraid of Dorothy. In Watts, Dorothy was known as "Big Red" and would "beat down people." (<u>Id.</u> at 45.) Dorothy was ultimately diagnosed with schizophrenia or bipolar disorder. Earlene, who was eight years older than petitioner, was also diagnosed with schizophrenia and manic-depressive disorder. Cedric was three years older than petitioner, and growing up he was big and often got into fights. He was kicked out of four schools by early adolescence and began drinking and abusing drugs when he was fourteen years old. Malissa considered Cedric such a "hothead" that she did not buy him a gun when she bought them for her other children. (<u>Id.</u> at 59.) Like his siblings, Cedric also had mental problems. Later, he was abusive to his son, and periodically, he was reduced to living at the Salvation Army because he was homeless. In addition, Cedric had criminal convictions for robbery and was frequently in court for domestic abuse and custody determinations.

On the weekends, when Malissa could have spent time with her children, she sent them to her parents' (Edward and Annie McGowan) small one bedroom apartment in Nickerson Gardens, a notorious housing project in the Watts neighborhood. Often, a dozen or more of the grandchildren would sleep there together. Petitioner's grandfather, Edward McGowan, Sr., was irritable and an alcoholic. After Edward was injured on the job, he could no longer work and had to use crutches to get around. Edward received no disability benefits, and he and Annie went on general assistance. Edward "cussed" out his wife Annie in front of their grandchildren and said things like "Annie, you are nothing but a church whore," and "Annie, you should have been a miscarriage." (<u>Id.</u> at 14.) He carried a .45 revolver in his pocket and threatened to use it on Annie and the grandchildren. One of petitioner's aunts describes Edward as a "strange character,

70

who always sat around the house with a machete by his side." (Id. at 27.) When Edward was drunk, he was mean and irritable. For example: (1) Edward shot one of Earlene's boyfriends between the legs because the boy was not paying attention to him; (2) without warning, Edward "clocked" another visiting boy who was wearing a leg cast, telling him, 'you're no better than I am" (id. at 73); and (3) there was an occasion when Edward was so drunk he could not hold onto the refrigerator door handle and, frustrated, shot off the handle with his gun. When Edward drank, the whole family helped to protect Annie, including tying up Edward and taking his crutches to the roof so that he could not get around. Sometimes Annie stayed with a friend to escape Edward's violence. According to one of petitioner's aunts, there was always "confusion ... "hollering, screaming, and bickering" around Edward. (Id. at 52.) Edward's abusive behavior and violence, which petitioner and his siblings saw every weekend, played a role in their "breakdowns." (Id.)

Even Annie, the most stable adult in petitioner's life, was unavailable to provide petitioner with adequate or proper nurturing. She was severely depressed and suffered mental breakdowns. She would hit petitioner and the other grandchildren on the head or face as hard as she could if they did not finish all their food.

As a child, petitioner was small and frail and was teased and bullied, both for his stutter and his abnormal family. Petitioner's brother Cedric, who was very large, protected petitioner from threats outside the family, but tormented petitioner within the family. Children, including Cedric and petitioner's cousin, Anthony Hogan, as well as some older relatives, teased petitioner by imitating his stutter. This upset petitioner and made him stutter more. Cedric continued to bully and attempted to control petitioner. Despite being bullied, petitioner was compassionate: on different occasions, he brought home a lost puppy, a bird with a broken wing, and a homeless child.

In 1961, petitioner started kindergarten at Willowbrook School. His father's location and occupation were "unknown." (LD 11 at 140.) His stuttering problem was noted from kindergarten throughout elementary school. Malissa was not involved with his schooling. Petitioner's kindergarten teacher remarked that "Parent works. He has remained in Nursery," and

71

the first grade teacher stated "very little parent teacher relations." (Id. at 138.) Despite his family violence and chaos in his early years, the teachers noted that petitioner got along with his peers, was cooperative, and liked school. He did, however, have problems with modulating his behavior: for example, his kindergarten teacher noted that he was "active," and his 5th grade teacher stated that he "participate[d] freely, perhaps too eager." (Id. at 138, 141.) Because of the lack of competent parenting, petitioner missed a significant amount of school in first and second grades. Not surprisingly, by third and fourth grade, petitioner tested at below grade level.

Drugs were rampant in petitioner's neighborhood in Compton. By the early 1960s, drug dealers had moved onto petitioner's block. Later, petitioner's classmates became the drug dealers. Malissa's response to the dangers of the neighborhood was to buy guns for her children. This was a common response, as "everyone" in Los Angeles had a gun. (Id. at 15.) Civil rights leaders and social workers warned about the growing social problems and likelihood of violence in South Central Los Angeles during this time. Unemployment was high; there was a lack of decent and fair housing; schools were segregated, and community leaders warned of smoldering resentment about unequal treatment at the hands of the police. There was a dangerous pattern in many civilian-police encounters; even routine arrests often resulted in arguments or struggles where the police officers typically used force. The police in Watts functioned in a climate of fear and hostility. (LD 14 at 882-87.)

In August 1965, shortly before petitioner's ninth birthday, he witnessed the Watts riots. There were six days of rioting in which thirty-four people were killed and at least 1,032 were injured. Thousands were arrested. There were many incidents of police brutality. It resembled wartime. The National Guard patrolled the streets. The property damage to Watts alone was estimated at forty million dollars. Edward and Annie McGowan's apartment was close to the epicenter of the riots, and petitioner watched rioters set fire to buildings, police beat and shoot people, and petitioner felt the presence of the National Guard occupation.

During petitioner's fifth grade year (1966-67), he lived with his grandparents and attended the 112th Street School. His attendance improved greatly from when he was living at Malissa's house. Petitioner's teacher noted that petitioner was below grade level but had a good attitude

toward school, worked very hard, and was a "good citizen." (LD 11 at 131, 141.) Despite speech class in third and fourth grade, petitioner continued to stutter. In 6th grade (1967-68), petitioner returned to live at Malissa's house with his siblings. He attended Carver school in the Willowbrook School District and his attendance again suffered. Petitioner's teacher commented that his interest in school was more limited and his family and home relationships were only "fair." (Id. at 132.) In 7th grade, petitioner was bused to Dana Junior High School in San Pedro. In March 1969, in the middle of petitioner's eighth grade year, the school busing policies changed, and petitioner was transferred back to the Watts-Willowbrook neighborhood, where he attended Willowbrook Junior High.

In 1970, by the time petitioner was fourteen years old, Watts was over 97% African-American, only 30% of its population had completed high school, 46% had no more than an eighth grade education, 39% of the population was at or below poverty level, and almost half of the population was on public assistance. In the four housing projects containing a third of its residents at that time, many families were headed by single mothers. The schools petitioner attended were segregated and disadvantaged. They suffered persistent and chronic shortages of qualified teachers, and teachers often displayed racial bias.

By the time petitioner was thirteen or fourteen years old, he and Cedric, who was fifteen or sixteen years old at the time, lived alone in Malissa's house. Cedric often held parties, and people were always in and out of the house. When the neighbors called the police, Malissa (who was living next door with Gerry) would be "easygoing" on her sons. (Id. at 61.) Malissa did not attempt to have a positive influence on petitioner as a teenager, and her example, in addition to the family atmosphere, was "a corrupting one regarding substance abuse." (Id.) Malissa grew marijuana in the backyard, which was available for use by her children, and indeed, petitioner reported that he began using marijuana in the eighth grade. Family drinking parties on the weekend were common; the adults drank and kicked the children out. Most of petitioner's siblings and adult relatives drank heavily and many were alcoholics. Most significantly, Malissa was a serious alcoholic during petitioner's formative years and sometimes attacked her children when she was drunk. Eventually, Cedric received social security disability because of his

addiction to alcohol and drugs.

During petitioner's high school years, gangs and police violence were constant and prevalent in the neighborhood. Petitioner eventually dropped out of high school in eleventh grade, after gang members threatened to kill Malissa. Malissa proposed two options for petitioner: carry a gun or leave and join the Navy. Petitioner chose the latter, and in 1973, at the age of sixteen, and with Malissa changing his birth certificate and signing her consent, petitioner joined the Navy, which is when petitioner's bipolar disorder began to manifest.

Petitioner served on the U.S.S. San Bernardino. From the beginning, petitioner had difficulty adjusting to shipboard life. In March 1974, he was disciplined by his commanding officer for an unauthorized absence, and he received low ratings for military behavior. During his time on the U.S.S. San Bernardino, he was "deemed to be serving in hazardous waters during such service and received hazardous pay as a result. To sail in hazardous waters during these periods was considered to be in combat." (LD 11 at 267.) While on leave in April 1974, petitioner married Margaret Roberta Scott, who was pregnant. In August 1974, petitioner returned to San Diego to attend school to become a corpsman. However, petitioner was unable to complete the necessary academic work. On August 11, 1974, petitioner's only child, Keama, was born.

In August 1974, petitioner was transferred to the U.S.S. San Jose, a supply ship. According to petitioner, this ship was stationed in the Philippines to supply the Seventh Fleet at sea. At times, they sailed into hazardous waters that were part of the theater of operations for the Vietnam War. In March 1975, petitioner's performance "deteriorated markedly," and his commanding officer noted it could be partially attributed to "ongoing personal problems." (Id. at 179.) Among other things, petitioner lost the keys to a high security area where ammunition was stored, which was a very serious matter. Around this same time, petitioner reported marital problems and told medical staff that his wife would not let him see his child since her birth and that a divorce was pending. He had already exhausted his leave and spoken to the chaplain and medical personnel in an attempt to deal with his situation. He was anxious and had difficulty sleeping, cried often, and feared he would get into a fight and hurt someone. The treating doctor

diagnosed him with mild situational anxiety and depression, prescribed valium and librium, and set up an appointment at the psychiatry clinic.

By the time petitioner saw a psychological professional on April 3, 1975, he was nervous, irritable, having trouble sleeping, and had "the feeling that everyone [was] waiting for him to 'screw up.'" (Id. at 207.)  He also reported that he was afraid he would hurt someone if he did not get out of the Navy.  After taking the valium he was prescribed, he had been caught sleeping on duty.  His thoughts and speech focused on his marital problems.  Petitioner feared he could not function in the Navy.  The doctor opined that he had no significant affective disorder and diagnosed him with Adjustment Reaction of Adult Life (or late adolescence), or Situational Adjustment Reaction.  Petitioner was returned to duty, with the suggestion of a neuropsychiatric consultation, but there is no record of further follow-up.  Petitioner recovered from this episode and his ratings improved.  He was recommended for re-enlistment and received an honorable discharge when he left the Navy in July 1976.  Petitioner was transferred to inactive duty in the Naval Reserve and was discharged in June 1979.

Following discharge from the Navy, petitioner returned to Malissa's house on E. 126th Street in Los Angeles.  By then, his family had dispersed and, on account of their own numerous mental and physical problems, they were unable to support petitioner's return to civilian life or his mental health problems.  Malissa was physically disabled and on psychiatric medication.  In 1975, complaining of too much work, pain, stress, and an inability to lift, bend, stoop or walk very far, she quit her job.  Petitioner's grandfather had died in 1974, and his grandmother was severely depressed.  Creadell Jr. had married, and Dorothy, Earlene, and Cedric had or were in the process of relocating to Sacramento.

Compounding his family members' deterioration and absence, the South Central neighborhood was worse economically when petitioner returned from the Navy.  Against this backdrop, petitioner attempted to make a life for himself by moving away to Oakland.  Unfortunately, as is typical for someone with bipolar disorder, petitioner entered a period of his life characterized by frequent mental breakdowns and hospitalizations, changes in jobs and living situations, and severe disruptions of family life.

In Oakland, petitioner lived in a housing project in the Hunter's Point area of San Francisco. He immediately secured work as a security guard, and then worked for a couple months as a mail and file clerk at the U.S. Mint in San Francisco, earning $3.22 an hour for a 40 hour work week. In November 1976, petitioner left the U.S. Mint to work as a mail handler with the U.S. Post Office Bulk Mail Center in Richmond, California, earning $5.66 per hour with health and life insurance and a retirement plan. Petitioner's probationary evaluation indicates that he was performing satisfactorily. In March 1977, petitioner suffered a small work injury and received medical treatment, but was back at work the next evening. However, a few months later, petitioner started acting erratically and was hospitalized for a codeine overdose. On July 20, 1977, petitioner resigned from the U.S. Post Office, citing "harassment after an industrial injury" that caused him to "become mentally depressed." (LD 12, Ex. 2 at 290-91, 293.) Petitioner's supervisor denied any harassment and commented:

> Up until approx. 2 months before this notice, employee's performance in all categories had been satisfactory. Since then, his behavior and attendance have become erratic. He was in an AWOL status from 7/12 till 7/21/77. When questioned about above allegations, he could not say who had harassed him or how. Refer to Medical Unit for further information.

(Id. at 293.)

After his employment termination from the U.S. Post Office, petitioner moved back to Los Angeles and worked part-time for the Veteran's Administration as a food service handler, earning $4.84 per hour. Petitioner then moved back to Malissa's house, quit his job at the Veteran's Administration, and enrolled in community college. Petitioner continued to suffer from mental breakdowns, and after one semester of community college, he relocated to Sacramento where Dorothy, Earlene, and Cedric resided. At some point during this period, family members report that petitioner had another breakdown. In November of 1977, he was cited in Sacramento for reckless driving.

During the next five years, petitioner attempted to earn a college degree, despite repeated hospitalizations for manic and depressive psychotic episodes. Dorothy, Earlene, and Cedric also continued to have their own problems and were unable to genuinely support petitioner's

educational efforts. For example, Cedric was a polysubstance abuser and neither he nor his wife could care for their baby son, who went to live with Malissa. Dorothy was very depressed and went from being happy to very sad and cried inconsolably; she took elavil and valium; her husband was killed in a knife fight; she was sometimes described as a paranoid schizophrenic, had seizures and black outs, was obese, suffered from degenerative arthritis; she had intestinal bypass surgery, liposuction, and a tummy tuck for her morbid obesity; and she was a chronic smoker and drank. Dorothy received a modest amount of social security earnings for several years, but otherwise did not work. Earlene attempted suicide multiple times in the early 1970s. In June 1976, Earlene was prescribed medication for depression, and, in September 1976, she was treated at the emergency room for an overdose suicide attempt. Earlene was diagnosed with paranoid schizophrenia, and possibly bipolar disorder. Earlene had numerous psychotic episodes. Once, she started choking her own daughter but was stopped by a boyfriend. She made her daughter stare into the sun and say "allah akbar." Another time she ran around naked in the snow and petitioner, Dorothy, and others had to stop her. Naturally, Earlene's ability to earn a living was severely impaired, and by the early to mid-1980s, she was unable to work and was on social security. She was treated with lithium and antipsychotic medication at various times, but was still symptomatic and had suicidal and homicidal ideas and heard voices. Earlene had surgery on both hips and was eventually wheel-chair bound and morbidly obese.

Like his siblings, petitioner's mental illness manifested itself again in Sacramento, and he was unable to complete his community college classes. Earlene recalls that he "acted crazy a lot" when he moved to Sacramento. Once, he stood on the steps of his apartment repeatedly saying "there they go," without responding to questions about what he was seeing. Another time, he blocked the door of a Muslim church and would not let anyone enter or exit the church. In the fall of 1978, after petitioner's girlfriend broke up with him, Dorothy brought him to Psychiatric Emergency Services under California Welfare Institutions Code section 5150 because he had smashed all the windows in his car and threatened his family. Dorothy reported that petitioner previously had been hospitalized in San Francisco and Los Angeles and given a diagnosis of paranoid schizophrenia and prescribed mellaril. For the previous two weeks, petitioner had been

talking loudly to animals. He also had allowed strangers to borrow his car and thrown money out of a moving car window. Petitioner was diagnosed with manic-depressive illness, manic phase. After a week in the hospital, the hyperactivity and grandiosity subsided, and petitioner was discharged with a prescription for lithium and an appointment at a mental health clinic.

Three days after discharge, however, petitioner readmitted himself voluntarily for a 72-hour hold. Although he was taking his medications, petitioner remained delusional: Dorothy had found a dead, decapitated, cut-up squirrel in petitioner's room, and petitioner explained that he had found it dead in the park and took it home to "show what [he] would do to [his] brother," who owed him money (LD 12 at 219); petitioner continued talking all day to "his people," (id. at 321); he was unable to eat or sleep; the voices inside him—JFK, RFK, MLK, Malcolm X—were trying to "reach the people through him" (id.); and petitioner believed the television was sending him special messages. Petitioner was agitated and demonstrated rapid, pressured speech and auditory hallucinations and had grandiose ideas, but with a depressed mood and labile affect— potentially explosive to tearful. Petitioner feared being secluded and restrained and was paranoid. Petitioner was given lithium and proloxin, but for several days he did not improve. His treating psychiatrist found petitioner's situation confounding and was unable to decide whether petitioner suffered from bipolar disorder or paranoid schizophrenia. After a week, however, petitioner improved enough to be discharged on October 20, 1978.

On October 26, when seen for follow-up at South Sacramento Community Health Center, petitioner still exhibited pressured speech and grandiosity. The treating psychiatrist continued petitioner on lithium, discontinued prolixin, started haldol, and prescribed cogentin if needed for the side effects of haldol. Petitioner continued an outpatient treatment program until March 1979.

Despite his mental illness, petitioner was committed to continuing his education at Sacramento City College. Petitioner applied to take a heavy course load for the 1978-79 academic year with the goal of earning a college degree. Although he was unable to complete all the course credits because of his illness, in the 1978 fall semester he received an "A" in an Afro-American Experience class and a "C" in a social services class. According to one of petitioner's psychology instructors (Sylvia Spencer), petitioner was soft-spoken, kind, and very approachable;

78

he never spoke loud or yelled; and he never exhibited a vicious or violent nature or any ability to plan—he was passive, more of a follower than a leader.  She knew that petitioner had an unstable family with an extensive history of mental illness and that petitioner's psychiatric problems began in the Navy.  In class, petitioner's mental and psychological disability and illness were readily apparent and he exhibited states of agitation and restlessness: sometimes, petitioner would stand up in the middle of the class and start continuously pacing around the classroom.  In addition, petitioner's medication caused him to walk "slowly, in a dazed manner, stiff like a zombie," and his mouth constantly moved without making a sound.  (LD 11 at 120.)  Petitioner's classmates were aware that he had mental difficulties and was medicated, and they felt protective towards him.  "The students really liked him, in fact they gravitated towards him.  Some took him over to their houses to spend the night as it was known that his family situation was erratic and disjointed."  (Id.)  In this time of his life, petitioner knew he had a mental illness, and he tried to understand it and to deal with it.  Petitioner recognized when he decompensating and, during those times, he would ask his family or those around him to get help for him.

Sometime during the late 1970s, petitioner began receiving social security disability payments because his mental illness interfered with his ability to work.  Consistent with the sporadic recurrences of his mental illness, petitioner cancelled his spring 1979 enrollment at community college, but then later reinstated it.  That semester, petitioner succeeded in completing thirteen credits and earned a 4.0 GPA.  In the 1979 summer semester, petitioner completed courses in english and general psychology and received grades of "C" and "B," respectively.  Petitioner successfully completed those courses despite spending the summer in a cast as a result of a motorcycle-car accident in June 1979, which resulted in a fractured right fibula.

However, petitioner's mental illness recurred later in the summer of 1979, and on August 26, 1979, he was arrested for taking and breaking a bottle in a convenience store and threatening the clerk with it.  Petitioner then went to a church and kicked the door in, inviting people to come out.  For several days following his arrest, petitioner was held in jail.  He was uncooperative and had rapid, rambling, disorganized thoughts with grandiose, delusional ideas about making money and robbing banks.  He was treated with haldol but remained agitated and hypomanic.  Four days

later, he was paranoid, delusional, and had suicidal ideation. Petitioner was placed on a 72-hour involuntary hold, but then voluntarily agreed to be admitted to the hospital, where it was reported he was attending college, dating, and having an active social life until August, when over the course of a week or two he began to talk fast, throw things, hit doors and push people. Petitioner exhibited an elevated mood, flight of ideas, and grandiose and delusional thoughts, such as interplanetary travel and claiming that he could make his roommate, who was in a wheelchair, walk again.

Despite his severe symptoms, petitioner knew the date and time and where he was, and his short-term memory and long-term memory were good. During his hospitalization he was prescribed a variety of medications, but continued to be delusional, confused, depressed and have hallucinations and grandiosity. Petitioner told his psychiatrist that he wanted to be arrested and taken to jail on a charge of attempted murder to prove he was a man. Petitioner was diagnosed with acute paranoid schizophrenia. He continued exhibiting hypomanic behavior and was discharged somewhat improved after his writ of habeas corpus was granted.

However, several days after discharge, on September 27, 1979, petitioner was brought back to the hospital under section 5150 for disturbing and aggressive behavior. For example, petitioner said he wanted to die and that "J.C. (Jesus Christ) and the White House or the Black House" had ordered a date when he or others would die. (LD 12 at 402.) His speech was rapid and rambling, and he was delusional, hearing voices, and belligerent. His mood was depressed and his affect labile; there were times when he was polite and childlike. Again, despite being delusional and perhaps hallucinating, he was neatly dressed and knew the date, time, and where he was. Petitioner was placed in restraints and given medication. He was hospitalized and continued to have hallucinations, grandiose delusions, and psychotic behavior. A conservatorship was granted for fourteen days. A week later, staff noted rising hyperactivity, boisterous behavior and racial-paranoid hostility. On October 14, petitioner's behavior escalated to mania after watching the World Series on television, and he was prescribed thorazine and lithium the following day. Petitioner was released after his writ of habeas corpus was granted.

////

A few weeks later, on November 5, 1979, petitioner went to U.C. Davis Medical Center in a psychotic state, threatening to kill someone. He reported not eating for two days. He was paranoid, grandiose, delusional, stating that the FBI would put him in the gas chamber because he was going to be the first black president. Petitioner also was upset that his brother would not give him his SSI check. He was treated with lithium and haldol and transferred to Sutter Memorial Hospital, where he voluntarily stayed for eight days and was discharged on November 15, 1979.

A week later, on November 22, 1979, petitioner was arrested for burglary and spent twelve days in jail for kicking down the door and ransacking the apartment of a former girlfriend, who was not home. Petitioner was convicted of burglary and received probation. Petitioner continued to get treatment through the U.C. Davis Medical Center under the direction of the probation department through June 1980. In sum, from 1977 through 1979, petitioner was severely and chronically mentally ill with rapid cycling and mixed episodes of mania and depression. Moreover, he expressed paranoid and delusional themes of robbing banks and being persecuted by federal agents.

In the spring and fall semesters of 1980, petitioner completed several courses at Sacramento City College. Petitioner's goal was to get a baccalaureate degree and become a counselor. However, during the early 1980s, petitioner's mental illness continued to interfere with his education and employment. For a time in 1980, petitioner counseled at-risk-youth through the Evangelical Lutheran Good Samaritan Society, but was still unable to hold a steady job. During the 1981 spring semester, petitioner attempted to take five classes, but ended up completing only seven units, with a GPA of 0.5. At the end of the 1981 fall semester, petitioner was academically dismissed, and his academic pursuits ended.

In the early 1980s, petitioner was living with his brother Cedric and Cedric's wife Judy. Cedric, who was already known in the family for being volatile, was abusing drugs and alcohol during this period, along with Judy. Petitioner's interactions with his own family were difficult, and when family problems arose, it often triggered a depressive episode. Petitioner kept to himself, stayed home, and slept a lot. Petitioner was able to leave this unhealthy environment and move in with his girlfriend, Debra Booker Smith. Debra had four young children. According to

Debra: petitioner treated her children like his own; they spent a lot of time together as a family; petitioner encouraged her to arrange for the children to visit their father; petitioner assisted her financially, "always took care of the groceries and the bills" (LD 11 at 4) and, one Christmas, he bought them all Christmas gifts; petitioner did not believe in spanking her children and was a good disciplinarian; petitioner was never violent and rarely angered, and when petitioner and Debra disagreed, he never yelled or cursed; there was a lot of mental illness in petitioner's family, which petitioner attributed to a chemical imbalance that he believed could be controlled through proper diet and vitamins; and petitioner's dream was to become a merchant seaman and buy Debra and the children a house with his veteran benefits. When petitioner went to prison in the 1980s (discussed below), it took Debra and her children a long time to get over petitioner leaving, describing him as "the best thing that ever happened to [them]," a "good man, who wouldn't hurt anybody over any amount of money." (Id. at 7.) Debra recalls that, although she and petitioner stayed in contact for a few years, petitioner told her "not to be in jail with him, to go live [her] life." (Id.)

When petitioner was living with Debra, he made a very favorable impression on one of her sons, Danielle Rollinskendell. Danielle recalls petitioner as "a very friendly and mild person. He never displayed anger, violence, or a bad temper." (Id. at 76.) His clearest memory of petitioner was when petitioner spent his entire paycheck on Christmas gifts for Debra and her children. Danielle describes petitioner as "a very nice person," and "very loving to the other kids and [him]. He was like a father to us. He was never violent or angry, but very mild. . . . He had a very good relationship with all the children." (Id.)

On December 26, 1983, petitioner was arrested for committing a series of robberies between September and December 1983. On December 29, 1983, petitioner asked the jail medical staff for vitamins (apparently, he still believed that vitamins were the solution to his symptoms). Petitioner complained of racing thoughts, depression, inability to sleep, and auditory hallucinations. At some point, jail staff put him on mellaril. In May 1984, competency proceedings were instituted. Two of the three psychiatrists appointed to examine petitioner found him incompetent. In the opinion of Dr. Walter Bromberg, in 1984, petitioner was "incompetent"

and "unable to understand the nature of the proceedings taken against him and to assist counsel in the conduct of a defense in a rational manner." (LD 13 at 543-44.) Dr. Alfred French also found petitioner "incompetent to stand trial" in 1984. (Id. at 545.) They reported symptoms consistent with a mixed bipolar episode: alternating agitation and depression, anxiety, paranoia, racing thoughts, and suicidal ideation. Petitioner reported to one of the psychiatrists that he wanted to go to California State University and become a counselor. In June 1984, jail psychiatric staff evaluated petitioner and determined that he was suicidal and needed to be hospitalized. Petitioner was placed on lithium. On August 6, 1984, a jury found petitioner competent to stand trial, and he was subsequently convicted of eight robberies and sentenced to sixteen years in prison.

During petitioner's incarceration, petitioner repeatedly sought treatment for his bipolar disorder symptoms and was classified as a Category "J" (active psychiatric case) throughout most or all of his incarceration. Specifically, in June 1985, petitioner was transferred from Sacramento County Jail to the California Department of Corrections, with the transfer summary noting his diagnosis of bipolar disorder, mixed type, and problems with suicide and visual and auditory hallucinations. Petitioner was sent to California Medical Facility at Vacaville (CMF) and classified as a Category "J" inmate. He was prescribed an anti-psychotic medication. Petitioner received positive reviews and was rated above-average for his work in the medical laboratory and in micrographics at the prison. On December 24, 1985, petitioner requested a psychiatric sick call and reported roaming thoughts and hallucinations. At the end of January, he reported that his thoughts were racing, that he was starting to hallucinate, and that he was very discouraged about the continued course of his illness. He was continued on mellaril and benadryl.

On February 28, 1986, petitioner's maternal grandmother, Annie McGowan, killed herself by taking an overdose of antidepressants while in the hospital at U.C. Davis Medical Center. In March 1986, petitioner was depressed but his doctors did not see signs of a thought disorder. In May, petitioner reported racing thoughts that were getting loud and "weird." (LD 13 at 597, 640.) Petitioner's depression continued, and his doctor prescribed a tricyclic antidepressant in July 1986. Petitioner was able to maintain with this medication, and he continued to receive positive evaluations for his work in the prison laboratory. However, by the fall of 1986, petitioner was

83

despondent over a cousin's death and the lack of contact with his family. This pattern continued, with petitioner requesting psychiatric sick calls to renew his medications and report on his symptoms and side effects so that adjustments could be made.

On January 5, 1987, petitioner's mother Malissa died of metastatic bladder cancer.

In July 1987, the prison psychiatrist recommended that petitioner be reclassified as a Category "U" (inactive psychiatric case) inmate and be transferred to the California Men's Colony (CMC) as he was maintaining on low doses of mellaril, an anti-depressant, and benadryl. Petitioner's reclassification to Category "U" did not last because in the fall of 1987, he had a major depressive episode in which he was perseverating on his mother's and cousin's deaths, as well as expressing rage. The psychiatrist noted that petitioner was becoming psychotic and had impaired reality testing. Petitioner was paranoid and reported that he had enemies, although he had never reported that alleged fact previously. Petitioner was prescribed lithium, and several days later, petitioner requested another psychiatric sick call where he reported he was re-stabilized and ready to return to work.

On September 15, 1987, his psychiatrist reported that petitioner had bipolar disorder characterized by both manic and depressive episodes; that the cycles are fairly frequent, occurring two to three times annually and are of rapid onset of one to two days. The psychiatrist explained that when there is a flare-up, petitioner requires immediate psychiatric care, and that the most recent flare-up was of psychotic proportions and was highly suicidal. The psychiatrist thus recommended that petitioner be placed in an institution that has the full range of psychiatric services, including acute psychiatric hospitalizations. (LD 15 at 1177.)

In October 1987, petitioner was transferred to CMC. According to the treating psychiatrist, petitioner exhibited flight of ideas and pressured speech, but was not irritable or euphoric. Mellaril and an antidepressant were discontinued but the lithium was continued. At CMC, petitioner worked successfully as a clerk until the fall of 1988 when psychiatric medications were discontinued and he requested a transfer to San Quentin in order to be closer to home. In May 1989, it was recommended that petitioner be reclassified as a Category "U" inmate, even though he was continuing psychological therapy.

By 1990, petitioner was again at California Medical Facility. In April 1990, he was working in the pre-cast concrete construction yard and was described as a consistently dependable and effective worker. It is not known whether petitioner had more depressive periods in 1990 and 1991.

In January 1992, prison staff filled out a pre-parole assessment of petitioner, which indicated that petitioner had no contact with his family, no serious disciplinary problems, and no enemies or gang affiliations.

In the summer of 1992, petitioner again exhibited symptoms of hypomania. He reported sleeping problems and was verbally counseled for disrespecting the staff. The reporting officer described bizarre and paranoid behavior and speech: petitioner accused the officer and her husband of conspiring against him, and petitioner approached an officer and started yelling "I've seen my attorney. Hey, what's a good number? . . . . $10,000, $30,000, $50,000 or $150,000," as if he were going to sue him. (LD 15 at 1180-81.) Petitioner's symptoms were not recognized or treated.

In September 1992, petitioner's assignment changed from working in the warehouse to pre-parole. Two weeks later, on September 24, 1992, petitioner was paroled as a "self-parole" to Sacramento. Thus, after eight and a half years of custody, during at least seven of which he was under active treatment and/or symptomatic, petitioner was released with only two weeks of preparation to direct himself to find a job, housing, and rebuild his life.

Unfortunately, petitioner's family members had deteriorated during the time he was incarcerated, and they were unable to help petitioner adjust to life outside of prison and stay out of trouble. Petitioner's siblings (Cedric, Earlene and Dorothy) were on social security disability because of mental disabilities and medical problems. Petitioner's brother Cedric had continued to drink and use drugs excessively and became a threat to his family members. In 1986, his then-wife Judy had applied for, and received, a restraining order to protect herself and the children. Dorothy received guardianship of Cedric's son, Cedric Jr. In 1987 and 1988, Cedric spent six months in jail following convictions for robbery. After his family made him move out, he went to live at the Salvation Army. In 1989, he was convicted of grand theft person, his probation was

85

revoked, and he was sentenced to four years and eight months in prison. In 1992, he was convicted and sentenced to six years in prison for drug possession. That same year he was involved in numerous physical altercations.

Dorothy, petitioner's only full sibling, had been diagnosed with a mixed bipolar disorder with psychotic features and was prescribed elavil (an anti-depressant), lithium (for bipolar disorder), cogentin (used to treat tremors and side effects of other drugs) and trilofan (used to treat schizophrenia and symptoms such as hallucinations, delusions and hostility.)

Earlene used a walker and later a wheelchair. She was described as a paranoid schizophrenic and manic-depressive and was prescribed lithium and haldol.

Despite his family members' deterioration, petitioner started out well on parole. He moved in with Juanita Washington, whom he met while in prison, and her two teenage children at her house on 43 Street in Sacramento. According to their neighbor Donzell Finister, petitioner attended church, was "always working," "always such a nice person," and "always talked about how he wanted to be a good person." (LD 11 at 18.) On October 23, 1992, petitioner applied for disability benefits due to his mental impairments. He also secured work through an employment agency, where he earned $827.57 during 1992. In 1993, he earned $1,322 at Skyline Construction and Home Improvement.

At all times during his life, petitioner has experienced "significant brain dysfunction" that affects "the overall integrity of the entire brain with particular concern for dysfunction of temporal and frontal brain structures and the connections between these brain regions." (LD 11 at 124F-G, Decl. of Dr. Myla Young.) Frontal brain regions are known to "predominantly mediate abilities for executive functioning," which is the "ability to think, reason, problem solve, anticipate consequences of actions, and change actions based on information received from the environment." (Id. at 124G-H.) "Impaired executive functioning results in impaired and/or inadequate social functioning, goal-directed behavior, planning, insight, foresight, and self-regulation." (Id. at 124H.) Petitioner's memory and ability to learn are also significantly impaired. His psychomotor abilities are impaired, and he has difficulty organizing complex information into an overall gestalt. (Id. at 124H-I.) Petitioner's brain dysfunction may be the

result of a major mental disorder, such as bipolar disorder and/or schizophrenia (like his siblings),

a dysfunctional early childhood environment where he "experienced sustained and severe

emotional stress," and a genetic vulnerability for a major mental disorder (124I-J.) Petitioner's

brain dysfunction "had a substantial impact on his life":

> His intelligence would permit him to obtain employment
> commensurate with a high school diploma, but his ability to hold a
> job would be affected by his brain dysfunction and mental disorder.
> He would be able to work satisfactorily under simple and clear
> circumstances, but he has a limited capacity to handle complexity
> and stress. His brain is "bruised" and damaged; it is like a rubber
> band with very little stretch to it. The more stressful and complex a
> situation becomes, the more difficulty [petitioner] would have in
> handling it successfully.

(Id. at 124K-L.)

ii. Evidence of Counsel's Preparation for the Penalty Phase

(a) What Counsel Did

Attorney Lyons hired investigator Charles Pacheco to work on petitioner's case. It was

the third capital case Pacheco had investigated.[21] (LD 11, Ex. 1 at 67-69 (October 16, 2002 Decl.

of C. Pacheco).) Pacheco worked with attorney Lyons on the guilt phase. Pacheco turned the

penalty phase investigation over to his employee, Michael Sailors, who worked with attorney

King, but had never worked on a death penalty case. Pacheco "turned the penalty phase over to

Sailors just to give him the experience of doing a penalty phase investigation, and because he

wanted to do it." (Id.) To prepare Sailors, Pacheco gave Sailors a copy of a death penalty manual

---

[21] Petitioner challenges the qualifications of Pacheco, arguing that, at the time of the
investigation, Pacheco "had only been issued a private investigator's license the previous year, on
March 26, 1992," and that his private investigator's license was revoked in July 2005 based on
three cases in which he was found to have failed to perform work for which he had been paid.
(LD 103 at 122, 125.) Petitioner cites to disciplinary proceedings before the California
Department of Consumer Affairs, to support these statements. (Id., Ex. 88 at 1257-67.) In
addition, petitioner provides the affidavit of Sheila O'Donnell, a California licensed private
investigator, who states that the loss of Pacheco's license was also related to threatening
witnesses and that, since petitioner's trial, Pacheco has been charged in Sacramento County
Superior Court with five felony threats against witnesses and sentenced to five years supervised
probation. (Id. at 125, Ex. 92 at 1287.) Petitioner does not appear to have presented the
disciplinary proceedings, O'Donnell's affidavit, or Pacheco's criminal records to the California
Supreme Court. Therefore, this court may not consider the evidence when determining whether
the state court decision was contrary to law or unreasonable. See Pinholster, 563 U.S. at 180-82.

"and told him to read it." (Id.) In December 1993, Sailors interviewed petitioner and petitioner's following family members: Creadell Polee, Jr. (petitioner's brother); Edward McGowan (petitioner's maternal uncle); Creadell Polee, Sr. (petitioner's step-father); and Tommy Morrison (petitioner's cousin). (CT 987.9[22] at 79-80.) Sailors also retrieved petitioner's school records from the Compton Unified School District and attempted to locate—without success— petitioner's medical records at local hospitals. (Id. at 79.) A few days before the guilt phase trial began, Sailors met with attorney King and reviewed together the videotape of the interviews Sailors conducted with petitioner's family members. (Id. at 267.) During the guilt phase trial, Sailors attempted to obtain petitioner's military medical records, obtained petitioner's authorization for the release of medical records, and served a subpoena duces tecum on the University of California at Davis Medical Center. (Id. at 307-09.)

On March 21, 1994, at the close of the guilt phase of the first trial, King filed a motion for the appointment of a psychologist, Dr. Shawn Johnston, to examine petitioner, to review documents, and to prepare a report. (Id. at 229-30.) King explained to the court in a hearing on the motion that Dr. Johnston would be a penalty phase expert and that he would "be prepared to testify as to the [petitioner's] mental state, both presently, at the time of the offense, if convicted, and at the time of the eight prior felony convictions where [petitioner] apparently engaged in a number of armed robberies and at that same period, he was hospitalized for mental conditions." (Id. at 232.) The request was approved on March 21. (Id. at 233-34.) Dr. Johnston's records indicate that he began work on the case on May 3, 1994. (Id. at 549.)

On March 24, Sailors met with King to discuss the penalty phase. (Id. at 330.) On March 29, Sailors served a subpoena duces tecum on the California Department of Corrections and made efforts to obtain more of petitioner's school records. (Id. at 330.)

////

---

[22] "CT 987.9" refers to "Clerk's Supplemental Transcript of Requests under Penal Code Section 987.9." Charles Pacheco submitted time-and-activity logs in support of his billing requests under Penal Code section 987.9. The logs show the time spent by Charles Pacheco (designated as "CP" in billing) and the time spent by Michael Sailors (designated as "MS").

After the first trial ended in a mistrial on April 4, 1994, Pacheco's billing resumed in June 1994. (Id. at 376.) Subpoenas were re-served on Mercy American River Hospital and Sutter Memorial Hospital, presumably for petitioner's psychiatric records. (Id. at 376.) On June 13, Sailors delivered "additional [petitioner's] medical records" to Dr. Johnston. (Id. at 378.) Dr. Johnston interviewed petitioner in jail for an hour on June 12 and tested him on June 15. (Id. at 549.) In September 1994, Sailors organized petitioner's military and school records and served a subpoena on the University of California at Davis Medical Center and subpoenaed petitioner's jail records. (Id. at 489.)

(b) What Petitioner Alleges Counsel Did Not Do

In October 1994, the second trial began. However, the following people, who had information regarding petitioner's background and family and social history, including petitioner's mental illness and his family history of mental illness, all stated that they were never contacted by petitioner's trial attorneys: Esther Battey (a friend of petitioner's maternal grandmother); Deborah Daniels (ex-wife of petitioner's step-brother Kenny Polee); petitioner's sisters, Earlene Edgar and Dorothy Slade (who died in 2001); petitioner's brother, Cedric McGowan; petitioner's cousins, Renard Polee and Anthony Hogan; petitioner's aunts, Beatrice McGowan and Virginia Morrison; petitioner's niece, Hasani Martinez; close friends and wives of petitioner's family members: Judy Silva (Cedric McGowan's wife), Rosie Haynes (Creadell Polee Jr.'s wife), and Kencey Polee (wife of Kenneth Polee); petitioner's long-term girlfriend, Deborah Booker Smith, and her son, Dan Rollinskendell; petitioner's neighbor, Donzell Finister; and Sylvia Spencer (petitioner's community college professor). (LD 11, Ex 1. at 2, ¶ 12; 7, ¶ 17; 9, ¶ 6; 17, ¶ 33; 19, ¶ 6; 26-27; 33, ¶ 13; 34, ¶ 7; 48, ¶ 37; 54, ¶ 21; 61, ¶ 28; 65-66; 75, ¶ 13; 76, ¶ 8; 121-22, ¶ 11.) Petitioner's trial counsel did not request records from petitioner's family members and failed to obtain petitioner's complete Navy medical records and complete records from petitioner's 1983 robberies trial, including his competency trial. (ECF No. 103 at 131.) In addition, petitioner's records from the Compton Unified School District, Navy records, employment records from his civil service jobs, California Department of Corrections records, and medical and psychiatric records from several hospitals in Sacramento were collected after

witnesses were interviewed.  Petitioner's trial counsel made no effort to identify additional witnesses based upon the records collected or to further investigate the events detailed in the records through the witnesses that were interviewed.

### 3. California Supreme Court's Decision

The California Supreme Court denied this claim summarily on habeas.

### 4. Discussion

#### a. Reasonableness of Counsel's Conduct

As an initial matter, petitioner claims that Lyons "unreasonably foisted off" the penalty phase to attorney Emory King, who, petitioner asserts, lacked the qualifications to serve as primary penalty phase counsel.  (ECF No. 103 at 121.)  King was admitted to practice law in California in 1976 and was Keenan[23] counsel in three other capital cases that went to trial and two cases that were resolved before trial.  None of King's cases went as far as a penalty phase trial, and King had not applied for a class six rating.  Thus, petitioner implicitly argues that King's inexperience should be considered when determining the reasonableness of his conduct.  Courts have considered such personal information when it likely impacted the attorney's work at the time of trial.  See Sanders v. Ratelle, 21 F.3d 1446, 1460 (9th Cir. 1994) (court considers counsel's pattern of indifference to other clients' interests, and eventual disbarment on that basis, as refuting argument that counsel's failures in this case were strategic); Cargle v. Mullin, 317 F.3d 1196, 1209-10 (10th Cir. 2003) (court considers effect of counsel's involvement in bankruptcy and professional grievance proceedings at the time of trial).  However, the standard under Strickland is an objective one.  Where the record provides evidence to support a determination that a reasonable attorney in King's position could have taken the actions King took or made the decisions he made, then a determination by the California Supreme Court that King acted reasonably is supported.  Where the record does not provide evidence about the bases

---

[23] See Keenan v. Superior Court, 31 Cal. 3d 424, 430 (1982) (trial court has discretion under statutes governing appointment of counsel to appoint a second attorney to assist in the defense of a capital case).  The trial court appointed attorney King as Keenan counsel to assist Mr. Lyon's in petitioner's defense.  (CT 987.9 at 35.)

1    for King's actions or inactions, then the court will consider whether King's inexperience may be

2    relevant to any presumption that his conduct was based on sound trial strategy.

3         The standards for counsel's conduct at the penalty phase are described above.  In brief,

4    counsel has an obligation to investigate and present mitigating evidence, including medical

5    history, educational history, employment and training history, family and social history, prior

6    adult and juvenile correctional experience, religious and cultural influences, mental health

7    history, and history of substance abuse.

8         The evidence of petitioner's dysfunctional and adverse childhood, which included neglect,

9    poverty, abuse, and pervasive mental illness and alcoholism in petitioner's family, and

10   petitioner's resulting psychological problems are just the sort of "classic mitigation evidence" the

11   United States Supreme Court has held counsel has an obligation to seek out.  See Williams, 529

12   U.S. at 396; Wiggins, 539 U.S. at 524; Porter v. McCollum, 558 U.S 30, 41 (2009) (mitigation

13   should "humanize [the defendant] or allow [the jury] to accurately gauge his moral culpability").

14   The record before this court is absent of any but perhaps a few, minimal attempts by petitioner's

15   attorneys to obtain this sort of evidence.

16        Counsel knew or should have known about petitioner's dysfunctional and neglectful

17   childhood and his adverse childhood experiences.  Counsel knew or should have known that

18   petitioner's immediate family members suffered from mental illness, that he grew up in the

19   violence and racially charged environment of Watts and Compton in the 1960s, and that he

20   suffered from mental illness, as detailed extensively above.  The law is clear that counsel had an

21   obligation to look further to find witnesses who could provide more detailed information about

22   petitioner's upbringing and mental illness who might be able and willing to testify.  See

23   Stankewitz, 365 F.3d at 719 (court recognizes that counsel has an obligation to interview people

24   "who may have examined or spent significant time with [the petitioner] during his childhood and

25   youth"); Douglas v. Woodford, 316 F.3d 1079 (9th Cir. 2003) (counsel ineffective where he had

26   notice that petitioner had a particularly difficult childhood, but made no attempt to contact

27   persons who might have more detailed information about petitioner's past).  Had petitioner's trial

28   attorneys acted reasonably and developed information on petitioner's background, they would

91

have needed to present that information to the jury in a way that helped the jury understand how petitioner came to be before them. It is certainly reasonable to assume that any such presentation would have included some sort of psychological analysis that took into account petitioner's childhood environment. Dr. Johnston's testimony did not include any discussion or analysis of petitioner's background or family and social history.

This court can conceive of no reasonable argument that counsel could have made a strategic decision not to at least investigate and likely present additional evidence of petitioner's difficult childhood and troubled family. The evidence of petitioner's early life of neglect and abuse and of growing up amidst the racial violence in Watts and Compton, as well as the pervasive mental illness in petitioner's family, would have shed some light on how he came to commit criminal acts. Respondent focuses on the fact that petitioner testified he had a great childhood and a close-knit family and that petitioner's brother, Creadell Polee, Jr., described to defense investigators a generally good family life and not the family background petitioner now details. Respondent thus argues that petitioner has failed to show counsel should have known to talk with further family members or acquaintances or to investigate further family members. However, the record shows that: during the brief time petitioner's father was around, he was abusive toward petitioner's mother; petitioner's mother suffered from mental illness, was largely uninvolved in petitioner's upbringing, and sometimes abusive toward her children; petitioner grew up in Compton and Watts and experienced the violence of the Watts riots; petitioner was primarily raised by his older siblings and his grandmother (deceased at the time of trial), who suffered from a variety of debilitating mental illnesses; and despite petitioner's efforts to lead a productive life by continuing his education and securing employment, petitioner's mental illness led to multiple hospitalizations and arrests. Talking to siblings, aunts, uncles, and cousins who may have had contact with petitioner when he was young certainly seems well within the scope of any reasonable investigation of petitioner's background. Moreover, even if petitioner was not forthcoming with useful information about his background, counsel had an obligation to obtain mitigating evidence from other sources. See Douglas, 316 F.3d at 1088.

////

Even assuming that an attempt was made to present some evidence of petitioner's childhood and mental illness and to explain why petitioner ended up committing criminal acts, the problem is that the attempt was far short of what a reasonably prepared attorney would have done. Both the United States Supreme Court and the Court of Appeals for the Ninth Circuit have found deficient attorney performance at the penalty phase where only a few family members testified in a general or cursory fashion about the petitioner's background and the petitioner's attorneys failed to thoroughly investigate or present a better picture of that background. See Williams, 529 U.S. at 396 (counsel's presentation of three mitigating witnesses to testify that petitioner was not a violent person was unreasonable where significant evidence of petitioner's childhood of abuse and neglect and possible mental impairments was available); Stankewitz, 365 F.3d at 706 (9th Cir. 2004) (petitioner made prima facie showing that counsel acted unreasonably for putting on very limited mitigation case and failing to investigate and present evidence of petitioner's traumatic and abusive childhood, history of mental illness, and long-term substance abuse); Ainsworth v. Woodford, 268 F.3d 868 (9th Cir. 2001) (counsel unreasonable for presenting several witnesses who gave very brief, general testimony about petitioner and his background; counsel failed to investigate and present available evidence of petitioner's troubled childhood and substance addictions); Bean, 163 F.3d at 1080 (counsel put on some mental health testimony at penalty phase, but those experts were unprepared; counsel failed to obtain evidence that petitioner was functionally mentally retarded, was brain-damaged, suffered from PTSD, and was incompetent at the time of trial). Although counsel put on some mental health testimony from Dr. Johnston at the penalty phase, Dr. Johnston was not prepared because counsel failed to obtain strong mitigating evidence related to petitioner's childhood and family and social history, as well as mitigating evidence related to petitioner's mental health deterioration and his burgeoning mental illness during the time of his 1983 burglaries and the Cashland robbery/murder.

Petitioner has made a prima facie showing that counsel acted unreasonably in preparing for the penalty phase and in presenting evidence at the penalty phase. To the extent the California Supreme Court found otherwise, it did so unreasonably.

////

1          b.  Prejudice

2          Petitioner's next hurdle is to show the California Supreme Court could not have

3  reasonably found he failed to make a prima facie showing that he suffered prejudice as a result of

4  counsel's failures to investigate and present mitigating evidence.  The standard under Strickland

5  is whether there is a reasonable probability the result of the proceedings would have been

6  different absent counsel's errors.  The effect of the aggravating evidence was strong.  The murder

7  of Mr. Reagan was certainly a violent crime.  There was also evidence about petitioner's prior

8  crimes.  When this aggravating evidence is weighed against the surprisingly small amount of

9  mitigating evidence, it is unsurprising that the jury chose the death penalty.  The jury had no

10  context for petitioner's life and no way to assess his "moral culpability" because they knew so

11  little about how he became the man that sat before them.

12          Petitioner now presents evidence of a childhood of emotional stress, abuse, exposure to

13  domestic violence, substance abuse, mental illness, instability, neglect, and poverty.  He also

14  presents evidence of the violence of growing up in Watts and Compton, most notably, the Watts

15  riots in the 1960s.  Petitioner presents evidence that, despite his troubled and tumultuous

16  upbringing and mental illness, he was kind and compassionate and continually strived to become

17  a productive member of society by furthering his education and seeking employment.  The

18  evidence also demonstrates that petitioner's mental illness proved an unforgiving and relentless

19  foe, leading to petitioner's frequent hospitalizations and criminal activity.  Finally, with Dr.

20  Young's declaration, petitioner shows how an expert could have put petitioner's life story in

21  context for the jury.  It would have shown the jury that, in Dr. Young's words, petitioner's

22  dysfunctional early childhood environment characterized by "sustained and severe emotional

23  stress" caused petitioner's brain damage or "worsened brain damage that already existed."  (LD

24  11 at 124J.)  The question is whether petitioner has made a prima facie showing that it is

25  reasonably probable this evidence would have caused at least one juror to vote for life without

26  parole.

27          Courts have held that similar evidence could have swayed a juror, even in the face of

28  significant aggravating evidence.  For example, in the sentencing phase of Williams, the

prosecution proved a number of prior convictions, including convictions for armed robbery, burglary, and provided evidence of other crimes, including violent assaults on elderly victims. One victim was in a vegetative state and not expected to recover. The defense case involved very brief testimony of Williams' mother and two neighbors that Williams was not a violent person and a focus on the fact Williams had initiated contact with the police and confessed. Williams, 529 U.S. at 368-69. After finding counsel acted unreasonably in failing to investigate and present evidence of Williams' background and mental health, the Court held that "the graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." Id. at 398 (citing Boyde v. California, 494 U.S. 370, 387 (1990)). The Court found that the state court's decision to the contrary was unreasonable. Id. at 399.

The Court of Appeals for the Ninth Circuit has also found prejudice from counsel's failure to investigate and present mitigating evidence of the defendant's background in cases where the prosecution presented a substantial case in aggravation. See, e.g., Douglas, 316 F.3d at 1091 ("the gruesome nature of the killing did not necessarily mean the death penalty was unavoidable"); Karis v. Calderon, 283 F.3d 1117, 1141 (9th Cir. 2002) (despite the substantial evidence of aggravation, the failure of counsel to present mitigating evidence of the defendant's violent childhood abuse, which would probably have had a "significant relevance" on the jury's decision of whether the defendant "should live or die," "made the sentencing neither fair nor reliable").

Petitioner presents evidence of "the kind of troubled history [the Supreme Court has] declared relevant to assessing a defendant's moral culpability." Wiggins, 539 U.S. at 535. The Court considers evidence of a defendant's "background and character" highly relevant "because of the belief, long held by this society, that defendants who commit criminal acts that are attributed to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." Penry v. Lynaugh, 492 U.S. 302, 319 (1989), abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304 (2002); see also Douglas, 316 F.3d at 1090 (background evidence is "precisely the type of evidence that we have found critical for a jury to consider when

deciding whether to impose a death sentence").  Because counsel failed to investigate and present mitigating evidence of petitioner's childhood, family and social history, including petitioner's mental state at the time of the 1983 prior convictions and the Cashland robbery/murder, counsel failed to rebut the prosecution's case in aggravation and failed to rebut the prosecution's arguments that (1) because petitioner was not insane at the time of the 1983 and 1992 crimes, there was no mitigation; (2) petitioner's background and childhood were irrelevant to the penalty phase determination; (3) there was nothing in petitioner's "childhood that would really indicate that he would end up where he is" (14 RT 5237); (4) petitioner had "a lot choices" (id. at 5244-46); (5) petitioner was "[n]ot by any stretch . . . desperate and downtrodden" (id. at 5243-44); and (6) petitioner had "a lot of things going for him," including his health (id. at 5244).

Petitioner need not prove his claim at this point.  He only needed to show the California Supreme Court that there was a reasonable likelihood he could succeed on this claim when the evidence was fleshed out.  And, the state court was required to consider the evidence proffered in the light most favorable to petitioner in making this determination.  Under those standards, this court cannot understand how the California Supreme Court could have determined petitioner failed to make a prima facie showing of prejudice.  This court finds petitioner has satisfied 28 U.S.C. § 2254(d) for claim 3.

D.  Prosecution's Use of Preemptory Challenges – Claim Four

Petitioner, in this claim, cites to People v. Wheeler, 22 Cal. 3d 258 (1978),[24] and Batson v. Kentucky, 476 U.S. 79 (1986), and alleges that the prosecution improperly used racially discriminatory peremptory challenges to excuse Juror T., an African-American woman.  The California Supreme Court denied this claim on direct appeal, finding that petitioner had not made a prima facie case of discrimination.

////

////

_____

[24] People v. Wheeler, 4 Cal. 4th 284, was superseded on another ground by statute as discussed in People v. Duran, 97 Cal. App.4th 1448 (2002).

1   1. <u>Legal Standards</u>

2   In <u>Batson</u>, the United States Supreme Court held that the Equal Protection Clause

3 prohibits a prosecutor from exercising peremptory challenges to strike a venire person on the

4 basis of race. <u>Batson</u>, 476 U.S. at 89. <u>Wheeler</u> is the California state counterpart to <u>Batson</u>.

5 <u>Wheeler</u>, 22 Cal. 3d at 272, <u>overruled in part on another ground in</u> <u>Johnson v. California</u>, 545

6 U.S. 162 (2005); <u>Yee v. Duncan</u>, 463 F.3d 893, 896 (9th Cir. 2006). However, it is the standards

7 of <u>Batson</u> that control the disposition of petitioner's claim on federal habeas corpus review. <u>See</u>

8 <u>Lewis v. Lewis</u>, 321 F.3d 824, 827 (9th Cir. 2003).

9   In order to prevail on a <u>Batson</u> claim, a defendant must first establish a prima facie case of

10 purposeful discrimination. <u>Batson</u>, 476 U.S. at 96-97; <u>Lewis</u>, 321 F.3d at 830; <u>United States v.</u>

11 <u>DeGross</u>, 960 F.2d 1433, 1442 (9th Cir. 1992). "To establish a prima facie case, the defendant

12 must show that 'he is a member of a cognizable racial group,' <u>Batson</u>, 476 U.S. at 96, and that

13 'the facts and circumstances of the case raise an inference' that the prosecution has excluded

14 venire members from the petit jury on account of their race." <u>McClain v. Prunty</u>, 217 F.3d 1209,

15 1219-20 (9th Cir. 2000) (quoting <u>Wade v. Terhune</u>, 202 F.3d 1190, 1195 (9th Cir. 2000)). In

16 deciding whether a defendant has made the requisite showing, the trial court should consider all

17 relevant circumstances. <u>Batson</u>, 476 U.S. at 96.

18   If a prima facie case is made out, "the burden shifts to the State to come forward with a

19 neutral explanation for challenging" the jurors in question. <u>Batson</u>, 476 U.S. at 97; <u>DeGross</u>, 960

20 F.2d at 1442; <u>Stubbs v. Gomez</u>, 189 F.3d 1099, 1104 (9th Cir. 1999). "The prosecutor's

21 challenges need not rise to a level justifying use of a challenge for cause." <u>United States v.</u>

22 <u>Power</u>, 881 F.2d 733, 740 (9th Cir. 1989) (citing <u>Batson</u>, 476 U .S. at 87-88). Indeed, for the

23 purposes of this step, the prosecutor's explanation need not be "persuasive or even plausible."

24 <u>Purkett v. Elem</u>, 514 U.S. 765, 768 (1995). Rather, a neutral explanation in this context "means

25 an explanation based on something other than the race of the juror." <u>McClain</u>, 217 F.3d at 1220

26 (quoting <u>Hernandez v. New York</u>, 500 U.S. 352, 360 (1991)). "At this step of the inquiry, the

27 issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is

28 inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral."

McClain, 217 F.3d at 1220 (quoting Stubbs, 189 F.3d at 1105). As with any credibility determination, the trial court's own observations are of significant importance. Batson, 476 U.S. at 98 n.21. See also Lewis, 321 F.3d at 830.

At the final step of this inquiry, "the trial court must determine whether the defendant has carried the burden of proving purposeful discrimination." McClain, 217 F.3d at 1220 (quoting Hernandez, 500 U.S. at 359). See also Batson, 476 U.S. at 98. The court must evaluate the prosecutor's reasons and make a credibility determination. Lewis, 321 F.3d at 830. A comparative analysis of the struck juror with empaneled jurors "is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination." Id. If a review of the record undermines the prosecutor's stated reasons, or many of the stated reasons, then the explanation may be deemed a pretext. Id. The proffer of various faulty reasons and only one or two otherwise adequate reasons may undermine the prosecutor's credibility to such an extent that a court should sustain a Batson challenge. Id. at 831.

On the other hand, "[t]he fact that a prosecutor's reasons may be 'founded on nothing more than a trial lawyer's instincts about a prospective juror' does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions." Power, 881 F.2d at 740 (quoting United States v. Chinchilla, 874 F.2d 695, 699 (9th Cir. 1989)). "Evidence in the record of objective reasons to strike a juror implies that racial bias did not motivate the prosecutor." Boyd v. Newland, 393 F.3d 1008, 1013 (9th Cir. 1987), amended by 467 F.3d 1139, 1148 (9th Cir. 2006).

Petitioner bears the burden of demonstrating the existence of unlawful discrimination, Batson, 476 U.S. at 93, as this burden of persuasion "rests with, and never shifts from, the opponent of the strike." Purkett, 514 U.S. at 768. However, petitioner "is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" Batson, 476 U.S. at 96 (quoting Avery v. Georgia, 345 U.S. 559, 662 (1953)).

////

////

1          2. <u>Background</u>[25]

2          Only two African-American persons were included in a venire of 117 persons.  The

3  prosecutor exercised a peremptory challenge against one of them, Juror T.; the prosecutor

4  repeatedly passed the other African-American prospective juror, and the individual served on the

5  jury.  In her juror questionnaire, Juror T. noted that she had relatives and several close friends

6  who had worked in law enforcement, commented that the criminal justice system seemed to

7  involve more spectacle than substance, that in that system, process is exalted above truth, and that

8  "[t]he law seems to exist to perpetuate its system rather than do justice.  Minorities are not treated

9  the same as whites."  She added that several of her close relatives had been arrested and that her

10  aunt served a prison sentence for homicide.  The juror stated that "nearly all" of her close

11  relatives have been subjected to "burglaries, robberies, car theft or break ins" and that she had

12  suffered a burglary and an auto theft.  She expressed the view that the criminal justice system

13  sometimes treats citizens unfairly because of race, offering an example: "The first Rodney King

14  trial where the officers were acquitted seemed to be a blatant miscarriage of justice, because the

15  victim . . . was black."  She wrote that "Blacks, poor people, minorit[ies and] women seem to get

16  harsher treatment than whites, rich people.  I've known many studies & research to show this as

17  fact."  On the other hand, she appeared to favor use of the death penalty and consistently

18  acknowledged a juror's duty to consider the evidence fairly and to follow the law as directed by

19  the court.

20          It was the trial court, not counsel, who conducted the individual voir dire.  During voir

21  dire, the same juror noted that her brother-in-law was a superior court judge in Los Angeles, that

22  other family members or friends were lawyers or were involved in law enforcement, and that she

23  had received some instruction on the basics of criminal law and criminal procedure in connection

24  with her employment.  She explained that she believed that the aunt who had served a prison term

25  for homicide had been wrongly convicted.

26  _____

[25] This overview of the facts is derived from the California Supreme Court's recitation of the
27  evidence presented at trial and from the court's independent review of the state court record.  <u>See</u>
<u>Cornwell</u>, 37 Cal. 4th at 67-69.
28

The court, having posed several questions concerning her aunt's conviction, asked: "Has that left you with any feelings about the criminal justice system, especially in murder cases, that you feel that you've developed any negative feelings about the system because of that case?" The juror responded: "No, not about the system. It's just that things aren't always the way they seem."

Voir dire continued the following morning. The court posed additional questions to Juror T., commenting that in her questionnaire "[i]n terms of the justice system treating people unfairly you said that yes, sometimes you feel it does, and as an example apparently you wrote in the first Rodney King trial. What do you mean by the injustice that you perceive there?"

The juror responded: "Well, it seemed that even with the major evidence, that having it on videotape there was still some lack of believing that police could treat a black man like that. And then when the trial took place, the first trial they were acquitted, even though almost the whole world saw it happening. And coming from Los Angeles and having had relatives treated like that myself it just—it makes it very very hard to keep trusting."

The juror also felt law enforcement officers were too "casual" in investigating the crimes committed against her and her family. Her questionnaire and voir dire disclosed that she believed the criminal justice system was too cumbersome and proceeded far too slowly. She consistently assured the court, however, that she would put aside her personal views in evaluating the evidence and the potential penalty.

When the prosecutor excused Juror T., defendant objected. Defense counsel offered to submit the matter without argument, but the court requested that counsel attempt to establish a prima facie case that the juror was excused because of bias against African-American persons, asking defense counsel to give "specific reasons . . . that would tend to indicate that there has been an invidious discrimination in the selection of jurors." Defense counsel responded briefly, making only two points. First, he noted there were only two African-Americans on the two jury panels in the venire, and that the prosecutor excused one of them, Juror T. Second, defense counsel asserted that neither Juror T.'s questionnaire nor her responses during voir dire indicated she was subject to challenge for cause or "that she couldn't sit as a fair and impartial juror in this matter."

The trial court determined defendant had not made a prima facie showing of group bias. The court noted that Juror T.'s questionnaire, which it had reviewed prior to its voir dire of the juror, caused the court to pose substantially more follow-up questions in a "much larger number of areas" than had been the case for other jurors. The court complimented the juror for her thoughtful responses but stated that the juror, unlike others, was distinguished by the circumstances that her aunt had been prosecuted for the crime of murder and by the juror's strongly held view that the criminal justice system is not fair when questions of race are presented. Specifically, the court observed, she had lost faith that the criminal justice system operates fairly for African-American persons. "While she did say some of her faith had been restored by the second Rodney King trial, she did indicate some continuing concerns about it, especially as it relates to participants in the trial who are black." The court also noted that although the other African-American juror, who had "been there since the beginning as a second juror," had been passed repeatedly by the prosecutor, the prosecutor challenged Juror T. "the moment she sat down."

Although the court expressly determined that defendant had not made a prima facie showing of group bias and denied the defense motion on that basis, it permitted the prosecutor to comment upon defendant's claim. The prosecutor asserted that defense counsel themselves had exhibited some interest in challenging Juror T. The prosecutor explained that his challenge was motivated not by group bias, but by the fear that Juror T. might not give the prosecution case against defendant, an African-American, a fair hearing because she believed "blacks were treated unfairly in the system" and "she's had relatives . . . 'treated like Rodney King.'" The prosecutor also alluded to the juror's statement that her aunt had been wrongly convicted of homicide.

3. California Supreme Court Decision

The California Supreme Court denied the claim as follows:

> Defendant, who is African-American, contends the prosecutor exercised a peremptory challenge against Juror T., who also is African-American, because of her race, in violation of the federal constitutional guaranty of equal protection of the laws (Batson v. Kentucky (1986) 476 U.S. 79, 84, 106 S. Ct. 1712, 90 L.Ed.2d 69 (Batson)) and the state constitutional right to a jury drawn from a representative cross-section of the community. (See People v.

<u>Wheeler</u> (1978) 22 Cal.3d 258, 276-277, 148 Cal.Rptr. 890, 583 P.2d 748 (<u>Wheeler</u>).) FN3

"'Exercising peremptory challenges because of group bias rather than for reasons specific to the challenged prospective juror violates both the California Constitution and the United States Constitution. [Citations.]'" (<u>People v. Cleveland</u> (2004) 32 Cal.4th 704, 732, 11 Cal.Rptr.3d 236, 86 P.3d 302.) In a recent decision, the United States Supreme Court reaffirmed that <u>Batson</u> states the procedure and standard to be employed by trial courts when challenges such as defendant's are made. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (<u>Johnson v. California</u> (2005) 545 U.S. 162, 168, 125 S. Ct. 2410, 2416, 162 L.Ed.2d 129, fn. omitted (<u>Johnson</u>).)

The court went on to explain that "a defendant satisfies the requirements of <u>Batson</u>'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (<u>Johnson</u>, <u>supra</u>, 545 U.S. at p. 170, 125 S. Ct. at p. 2417.) The defendant having shown membership in a cognizable class, and keeping in mind "that peremptory challenges constitute a jury selection practice that permits '"those to discriminate who are of a mind to discriminate,"'" the defendant "'must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.'" (<u>Ibid.</u>)

In the present case, as we shall explain, our scrutiny of the record causes us to believe that defendant failed to meet the standard imposed by <u>Batson</u>, <u>supra</u>, 476 U.S. 79, 106 S. Ct. 1712, 90 L.Ed.2d 69, and <u>Johnson</u>, <u>supra</u>, 545 U.S. 162, 125 S. Ct. 2410. We note that because we reach this conclusion, we are not obliged to consider the persuasiveness of the prosecutor's justifications. (<u>People v. Young</u>, <u>supra</u>, 34 Cal.4th at p. 1173, 24 Cal.Rptr.3d 112, 105 P.3d 487; <u>People v. Farnam</u> (2002) 28 Cal.4th 107, 135, 121 Cal.Rptr.2d 106, 47 P.3d 988; <u>see also</u> <u>Johnson</u>, <u>supra</u>, 545 U.S. at p. 171, 125 S. Ct. at p. 2418 ['"It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination'"].)

As noted, in support of his claim in the trial court, defendant alluded to nothing more than the circumstance that (1) one of the two African-Americans among the potential jurors had been challenged, and (2) the juror would not have been subject to excusal for cause. The circumstance that the prosecutor challenged one out of two African-American prospective jurors does not support an inference of bias, particularly in view of the circumstance that the

other African-American juror had been passed repeatedly by the prosecutor from the beginning of voir dire and ultimately served on the jury. (See People v. Box (2000) 23 Cal.4th 1153, 1188-1189, 99 Cal.Rptr.2d 69, 5 P.3d 130; People v. Arias (1996) 13 Cal.4th 92, 136, fn. 15, 51 Cal.Rptr.2d 770, 913 P.2d 980; People v. Crittenden (1994) 9 Cal.4th 83, 119, 36 Cal.Rptr.2d 474, 885 P.2d 887.) The circumstance that the juror was not subject to exclusion for cause certainly did not support an inference that the exercise of a peremptory challenge against her was motivated by group bias. (See People v. Turner (1994) 8 Cal.4th 137, 165, 32 Cal.Rptr.2d 762, 878 P.2d 521, disapproved on another point in People v. Griffin (2004) 33 Cal.4th 536, 555, fn.5, 15 Cal.Rptr.3d 743, 93 P.3d 344 [a prosecutor may act on a hunch or apparently arbitrarily, as long as the peremptory challenge is not based on group bias]; People v. Arias, supra, 13 Cal.4th at p. 136, 51 Cal.Rptr.2d 770, 913 P.2d 980.)

The juror's own remarks also clearly do not support an inference she was excused because of her race—on the contrary, despite her obvious intelligence and good faith, her voir dire disclosed a large number of reasons other than racial bias for *any* prosecutor to challenge her, including but not limited to her personal experience with an allegedly unfair homicide prosecution of a close relative and her express distrust of the criminal justice system and its treatment of African-American defendants—a view not restricted to African-American persons. (See People v. Farnam, supra, 28 Cal.4th at p. 138, 121 Cal.Rptr.2d 106, 47 P.3d 988; People v. Cleveland, supra, 32 Cal.4th at p. 733, 11 Cal.Rptr.3d 236, 86 P.3d 302; People v. Pride (1992) 3 Cal.4th 195, 230, 10 Cal.Rptr.2d 636, 833 P.2d 643.) Nor do we find anything else in the record to supply a basis for an inference that the prosecutor was motivated by racial prejudice.

Defendant claims the trial court erroneously required him to prove the existence of "systematic discrimination" (that is, proof that minorities are underrepresented in the venire), citing People v. Arias, supra, 13 Cal.4th 92, 51 Cal.Rptr.2d 770, 913 P.2d 980. In that case, we commented that "[c]ertain aspects of the trial court's findings were neither necessary nor relevant, since a Wheeler violation does not require 'systematic' discrimination [citation], and is not negated simply because both sides have dismissed minority jurors or because the final jury is 'representative.'" (Id. at pp. 136-137, 51 Cal.Rptr.2d 770, 913 P.2d 980.) Contrary to defendant's claim, however, the trial court in the present case did not suggest that a prima facie case of group bias could not be established so long as a member of the cognizable group remained on the jury, nor did the court refer to systematic discrimination or to minority jurors struck by the defense. FN4

Defendant asks us to examine the responses of jurors other than Juror T. in determining whether the trial court erred in finding that defendant failed to establish a prima facie case of group bias. In earlier cases we explained that, although such an examination is appropriate at the trial court level when the issue properly is brought to that court's attention, such an examination for the first

time on appeal is unreliable. (See People v. Box, supra, 23 Cal.4th at p. 1190, 99 Cal.Rptr.2d 69, 5 P.3d 130; People v. Ervin (2000) 22 Cal.4th 48, 76, 91 Cal.Rptr.2d 623, 990 P.2d 506, and cases cited.) Defendant urges reconsideration of these cases in light of the high court's decision in Johnson, supra, 545 U.S. 162, 125 S. Ct. 2410, in which the court did not comment upon whether comparative analysis should be undertaken for the first time on appeal, and another decision issued the same day, Miller-El v. Dretke (2005) 545 U.S. 231, 125 S. Ct. 2317, 162 L.Ed.2d 196, in which the court employed comparative juror analysis in circumstances in which it was undisputed that a prima facie case had been made. Assuming without deciding that a comparative juror analysis should be undertaken under the circumstances presented, we conclude defendant's proffered analysis fails to establish a prima facie case of group bias.

In the present case, defendant did not direct the trial court's attention to voir dire or questionnaire responses of jurors other than Juror T. other than to comment on the thoroughness of Juror T.'s questionnaire and voir dire responses. Assuming without deciding that a comparative analysis is appropriate for the first time on appeal when a reviewing court is engaged in determining whether a prima facie case of group bias was established, we agree with respondent that, contrary to defendant's claims, defendant has not identified prospective jurors of other ethnicities who were not challenged but had a similar background and views, including personal experience with a close relative's assertedly wrongful homicide conviction. We note that two jurors were excused who also had the experience of having close relatives prosecuted for murder (Juror S. and Juror F.), whereas the jurors cited by defendant and not excused experienced the prosecution of relatives for much less serious matters such as driving offenses and, moreover, these jurors did not express the belief that their relatives had been wrongly convicted. (E.g., Juror J. [driving offense], Juror R. [juvenile theft offense], Juror W. [driving offense; this juror also had a relative who had served prison time but she knew nothing else about that matter], Juror O. [a long-deceased relative had been convicted of many theft-related crimes].) Nor did the jurors to whom defendant refers share Juror T.'s marked view that the criminal justice system treats African-American persons unfairly. (Cf. Juror M. [police officers fail to handle inebriated persons well], Juror R. [O.J. Simpson was treated differently from the way ordinary citizens would have been treated during the so-called Bronco chase], Juror C. [this juror, examined subsequent to the Wheeler motion, commented on the Rodney King trial but related her concerns about racial issues in the criminal justice system to the riots that followed that individual's first trial and the effect of this civil strife upon his second jury, denying the episode caused her to lose faith in the jury system: "I'm not concerned about it being fair, I'm concerned about the riot continuing and the civil disorder and how it may have related to the thinking of the second jury"], Juror O. [suggesting that justice is not always done, because the criminal justice system is overburdened].)

Defendant urges that Juror T. appeared more knowledgeable about

legal procedure than jurors who served on the jury, pointing to her statement that 10 years prior to trial, she had received some training in law enforcement issues in connection with her employment in an administrative capacity, whereas other jurors displayed some confusion concerning matters such as delay in prosecution and the right to public trial. We see no reason why Juror T.'s limited training would render her a more desirable juror for the prosecution or that a comparison with the other jurors would support an inference Juror T. was challenged on the basis of racial bias. Defendant also emphasizes Juror T.'s connection to persons involved in law enforcement and the judicial system, including the late Attorney Johnnie Cochran, contending that some other jurors who served actually were less desirable for the prosecution by virtue of their lack of similar relationships. Again, we do not see that the comparison supports an inference that Juror T. was excused because of racial bias. Defendant claims that Juror T. exhibited many views favoring the prosecution's case, including support for the death penalty and the view that there should be more vigorous prosecution of crime. He contends that the unchallenged jurors expressed more equivocal views on such subjects and that some failed to exhibit the enthusiasm for jury service expressed by Juror T. He notes Juror T. repeatedly acknowledged a juror's duty to put aside personal opinions and to follow the law. These circumstances do not signify, however, that the prosecutor was bound to accept her as a juror if reasons apart from group bias supported his challenge, nor, in view of the totality of the evidence, do such circumstances support an inference that the prosecutor challenged Juror T. because of her race.

In supplemental briefing, defendant contends reversal is required on the ground that the trial court determined (or may have determined) whether defendant established a prima facie case by asking whether it was "more likely than not" that the prosecutor challenged Juror T. on the basis of impermissible group bias. As defendant observes, the high court in Johnson, supra, 545 U.S. at p. 168, 125 S. Ct. at p. 2416 expressly disapproved of that standard for purposes of establishing a prima facie case. He points out that we must presume the trial court followed existing law, and that at the time of trial the court would have relied upon our Wheeler decision, which alluded to a "reasonable inference" of group bias as a basis for a prima facie showing and also called for the defendant to establish a "strong likelihood" that a juror has been peremptorily challenged on the basis of group bias. (Wheeler, supra, 22 Cal.3d at pp. 280, 281, 148 Cal.Rptr. 890, 583 P.2d 748.) Our subsequent decision holding that both of the quoted terms were essentially the same as the Batson standard, and that a prima facie showing called for a demonstration that it was "more likely than not" that group bias accounted for the challenge, was disapproved in Johnson, supra, 545 U.S. at pp. 166-167, 125 S. Ct. at pp. 2414-2415, 2419 (revg. People v. Johnson (2003) 30 Cal.4th 1302, 1 Cal.Rptr.3d 1, 71 P.3d 270).

We are not persuaded. Regardless of the standard employed by the trial court, and even assuming without deciding that the trial court's decision is not entitled to deference, we have reviewed the record and, like the United States Supreme Court in Johnson, supra, 545

U.S. 162, 125 S. Ct. 2410, are able to apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror on the basis of race. The record does not support such an inference; it is devoid of any suggestion that the basis for the challenge to Juror T. was even "close" or "suspicious." (Johnson, supra, 545 U.S. at p. 172, 125 S. Ct. at p. 2419.)

In his supplemental brief, defendant also contends that the trial court's determination was flawed because it speculated as to the prosecutor's reasons for challenging the juror when it referred to the juror's views on the criminal justice system and the circumstance that her aunt had been convicted of murder. He relies again upon the Johnson decision, in which the court stated: "The Batson framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. [Citation.] The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question. See Paulino v. Castro, 371 F.3d 1083, 1090 ([9th Cir.] 2004) ('[I]t does not matter that the prosecutor might have had good reasons . . . [w]hat matters is the real reason they were stricken' . . .)." (Johnson, supra, 545 U.S. at p. 171, 125 S. Ct. at p. 2418.) The quoted caution against speculation must be read in light of the high court's statement that a prima facie case is established when the "defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (Id. at p. 170, 125 S. Ct. at p. 2417.) Once the trial court concludes that the defendant has produced evidence raising an inference of discrimination, the court should not speculate as to the prosecutor's reasons—it should inquire of the prosecutor, as the high court directed. But there still is a first step to be taken by the defendant, namely producing evidence from which the trial court may infer "that discrimination has occurred." (Ibid.) We have concluded that the evidence alluded to by defendant in the trial court did not support such an inference, nor was such an inference supported by the challenged juror's own statements or anything else in "'the totality of the relevant facts'" (Miller-El v. Dretke, supra, 545 U.S. at p. 239, 125 S. Ct. at p. 2324) that we have seen in our examination of the record (including the statements of other prospective jurors).

> FN3 At trial, defense counsel referred only to Wheeler, supra, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748. We permit defendant to raise his Batson claim for the first time on appeal, because the claims are so closely related. (People v. Young (2005) 34 Cal.4th 1149, 1174, 24 Cal.Rptr.3d 112, 105 P.3d 487.)

> FN4 On appeal, defendant for the first time suggests it would be inaccurate to conclude a member of the cognizable group remained on the jury, claiming the relevant group was African-American *women*. We have agreed that such persons constitute a cognizable group (People v. Young,

*supra*, 34 Cal.4th at p. 1173, 24 Cal.Rptr.3d 112, 105 P.3d 487), but the claim was not raised in the trial court and is forfeited. (People v. Cleveland, *supra*, 32 Cal.4th at p. 734, 11 Cal.Rptr.3d 236, 86 P.3d 302.) In any event, the underlying premise that the court assumed no prima facie case had been established as long as one African-American man served on the jury simply is not supported by the record.

Cornwell, 37 Cal. 4th at 66-74.

### 4. Discussion

As demonstrated above, the California Supreme Court rejected petitioner's Batson claim in a reasoned decision. Under AEDPA, this court must review the state supreme court's decision under the deferential AEDPA standard to determine whether it was contrary to, or an unreasonable application of, Batson, or rested on an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d)(1) & (2).[26] Thus, the question for this court on collateral review is whether the California Supreme Court's findings that the record supported the trial court's findings of no prima facie case of discrimination was an objectively unreasonable determination of the facts in light of clearly established Supreme Court law. The undersigned finds and recommends that it was not.

A state court's determination as to whether a prima facie case has been made is a factual determination entitled to a presumption of correctness. Tolbert v. Page, 182 F.3d 677, 685 (9th Cir. 1999). Here, considering the totality of the relevant circumstances surrounding the prosecution's strike of Juror T., the trial court's finding that the peremptory challenge did not raise an inference of discriminatory purpose is amply supported by the record.

First, the trial court acknowledged the presence of one other African-American seated on the jury who was not challenged by the prosecution. (9 RT 3740.) Turning to Juror T.'s

---

[26] This court does not need to decide whether the trial court applied the correct legal standard in determining whether a prima facie case existed, because the California Supreme Court, which provided the last reasoned decision, applied the standard established by the Supreme Court in Johnson, 545 U.S. at 169 (under Batson, a prima facie case of discrimination is made if the sum of the proffered facts gives "rise to an inference of discriminatory purpose"). However, even if the trial court applied an incorrect legal standard, its factual findings are still presumed correct under 28 U.S.C. § 2254(e)(1).

questionnaire (5 Supp. CT 1335-50) and her answers at voir dire, the trial court determined that Juror T.'s responses could have formed the basis for the prosecution's challenge.  (Id. at 3739-40.)  Juror T., unlike other jurors, was distinguished by the circumstances that her aunt had been prosecuted for the crime of murder and by the juror's strongly held view that the criminal justice system is not fair when questions of race are presented.  Juror T. indicated that she had lost faith that the criminal justice system operates fairly for African-American persons.  Although she did state that some of her faith in the criminal justice system had been restored by the second Rodney King trial, she indicated some continuing concerns about it, especially as it relates to participants in the trial who are African-American.

The court is well-aware that it is not in the same unique position as the trial court to evaluate the totality of the relevant circumstances, including counsels' demeanor and tone of voice, as well as Juror T.'s demeanor, tone of voice, attention span, alertness, and interest in the proceedings.  However, this court is convinced that Juror T.'s answers to her questionnaire and voir dire responses formed the basis for a reasonable prosecutorial challenge that was not race-based.  The trial court's evaluation of the totality of the relevant circumstances, including the presence of one other African-American seated on the jury and the potential non-racial reasons that could reasonably be gleaned from Juror T.'s answers, do not support petitioner's claim that the prosecution systematically exercised a race-based peremptory challenge.  Petitioner's contention that the challenged juror was an "ideal juror for the prosecution" does not compel a different conclusion because the record indicates that there were indeed race-neutral reasons for the prosecution's decision to remove Juror T.  See Tolbert, 190 F.3d at 989; see also Wade, 202 F.3d at 1198 (noting that "entirely plausible reasons, independent of race," for striking a juror support a finding that the prosecutor did not act based on racial bias).

After careful consideration of the record, including Juror T's answers to the jury questionnaire and her voir dire, and the applicable legal authorities, the court finds that petitioner has failed to satisfy his burden under AEDPA to establish that the California Supreme Court's denial of this claim was based on an unreasonable determination of the facts in light of the evidence presented in state court or involved an unreasonable application of Batson and its

1    progeny.  See 28 U.S.C. § 2254(d)(1)-(2); Williams, 529 U.S. at 412-13.  Accordingly, the court

2    recommends that federal habeas relief be denied as to claim four of the petition.

3              E.  Failure to Hold Hearing Regarding Conflict of Interest of Trial Counsel – Claim Five

4              Petitioner asserts that his sentence was unlawfully and unconstitutionally imposed because

5    the trial court failed to hold a hearing to determine if trial counsel's prior representation of Roland

6    Johnson's wife, Mary Jane Johnson, created a conflict of interest.  For the reasons described

7    below, this court finds that petitioner has failed to satisfy any of the requirements of 28 U.S.C.

8    § 2254(d) for the conflict of interest claim and recommends its denial.

9              1.  Background

10             Before the first trial, the prosecution informed the court that prosecution witness Roland

11   Johnson recognized Mr. King as the attorney who represented Roland Johnson's wife, Mary Jane

12   Johnson, in a criminal matter nine years earlier where Johnson was charged as a co-defendant.  (2

13   RT 1337.)  Mr. King stated that he had no recollection of representing Mary Jane Johnson.  (Id.)

14   Based on this information, the court stated that it

15             would indicate . . . that if that were true that Mr. King's client
              [Mary Jane] had an adverse interest to Mr. Johnson, that there was a
16            conflict of interest that did not [permit] counsel to represent both of
              them, and Mr. King continues to have an adverse interest with Mr.
17            Johnson.

18   (Id.)  The court made an initial determination that it did not "appear from what [the prosecutor]

19   [is] saying so far that this is going to raise any problems in this case."  (Id. at 1337-38.)  The trial

20   court told Mr. King he should confirm whether he represented Mary Jane Johnson.  (Id. at 1338.)

21   The court then determined:

22            At this point I see no possible conflict.  The conflict that would
              exist would be if Mr. King represented the witness and had some
23            ongoing relationship that might prevent him from adequately cross-
              examining Mr. Johnson.  Two things I note about that, first Mr.
24            Lyons will be doing the examination in the case, the guilt and
              innocence phase of this case, secondly, it doesn't appear that Mr.
25            King was Mr. Johnson's lawyer on a prior occasion, and therefore
              there should be no legal conflict.
26

27   (Id.)  The court again requested that Mr. King "clarify" the nature of his representation of Mary

28

Jane Johnson.

At a subsequent hearing, the court asked the parties whether there was any further information to be placed on the record and directed "[b]oth sides [to] try to look into that to see if there's any further information to be brought to the Court's attention." (Id. at 1379.) Mr. King agreed that the court was "accurate" in stating that he had not represented Roland Johnson, but instead his wife. (Id. at 1379-80.) Mr. King stated that he was continuing to look for the relevant case file, but that he did not "perceive any conflict even if [he] had represented" Roland Johnson's wife. (Id.)

Before the second trial, the court issued an order that included the following finding: "The Court finds no conflict of interest in the fact that defense counsel Emory King was counsel of record in a 1986 criminal matter, case number 86F03349 charging witness Roland Johnson and Mary Jane Johnson, Mr. Johnson's wife." (3 CT 840.) Neither petitioner nor defense counsel objected.

## 2. Legal Standards

It is well established that the Sixth Amendment right to effective assistance of counsel carries with it "a correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981). Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests. See generally ABA, Model Rules Prof. Conduct, Rule 1.7 and Commentary (1983). Conflicts may occur in various factual settings. For example, conflicts may arise in circumstances in which one attorney represents more than one defendant in the same proceeding. See, e.g., Holloway v. Arkansas, 435 U.S. 475, 481-91 (1978). Conflicts may also arise in situations in which an attorney has represented a person who is a witness, has a financial interest in the outcome of the case, or has a personal relationship with the prosecutor. See, e.g., Houston v. Schomig, 533 F.3d 1076, 1081 (9th Cir. 2008); United States v. Hearst, 638 F.2d 1190, 1193 (9th Cir. 1980). The rule prohibiting counsel from representing conflicting interests serves to protect confidential information obtained during the course of an earlier representation, ensure undivided attorney

loyalty, and/or guard against infringement of the right to cross-examination.  See Sanders, 21

F.3d at 1452-53; Fitzpatrick v. McCormick, 869 F.2d 1247, 1251 (9th Cir. 1989); United States v.

Allen, 831 F.2d 1487, 1497 (9th Cir. 1987); Trone v. Smith, 621 F.2d 994, 999 (9th Cir. 1980).

Courts "generally presume that the lawyer is fully conscious of the overarching duty of complete

loyalty to his or her client."  Burger v. Kemp, 483 U.S. 776, 784 (1987).

Generally, courts apply the Strickland standard to ineffective assistance of counsel claims,

and a petitioner must therefore prove that his attorney acted unreasonably and that those actions

or inactions prejudiced him.  466 U.S. at 694.  However, the Supreme Court has carved out an

exception to the requirement that a petitioner prove prejudice for certain claims of attorney

conflict of interest:  where a petitioner's attorney "actively represented conflicting interests," the

petitioner must show that "an actual conflict of interest" existed and that it "adversely affected his

lawyer's performance."  Cuyler v. Sullivan, 446 U.S. 335, 348 (1980).  In Sullivan, the Court

examined multiple concurrent representations and stressed the "high probability of prejudice

arising" from this conflict situation and the difficulty of proving prejudice.  Mickens v. Taylor,

535 U.S. 162, 175 (2002) (citing Sullivan, 446 U.S. at 348-49).  A petitioner who shows an

"adverse affect" as a result of this conflict need not also show he was prejudiced under Strickland.

Sullivan, 446 U.S. at 349-50.

Many courts of appeals have applied the Sullivan prejudice standard to a variety of

conflicts of interest.  See Mickens, 535 U.S. at 174-75 (collecting cases).  In Mickens, the

Supreme Court noted that this "expansive application" of the Sullivan prejudice standard was not

supported by the language of Sullivan.  Mickens, 535 U.S. at 175.  The Court in Mickens

explained that whether or not the Sullivan prejudice standard should apply to conflict situations

other than those involving multiple concurrent representation was an "open question."  Mickens,

535 U.S. at 176; see also Schomig, 533 F.3d at 1081 ("Supreme Court . . . has left open the

question whether conflicts in successive representation that affect an attorney's performance

require a showing of prejudice for reversal."); Alberni v. McDaniel, 458 F.3d 860, 873 (9th Cir.

2006) (same); Earp v. Ornoski, 431 F.3d 1158, 1184 (9th Cir. 2005) (same); but see Lewis v.

Mayle, 391 F.3d 989 (9th Cir. 2004) (court applies Sullivan prejudice standard to conflict based

111

on successive representation; no discussion of, or citation to, Mickens).  The Court stated that Sullivan does not "clearly establish, or indeed even support" application of the Sullivan prejudice standard to these other situations.  Mickens, 535 U.S. at 176.  If Sullivan does not apply, a petitioner must meet the Strickland prejudice standard by establishing a reasonable probability that, but for the conflict, the result of the proceedings would have been different.  Mickens, 535 U.S. at 176; Strickland, 466 U.S. at 694.

A defendant may "waive his right to the assistance of an attorney unhindered by a conflict of interests."  Holloway, 435 U.S. at 483 n.5.  "A valid waiver of conflict of interest must be voluntary, knowing, and intelligent, such that the defendant is sufficiently informed of the consequences of his choice."  Lewis, 391 F.3d at 996.  See also Garcia v. Bunnell, 33 F.3d 1193, 1195 (9th Cir. 1994) ("Even if counsel is subject to an actual conflict of interest, however, the trial court may generally allow the attorney to proceed if the defendant makes a voluntary, knowing, and intelligent waiver."); Allen, 831 F.2d at 1494 ("Of course, a defendant may waive his right to the assistance of an attorney who is unhindered by conflicts . . . provided the waiver is given knowingly and intelligently.").  Whether there is a proper waiver is to be determined by the trial court and any such waiver should appear on the record.  Johnson v. Zerbst, 304 U.S. 458, 464-65 (1938).  Resolution of the issue of waiver depends "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  Id.; see also Edwards v. Arizona, 451 U.S. 477, 482 (1981).  Moreover, a court must "indulge every reasonable presumption against the waiver of fundamental rights."  Lewis, 391 F.3d at 997 (citations omitted).

Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.  Sullivan, 446 U.S. at 347.

### 3.  California Supreme Court Decision

Petitioner raised his conflict of interest claim on direct appeal.  The California Supreme Court denied the claim as follows:

> Defendant contends a potential conflict of interest came to light when, prior to defendant's *first* trial, the prosecutor informed the court that prosecution witness Roland Johnson recognized one of

defendant's two defense counsel, Emory King, as the man who had represented Johnson's wife when the couple were prosecuted jointly for drug sales nine years prior to the trial in the present case. The court instituted an inquiry of King and found there was no conflict of interest. Defendant contends the court's failure to conduct a more thorough hearing constituted a violation of his federal constitutional right to the effective assistance of counsel, specifically to counsel free from a conflict of interest. He contends we must reverse the judgment or at least remand for further hearing in the trial court. We are not persuaded.

The trial court questioned the prosecutor and King at a brief hearing, ascertaining the nature of the case in which King had been involved and noting that King had not represented prosecution witness Roland Johnson, but his wife. The court reasoned that the wife's interest must have been adverse to her husband's, judging by the appointment of separate counsel for each defendant. King did not recall having been involved in any previous prosecution of Roland or his wife. The court saw no indication of any potential conflict of interest, adding that King was not responsible for the examination of witnesses during the guilt phase of defendant's trial. The court requested that King check his own records. At a subsequent hearing, the court asked the parties whether there was any further information to be placed on the record and directed "[b]oth sides [to] try to look into that to see if there's any further information to be brought to the [c]ourt's attention." King then agreed that the court was accurate in stating that King had not represented Roland Johnson, but instead his wife. King stated that he still was looking for the relevant case file, but added that he did not believe there was any potential conflict of interest. Prior to the *second* trial, the court expressly found that King and defendant had no conflict of interest. Neither defendant nor defense counsel objected.

The Sixth Amendment right to effective assistance of counsel under the federal Constitution includes the right to representation free from any conflict of interest that impairs counsel's efforts on behalf of his or her client. (Mickens v. Taylor (2002) 535 U.S. 162, 166, 171, 122 S. Ct. 1237, 152 L.Ed.2d 291; see Wood v. Georgia (1981) 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L.Ed.2d 220; People v. Hardy (1992) 2 Cal.4th 86, 135, 5 Cal.Rptr.2d 796, 825 P.2d 781.) We have recognized that counsel's current or prior representation of a witness may create a conflict, because counsel bears professional responsibilities both to the witness and to the client and may have confidential information concerning his or her representation of the witness. (People v. Cox (2003) 30 Cal.4th 916, 949, 135 Cal.Rptr.2d 272, 70 P.3d 277; People v. Bonin (1989) 47 Cal.3d 808, 835, 254 Cal.Rptr. 298, 765 P.2d 460.) But when the attorney has not received any pertinent confidential information from the witness, ordinarily there is no actual or potential conflict of interest. (People v. Cox, supra, 30 Cal.4th at p. 949, 135 Cal.Rptr.2d 272, 70 P.3d 277.)

Under the federal Constitution, a defendant who did not object to an asserted conflict at trial must demonstrate on appeal that there was

an actual conflict of interest that "adversely affected [the] lawyer's performance." (Cuyler v. Sullivan (1980) 446 U.S. 335, 348, 100 S. Ct. 1708, 64 L.Ed.2d 333.) In some circumstances, the defendant in such a situation is not obliged to establish that the conflict and its adverse effect on counsel's representation was prejudicial—that is, that it is reasonably probable, in the absence of the conflict and its effect on counsel's performance, that the outcome of the trial would have been different. Reversal is required simply on a showing of actual conflict that adversely affected counsel's representation. (Mickens v. Taylor, supra, 535 U.S. at pp. 166, 172-175, 122 S. Ct. 1237 [assuming, without deciding, that lower courts correctly have extended this rule beyond an attorney's concurrent representation of multiple defendants]; see also People v. Cox, supra, 30 Cal.4th at p. 948, 135 Cal.Rptr.2d 272, 70 P.3d 277.)

When a court "'knows or reasonably should know that a particular conflict exists,'" it should inquire into the conflict even in the absence of objection by the defendant or his or her counsel. (Mickens v. Taylor, supra, 535 U.S. at p. 168, 122 S. Ct. 1237; Cuyler v. Sullivan, supra, 446 U.S. at p. 347, 100 S. Ct. 1708; People v. Bonin, supra, 47 Cal.3d at p. 836, 254 Cal.Rptr. 298, 765 P.2d 460.) Under the federal Constitution, the duty to inquire is not triggered merely because of "a vague, unspecified possibility of conflict." (Mickens v. Taylor, supra, 535 U.S. at p. 169, 122 S. Ct. 1237.) Although the trial court is required to perform some inquiry once it knows or reasonably should know of a particular conflict of interest, the court may decline to pursue the matter if, in its view, the potential for conflict is too slight. (See People v. Bonin, supra, 47 Cal.3d at p. 837, 254 Cal.Rptr. 298, 765 P.2d 460.) In Cuyler v. Sullivan, supra, 446 U.S. 335, 100 S. Ct. 1708, 64 L.Ed.2d 333, for example, although the high court recognized the trial court's duty to inquire into potential conflicts, the circumstance that defense counsel represented three defendants charged and tried separately for murder did not trigger a duty to inquire in the absence of any objection from a defendant. The separate prosecutions mitigated the potential for conflicting defenses, the defenses were consistent, and there was no indication counsel provided less than a vigorous defense. (Id. at pp. 346-347, 100 S. Ct. 1708; see also Mickens v. Taylor, supra, 535 U.S. at pp. 168-169, 122 S. Ct. 1237.) The trial court may place substantial weight on counsel's assertion that no conflict of interest exists. (People v. Lawley (2002) 27 Cal.4th 102, 146, 115 Cal.Rptr.2d 614, 38 P.3d 461.)

As noted, neither defendant nor his counsel objected to King's continued representation at the first or second trial. Indeed, King stated he believed there was no potential for a conflict. The circumstance that many years prior to the first trial in the present case one of defendant's attorneys had taken responsibility for the defense of a person who was not a witness in the present case and whose interest was adverse to that of a prosecution witness does not suggest that defense counsel's loyalty to defendant was impaired in any manner. Defendant speculates that Johnson's wife *might* have related to King some statement by her husband that *might* have been useful to the defense. Defendant urges that defense counsel would be obliged to treat such a statement as a privileged

communication between spouses. There was no indication, however, that King had received any confidential information that would relate to the present case. There is no basis even for informed speculation that such a communication, had it occurred, had any bearing on the present unrelated case many years later. We believe that the potential conflict identified by defendant in this appeal was so remote and tenuous that it did not require the trial court to inquire further than it did.

Even if we were to conclude that the court should have conducted further inquiry, any error would not require reversal. This court repeatedly has concluded that "[a] conviction will be reversed on the ground the trial court failed to satisfy its duty to inquire into a possible conflict, or to adequately respond to its inquiry, only where the defendant demonstrates that an actual conflict of interest existed, *and that the conflict adversely affected counsel's performance*." (People v. Frye (1998) 18 Cal.4th 894, 999, 77 Cal.Rptr.2d 25, 959 P.2d 183, and cases cited, italics added.)

Defendant does not attempt to demonstrate how the alleged conflict affected King's performance. As noted, there is no evidence defense counsel actually possessed confidential information arising from his prior representation; indeed, defense counsel agreed with the court that there was no potential for conflict. As the trial court observed, King was not responsible for examining Johnson. (See People v. Clark (1993) 5 Cal.4th 950, 1002, 22 Cal.Rptr.2d 689, 857 P.2d 1099 [noting a similar circumstance].) Defendant offers no basis for concluding that the performance of either of his attorneys was adversely affected by King's prior contact with Roland Johnson's wife.

Defendant contends he should not be required to establish that the asserted conflict had an impact on his attorney's performance. He claims that the standard of review we have applied in our prior cases—namely, that failure to conduct an adequate inquiry does not require reversal of the conviction unless the defendant can establish actual conflict, including an adverse impact on counsel's performance—is contrary to the high court's approach and analysis in Wood v. Georgia, supra, 450 U.S. 261, 101 S. Ct. 1097, 67 L.Ed.2d 220. In Wood, the trial court failed to conduct an inquiry although it was on notice that the defendants, former employees charged with failure to pay a fine imposed as a condition of probation, were represented by counsel retained by their employer, whose interest diverged from theirs. The employees' defense was that (1) imposition of the fine violated equal protection principles because the employees would be incarcerated on the basis of their inability to pay, and (2) they had believed their employer would pay the fine. The interests of the former employees and the employer were in potential conflict, because it was in the employer's interest to avoid its obligation to pay the fines by permitting heavy fines to be levied against its employees and then to raise the equal protection defense on their behalf. (Id. at pp. 264, 267, 101 S. Ct. 1097.) The employer's counsel "may not have pursued [the employees'] interests single-mindedly," as the trial court should have recognized. (Id. at pp. 271-272, 101 S. Ct. 1097.) The high

court vacated the judgment and remanded the case to the trial court to determine whether an actual conflict existed, without clearly referring to any adverse effect on counsel's performance.

But the high court in the <u>Mickens</u> case specifically rejected the view that the <u>Wood</u> decision stands for the proposition that a trial court's failure to perform an adequate inquiry into a potential conflict requires reversal in the absence of a showing of an adverse effect on counsel's performance. In <u>Mickens</u>, in which it also was alleged that the trial court had conducted an inadequate inquiry, the high court explained that prior cases held that failure to conduct an adequate inquiry required reversal when the defendant demonstrated an "actual conflict." An actual conflict and an adverse effect on counsel's performance are not separate considerations, however. Rather, an *actual* conflict is demonstrated precisely when it can be established that a conflict of interest "adversely affected counsel's performance." (<u>Mickens v. Taylor</u>, <u>supra</u>, 535 U.S. at p. 171, 122 S. Ct. 1237.)

In <u>Mickens</u>, the court explained that its conflict of interest doctrine is a product of its enforcement of the Sixth Amendment right to effective assistance of counsel. (<u>Mickens v. Taylor</u>, <u>supra</u>, 535 U.S. at p. 166, 122 S. Ct. 1237.) Denial of that right ordinarily does not require reversal of a conviction in the absence of a showing that it is reasonably probable the attorney's ineffective representation affected the outcome. (<u>Ibid.</u>, citing <u>Strickland v. Washington</u> (1984) 466 U.S. 668, 685-686, 694, 104 S. Ct. 2052, 80 L.Ed.2d 674.) Exceptions to the <u>Strickland</u> prejudice standard arise when a defendant has been denied the assistance of counsel entirely, or has been denied the assistance of counsel at a critical stage or in other "'circumstances of that magnitude.'" (<u>Mickens v. Taylor</u>, <u>supra</u>, 535 U.S. at p. 166, 122 S. Ct. 1237.) An attorney who actively represents conflicting interests may create a situation "'of that magnitude'" (<u>ibid.</u>), but only after it is established that the conflict of interest actually affected counsel's representation. A trial court's duty to inquire into a potential conflict does not involve a problem of the same magnitude. When a defendant claims that a trial court's inquiry into a potential conflict was inadequate, the defendant still must demonstrate the impact of the conflict on counsel's performance. (<u>Id.</u>, at pp. 173-174, 122 S. Ct. 1237.)

Further, contrary to defendant's suggestion, the <u>Wood</u> decision certainly did not conclude that due process or Sixth Amendment principles require, if not an outright reversal, an automatic remand for further hearing whenever a trial court has not inquired sufficiently into a potential conflict of interest. Rather, the high court relied upon a record demonstrating an obvious potential conflict of interest that seriously implicated the employees' counsel's decision to pursue a theory of the case that benefited the employer rather than the employees. The case before us does not present such a record.

Accordingly, even if the trial court should have inquired further, we reject defendant's argument in light of the record as a whole and the absence of any evidence—or even a claim—that a conflict of

interest affected defense counsel's performance.
Cornwell, 37 Cal. 4th at 74-78.[27]

4. Discussion

Petitioner contends that the trial court erred in failing to hold an evidentiary hearing to determine whether trial counsel had a conflict of interest. Petitioner has not shown that the California Supreme Court rejection of this contention was contrary to or an unreasonable application of federal law, as determined by the Supreme Court. Similarly, petitioner has not shown the California Supreme Court made an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d).

This court adopts the findings of fact and law set forth by the California Supreme Court in Cornwell, 37 Cal. 4th at 74-78. Notably, this case does not involve concurrent multiple representation by counsel. Mr. King had not represented prosecution witness Roland Johnson, but rather Mr. Johnson's wife, Mary Jane Johnson. As set forth above, in Mickens, the Supreme Court stated that whether the Sullivan-mandated inquiry applied outside the context of concurrent multiple representation remains an "open question" in Supreme Court jurisprudence. Mickens, 535 U.S. at 176. This court thus finds that the California Supreme Court's determination that the trial court was not required to hold a Sullivan-mandated inquiry is not contrary to, or an unreasonable application of, any right clearly established by the Supreme Court.

In any event, the record reflects that the trial court did in fact inquire into the allegations of a potential conflict. Upon learning from the prosecution that Roland Johnson recognized Mr. King as the attorney who had represented his wife when the couple was prosecuted jointly for drug sales nine years before the trial in this case, the court questioned the prosecutor and Mr. King at a brief hearing, determining the nature of the case in which Mr. King had been involved

---

[27] As previously stated above, see n.5, supra, the California Supreme Court later overturned the standards it used in this case to analyze the state law aspects of this claim. See Doolin, 45 Cal. 4th at 421 & n.22 (Court disapproves its earlier cases, including its decision in Cornwell, which analyzed an attorney conflict of interest claim under the California constitution using a different standard than that articulated by the United States Supreme Court.). Because this court reviews only the California Supreme Court's decision on petitioner's federal law claims, the decision in Doolin is not relevant to the federal habeas analysis in the present case.

and noting that Mr. King had not represented prosecution witness Roland Johnson, but his wife. Mr. King did not recall representing Roland Johnson's wife. The court found no initial indication of any potential conflict of interest, adding that Mr. King was not responsible for the examination of witnesses during the guilt phase of petitioner's trial. Nonetheless the court directed Mr. King to check his own records. At a subsequent hearing, the court asked the parties whether there was any further information to be placed on the record and directed "[b]oth sides [to] try to look into that to see if there's any further information to be brought to the Court's attention." (2 RT 1379.) Mr. King then agreed that the court was accurate in stating that he had not represented Roland Johnson, but instead his wife. Mr. King stated that he still was looking for the relevant case file, but added that he did not believe there was any potential conflict of interest. Before the second trial, the court expressly found that Mr. King and petitioner had no conflict of interest.

Further, neither petitioner nor his counsel objected to Mr. King's continued representation at the first or second trial. Indeed, Mr. King stated he believed there was no potential for a conflict. That many years before the first trial in this case Mr. King had represented Roland Johnson's wife, who was not a witness in this case, does not suggest that Mr. King's loyalty to petitioner was impaired in any way. Petitioner speculates that Roland Johnson's wife *might* have related to Mr. King some statement by her husband that *might* have been useful to the defense. Petitioner urges that Mr. King would be obliged to treat such a statement as a privileged communication between spouses. There was no indication, however, that Mr. King received any confidential information that would relate to this case. Nor is there any basis even for informed speculation that such a communication, had it occurred, had any bearing on this unrelated case many years later. This court finds that the California Supreme Court's determination that the potential conflict of interest identified by petitioner in his habeas petition was so remote and tenuous that it did not require the trial court to inquire further than it did is not an unreasonable determination of the facts.

Petitioner relies on <u>Wood</u> and essentially argues that he needs to show only that the trial court neglected to inquire into a potential conflict to obtain a reversal. In <u>Mickens</u>, the Supreme Court expressly rejected the argument that <u>Wood</u> automatically requires a reversal if such an

1   inquiry is not conducted.  535 U.S. at 171.  Instead, the Court in <u>Mickens</u> found that to "void [a]

2   conviction [the] petitioner ha[s] to establish, at a minimum, that the conflict of interest adversely

3   affected his counsel's performance."  <u>Id.</u>  Petitioner contends that "adverse performance has been

4   shown here in claim 2(a), where trial counsel failed to impeach Mr. Johnson on a fact that would

5   have been basic to his credibility:  that he lied about growing up with Petitioner."  (ECF No. 103

6   at 296.)   There is absolutely no indication that Mr. King's prior representation of Roland

7   Johnson's wife constrained or even influenced Mr. Lyons's cross-examination of Johnson.  In

8   contrast, the Supreme Court in <u>Wood</u> relied upon a record demonstrating an obvious potential

9   conflict of interest that seriously implicated the employees' counsel's decision to pursue a theory

10  of the case that benefited the employer rather than the employees.  450 U.S. at 271-72.  The case

11  before us does not present such a record.  Therefore, this court finds that the California Supreme

12  Court reasonably determined that, even assuming that the trial court should have conducted

13  further inquiry, any error would not require reversal because petitioner failed to demonstrate that

14  any alleged conflict adversely affected his counsel's performance.

15          Accordingly, Claim 5 should be denied.

16          F.   <u>Limitation of Testimony of Defense Experts – Claim 6</u>

17          Petitioner next maintains that he is entitled to habeas relief because the trial court limited

18  his constitutional right to present relevant evidence in his own defense.  Specifically, he asserts

19  that the trial court violated his constitutional rights by limiting the expert testimony of two

20  defense experts:  Geoffrey Loftus, psychologist; and Eugene Schoenfeld, medical doctor.  The

21  trial court prohibited Dr. Loftus, an eyewitness-identification expert, to testify about

22  "unconscious transference," and prohibited Dr. Schoenfeld to testify regarding Roland Johnson's

23  mental condition based on the medications he was taking.  The California Supreme Court denied

24  these claims on direct appeal.  As set forth below, this court finds that petitioner has not

25  demonstrated that the California Supreme Court's decision was contrary to, or an unreasonable

26  application of, any right clearly established by the Supreme Court.

27  ////

28  ////

### 1. Limitation of Dr. Loftus's Testimony – Claim 6(a)

#### a. Background

The California Supreme Court set out the background for this claim as follows:

> At defendant's second trial, Dr. Geoffrey Loftus, a professor of psychology at the University of Washington in Seattle, was permitted to testify as an expert on the subject of memory, specifically memory as it functions during the stress of witnessing a crime or other disturbing event. As a witness, his thesis was that memory's function should not be compared to a recording device. Rather, memory is a creative endeavor that employs fragments of perception in the construction of a coherent narrative of an event. Dr. Loftus also commented upon the function of stress, intoxication, bias, and the lapse of time on a witness's ability accurately to recall events such as violent crimes. He commented specifically that witnesses who observe or feel threatened by weapons often fail to pay attention to other circumstances. Among several other topics, he also commented upon the effect of events subsequent to a crime upon a witness's recollection of the crime itself, the weight to be accorded the degree of confidence expressed by a witness in an identification, and cross-racial identification. (As already noted, defendant is African-American. Some of the identification witnesses were African-American and some were White.) The court gave a pattern jury instruction specifically advising the jury that many of the topics touched upon by Dr. Loftus, including stress, lapse of time, focus upon a weapon, the witness's confidence in his or her identification, and problems of cross-racial identification, were relevant to their evaluation of the identification witnesses. (See CALJIC No. 2.92.) Defense counsel relied extensively upon Dr. Loftus's testimony in closing argument to the jury.
>
> . . . .
>
> Defense counsel had sought to call Dr. Loftus as a witness at defendant's first trial, but the court excluded his testimony pursuant to Evidence Code section 352. The court announced that the same ruling would remain in effect for the second trial. After the eyewitnesses testified at the second trial, defendant urged the court to reconsider. Further arguments of counsel ensued, and defendant made a thorough offer of proof as to the subjects upon which it was proposed the expert would testify. Placing the burden on defendant to establish the relevance of the evidence, and the burden on the prosecution to support its claim that the evidence should be excluded pursuant to Evidence Code section 352, the court reversed its earlier ruling, concluding all of the subject matter proposed for expert testimony was relevant and sufficiently probative, with very limited exceptions described below.
>
> Defense counsel proposed to ask Dr. Loftus to "testify to unconscious transference. And . . . what that is[,] is if [defendant] had been seen in that neighborhood at some earlier time, either that day or some previous day, some of the witnesses may have

recognized him on that basis, rather than the observation itself, but as being someone they had seen in the area."

The court declined to permit this line of questioning, determining that the "unconscious transference" evidence was irrelevant and commenting that "it would be entirely speculative based on this record to suggest that any of the witnesses who testify in this case would be unconsciously transferring a prior examination of the [d]efendant at the scene to this event." The court went on to explain that the evidence was to a certain extent cumulative to other admissible evidence: "To the extent that the transference refers to other things such as seeing him in a photograph or seeing him in a prior proceeding, that is able to be explained under those theories and offers of testimony."

As noted, the court determined that most of the proposed expert testimony was admissible: "The remaining theories of . . . Dr. Loftus's testimony of factors such as duration, distance, attention, weapon focus, stress, cross-racial identification, retention intervals, effect of prior trial and photo bias, statistical versus chance identification, and the relationship between confidence and accuracy, I find all to be relevant to these proceedings."

The court reiterated the limitations it was imposing on Dr. Loftus's testimony, referring both to relevance and undue confusion of the jury: "[H]e may not make reference to the unconscious transference by seeing someone at the scene. Those are facts as I already indicated are irrelevant. And they should not be added to confuse the jury and cause them to speculate that maybe someone did see Mr. Cornwell there before, since there was no evidence he was ever there before." Defense counsel acknowledged that he understood the court's ruling. FN5

> FN5 The People assert that the trial court properly excluded elements of Dr. Loftus's testimony pursuant to Evidence Code section 352. The People also assert that defendant forfeited the claim that the limitation on the expert's testimony constituted a violation of defendant's constitutional right to present a defense. The People note that defendant did not make such a claim in the trial court. We need not reach the question whether the constitutional claim was forfeited. (People v. Champion (1995) 9 Cal.4th 879, 908, fn.6, 39 Cal.Rptr.2d 547, 891 P.2d 93; disapproved on another point in People v. Ray (1996) 13 Cal.4th 313, 369, fn.2, 52 Cal.Rptr.2d 296, 914 P.2d 846.) Even assuming, without deciding, that defendant's constitutional claim was preserved, it lacks merit, as explained in the text above.

Cornwell, 37 Cal. 4th at 78-80.

////

////

## b. California Supreme Court Decision

Petitioner raised this issue on direct appeal. The California Supreme Court denied the claim as follows:

> On appeal, defendant complains that the court erred in refusing to "permit Dr. Loftus to explain the concept of 'unconscious transference,' that is, if the witnesses had seen defendant at or near Cashland weeks or months before the crime, they might have based their identification of defendant as the robber on their earlier sighting, and not on what they saw at the scene of the crime." According to defendant, such testimony would have been relevant because, in testimony subsequent to the hearing on Dr. Loftus's testimony, Michael Johnson testified that defendant had been present at the scene "a couple of months" before the crime. Defendant surmises that he may have been present on the same occasion at which certain identification witnesses previously had been at Cashland. He points out that Kimberly Scott testified that Michael Johnson ordinarily worked at Cashland only on the first day of the month. According to defendant, it follows that Johnson "probably" saw him (defendant) at Cashland on the first of the month. Further, defendant claims, there was evidence that three identification witnesses were present at Cashland to transact business on the busiest day of the month, which would coincide with the first business day of any month. He refers to Cassandra Henderson, who was outside waiting for her children to transact business, Susan Erickson, who was inside Cashland, and Frances Rivers, who was waiting for her sister to transact business. Defendant further observes that one of the witnesses testified that she came to Cashland to cash her welfare check on a monthly basis. According to defendant, "[t]hese undisputed facts give rise to a reasonable inference that these eyewitnesses had, perhaps unwittingly, observed defendant on a prior occasion. 'Standing alone the inference may have been weak, but that does not make the evidence irrelevant.'"
>
> Defendant does not claim he renewed his efforts to broaden the testimony of Dr. Loftus after Michael Johnson testified he had seen defendant at Cashland on a prior occasion. Moreover, the question whether defendant presented an adequate foundation to establish the relevance of this line of questioning lies within the trial court's broad discretion. (People v. Ramos (1997) 15 Cal.4th 1133, 1175, 64 Cal.Rptr.2d 892, 938 P.2d 950.) Additionally, even if the "unconscious transference" theory was of some tenuous relevance under the facts presented to the court, the court also excluded the line of questioning because of its tendency to confuse the jury. Defendant certainly did not present evidence that any of the identification witnesses *had* seen defendant at Cashland on a previous occasion, and the chain of inference recited above in support of the claim that the witnesses and defendant *might* have been at the establishment on the same day and at the same time is highly speculative. It also would be speculative to draw the inference that, even had their prior visits to Cashland coincided, the witnesses unconsciously had observed defendant. Expert testimony

concerning the possibility that a prior sighting could have influenced a witness's identification might have led the jury to believe there *was* evidence the witnesses had observed defendant prior to the commission of the crime. Moreover, the court permitted thorough questioning of the identification expert on multiple topics that were highly relevant to the facts of the case; the court reasonably could conclude the time necessary to develop the "unconscious transference" theory was not worth the speculative probative value of the evidence.

"Exclusion of evidence as more prejudicial, confusing or distracting than probative, under Evidence Code section 352, is reviewed for abuse of discretion." (People v. Holloway (2004) 33 Cal.4th 96, 134, 14 Cal.Rptr.3d 212, 91 P.3d 164.) But "exclusion of evidence that produces only speculative inferences is not an abuse of discretion." (People v. Babbitt (1988) 45 Cal.3d 660, 684, 248 Cal.Rptr. 69, 755 P.2d 253.) The trial court acted within its discretion in concluding that, even if relevant, the very limited and speculative relevance of the evidence and its marginal probative value was outweighed by the time necessary to explain the point and by the potential that the evidence would confuse the jury. Moreover, any possible error cannot have been prejudicial, in light of the broad scope of the far more significant testimony the expert was permitted to give, the instruction focusing the jury's attention on many of the factors relied upon by the expert, and the circumstance that defense counsel was permitted to and did weave in the expert's testimony throughout his extensive evaluation of the eyewitness testimony.

Citing Chambers v. Mississippi (1973) 410 U.S. 284, 93 S. Ct. 1038, 35 L.Ed.2d 297, defendant claims that exclusion of testimony on the subject of "unconscious transference" violated his federal constitutional right to present a defense. We are not persuaded. A defendant has the general right to offer a defense through the testimony of his or her witnesses (Washington v. Texas (1967) 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L.Ed.2d 1019), but a state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon this right (People v. Lawley, supra, 27 Cal.4th at pp. 154-155, 115 Cal.Rptr.2d 614, 38 P.3d 461; People v. Lucas (1995) 12 Cal.4th 415, 464, 48 Cal.Rptr.2d 525, 907 P.2d 373.) The excluded evidence in the present case was not so vital to the defense that due process principles required its admission. (See People v. Hawthorne (1992) 4 Cal.4th 43, 56-58, 14 Cal.Rptr.2d 133, 841 P.2d 118; People v. Babbitt, supra, 45 Cal.3d at p. 684, 248 Cal.Rptr. 69, 755 P.2d 253.) Although the high court in Chambers determined that the combination of state rules resulting in the exclusion of crucial defense evidence constituted a denial of due process under the unusual circumstances of the case before it, it did not question "the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." (Chambers v. Mississippi, supra, 410 U.S. at pp. 302-303, 93 S.Ct. 1038.) Defendant is unable to point to the exclusion of evidence of vital or significant probative value (see People v. Babbitt, supra, 45 Cal.3d at p. 684, 248 Cal.Rptr. 69, 755 P.2d 253), and the court

accorded him broad latitude to examine Dr. Loftus, including examination on the far more probative question whether the witness's *proven* observation of defendant in photo lineups or at the prior trial might have affected the confidence with which they identified him in the present case. (See People v. Ramos, supra, 15 Cal.4th at pp. 1178-1179, 64 Cal.Rptr.2d 892, 938 P.2d 950.)

Cornwell, 37 Cal. 4th at 80-82.

    2.  Limitation of Dr. Schoenfeld's Testimony – Claim 6(b)

    a.  Background

The California Supreme Court set out the background for this claim as follows:

> The defense called Dr. Eugene Shoenfeld, a psychiatrist with particular expertise in the field of drug addiction and the properties of heroin and methadone, who testified concerning the effect of those substances on the perception, ability to recall, and veracity of persons using them.

> Defense counsel questioned Dr. Shoenfeld about Elavil, lithium, and Stelazine, which are psychotropic medications that Roland Johnson testified he was taking at the time of the events underlying the present crime. Instead of pursuing the question of the effect of such medication on the ability of a person to perceive and recollect, however, defense counsel inquired as to the condition for which Stelazine was prescribed. Dr. Shoenfeld testified that Stelazine is a "[m]ajor tranquilizer [ ] . . . generally used in the treatment of psychoses. Stelazine is one of the older drugs used for the treatment of psychosis. It's related closely to [T]horazine, for example. It's another antipsychotic drug." When defense counsel asked, "[W]hat do you mean by psychoses? Is that some sort of mental condition?," the prosecutor objected. The prosecutor explained to the court that he feared defense counsel was "trying to establish what's wrong with Roland Johnson mentally and physically based on these short questions of what drugs he was taking. And I don't believe [there is] a proper foundation for this doctor to now discuss that we use this drug for psychoses. We don't know what—anything about [why] Roland Johnson . . . was prescribed this drug, and I don't think [defense counsel] has laid a foundation for that. [¶] And I would note that he [Roland Johnson] said he used them as needed. And without knowing more about it, this doctor's never treated him, we don't know when, why he's on them."

> In questioning by the court, Dr. Shoenfeld commented that, in addition to its use as an antipsychotic, Stelazine may be prescribed for relief of nausea or as a tranquilizer. It was established that the witness had neither examined Roland Johnson nor reviewed Johnson's medical records. The court determined defendant had not established a foundation "from Mr. Johnson's doctor as to whether he, in fact, has prescribed [S]telazine. . . . Roland Johnson's not even qualified to tell us for sure what he's getting. More importantly, we don't have a medical opinion why it was prescribed

124

for him." The court also commented that, according to Dr. Shoenfeld, the drug is prescribed for reasons other than psychosis, and hence further questioning concerning the psychiatric condition for which Roland Johnson might have been prescribed the drug would be speculative.

The court ultimately ruled that defense counsel could explore the likely *effects* upon a person taking Stelazine and lithium but that counsel could not elicit Dr. Shoenfeld's opinion concerning the probable condition for which the drugs had been prescribed. The court explained that this sort of "reverse diagnosis" on the basis of prescribed medication was too speculative, referring to Evidence Code section 352. The court characterized the line of inquiry as speculative, because Dr. Shoenfeld had not examined Roland Johnson or prescribed medication for him. In addition, the court pointed out that defendant could introduce direct evidence of Roland Johnson's condition and the reasons he took the medication by calling his prescribing physician as a witness.

Cornwell, 37 Cal. 4th at 82-83.

b. California Supreme Court Decision

Petitioner raised this issue on direct appeal. The California Supreme Court denied the claim as follows:

Contrary to defendant's claim, neither the trial court's application of the rule of evidence requiring the proponent of evidence to supply an adequate foundation (Evid.Code, § 403), nor the court's exercise of discretion pursuant to Evidence Code section 352, deprived defendant of his Sixth Amendment right to present a defense. FN6 "The decision whether foundational evidence is sufficiently substantial is a matter within the court's discretion." People v. Lucas, supra, 12 Cal.4th at p. 466, 48 Cal.Rptr.2d 525, 907 P.2d 373.) We see no abuse of discretion in the present case, particularly because Dr. Schoenfeld lacked personal knowledge concerning Johnson's condition. (See ibid.) In addition, the physician informed the court that there were a number of reasons Stelazine might be prescribed. Defendant was able to elicit testimony from Dr. Shoenfeld demonstrating that Stelazine primarily is used to treat psychosis, and thus the jury could have surmised that Johnson suffered from some variety of psychosis. More specific information concerning Johnson's condition could have been made available by calling Johnson's prescribing physician as a witness. There was nothing fundamentally unfair about applying ordinary rules of evidence to exclude speculative opinion testimony, especially because of the availability of an obvious other source for the same information, as pointed out by the trial court. (See People v. Ramos, supra, 15 Cal.4th at pp. 1175-1176, 64 Cal.Rptr.2d 892, 938 P.2d 950.)

FN6 As with the preceding claim, we assume without deciding that the constitutional claim was preserved by

125

defendant's efforts to meet the prosecutor's evidentiary objections, despite defendant's failure to have claimed, in the trial court, that constitutional principles required the admission of the evidence.

Cornwell, 37 Cal. 4th at 83-84.

### 3. Discussion

Supreme Court precedent holds that defendants have a constitutional right to present relevant evidence in their own defense. See Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (internal quotation marks omitted). The Supreme Court has indicated that a defendant's right to present a defense stems both from the right to due process provided by the Fourteenth Amendment, see Chambers v. Mississippi, 410 U.S. 284, 294 (1973), and from the right "to have compulsory process for obtaining witnesses in his favor" provided by the Sixth Amendment, see Washington v. Texas, 388 U.S. 14, 23 (1967) (explaining that the right to compulsory process would be meaningless if the defendant lacked the right to use the witnesses whose presence he compelled).

However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," such as evidentiary and procedural rules. United States v. Scheffer, 523 U.S. 303, 308 (1998). In fact, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," id., and the Supreme Court has indicated its approval of "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury," Holmes v. South Carolina, 547 U.S. 319, 326 (2006). Evidentiary rules do not violate a defendant's constitutional rights unless they "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." Id. at 324 (alteration in original) (internal quotation marks omitted); see also Scheffer, 523 U.S. at 315 (explaining that the exclusion of evidence pursuant to a state evidentiary rule is unconstitutional only where it "significantly undermined fundamental elements of the accused's defense"). In general, it has

126

taken "unusually compelling circumstances . . . to outweigh the strong state interest in administration of its trials." Perry v. Rushen, 713 F.2d 1447, 1452 (9th Cir. 1983).

The Supreme Court has explained these principles in cases where defendants have argued that state evidentiary rules, by their own terms, impinge upon their constitutional right to present a complete defense. Thus, in Holmes, the Supreme Court concluded that a defendant's constitutional rights were violated by an evidentiary rule that prevented the defendant from presenting evidence that a third party had committed the crime if the judge determined that the prosecutor's case was strong. 547 U.S. at 328-31. The Court determined that this evidentiary rule did not "rationally serve" the goal of "excluding evidence that has only a very weak logical connection to the central issues." Id. at 330. In Rock v. Arkansas, 483 U.S. 44, 61 (1987), the Supreme Court reached the same conclusion about an evidentiary rule that limited the defendant's testimony to matters she remembered before her memory had been hypnotically refreshed because it was "an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections." Finally, in Washington v. Texas, the Court rejected an evidentiary rule that precluded an alleged accomplice of the defendant from testifying on the defendant's behalf (though he could testify for the government) because it could not "even be defended on the ground that it rationally sets apart a group of persons who are particularly likely to commit perjury." 388 U.S. at 22; see also Crane, 476 U.S. at 690-92 (identifying a constitutional violation where a state evidentiary rule precluded a defendant from introducing any evidence relating to the unreliability of his own confession); Chambers, 410 U.S. at 302 (concluding that a defendant's fair trial rights were violated when the combined effect of two state rules of evidence precluded him from effectively impeaching a witness whom he alleged was the actual culprit). On the other hand, the Supreme Court has upheld an evidentiary rule that excluded polygraph evidence in military trials because it did not "implicate any significant interest of the accused" and because it "serve[d] several legitimate interests in the criminal trial process." Scheffer, 523 U.S. at 309, 316-17.

The Supreme Court has not squarely addressed the question whether an evidentiary rule requiring a trial court to balance factors and exercise its discretion "infring[es] upon a weighty

interest of the accused" and is "arbitrary or disproportionate to the purposes [it is] designed to serve." Moses v. Payne, 555 F.3d 742, 758 (9th Cir. 2009) (quoting Scheffer, 523 U.S. at 308) (internal quotation marks omitted). Rather, as a "well-established rule[ ] of evidence" that permits a court to exercise its discretion in excluding "evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury," California Evidence Code section 352 is more analogous to those evidentiary rules described with approval in Holmes. See Holmes, 547 U.S. at 326 ("While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.").

Indeed, California Evidence Code section 352 is different in kind from the rules in Washington, Crane, Chambers, Rock, and Holmes. The evidentiary rules in those cases, by their terms, required the trial court to exclude crucial evidence that had a critical effect on the trial, with little or no rational justification. In general, the rules precluded a defendant from testifying, excluded testimony from key percipient witnesses, or excluded the introduction of all evidence relating to a crucial defense. In contrast, Evidence Code section 352 does not *require* a trial court to exclude evidence. Rather, it authorizes a court "in its discretion" to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Accordingly, a decision that Evidence Code section 352 itself is constitutional would be consistent with Supreme Court precedent.

Because petitioner could not successfully argue that California Evidence Code section 352 by its terms infringed his constitutional right to present a complete defense, petitioner's argument is best interpreted as challenging the trial court's exercise of discretion in this case to exclude certain expert testimony under a valid state rule. As noted above, the Supreme Court's cases have

focused only on whether an evidentiary rule, by its own terms, violated a defendant's right to present evidence. These cases do not squarely address whether a court's exercise of discretion to exclude expert testimony violates a criminal defendant's constitutional right to present relevant evidence. Cf. Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (Supreme Court precedents did not squarely address whether counsel's participation by speaker phone during plea hearing amounted to complete denial of counsel, on par with total absence). Nor do they clearly establish a "controlling legal standard" for evaluating discretionary decisions to exclude the kind of evidence at issue here. See Panetti, 551 U.S. at 953. Therefore, the California Supreme Court's determination that the trial court's exercise of discretion to exclude certain expert testimony under Evidence Code section 352 did not violate petitioner's constitutional rights cannot be contrary to, or an unreasonable application of, clearly established Supreme Court precedent. See Van Patten, 552 U.S. at 125-26; Panetti, 551 U.S. at 953; Musladin, 549 U.S. at 76; cf. Patrick, 508 F.3d at 1260.

Although the Supreme Court has not addressed this issue, several Ninth Circuit decisions considered whether a trial court's discretionary determination to exclude evidence violated a defendant's constitutional rights. In Perry v. Rushen, 713 F.2d 1447, 1450 (9th Cir. 1983), the court derived a balancing test to determine when a trial court's exercise of discretion to exclude evidence under an otherwise valid evidentiary rule might violate a defendant's rights. The Ninth Circuit refined this test in Miller v. Stagner, 757 F.2d 988 (9th Cir. 1985), amended on other grounds, 768 F.2d 1090 (9th Cir. 1985), and held that:

> In a habeas proceeding, determining whether the exclusion of evidence in the trial court violated petitioner's due process rights involves a balancing test. In weighing the importance of evidence offered by a defendant against the state's interest in exclusion, the court should consider [1] the probative value of the evidence on the central issue; [2] its reliability; [3] whether it is capable of evaluation by the trier of fact; [4] whether it is the sole evidence on the issue or merely cumulative; and [5] whether it constitutes a major part of the attempted defense.

Id. at 994; accord Chia v. Cambra, 360 F.3d 997, 1003-04 (9th Cir. 2004); Alcala v. Woodford, 334 F.3d 862, 877 (9th Cir. 2003); see also Moses, 555 F.3d at 759.

////

129

For purposes of AEDPA analysis, however,

> [T]he *only* definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied.

Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003) (internal citations omitted), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003); see also Crater, 491 F.3d at 1126 ("[Section] 2254(d)(1) renders decisions by lower courts nondispositive for habeas appeals."); Brewer v. Hall, 378 F.3d 952, 957 (9th Cir. 2004). Nor can this court conclude that Miller merely "illuminates the application of clearly established federal law as determined by the United States Supreme Court." Moses, 555 F.3d at 759 (quoting Crater, 491 F.3d at 1126 n.8). Unlike Washington and its progeny, Miller is not concerned with the question whether a given rule of evidence, by its own terms, impinges on defendants' constitutional rights; rather, the Miller balancing test evaluates whether the trial court used its discretion to unconstitutionally apply an otherwise valid rule. Thus, because the Miller balancing test is a creation of circuit law, rather than a Supreme Court holding, this court cannot fault the California Supreme Court for not employing it, so long as the Court's ultimate disposition of petitioner's appeal is not contrary to or an unreasonable application of the Supreme Court precedent that Miller interpreted. See Moses, 555 F.3d at 759; Casey v. Moore, 386 F.3d 896, 907 (9th Cir. 2004).

This court further notes that, although the Ninth Circuit applied the Miller balancing test in the context of AEDPA review, see Chia, 360 F.3d at 1003-04, that was before the Supreme Court provided further clarification of the bounds of an appellate court's AEDPA analysis in Musladin, Panetti and Van Patten. As discussed above, these precedents clarified that in the absence of a Supreme Court decision that "squarely addresses the issue" in the case before the state court, Van Patten, 552 U.S. at 125, or establishes an applicable general principle that "clearly extend[s]" to the case before us to the extent required by the Supreme Court in its recent decisions, Van Patten, 552 U.S. at 123; see also Panetti, 551 U.S. at 953; Musladin, 549 U.S. at 76, this court cannot conclude that a state court's adjudication of that issue resulted in a decision

contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Van Patten, 552 U.S. at 126. By necessity, Van Patten and Musladin impose limits on the relevance of circuit precedent; they are "clearly irreconcilable," Miller v. Gammie, 335 F.3d 889, 893 (9th Cir. 2003), with the conclusion that circuit law may be used to fill "open question[s]" in the Supreme Court's holdings for purposes of AEDPA analysis. Musladin, 549 U.S. at 76; see also Crater, 491 F.3d at 1126 & n.8 (explaining that, in Musladin, the Supreme Court "discussed and accepted" the principle that § 2254(d)(1) imposes "limits on the relevance of circuit precedent").

Because the Supreme Court's precedents do not establish a principle for evaluating discretionary decisions to exclude the kind of testimony at issue here, AEDPA does not permit this court to rely on the Ninth Circuit balancing test to conclude that the California Supreme Court's exclusion of certain testimony under Evidence Code section 352 violated clearly established Supreme Court precedent.

Furthermore, even if the trial court's discretionary exclusion of certain expert testimony could be a basis for federal habeas relief under the Ninth Circuit's standard, the exclusion of marginally relevant, speculative, or confusing evidence does not violate due process. See Holmes, 547 U.S. at 326. As the trial court and the California Supreme Court cogently explained, Dr. Loftus' proffered testimony regarding "unconscious transference" and Dr. Shoenfeld's proffered testimony concerning "reverse diagnosis"—even if marginally relevant—was speculative and/or potentially confusing to the jury. This court adopts the reasoning of the California Supreme Court and concurs that the trial court's exclusion of the experts' speculative opinion testimony was not fundamentally unfair.

The California Supreme Court's rejection of petitioner's evidentiary error claims was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court. Accordingly, federal habeas relief on claim 6 should be foreclosed.

G. Spectator Misconduct – Claim 7

Petitioner claims that the trial court's failure to "control and abate continuing prejudicial spectator misconduct" violated his rights to an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution. The California Supreme Court's rejection of this

131

claim on direct appeal was not contrary to, or an unreasonable application of, any right clearly established by the Supreme Court.

### 1. Legal Standards

The Due Process Clause of the Fourteenth Amendment requires a "fair trial in a fair tribunal." Bracy v. Gramley, 520 U.S. 899, 904 (1997) (quoting Withrow v. Larkin, 421 U.S. 35, 46 (1975)). At minimum, due process requires fundamental fairness and a meaningful opportunity to present a complete defense. California v. Trombetta, 467 U.S. 479, 485 (1984). But the constitution "entitles a criminal defendant to a fair trial, not a perfect one." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).

The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). A defendant is denied a fair trial if even a single juror is prejudiced or biased. Fields v. Woodford, 309 F.3d 1095, 1103 (9th Cir. 2002), amended, 315 F.3d 1062 (9th Cir. 2002). "[A] criminal defendant has the right to be tried in an atmosphere undisturbed by public passion." Norris v. Risley, 918 F.2d 828, 831 (9th Cir. 1990) (citations omitted). Indeed, "[t]he constitutional safeguards relating to the integrity of the criminal process . . . embrace the fundamental conception of a fair trial, and . . . exclude influence or domination by either a hostile or friendly mob." Id. (quoting Cox v. Louisiana, 379 U.S. 559, 562 (1965)).

### 2. Background

The California Supreme Court set out the background for this claim as follows:

> After the jury rendered its guilty verdict, defendant requested an evidentiary hearing and moved for new trial on the basis of spectator misconduct he asserted occurred during trial. In support, he offered the declarations of Defense Attorney Lyons, defense investigator Michael Sailors, and defendant's wife, Carolyn Cornwell.
>
> In his declaration, Defense Counsel Lyons stated that spectators had burst into the courtroom during the defense closing argument, and that spectators had rolled their eyes and sighed audibly. He believed the spectators were attempting to influence the jury.
>
> Sailors declared that he had observed "constant whispered remarks, snickers, laughter and gasps of disbelief from both Ms. Reagan [the victim's daughter] and Ms. Scott [the owner of Cashland], and

similar activity from the group seated in front of them" during certain defense testimony. He believed the remarks "could have been overheard by the jurors," who seemed to redouble their attention to the testimony during these episodes—possibly, Sailors believed, in order to "shut out" the disturbance.

Defendant's wife stated in her declaration that she observed members of the victim's family gesturing, whispering, and frowning in response to testimony. She observed Ms. Scott, who was the owner of Cashland and was the victim's romantic partner, leave her seat briefly during prosecution witness Erickson's testimony, then greet and touch Erickson as she left the courtroom. Mrs. Cornwell also claimed one juror observed Ms. Scott making a dismissive gesture and statement concerning questions put to Roland Johnson during defense cross-examination—questions related to Johnson's potential access to information concerning the crime through newspaper reports. Mrs. Cornwell declared that Ms. Scott gasped, sighed, and shook her head visibly during testimony she found objectionable and that, addressing a spectator seated behind her, she stated: "you think he would just jump up saying I did it, I did it." According to Mrs. Cornwell, Ms. Scott was admonished by the prosecutor to stop conversing about the case with the other spectator. Mrs. Cornwell stated that, when the prosecutor remarked in closing argument that defendant had underestimated Reagan, Ms. Scott audibly said "that's right."

The prosecutor opposed defendant's motion for an evidentiary hearing and for a new trial, noting that because the jurors' mental processes were not subject to inquiry, an evidentiary hearing could establish only whether or not the jurors observed the alleged misconduct. The prosecutor made an offer of proof based upon his own observations, stating that (1) the juror referred to in Mrs. Cornwell's declaration who allegedly observed Ms. Scott's dismissive gesture was an alternate who did not serve during the guilt phase deliberations; and (2) the prosecutor's admonition to Ms. Scott occurred in response to a conversation he had witnessed on an occasion when the jury was not present in the courtroom. The prosecutor reminded the court that it had witnessed the alleged disturbance during defense counsel's closing argument, and contended the incident had been inadvertent and at most had constituted a brief distraction. The comment made during the prosecutor's closing argument "wasn't a loud outburst of screaming, but you could hear it. That was the only thing I heard throughout the entire trial. And I . . . thought the Court heard it, because I thought you mentioned something to the people who were here present in court afterwards. Make sure you keep it down, something to that effect."

The prosecutor urged: "I'm asking this court to assume that they [the jurors] did observe some of these items and to rule that because of the nature of them and trivial nature of them, that there's no substantial likelihood that could have possibly influenced the jury."

The court carefully described the layout of the courtroom for the record. It noted that it frequently had glanced at counsel during

trial, and at those times could not help but observe the spectators. The court pointed to the prosecutor's invitation to the court to assume the defense allegations were true, noting that the concession eliminated the need for an evidentiary hearing to "resolve material, disputed issues of fact." The court also commented that "[t]he persons necessary to shed light on the actual physical actions are all available to the [c]ourt without the jury having to come forward." It also commented upon the potentially disruptive effect of examining the jury between the conclusion of the guilt phase and commencement of its continued service during the penalty phase. The court denied the defense's motion for an evidentiary hearing.

The court subsequently denied a motion for new trial based upon the alleged misconduct, FN7 explaining that it was "aware of the overall conduct [of spectators] and the overall impact that the matter would have" and therefore was in a unique position to interpret the "otherwise undisputed facts." As to each allegation, the court commented that, to the extent it witnessed the events, they were minor and innocuous in their impact. For example, the court stated that when the spectators entered the courtroom during defense closing argument, they did not "burst" in but merely entered, permitting the noise from the hallway to penetrate the courtroom. The court found that the statement "that's right," made by a spectator during the prosecutor's closing argument, could be heard only as a soft sibilant at the front of the courtroom. The court acknowledged it had admonished the spectators concerning courtroom demeanor, but stated this had occurred after the bailiff noted there had been a great deal of "eye rolling."

The court characterized Ms. Scott's demeanor and behavior during trial as polite and quiet, and added that the jury would not interpret any comments made by her as based on personal knowledge, because she did not witness the crime.

As for the remaining alleged incidents, the court did not observe them but, accepting each of them as true, concluded they were minor and innocuous, as the court explained at length. The court also commented that it had observed the jury frequently during the trial, and that the jurors always seemed attentive and never distracted by events involving the spectators. Having compared the allegations with those in other cases, including <u>People v. Hill</u> (1992) 3 Cal.4th 959, 13 Cal.Rptr.2d 475, 839 P.2d 984 (disapproved on another ground in <u>Price v. Superior Court</u> (2001) 25 Cal.4th 1046, 1069, fn.13, 108 Cal.Rptr.2d 409, 25 P.3d 618), the court concluded "there is no substantial likelihood, there is no likelihood whatsoever that anything that occurred during this [trial] deprived the [d]efendant of a fair trial and meets the standards applicable to granting a new trial pursuant to Penal Code section 1181 or any [c]onstitutional standard for due process of law."

FN7 The trial court raised the question whether the motion was timely, commenting that defense counsel were under an obligation to bring the alleged misconduct to the court's attention as soon as they became aware of the problem. In the present case, in lieu of declarations concerning when the

defense became aware of spectator problems, the prosecutor accepted defense counsel King's assertion that he, King, had not been aware of the problems prior to the rendering of the verdict and that co-counsel, Lyons, was not available. The trial court therefore accepted the motion as timely, a determination that respondent does not contest.

Cornwell, 37 Cal. 4th at 84-87.

### 3. California Supreme Court Decision

Petitioner raised this issue on direct appeal, contending that "continuing and unchecked" spectator misconduct violated his right to a fair trial and a trial by an impartial jury, in violation of the Sixth and Fourteenth Amendments to the United States Constitution. The California Supreme Court denied the claim as follows:

Although spectator misconduct constitutes a ground for new trial "if the misconduct is of such a character as to prejudice the defendant or influence the verdict," the trial court must be accorded broad discretion in evaluating the effect of claimed spectator misconduct. (People v. Lucero (1988) 44 Cal.3d 1006, 1022, 245 Cal.Rptr. 185, 750 P.2d 1342.) The reason is obvious: the court ordinarily is present in the courtroom at any time when a spectator engages in an outburst or other misconduct in the jury's presence and is in the best position to evaluate the impact of such conduct on the fairness of the trial. (See, e.g., Messer v. Kemp (11th Cir.1985) 760 F.2d 1080, 1087.) We believe the trial court in the present case acted within its discretion in concluding that the alleged spectator misconduct was not of the sort that would be prejudicial and influence the verdict. As the court explained, defendant assumed that the jury witnessed various alleged acts of misconduct or viewed the events as disruptive or prejudicial. From its own observations, however, the court was satisfied that defendant's assumptions were unjustified and that the effect of the incidents was innocuous or, at most, trivial. FN8

The trial court's proper exercise of discretion also is illustrated by a comparison of these incidents with other cases that uphold the discretion of trial courts in the face of claims of spectator misconduct. In Lucero, for example, the anguished mother of a child murder victim screamed incriminating information to the jury as it departed for deliberation and was removed from the courtroom, still screaming. (People v. Lucero, supra, 44 Cal.3d at p. 1022, 245 Cal.Rptr. 185, 750 P.2d 1342.) Although the conduct in the Lucero case was far more dramatic than anything alleged in the present case, we determined the court acted within its discretion in denying a motion for mistrial. (Id., at pp. 1023-1024, 245 Cal.Rptr. 185, 750 P.2d 1342; see also People v. Hill, supra, 3 Cal.4th at p. 1002, 13 Cal.Rptr.2d 475, 839 P.2d 984.) In the present case, although more than one incident was alleged and, unlike the situation in Lucero, there was no pointed admonition from the

court, defendant does not claim that the spectators actually attempted to convey information to the jury; there was no dramatic, anguished outburst, and the spectator conduct, even taking defendant's claims at face value, was not particularly disruptive or likely to influence the jury.

As defendant concedes, prejudice is not presumed when spectators misbehave during trial; rather, the defendant must establish prejudice. He was unable to do so in the trial court and has failed in this court as well. FN9

Defendant also claims a denial of due process occurred because the alleged spectator misconduct undermined the fairness of the factfinding process. The record, which establishes the limited nature and impact of any misconduct, refutes this claim.

> FN8 We agree with the trial court in the present case that, in general, a party promptly should object to audible comments from spectators that have the potential to prejudice the jury, thereby enabling the trial court to correct the problem at the outset.

> FN9 Defendant's attempt to characterize the issue as one involving jury misconduct giving rise to a presumption of prejudice is unavailing. There is no indication of misconduct by any juror.

Cornwell, 37 Cal. 4th at 87-88.

### 4. Discussion

In Musladin, 549 U.S. at 76, the Supreme Court found that the Ninth Circuit had incorrectly concluded that the Supreme Court had previously established a test for inherent prejudice applicable to spectators' conduct in Estelle v. Williams, 425 U.S. 501 (1976) and Holbrook v. Flynn, 475 U.S. 560 (1986). In Musladin, the Supreme Court recognized that its prior precedent had prohibited inherently prejudicial state sponsored practices, such as forcing the accused to wear identifiable prison attire (Williams), or seating several armed uniformed troopers immediately behind the defendant (Flynn). Musladin, 549 U.S. at 75. But the Supreme Court also recognized that other situations not involving inherently prejudicial *state sponsored practices*— such as the mere wearing of buttons by spectators at Musladin's trial—remained "an open question in our jurisprudence." Id. at 76 (emphasis added). "This Court has never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." Id. The spectator conduct identified by petitioner in this

case is not state sponsored conduct triggering the inherent or actual prejudice inquiry described in Williams and Flynn.  As there is no clearly established federal law addressing a claim involving private-actor spectator misconduct, it cannot be said that the California Supreme Court's determination that the spectators' alleged misconduct had no prejudicial effect on the verdict was contrary to, or an unreasonable application of, clearly established federal law.  See id. at 76-77.

Further, as the California Supreme Court found, petitioner was not prejudiced by the improper spectator conduct.  The record reflects that petitioner was not denied the right to confront and cross-examine witnesses.  Even if the spectators' conduct was a distraction, there is no evidence that the jury's determination of the witnesses' credibility was influenced by the spectators' conduct.  As noted by the California Supreme Court, there was no dramatic, anguished outburst; there was no incriminating information disseminated to the jury; the effect of the incidents was innocuous or, at most, trivial; and the spectator conduct was not particularly disruptive or likely to influence the jury.  In addition, the trial court instructed the jury to base its decision solely on the evidence introduced at trial, i.e., the testimony from the witnesses on the witness stand and the exhibits marked and admitted, "not from any other source."  (3 CT 895, 4 CT 906.)  The Court must assume that the jury followed these instructions and that the outbursts did not impact the jury's verdict.  See Richardson v. Marsh, 481 U.S. 200, 211 (1987) ("Juries are presumed to follow their instructions."); see also Weeks v. Angelone, 528 U.S. 225, 234 (2000).  Thus, petitioner has failed to establish prejudice from the spectators' alleged misconduct.  Accordingly, petitioner is not entitled to habeas relief on this claim.

H.  Error in Instructing the Jury with CALJIC No. 2.11.5 – Claim 8

Petitioner claims the trial court's error in instructing the jury with CALJIC No. 2.11.5, which provides that the jurors are not to consider why potential co-participants were not prosecuted, violated his Fifth and Sixth Amendment rights to present relevant and exculpatory evidence to the jury.  Petitioner argues that, because Roland Johnson and Michael Johnson were witnesses, the trial court should not have given this instruction as it did not allow the jury to consider the lack of prosecution in assessing the credibility of the witnesses and their denial of complicity in determining petitioner's guilt.  The California Supreme Court denied this claim on

1  direct appeal.  As set forth below, this court finds that petitioner has not demonstrated that the

2  California Supreme Court's decision was contrary to, or an unreasonable application of, any right

3  clearly established by the United States Supreme Court.

4      1.  Legal Standards

5      A claim that jury instructions were incorrect under state law does not state a cognizable

6  federal habeas corpus claim.  McGuire, 502 U.S. at 71-72.  To find constitutional error, a court

7  must find a "'reasonable likelihood that the jury has applied the challenged instruction in a way'

8  that violates the Constitution."  Id. at 72 (quoting Boyde, 494 U.S. at 380).  In making this

9  determination, the jury instruction "'may not be judged in artificial isolation,' but must be

10  considered in the context of the instructions as a whole and the trial record."  Id. (quoting Cupp v.

11  Naughten, 414 U.S. 141, 147 (1973)).  It is not enough that the instruction is "undesirable,

12  erroneous, or even universally condemned," it must violate some constitutional right.  Id. at 72

13  (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

14      To obtain relief on federal habeas corpus review based on instructional error, a petitioner

15  must show that the error "'so infected the entire trial that the resulting conviction violates due

16  process.'"  Id. (quoting Cupp, 414 U.S. at 147); Middleton v. McNeil, 541 U.S. 433, 437 (2004);

17  Hendricks v. Vasquez, 974 F.2d 1099, 1106 (9th Cir. 1992).  The standard for determining

18  whether a petitioner is entitled to relief is whether the error "had substantial and injurious effect

19  or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637; Fry v. Pliler, 551 U.S.

20  112, 121-22 (2007) (on federal habeas review, the Brecht standard applies whether or not the state

21  court has applied harmless error analysis under Chapman v. California, 386 U.S. 18 (1967)).

22      2.  Background

23      Roland Johnson, a prosecution witness, claimed that he was testifying against petitioner

24  "because of [his] own conscience."  (11 RT 4248.)  He also testified that he received a reduction

25  in his sentence for cooperating with the police and testifying at trial and received immunity for

26  his involvement in the Cashland robbery/homicide.  (Id. at 4247-48.)  Michael Johnson, a defense

27  witness who was dismissed before trial for lack of evidence, testified that he did not have any

28  involvement in the commission or planning of the crime.  (12 RT 4486.)  The prosecution,

however, argued that Michael Johnson was involved as the "inside man," providing petitioner

with the information on William Reagan's cash runs so that petitioner would know exactly when

to rob him.  (13 RT at 4767-72.)

The court instructed the jury with CALJIC No. 2.11.5:

> There has been evidence in this case indicating that a person other than the defendant was or may have been involved in the crime for which the defendant is on trial.
>
> There may be many reasons why such person is not here on trial. Therefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted.  Your sole duty is to decide whether the People have proved the guilt of the defendant on trial.[28]

(4 CT 908.)  The court also provided the jury with specific instructions on weighing the

credibility of a witness and considering such factors as the existence of bias, interest, or other

motive to lie, see CALJIC No. 2.20 (3 CT 897-98).  The court instructed the jury on accomplice

testimony, which specifically advised the jury to view accomplice testimony with caution, see

CALJIC Nos. 3.00-3.11, 3.18 (4 CT 921-24).  The trial court further instructed the jury as

follows:

> In evaluating testimony of a witness who has received a favorable disposition of a sentence upon the recommendation of the prosecution or law enforcement, you should consider the extent to which the testimony may have been influenced by the receipt of any benefits from the party calling that witness.  This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in light of all the evidence in this case.

(4 CT 925; 13 RT 4737.)

When, in closing argument, defense counsel stated that Michael Johnson was not involved

in the crime in any way, the trial court reminded the jury "not to consider why or if another

person will be or has been charged in this case."  (13 RT 4844.)

////

---

[28] The use note to CALJIC No. 2.11.5 states that a court should "not use this instruction if the other person is a witness for either the prosecution or the defense."

### 3.  California Supreme Court Decision

Petitioner raised this issue on direct appeal.  The California Supreme Court denied the claim as follows:

> As the Attorney General concedes, the trial court erred in instructing the jury pursuant to CALJIC No. 2.11.5: "There has been evidence in this case indicating that a person other than the defendant was or may have been involved in the crime for which the defendant is on trial. [¶] There may be many reasons why such a person is not here on trial. Therefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted. Your sole duty is to decide whether the People have proved the guilt of the defendant on trial." A court should "not use this instruction if the other person is a witness for either the prosecution or the defense." (Use note to CALJIC No. 2.11.5 (7th ed.2005), p. 43.) When an accomplice (as both prosecution witness Roland Johnson and defense witness Michael Johnson may have been) testifies, the instruction might suggest to the jury that it need not consider the factors it otherwise would employ to weigh the credibility of these witnesses, such as the circumstance that the witness has been granted immunity from prosecution in return for his or her testimony. (See People v. Williams (1997) 16 Cal.4th 153, 226-227, 66 Cal.Rptr.2d 123, 940 P.2d 710; People v. Price (1991) 1 Cal.4th 324, 445-446, 3 Cal.Rptr.2d 106, 821 P.2d 610)
>
> We conclude, however, that the error was harmless. Other instructions adequately directed the jury how to weigh the credibility of witnesses. (See CALJIC Nos. 2.20 [weighing credibility and considering such factors as the existence of bias, interest, or other motive to lie], 3.00-3.11 [specific instructions on accomplice testimony].) The court also specifically informed the jury to keep in mind any sentencing benefits received by a witness in the jury's evaluation of the witness's credibility. As our cases recognize, such instructions adequately channel the jury's consideration of the testimony of possible accomplices—even in the face of error in instructing pursuant to CALJIC No. 2.11.5. (See People v. Crew (2003) 31 Cal.4th 822, 845, 3 Cal.Rptr.3d 733, 74 P.3d 820; People v. Williams, supra, 16 Cal.4th at p. 227, 66 Cal.Rptr.2d 123, 940 P.2d 710.)
>
> Ordinarily, defendants contend, error in instructing pursuant to CALJIC No. 2.11.5 is prejudicial because it diminishes the ability of the defense to impeach the prosecution's witnesses. In the present case, defendant adds a contention that the instructional error may have caused the jury to fail to consider defense witness Michael Johnson's denial of culpability as evidence in support of defendant's position. Defendant asks us to believe that the jury would discount whatever exculpatory weight otherwise was produced by Michael Johnson's denial that he *was* an accomplice simply because the instruction informed them they should not consider or speculate on why Michael Johnson was not being prosecuted. We are not persuaded it is reasonably likely that, taken

as a whole, the instructions misled the jury in the manner claimed by defendant or that they relieved the prosecution of any part of its burden of proof. (See People v. Cole (2004) 33 Cal.4th 1158, 1212, 17 Cal.Rptr.3d 532, 95 P.3d 811 [standard of review for comparable asserted instructional error is whether the instructions as a whole were reasonably likely to mislead the jury]; People v. Catlin (2001) 26 Cal.4th 81, 151, 109 Cal.Rptr.2d 31, 26 P.3d 357 [same].) In the present case, the instructions as a whole supplied adequate direction concerning the process of evaluating the testimony of the witnesses. FN10

Defendant contends the erroneous instruction pursuant to CALJIC No. 2.11.5 substantially interfered with the jury's consideration of exculpatory evidence, in violation of the Fifth and Sixth Amendments to the federal Constitution. Under the circumstances, he claims, the error requires reversal unless it was harmless beyond a reasonable doubt, applying the Chapman (Chapman v. California (1967) 386 U.S. 18, 24, 87 S. Ct. 824, 17 L.Ed.2d 705) standard of review. Defendant's citation to cases such as Chambers v. Mississippi, supra, 410 U.S. 284, 93 S. Ct. 1038, 35 L.Ed.2d 297, is of no assistance to his claim. He asserts error in instructing the jury, not in the admission of evidence, and, as we have observed, the instruction did not substantially interfere with his ability to introduce exculpatory evidence. Although certain instructional error—such as failure to instruct on an element of the charged offense—constitutes a violation of the federal Constitution and requires reversal unless the error was harmless beyond a reasonable doubt (People v. Flood (1998) 18 Cal.4th 470, 502-504, 76 Cal.Rptr.2d 180, 957 P.2d 869; see also People v. Cole, supra, 33 Cal.4th at p. 1208, 17 Cal.Rptr.3d 532, 95 P.3d 811), any error in the present case was not of a similar magnitude and did not implicate defendant's federal constitutional rights.

> FN10 Although Roland Johnson was an important witness for the prosecution, and Michael Johnson was of modest importance to the defense case, we do not agree with defendant's claim that "[d]efendant could not be convicted unless the jury credited Roland's testimony," nor is it true that defendant could not be convicted if the jury credited Michael Johnson's claim that he did not act as defendant's "inside man."

Cornwell, 37 Cal. 4th at 88-89.

4. Discussion

Petitioner argues that the instruction prevented the jury from considering whether Roland Johnson "lied in order to dodge criminal responsibility for the crime." (ECF No. 103 at 318.) Petitioner also argues that the instruction prevented the jury from considering Michael Johnson's

////

////

lack of prosecution as "weighing on his credibility." (Id.) Petitioner further asserts that the instruction

> prevented the jury from considering Michael Johnson's denial of guilt and whether this played a role in the [prosecution's] decision not to bring him to trial. They jury should not have been denied the opportunity to consider this testimony, because if the prosecution was wrong about Michael Johnson's involvement, it could also have been wrong about Petitioner's.

> . . . .

> Moreover, no other instruction informed the jury that it could take into account Michael Johnson's innocence in deciding whether the prosecution had proved its case against Petitioner beyond a reasonable doubt.

(Id. at 318-19.) Petitioner contends that the error in giving the instruction was not harmless:

> Roland Johnson and Michael Johnson were key witnesses, contrary to the state court's holding. Petitioner could not be convicted unless the jury credited Roland's testimony and dismissed Michael's declaration that he was *not* the "inside man" who conspired with Petitioner. The instructions foreclosed the jury from giving full consideration to the possibility that the reason Michael Johnson was not charged with a crime was because he had not committed one. The trial court then exacerbated the error by reminding the jury during defense counsel's closing argument, "I specifically instructed the jury that you were not to consider why or if another person will be or has been charged in this case."

(Id. at 320.)

The purpose of CALJIC 2.11.5 is to discourage the jury from speculating about the prosecution's reasons for not jointly prosecuting all those shown by the evidence to have participated in the charged offenses, and to discourage speculation about the fates of unknown perpetrators. People v. Price, 1 Cal. 4th 324, 446 (1991). Under this rationale, the instruction should not be given if the "other person" who may have been involved testifies at trial, because it could prevent a jury from considering evidence of a co-participant's bias. Id. Another purpose for the instruction "is to focus the jury's attention on an individualized evaluation of the evidence against the person on trial without extraneous concern for the fate of other participants *irrespective* of their culpability." People v. Cox, 53 Cal. 3d 618, 668 (1991) (emphasis added, footnote omitted), disapproved on another ground in Doolin, 45 Cal. 4th at 421 n.22.

In view of the trial court's instructions taken as a whole, it is not reasonably likely that the jury applied CALJIC No. 2.11.5 to bar consideration of Roland Johnson's motive for testifying. See Boyde, 494 U.S. at 380. The jury was instructed that they were the sole judges of witness credibility and could assign the weight to be given to the testimony of each witness. The jury was also instructed regarding witness bias, interest, or other motive. Finally, the jury was instructed that an accomplice's testimony should be "viewed with distrust" and examined with care and caution in light of all the evidence presented. Courts must presume that jurors followed their instructions. See Marsh, 481 U.S. at 206. Nor is it reasonably likely that the jury applied CALJIC No. 2.11.5 to bar consideration of Michael Johnson's denial of involvement in the crime. CALJIC No. 2.11.5 merely restricts the jury from considering why a co-participant is not on trial; it does not prevent the jury from considering a co-participant's testimony denying involvement. Viewing the instructions as a whole, it does not appear that CALJIC No. 2.11.5 so infected the entire trial that it resulted in a conviction that violates due process. See McGuire, 502 U.S. at 72. Moreover, there is not a "reasonable likelihood" that the jury applied the challenged instruction unconstitutionally because the jury received the "full panoply of witness credibility and accomplice instructions." See id. at 72 & n.4; Boyde, 494 U.S. at 380.

Even assuming that CALJIC No. 2.11.5 was given in error, the error was harmless because the other instructions given regarding witness credibility discussed above ameliorated the impact of the mistaken instruction. See Allen v. Woodford, 395 F.3d 979, 996 (9th Cir. 2005) (when the trial court also instructs the jury regarding witness credibility and accomplices, "there is no reasonable likelihood that the jury understood CALJIC No. 2.11.5 to bar consideration of [the witness's] motives for testifying."). Furthermore, although Roland Johnson was an important prosecution witness, there was substantial independent evidence of petitioner's guilt, including eyewitness identifications and corroborating proof of petitioner's presence in the area at the time of the crime, and petitioner's purchase of a vehicle with a large amount of cash soon after the crime. With respect to defense witness Michael Johnson, even if the jury believed that he was not involved in the Cashland robbery/homicide, the evidence nonetheless implicated petitioner, and the jury reasonably could have believed that petitioner acted alone. The California Supreme

143

Court's rejection of this claim was not contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, this claim should be denied as without merit.

I. Claims Involving Prosecutorial Misconduct – Claims 9 & 10

    1. Legal Standards

Prosecutorial misconduct merits habeas relief only where the misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citation omitted); Bonin v. Calderon, 59 F.3d 815, 843 (9th Cir. 1995), cert. denied, 516 U.S. 1051 (1996) ("To constitute a due process violation, the prosecutorial misconduct must be so severe as to result in the denial of [the petitioner's] right to a fair trial."). The court must consider the entire proceeding to determine whether the alleged misconduct rendered the trial so unfair as to violate due process. Sechrest v. Ignacio, 549 F.3d 789, 807-08 (9th Cir. 2008), cert. denied, 558 U.S. 938 (2009). Claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995). See also Greer v. Miller, 483 U.S. 756, 765 (1987); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Turner v Calderon, 281 F.3d 851, 868 (9th Cir. 2002). Relief is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice. Johnson, 63 F.3d at 930 (citing Brecht, 507 U.S. at 637-38); see also Darden, 477 U.S. at 181-83; Turner, 281 F.3d at 868. Put another way, prosecutorial misconduct violates due process when it has a substantial and injurious effect or influence in determining the jury's verdict. See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

In considering claims of prosecutorial misconduct involving allegations of improper argument, the court must examine the likely effect of the statements in the context in which they were made and determine whether the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. Turner, 281 F.3d at 868; Sandoval v. Calderon, 241 F.3d 765, 778 (9th Cir. 2000); see also DeChristoforo, 416 U.S. at 643; Darden, 477 U.S. at 181-83.

144

In fashioning closing arguments, prosecutors are allowed "reasonably wide latitude," United States v. Birges, 723 F.2d 666, 671-72 (9th Cir. 1984), and are free to argue "reasonable inferences from the evidence." United States v. Gray, 876 F.2d 1411, 1417 (9th Cir. 1989). See also Duckett v. Godinez, 67 F.3d 734, 742 (9th Cir. 1995). "[Prosecutors] may strike 'hard blows,' based upon the testimony and its inferences, although they may not, of course, employ argument which could be fairly characterized as foul or unfair." United States v. Gorostiza, 468 F.2d 915, 916 (9th Cir. 1972).

2. Commenting on Petitioner's Failure to Testify – Claim 9

Petitioner claims that, during closing argument, the prosecutor commented on petitioner's failure to testify when stating that the defense failed to produce any witness to explain why petitioner's car was parked in the area at the time of the Cashland robbery/homicide. Relying on Griffin, petitioner claims the comments violated his Fifth Amendment right not to testify. For the reasons set forth below, this court finds that petitioner has not demonstrated that the California Supreme Court's rejection of this claim on direct appeal was contrary to, nor an unreasonable application of, any right clearly established by the Supreme Court.

a. Background

The California Supreme Court set out the background for this claim as follows:

> It was significant to the prosecution's case that the automobile defendant had borrowed from his girlfriend, Juanita Washington, had been parked near the scene of the homicide at or near the time of the crime. Washington testified defendant told her that his work had brought him to the neighborhood where he left the vehicle, but defendant's employer testified otherwise.
>
> During closing argument, the prosecutor commented upon the above circumstances, noting the close proximity of the vehicle to the scene of the crime, the ease of access from the crime scene to the alley that led to the parking space, and the circumstance that defendant did not reside or work in the area where the crime was committed. The prosecutor continued: "Have you heard one single piece of evidence from the defense that tells you why that car was there? [¶] Weren't you waiting for it? Weren't you waiting for it? I'm sure you were waiting for it. You know that's uncontroverted. You knew that can't be denied." The prosecutor questioned the likelihood the vehicle would be parked so near the crime scene if defendant had not been involved in the crime, adding: "And what are the odds that we go through this whole trial and not a single witness came in here to take the stand and tell you why. [¶] There is

145

no why. The only why points directly to [defendant], that's why. [¶] There is no other explanation [aside from defendant's guilt]. If there was, you saw the investigator, you know he's been working on a case. You saw witnesses that have been subpoenaed by the defense, they could bring in anybody they want and they could bring in a person to say why that car was parked there. But you already know why." In his rebuttal argument, the prosecutor again stated that the defense "didn't bring a single person in here to explain why that car was there."

Cornwell, 37 Cal. 4th at 90. Trial counsel did not object to the prosecutor's comments.

### b. California Supreme Court Decision

Petitioner raised this issue on direct appeal, contending that the quoted remarks constituted a comment on his failure to testify in his own defense, a violation of his privilege against self-incrimination as secured by the Fifth Amendment to the United States Constitution. The California Supreme Court denied the claim as follows:

Although a prosecutor is forbidden to comment "'either directly or indirectly, on the defendant's failure to testify in his defense,'" the prosecutor may comment "'on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses.'" (People v. Turner (2004) 34 Cal.4th 406, 419, 20 Cal.Rptr.3d 182, 99 P.3d 505.) The prosecutor's comments fell within the latter category. The presence of Washington's vehicle close to the crime scene and near the time of the crime constituted material inculpatory evidence, and it was fair comment to draw the jury's attention to the failure of the defense to call witnesses who might logically explain the presence of the vehicle. We do not view the prosecutor's argument as a comment upon defendant's failure to testify. We are not persuaded otherwise by defendant's claim that the prosecutor's argument would be understood as a comment on defendant's failure to testify because only defendant could explain the vehicle's location. Defense witness Mackey, who testified he was with defendant much of the day, defendant's employer, or Washington, who lent defendant the vehicle, all were persons who might be expected to know why the vehicle was parked where it was, and the circumstance that they did not testify concerning that point was a fair subject for comment by the prosecutor.

Moreover, defendant failed to object to the prosecutor's comments. We are not persuaded that we should overlook this failure, which ordinarily bars consideration of such a claim on appeal, on the ground that a prompt admonition by the court could not have cured any harm. (See People v. Medina (1995) 11 Cal.4th 694, 756, 47 Cal.Rptr.2d 165, 906 P.2d 2; People v. Benson (1990) 52 Cal.3d 754, 794, 276 Cal.Rptr. 827, 802 P.2d 330.) Defendant has not offered any persuasive explanation in support of his theory that the jury would have disregarded any such admonition from the court. FN11

146

Defendant's contention that defense counsel's failure to object constituted ineffective assistance of counsel fails because, as demonstrated in the text above, the comments were not objectionable under <u>Griffin v. California</u>, <u>supra</u>, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L.Ed.2d 106. (<u>See</u> <u>People v. Lucas</u>, <u>supra</u>, 12 Cal.4th at p. 475, 48 Cal.Rptr.2d 525, 907 P.2d 373.)

<u>Cornwell</u>, 37 Cal. 4th at 90-91.

        c.  <u>Discussion</u>

In <u>Griffin</u>, the Supreme Court held that "the Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." 380 U.S. at 615. Although a direct comment about the defendant's failure to testify always violates <u>Griffin</u>, a prosecutor's indirect comment violates <u>Griffin</u> only "if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." <u>Lincoln v. Sunn</u>, 807 F.2d 805, 809 (9th Cir. 1987). In analyzing whether a prosecutor's indirect comment violates <u>Griffin</u>, "[c]ourts have distinguished between those cases in which the defendant is the sole witness who could possibly offer evidence on a particular issue, and those cases in which the information is available from other defense witnesses as well." <u>Lincoln</u>, 807 F.2d at 810. If <u>Griffin</u> error occurs, reversal is required only if "(1) the commentary is extensive; (2) an inference of guilt from silence is stressed to the jury as a basis for the conviction, and (3) [ ] there is evidence that could have supported acquittal." <u>Jeffries v. Blodgett</u>, 5 F.3d 1180, 1192 (9th Cir. 1993) (quoting <u>Lincoln</u>, 807 F.2d at 809).

Here, the California Supreme Court's rejection of petitioner's <u>Griffin</u> error claim was not contrary to, nor an unreasonable application of, clearly established federal law. The prosecutor's comments during closing arguments were not a direct attack on petitioner's failure to testify. Nor did the comments indirectly attack, or call attention to, petitioner's failure to testify. Instead, the prosecutor's comments directly related to the failure of the defense to call witnesses who might logically explain the presence of Washington's vehicle close to the crime scene and near the time of the crime. Rather than point to petitioner's own failure to testify on the subject, the prosecutor

highlighted that the jury had not heard any explanation regarding the presence of the vehicle. Thus, the prosecutor simply pointed to petitioner's failure to introduce material evidence or to call other individuals whose testimony could counter the inference of guilt based on the location of Washington's vehicle at the time of the crime. As the California Supreme Court observed, petitioner was not the only one who could explain the vehicle's location. Indeed, defense witness Mackey, who testified that he spent much of the day of the crime with petitioner, petitioner's employer, and petitioner's girlfriend, Juanita Washington, who lent petitioner the vehicle, were persons who could be expected to know why the vehicle was parked where it was, and the fact that they did not testify concerning this issue was a fair subject of the prosecutor's closing argument. Consequently, the comments were not of "such a character that the jury would naturally and necessarily take it to be a comment on the failure" of petitioner to testify. See Lincoln, 807 F.2d at 809.

Moreover, even if the comment resulted in Griffin error, there is no showing of any resulting prejudice to petitioner. The prosecutor's comments were isolated in nature, and it was never insinuated that the jury should draw an inference of guilt from petitioner's failure to testify. In addition, the jury was instructed with CALJIC No. 1.00c in relevant part as follows:

> You must base your decision on the facts and the law. You, therefore, have two duties to perform: First, you must determine the facts from the evidence received in the trial and not from any other source. A "fact" is something proved directly or circumstantially by the evidence or by stipulation. Second, you must apply the law that I state to you, to the facts, as you determine them, and in this way arrive at your verdict and the findings that you are instructed to include in your verdict.

> You must accept and follow the law as I state it to you, whether or not you agree with the law. If anything is said by the attorneys in their arguments concerning the law, or at any other time during the trial, that conflicts with my instructions on the law, you must follow my instructions.

(4 CT 906; 13 RT 4722.) The just was instructed to not consider the attorneys' opening statements, closing arguments, or remarks made during the other portions of the trial to be evidence, unless the attorneys entered into a stipulation. (3 CT 895.)

The jury was also instructed pursuant to CALJIC Nos. 2.60 & 2.61 that:

> The defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference from the fact that the defendant does not testify. Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way.

> In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him. No lack of testimony on the defendant's part will make up for a failure of proof by the People so as to support a finding against him on any such essential element.

(4 CT 907; 13 RT 4723.)

Such instructions were sufficient to cure any prejudice petitioner may have suffered from the allegedly impermissible comments. The court presumes the jury followed the instructions that it was given. See Weeks, 528 U.S. at 234 ("A jury is presumed to follow its instructions."). In light of the foregoing, this court concludes that petitioner has failed to show that the prosecutor's isolated comments "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 637-38 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Any contention that trial counsel's failure to object constituted ineffective assistance of counsel fails because, as demonstrated above, the comments were not objectionable under Griffin. See Boag v. Raines, 769 F.2d 1341, 1344 (9th Cir. 1985) (failure to raise a meritless argument does not constitute ineffective assistance).

This court finds that petitioner has not demonstrated that the California Supreme Court's rejection of this claim was an unreasonable determination of the facts or contrary to, or an unreasonable application of, any right clearly established by the Supreme Court. As such, Claim 9 should be denied.

### 3. Comments on Discipline and a Free Society – Claim 10

Petitioner also claims that, during closing argument, the prosecutor committed misconduct by urging the jury to convict petitioner in order to maintain a free society. For the reasons set forth below, this court finds that petitioner has not satisfied section 2254(d) for claim 10.

### a. Background

The California Supreme Court set out the background for this claim as follows:

> At the beginning of his argument to the jury, the prosecutor discussed the role of the jury in a democratic society. He asked the jury to understand the somewhat paradoxical interplay between the freedom that democracy promises and the discipline democracy requires of its citizens.
>
> In the context of these remarks, the prosecutor commented on the rule of law: "[A]nybody who's lived a life . . . knows that in reality discipline is the cornerstone of freedom. And that's what we are doing here today, and that's why I'm bringing this up." The prosecutor pursued the theme that law and its enforcement constitute the "[d]iscipline [that] is the cornerstone of freedom." He observed: "I mean, if you don't have some kind of control, some type of law and order in your society, you have chaos, obviously. And the next step from chaos is anarchy. And you don't have to be a history major, you just need to read the newspaper once in a while and you can see what it's like in those Third World countries where there is no law and order, where there is no discipline. Do those people feel free because there's nobody looking over their shoulder or because there's no law? You don't even have to go that far. You can go right here in Sacramento in some of the neighborhoods where people were afraid to go out on their porch at night, [fearing] they might get involved in a drive-by shooting. Those people, what would they give for a little bit of discipline, a little bit of control?"
>
> The prosecutor explained he was making these points because he understood that jury service makes uncomfortable demands upon citizens. In the prosecutor's words, "[y]ou have gotten yourself into the duty that every citizen has, but every citizen wishes [he or she] could avoid." The prosecutor went on to acknowledge how difficult it is for most persons to impose discipline on others, but expressed the view that most individuals are willing to do so—as, for example, by firing an incompetent employee—"because they realize it's essential to our society." Bringing the point closer to home, the prosecutor asked the members of the jury to shoulder the unenviable task of judging defendant just as they would shoulder the task of firing an incompetent employee. He went on to caution those quick to make decisions to be patient and open-minded during deliberations, and urged those who had difficulty reaching a decision not to act simply on the basis of a reluctance to participate in imposing harsh sanctions on defendant.

Cornwell, 37 Cal. 4th at 91-92.

### b. California Supreme Court Decision

Petitioner raised this issue on direct appeal, contending that the prosecutor's remarks constituted an appeal to the passion and prejudice of the jury, because they focused on the chaos

and danger that follow from the absence of law and order, and that the comments violated his right to trial by jury and to due process of law as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution. Petitioner claimed that the prosecutor "implicitly urged the jury to convict [petitioner] in order to bring discipline and freedom to the community" and to "keep society free of crime." The California Supreme Court denied the claim as follows:

> Considering the prosecutor's remarks in their context, as we must (People v. Lucas, supra, 12 Cal.4th at p. 475, 48 Cal.Rptr.2d 525, 907 P.2d 373), the prosecutor's argument did not urge the members of the jury to act on the basis of their fear of chaos and crime in the community, but to act with an understanding of the importance of law in the abstract. The prosecutor acknowledged the onerous task faced by the jury in applying the law and in fulfilling its important function. Far from asking the jury to act on the basis of fear, the prosecutor urged the jurors to remain patient, open-minded, and unaffected by emotion during their deliberations. And far from asking the jury to disregard the evidence, the prosecutor asked the jury to sift through it with care.
>
> Although it is improper for a prosecutor to appeal to the passion or prejudice of the jury (People v. Young, supra, 34 Cal.4th at p. 1195, 24 Cal.Rptr.3d 112, 105 P.3d 487), there is no indication that the prosecutor's temperate speech concerning the function of the jury and of the rule of law constituted such an appeal. Moreover, as respondent points out, defendant failed to object to the comments at the time of trial, an omission that ordinarily bars consideration of the claim on appeal. (People v. Medina, supra, 11 Cal.4th at p. 756, 47 Cal.Rptr.2d 165, 906 P.2d 2; People v. Benson, supra, 52 Cal.3d at p. 794, 276 Cal.Rptr. 827, 802 P.2d 330.) Defendant has not supplied any plausible basis for his contention that an objection and admonition could not have cured any harm that assertedly flowed from the prosecutor's remarks, despite his claim that "the harm was done the moment the prosecutor committed the misconduct." FN12
>
> > FN12 Contrary to defendant's claim, defense counsel's failure to object did not constitute ineffective assistance of counsel, because the prosecutor's remarks came within the bounds of proper argument.

Cornwell, 37 Cal. 4th at 92-93.

### c. Discussion

Under both federal and state law, it is improper for a prosecutor to appeal to the sympathy or passions of a jury at the guilt phase of a trial. Bains v. Cambra, 204 F.3d 964, 974-75 (9th Cir. 2000); People v. Fields, 35 Cal. 3d 329, 362-63 (1983).

////

Assuming that the prosecutor's argument was improper and that petitioner's trial counsel should have objected, petitioner has not demonstrated that he was prejudiced by his counsel's failure to do so. The comments were brief, consuming merely a few paragraphs of an approximately ninety page argument. (13 RT 4740-807, 4865-90.) Further, although the comments alluded to the importance of law in the abstract, they did not suggest that the jury ought to fear petitioner or convict him to protect society. Cf. Commonwealth of N. Mariana Islands v. Mendola, 976 F.2d 475, 486-87 (9th Cir. 1992) (finding prejudicial the prosecutor's remarks during the closing argument of a murder trial that the gun was still "out there" and that "[i]f you say not guilty, he walks out right out the door, right behind you"), overruled on other grounds, George v. Camacho, 119 F.3d 1392 (9th Cir. 1997) (en banc). The prosecutor did not suggest the consequences of a particular verdict, nor did the prosecutor point to a particular crisis in our society and ask the jury to make a statement. See United States v. Leon-Reyes, 177 F.3d 816, 823 (9th Cir. 1999). Although the prosecutor explained the importance of the case in grandiose terms, such statements did not seem to be intended to appeal to the passions and prejudice of the jury. See id.

Moreover, petitioner has not shown that the comments were "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Matthews, 567 U.S. at 47. In Darden, the Court upheld a closing argument considerably more inflammatory than the one at issue here. In Darden, the prosecutor told the jury that the petitioner was an "animal" whom the prosecutor wished to see "with no face, blown away by a shotgun." 477 U.S. at 180 nn.11, 12. Particularly because the Darden standard is a very general one, leaving courts "more leeway . . . in reaching outcomes in case-by-case determinations," Alvarado, 541 U.S. at 664, this court has no warrant to set aside the California Supreme Court's conclusion. See Matthews, 567 U.S. at 48. Moreover, as explained above, the evidence of petitioner's guilt was overwhelming and therefore the statements made by the prosecutor did not seriously affect the "fairness, integrity or public reputation of judicial proceedings." See Johnson v. United States, 520 U.S. 461 469-70 (1997) (internal quotation omitted).

1     In addition, the trial court instructed the jury that the statements of the attorneys are not

2     evidence; that it was to decide the case solely on the evidence received in the trial; and that it

3     could not be influenced by pity for, or prejudice against, petitioner.  (3 CT 895, 4 CT 906.)  A

4     jury is presumed to follow the trial court's instructions, see Weeks, 528 U.S. at 234, and in the

5     absence of any evidence to the contrary, this court presumes that the jury disregarded any

6     assertions by the prosecutor that were not based on the evidence.  See Buckhalter v. Small, 2011

7     WL 7168920, at *26 (C.D. Cal. 2011) (rejecting a claim of ineffective assistance of counsel based

8     upon trial counsel's failure to object to improper prosecutorial argument, and stating that the

9     petitioner failed to demonstrate prejudice partly because "the Court presumes that, even without a

10    specific admonishment to disregard the comments, the jury followed its instructions and

11    disregarded the prosecutor's assertions that were not based on the evidence"), report and

12    recommendation adopted by, 2012 WL 404894 (C.D. Cal. 2012).  Finally, petitioner's contention

13    that trial counsel's failure to object constituted ineffective assistance of counsel fails because, as

14    demonstrated above, the objection lacks merit.  See Boag, 769 F.2d at 1344.

15        This court finds that petitioner has not demonstrated that the California Supreme Court's

16    rejection of this claim was an unreasonable determination of the facts or contrary to, or an

17    unreasonable application of, any right clearly established by the Supreme Court.  Thus, Claim 10

18    should be denied.

19        J.    Restriction on Cross-Examination of Roland Johnson – Claim 11

20        Petitioner next claims that the trial court violated his constitutional rights by not allowing

21    defense counsel to question Roland Johnson about his understanding of California's Three Strikes

22    Law to show Johnson's motivation for testifying against petitioner.  For the reasons set forth

23    below, this court finds that petitioner has not demonstrated that the California Supreme Court's

24    rejection of this claim was an unreasonable determination of the facts or contrary to, or an

25    unreasonable application of, any right clearly established by the Supreme Court.

26        1.    Legal Standards

27        The Confrontation Clause of the Sixth Amendment guarantees a defendant in a criminal

28    case an opportunity for effective cross-examination of the witnesses against him.  Van Arsdall,

475 U.S. at 679 (1986); Davis v. Alaska, 415 U.S. 308, 315 (1974). The exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. See Davis, 415 U.S. at 316-17. However, the Supreme Court has explained that trial judges retain wide latitude "to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679. The exclusion of specific lines of cross-examination is not error if there is "no substantial likelihood" that "the jury's impression of [the witness's] credibility" would have been changed. Sully v. Ayers, 725 F.3d 1057, 1075 (9th Cir. 2013) (witness subjected to "extensive cross-examination that tested her biases, motivations to lie, and consistency"; excluded cross-examination topic was on "peripheral" issue).

### 2. Background

The California Supreme Court set out the background for this claim as follows:

> As noted above, prosecution witness Roland Johnson claimed it was the prompting of his conscience that caused him, while serving a prison term, to contact law enforcement authorities concerning defendant's role in the death of William Reagan. Johnson testified he also was fearful because he knew he was implicated in the crime; although he was not responding to an active threat, he would be held responsible for it. Law enforcement authorities assertedly were unaware he had any connection with the crime until he came forward.

> Seeking to establish Johnson's bias and motive for fabrication, the defense conducted vigorous cross-examination. Defense counsel asked why Johnson's conscience had lain dormant until he was incarcerated, and elicited admissions that Johnson was testifying under a grant of immunity, that he had received a sentence reduction in return for his testimony, and that, when he first contacted the authorities, he did not refer to his conscience but requested an interview with detectives concerning "a matter involving [his] judgment relating to [his] prison sentence." Defense counsel impeached Johnson's credibility in numerous other ways, including by eliciting the information that Johnson had been making his living as a drug dealer, had been taking various psychotropic medications and using marijuana at the time of the crimes, and could have learned facts concerning the crime through news reports. Through this cross-examination, defense counsel provided the jury with evidence that Johnson's testimony was not disinterested, that his hope of early release provided him with a motive for fabrication, and that there were various reasons to doubt his veracity.

154

On redirect examination, Johnson explained that the grant of immunity followed his admission to law enforcement authorities that he had provided defendant with a weapon. Seeking to demonstrate Johnson's candor and thereby enhance his credibility, the prosecutor asked Johnson whether he had committed other crimes, which Johnson candidly admitted he had, volunteering that he had shot someone but had not been charged with the crime.

Defense counsel further questioned Johnson concerning this shooting. It was during this exchange that defendant alleges the court imposed an unconstitutional limitation upon his right to confront the witnesses against him. In response to defense counsel's questions, Johnson stated that the prior shooting occurred in 1983, that he had not killed anyone, that the shooting occurred while Johnson was dealing in drugs, that Johnson viewed the shooting as having involved self-defense, that no one ever was arrested for the shooting, and that this was the only occasion Johnson had shot anyone.

At this point defense counsel asked Johnson whether he had "ever heard [of] 'Three Strikes and you're out?'" The court sustained the prosecutor's relevance objection, subsequently explaining: "First, any 'Three Strikes' law could not have applied to Mr. Johnson since any crime he would have committed relative to this case would have been before the effective date . . . of the 'Three Strikes' law. And, secondly, I looked back in my notes to look at his prior convictions that were brought out during his impeachment . . . and I noted that [they] . . . do not qualify as strikes. [¶] And, therefore, I did not see any relevance of the 'Three Strikes' law to any motivation of his testimony here."

Defense counsel countered that he was interested in the witness's own understanding of the law, not the state of the law in fact. Counsel hoped to establish that, however misguided Johnson's concern may have been, Johnson feared future incarceration for life under the Three Strikes law and that it was this fear that caused him to contact authorities with information concerning the present case. The trial court was not persuaded, reiterating that Johnson was not actually subject to Three Strikes sentencing.

Cornwell, 37 Cal. 4th at 93-94.

### 3. California Supreme Court Decision

Petitioner raised this issue on direct appeal, which the California Supreme Court denied as follows:

It appears to us that the court's ruling on relevance would not have precluded counsel from asking his question more directly. Counsel simply could have asked Johnson what criminal liability he *believed* he risked for his part in the murder of William Reagan. It was unnecessary to pursue the basis for Johnson's belief, if he had one (such as fearing that he faced a life sentence). In any event, any error in excluding this testimony was harmless as a matter of state

law because of the ample other evidence that came before the jury suggesting reasons to believe that Johnson's cooperation with law enforcement was not altruistic and that his testimony was the product of his hope to secure early release from prison.

Nor do we believe that any error in the application of state rules of evidence rose to the level of a constitutional violation pursuant to Chambers v. Mississippi, supra, 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L.Ed.2d 297. As the United States Supreme Court has explained, the confrontation clause permits trial courts to retain "wide latitude" to impose limits on cross-examination concerning matters of marginal relevance. (Delaware v. Van Arsdall (1986) 475 U.S. 673, 678-679, 106 S. Ct. 1431, 89 L.Ed.2d 674.) In the present case, the *source* of whatever fear Johnson might have entertained that he might face a life sentence was of the most marginal relevance. (See People v. Frye, supra, 18 Cal.4th at p. 946, 77 Cal.Rptr.2d 25, 959 P.2d 183 [the source of a witness's knowledge concerning marijuana was of marginal relevance].)

Further, even if we were of the view that the court should not have sustained the prosecutor's objection to the defense questions and that defendant has demonstrated a constitutional violation, any error would be harmless beyond a reasonable doubt. Defense counsel was able to conduct searching cross-examination concerning Johnson's unsavory past and motives for volunteering evidence to law enforcement officials. The jury was provided with an ample basis for doubting Johnson's veracity, without being informed that he feared a life sentence under the Three Strikes law. The jurors knew that he had supplied defendant with the murder weapon in the present case and could have been subject to prosecution as an accomplice in the absence of his cooperation with the police, that he had dealt in drugs, that he had shot another person, that his prison sentence had been reduced as a reward for his testimony, and that he had received immunity from prosecution as an accomplice to a murder in exchange for his testimony. As we have explained, "unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witness's] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." (People v. Frye, supra, 18 Cal.4th at p. 946, 77 Cal.Rptr.2d 25, 959 P.2d 183, quoting Delaware v. Van Arsdall, supra, 475 U.S. at p. 680, 106 S. Ct. 1431.) Questioning Johnson concerning his fears of a life sentence under the Three Strikes law would *not* have afforded the jury a significantly different impression of Johnson's credibility.

Cornwell, 7 Cal. 4th at 94-95.

4. Discussion

On deferential habeas review, this court finds no constitutional error. The state court was entitled to impose limits on Roland Johnson's cross-examination so as to prevent him from giving an interpretation of the Three Strikes law. As the California Supreme Court noted, defense

1   counsel could have asked Roland Johnson what criminal liability he *believed* he risked for his part

2   in the murder of William Reagan without delving into the legal basis for his belief.  It would have

3   been enough to elicit testimony from Johnson that he feared he faced a life sentence for his

4   involvement in the Cashland robbery/murder.  The Three Strikes law was irrelevant and to allow

5   testimony on it had the potential to confuse the issues.  Indeed, the trial court found that the Three

6   Strikes law could not have applied to Johnson because any crime he would have committed

7   relative to this case would have been before the effective date of the Three Strikes law, and his

8   prior convictions did not qualify as strikes.  Further, based on the actual cross-examination of

9   Johnson, petitioner has not advanced a legitimate Confrontation Clause claim.  A review of the

10  trial transcripts reveals that the defense thoroughly impeached Johnson with his other criminal

11  convictions, drug dealing, and use of psychotropic medications and marijuana at the time of the

12  crimes.  Moreover, the jurors learned that Johnson had supplied petitioner with the murder

13  weapon in this case and could have been subject to prosecution as an accomplice in the absence

14  of his cooperation with the police, that he had shot another person, that his prison sentence had

15  been reduced as a reward for his testimony, and that he had received immunity from prosecution

16  as an accomplice to the murder in exchange for his testimony.  This court finds that Johnson was

17  subjected to extensive cross-examination that tested his biases and motivations to lie and that the

18  excluded cross-examination topic was on a peripheral issue.  The Confrontation Clause

19  guarantees an opportunity for effective cross-examination, not cross-examination that is effective

20  in whatever way, and to whatever extent, the defense might wish.  See Delaware v. Fensterer, 474

21  U.S. 15, 20 (1985) (per curium).  Petitioner fails to convincingly demonstrate a substantial

22  likelihood that the jury would have disbelieved Johnson and acquitted petitioner if the trial court

23  had permitted the incremental impeachment of Johnson with testimony about his fear of a life

24  sentence under the Three Strikes law.  See Sully, 725 F.3d at 1075.  On deferential review, this

25  court concludes that petitioner failed to scale the "formidable barrier" entitling him to federal

26  habeas relief.  See Burt v. Titlow, 134 S. Ct. 10, 16 (2013).

27  ////

28  ////

K.  Evidence of Petitioner's Financial Condition – Claim 12

Petitioner next claims that his due process rights were violated by the admission of evidence of his poor financial condition prior to the Cashland murder/robbery.  The California Supreme Court determined that evidence of petitioner's poverty prior to the robbery was admissible when viewed in conjunction with evidence of an upturn in his financial situation immediately after the charged crimes occurred.  This court finds that the admission of the evidence of petitioner's poor financial condition did not constitute a due process violation and thus does not entitle him to habeas relief.

1.  Legal Standards

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

Courts should not permit the admission of evidence of a defendant's poverty if such evidence serves as the sole basis for the prosecution's claim that the defendant possessed the requisite motive to commit a crime.  See United States v. Mitchell, 172 F.3d 1104, 1108 (9th Cir. 1999) ("Evidence of poverty is not admissible to show motive, because it is of slight probative value and would be unfairly prejudicial to poor people charged with crimes").  However, evidence of poverty is admissible to the extent that it eliminates alternative explanations for a defendant's sudden access to funds following a theft offense.  United States v. Jackson, 882 F.2d 1444, 1449 (9th Cir. 1989).

2.  Background

The California Supreme Court set out the background for this claim as follows:

> [T]hree of [defendant's] checks had been returned to his bank for insufficient funds during the month of May and . . . two checks were returned for insufficient funds in June 1993. Evidence was

> admitted that defendant's bank account contained $1.20 on May 21, 1993, and that defendant deposited $100 on May 28 and $300 on June 3, 1993. Defendant earned approximately $1,500 in May 1993. Cable service to defendant's home was discontinued on April 16, 1993, for nonpayment of the bill, and was restored on June 4, 1993. Referring to this evidence, the prosecutor stressed at closing argument: "It's not because [defendant] is destitute and that he was desperate for money. That is not the reason the evidence of his finances [was] put on. That was to show he didn't have money and then did. . . ."

Cornwell, 37 Cal. 4th at 95-96.  The evidence at trial also demonstrated that, at some time between 2:30 and 3:00 p.m. on the day of the Cashland robbery/murder, petitioner arrived at an auto dismantling business and purchased a used white Camaro, paying for the automobile, which cost $1,400, with $20 bills.  See id. at 61.

### 3. California Supreme Court Decision

On direct appeal, petitioner contended that admission of evidence concerning his depleted bank balance in May 1993 and his limited income in the weeks prior to the commission of the crime constituted a violation of his right to due process of law.  The California Supreme Court initially observed "that the claim is forfeited because, as defendant concedes, at trial defense counsel failed to object on any basis to the admission of this evidence."  Id. at 96 (citing People v. Koontz, 27 Cal. 4th 1041, 1076 (2002)).  The Court then denied the claim on the merits as follows:

> Ordinarily it would be unfair to persons in difficult financial circumstances to permit general evidence of their poverty to be introduced for the purpose of establishing a motive for theft or robbery. The risk of causing suspicion of indigent persons generally outweighs the probative value of such evidence. (People v. Koontz, supra, 27 Cal.4th at p. 1076, 119 Cal.Rptr.2d 859, 46 P.3d 335 [evidence of a defendant's poverty "generally may not be admitted to prove a motive to commit a robbery or theft; reliance on such evidence is deemed unfair to the defendant, and its probative value is outweighed by the risk of prejudice"]; see also People v. Wilson (1992) 3 Cal.4th 926, 939, 13 Cal.Rptr.2d 259, 838 P.2d 1212.)

> Relying on federal court authority, a recent Court of Appeal decision explains that although evidence of poverty to establish motive for theft seems logically relevant, "'[t]he trouble is that it would prove too much against too many.' [Citation.] As the court explained in United States v. Mitchell (9th Cir.1999) 172 F.3d 1104, 'Lack of money gives a person an interest in having more. But so does desire for money, without poverty. A rich man's greed

is as much a motive to steal as a poor man's poverty. Proof of either, *without more*, is likely to amount to a great deal of unfair prejudice with little probative value.'" (<u>People v. Carrillo</u> (2004) 119 Cal.App.4th 94, 102, 13 Cal.Rptr.3d 878, italics added.)

On the other hand, evidence of the defendant's indebtedness or relative poverty may be admitted without undue prejudice to persons of limited means in order "to eliminate other possible explanations for a defendant's sudden wealth after a theft offense." (<u>People v. Edelbacher</u> (1989) 47 Cal.3d 983, 1024, 254 Cal.Rptr. 586, 766 P.2d 1; <u>see also</u> <u>People v. Koontz</u>, <u>supra</u>, 27 Cal.4th at p. 1076, 119 Cal.Rptr.2d 859, 46 P.3d 335; <u>United States v. Weller</u> (10th Cir.2001) 238 F.3d 1215, 1221 [trial court properly admitted evidence of the defendant's possession of large sums of money after a robbery, when prior to the crime "she had an empty bank account, 'maxed out' credit cards, and no other obvious source from which to obtain cash"].) A recent federal court decision supplies a helpful illustration: "If a man is notoriously broke and cannot buy a pack of cigarettes Tuesday, that night a laundromat is burglarized, and on Wednesday the man buys a carton of cigarettes and a $40 bottle of scotch, all with quarters, the man's financial circumstances have obvious and significant probative value." (<u>United States v. Mitchell</u>, <u>supra</u>, 172 F.3d at p. 1108.)

Persons at most economic levels have limits to their wealth; sudden possession of greater wealth than usual is relevant circumstantial evidence in a theft-related prosecution, but does not present a risk of unfair prejudice to persons of limited means. Contrary to defendant's claim that admission of the evidence rendered his trial fundamentally unfair, it was within the trial court's discretion to admit evidence of defendant's financial circumstances, in light of the evidence of his "sudden wealth" and, indeed, his possession of currency in the denominations taken in the charged robbery, immediately following the robbery. The possibility that he came into possession of the money legitimately was rendered more doubtful by the circumstances that his earnings were extremely modest and his bank account was depleted at the time of the crime. Defendant's effort to dress his claim in constitutional garb adds nothing to the merit of his position. He cites <u>Estelle v. McGuire</u> (1991) 502 U.S. 62, 112 S. Ct. 475, 116 L.Ed.2d 385, but that case does not suggest that the admission of relevant evidence in a criminal trial led to a denial of due process. (<u>Id.</u>, at pp. 70-71, 112 S. Ct. 475 [permitting admission of evidence of battered child syndrome to be admitted as relevant evidence in a prosecution for murder of a child and observing that, although the due process clause "'guarantees the fundamental elements of fairness in a criminal trial,'" it does not turn the high court into a body responsible for making rules of evidence for the states].)

Defendant claims that the admission of this evidence as part of the prosecution's case-in-chief "forced [him] to explain that he was not impecunious, a difficult task given that much of [his] income apparently came in under-the-table cash payments for carpentry work and sales of refurbished vehicles," and that "[t]o force a person to establish income is the 'relative disadvantage' [that has

been noted] as the inherent danger of admitting this sort of evidence." Defendant, having failed to object below, did not offer this explanation in the trial court, so we cannot fault that court for failing to identify the potential source of prejudice to which defendant alludes. In any event, the evidence in question was relevant to the prosecution's case and was admissible pursuant to the authority cited above, and its introduction no more "forced" defendant to respond than any other probative evidence presented by the prosecution. Nor did the evidence unfairly "force" defendant to respond under circumstances in which a person of greater wealth who suddenly possessed an unusual sum of money would not be forced to respond. We also do not understand why it would have been particularly difficult for defendant to secure evidence from various employers or clients establishing that they had paid him for his work, even "under the table."

Also unpersuasive is defendant's claim that there was no evidence of the "suddenness" with which he came into possession of $1,500 in cash, and that the court merely assumed he acquired the money suddenly. Prior to admission of the evidence of which defendant complains, defendant's girlfriend testified that she was concerned about his purchase of an automobile on the date of the crime because she and defendant were then experiencing financial difficulties. It was within the court's discretion to conclude the evidence did not constitute mere general evidence of poverty going to the issue of motive, but instead constituted admissible circumstantial evidence that defendant was the person who committed the crime.

Cornwell, 37 Cal. 4th at 96-98. The California Supreme Court further noted that, "[b]ecause it was within the court's discretion to admit this evidence, counsel's failure to object did not constitute ineffective assistance of counsel, as explained in the text, above." Id. at 96 n.13.

4. Discussion

Petitioner argues that the California Supreme Court's rejection of this claim was an unreasonable determination of the facts because there was "no evidence that Petitioner's possession of $1,500 was 'sudden.'" (ECF No. 103 at 335.) Petitioner admits that he spent $1,500 in cash "shortly after the charged crime." (Id. at 336.) But he disagrees that Juanita Washington's testimony shows the "suddenness" of the money, arguing that he "could well have been keeping [the money] a secret from her." (Id. at 335.) Regardless of petitioner's explanation, the jury reasonably could have interpreted Juanita Washington's testimony as establishing that, before the Cashland robbery/murder, petitioner was struggling financially. Other evidence—such as petitioner's bank account balance, unpaid bills, and bounced checks—

161

corporated Juanita Washington's testimony regarding petitioner's poor financial condition before the crimes. This evidence provided context to the evidence showing that, after the crimes, petitioner was in possession of at least $1,500 in cash. Federal law mirrors the California rule applied by the California Supreme Court in allowing the admission of evidence of poverty where this evidence is presented alongside evidence of an otherwise inexplicable improvement in a petitioner's financial circumstances after the charged offense took place. See Jackson, 882 F.2d at 1449. As this rule permits the introduction of evidence of petitioner's poor financial condition in the present case, the jury could draw permissible inferences from this evidence. See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process." Id. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." Id. (citation omitted). Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose. See id. Here, there is a rational inference the jury could draw from the challenged evidence, an inference that is not constitutionally impermissible. The evidence was not highly inflammatory. This court concludes that evidence of petitioner's financial condition did not violate petitioner's due process rights or deprive him of a fair trial. As such, even if it is assumed that counsel was ineffective for failing to challenge the admission of petitioner's financial condition, for the reasons explained by the California Supreme Court, there is no resulting prejudice. Accordingly, the California Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d).

L. Cumulative Error in the Guilt Phase – Claim 13

Petitioner asserts that the errors in the guilt phase—the limitations on the experts' testimony, the spectator misconduct, the evidence of poverty, the instructions that improperly foreclosed the jury from considering the credibility of Roland Johnson and Michael Johnson, prosecutorial misconduct, and trial counsel's errors—in combination denied him a fair trial. (ECF No. 103 at 338-40.)

1          1.  Legal Standards

2          The combined effect of multiple errors at trial violates due process where it renders the

3   trial fundamentally unfair.  Montana v. Egelhoff, 518 U.S. 37, 53 (1996) (citing Chambers, 410

4   U.S. 284); Taylor v. Kentucky, 436 U.S. 478, 487 n.15 (1978).  The Ninth Circuit has described

5   the standard for evaluating cumulative error on habeas as "determining whether the combined

6   effect of multiple errors rendered a criminal defense 'far less persuasive' and had a 'substantial

7   and injurious effect of influence' on the jury's verdict."  Parle v. Runnels, 505 F.3d 922, 928 (9th

8   Cir. 2007).

9          2.  California Supreme Court

10         Petitioner raised this claim on both direct appeal and in his state habeas petitions.[29]  The

11  last reasoned decision on this claim was from the California Supreme Court on direct appeal.  See

12  Nunnemaker, 501 U.S. at 803-04; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

13  That court stated the following with respect to this claim:

14              Having reviewed defendant's claims, we have identified only one
            clear error, namely the giving of an unmodified instruction pursuant
15          to CALJIC No. 2.11.5.  The instructional error was harmless and,
            even assuming there was additional error in the trial court's
16          limitation on Roland Johnson's testimony, any so-called cumulative
            error was harmless even under the most exacting standard of
17          review.

18  Cornwell, 37 Cal. 4th at 98.

19         3.  Discussion

20         As the California Supreme Court recognized, when any errors are harmless, a claim of

21  cumulative error is meaningless.  Similarly, this court's conclusion that petitioner's claims of

22  guilt-phase error are either baseless or harmless means that the state court's resolution of the

23  claim of cumulative error was proper.  Accordingly, this claim presents no basis for habeas

24  corpus relief and should be denied.

25  [29] In the first state habeas petition, the California Supreme Court summarily denied the claim on
26  the merits, stating that, except to the extent it alleges ineffective assistance of counsel, the claim is
    as raised and rejected on appeal and as untimely.  (LD No. 18.)  In the supplemental state habeas
27  petition, the California Supreme Court summarily denied the claim on the merits and also
    determined that the claim was barred as untimely and successive.  (LD No. 23.)
28

M. <u>Refusal to Allow Motion for New Trial Based on Ineffective Assistance of Counsel – Claim 14</u>

Petitioner next claims that the trial court violated his due process rights by directing him to pursue his ineffective assistance of counsel claims in a state habeas proceeding rather than in a motion for new trial. As set forth below, the California Supreme Court's rejection of this claim was not an unreasonable application of clearly established federal law, as determined by the United States Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

1. <u>Background</u>

The California Supreme Court set out the background for this claim as follows:

> The record establishes that on November 2, 1994, after entry of the guilty verdicts, defense counsel informed the court that defendant wished to make a motion for new trial. Defendant personally addressed the court, urging that the attorney who represented him during the guilt phase of the trial had provided ineffective assistance. The court explained that as long as defendant was represented by counsel, a motion for new trial could not be brought by defendant independently, although the court would entertain a motion for substitution of counsel under <u>Marsden</u>, <u>supra</u>, 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44, or for self-representation under <u>Faretta v. California</u> (1975) 422 U.S. 806, 95 S. Ct. 2525, 45 L.Ed.2d 562. Defendant stated various grounds for dissatisfaction with William Lyons, one of his trial counsel, and moved to have him discharged. The trial court initially treated the motion as a <u>Marsden</u> motion, carefully examining defendant outside the presence of the prosecutor and encouraging him to make a full statement of the grounds for his dissatisfaction with counsel. The court permitted defendant to explain his concerns very specifically and at great length. The court also questioned defendant and required defense counsel to respond to each of defendant's points, which concerned counsel's asserted failure to investigate, to introduce evidence or call particular witnesses, and to rebut elements of the prosecution's case.

> The court concluded that defendant was attacking the *validity* of the guilty verdicts on the ground he had received ineffective assistance of counsel. Concluding the claim was one that could be brought by means of a motion for new trial, the court cited <u>People v. Fosselman</u>, <u>supra</u>, 33 Cal.3d 572, 189 Cal.Rptr. 855, 659 P.2d 1144, but observed it would be difficult to expect defendant's attorneys to decide to bring such a motion. The court determined that defendant's allegations were serious and complete enough for the court to appoint separate counsel, who would be charged with examining the record and the evidence that defendant claimed had not been proffered at trial, in order to determine whether there were

grounds for filing a motion for new trial on the basis of ineffective assistance of counsel.

A further hearing on defendant's claims concerning trial counsel was conducted on November 9, 1994, and defendant again was given an opportunity to air his complaints concerning counsel's asserted omissions. The court appointed Attorney John Lippsmeyer to assist defendant in *evaluating* whether a motion for new trial should be filed. In the meantime, the jury returned its verdict of death.

On December 2, 1994, the court asked Lippsmeyer to make a preliminary estimate of how long it would take him to determine whether a motion for new trial should be made. Lippsmeyer estimated the task would take four to six months. The matter was set for further hearing on December 9, 1994, when defendant made a motion to relieve King, the attorney responsible for presenting the defense at the penalty phase of the trial. At a further closed hearing, defendant explained his specific concerns with counsel, who was required to respond. The court denied the motion to relieve penalty phase counsel.

At a final hearing held on December 12, 1994, the court explained it had requested that Lippsmeyer determine whether a motion for new trial should be filed and what "time and resources" such a motion would consume. Lippsmeyer reported to the court that it would take a substantial period of time, probably at least six months, for him to be prepared for a hearing on a motion for new trial. The court agreed with Lippsmeyer's estimate, observing that the issue "would take a considerable time to review and a massive amount of documentation would have to be evaluated and presented to the [c]ourt." The court concluded that, under the circumstances, it was not possible to decide the ineffective-assistance-of-counsel claim expeditiously in a motion for new trial, explaining that "[t]he issues could only be resolved by a presentation and evaluation of the evidence that would be made in the equivalent of a habeas corpus review." The court further concluded that "the only practical approach" would be by way of "post trial habeas corpus review based on the claim that counsel performed inadequately *in matters that occurred outside the courtroom.*" (Italics added.) The court announced it would deny the motion for substitution of counsel, deeming defendant's oral presentations in the closed court sessions to be a petition for writ of habeas corpus and assigning the matter a separate superior court number for the purpose of further proceedings. The court directed that a written petition be filed within six months and also appointed counsel to represent defendant in the habeas corpus proceeding.

Cornwell, 37 Cal. 4th at 99-100.

2. California Supreme Court Decision

On direct appeal, petitioner relied upon People v. Fosselman, 33 Cal. 3d 572 (1983), in

support of his contention that the trial court abused its discretion in allegedly refusing to consider

a claim of ineffective assistance of counsel in connection with petitioner's pro se request for a new trial. Petitioner contended that arbitrary deprivation of his right to raise a claim of ineffective assistance of counsel by way of a motion for new trial constituted a violation of his right to due process of law. The California Supreme Court rejected the claim as follows:

> Making no effort to establish that his ineffective-assistance-of-counsel-claim in the trial court had merit, defendant merely contests the court's failure to reach the merits of the claim.
>
> We note at the outset that defense counsel never made a motion for new trial on the basis of ineffective assistance of counsel, nor was defendant permitted actually to file such a motion pro se; the trial court explained that defendant could not do so while represented by counsel. Rather, in hearings spread over several days, the court sought to determine whether defendant had stated grounds for substitution of counsel pursuant to People v. Marsden (1970) 2 Cal.3d 118, 84 Cal.Rptr. 156, 465 P.2d 44 (Marsden), whether defendant was requesting leave to proceed in propria persona, and whether a motion for new trial *should* be filed on defendant's behalf by substitute counsel. The court's ultimate ruling on the matter was based upon an evaluation of the undue time that would be consumed by consideration of an ineffective-assistance-of-counsel claim in the context of such a motion in lieu of consideration by way of a petition for writ of habeas corpus.
>
> . . . .
>
> Contrary to the implication of defendant's argument in this court, the trial court did not conclude that a claim of ineffective assistance of counsel was not *cognizable* in a motion for new trial, nor did it refuse to consider a properly brought motion for new trial. Rather, our review of the record discloses that the court closely considered two of this court's relevant decisions, People v. Fosselman, supra, 33 Cal.3d 572, 189 Cal.Rptr. 855, 659 P.2d 1144, and People v. Smith (1993) 6 Cal.4th 684, 25 Cal.Rptr.2d 122, 863 P.2d 192, concluding defendant's case was not an *appropriate* one in which to resolve the issue by way of such a motion. We conclude the trial court did not err in reaching this conclusion.
>
> Our cases explain that, in appropriate circumstances, the trial court should consider a claim of ineffective assistance of counsel in a motion for new trial, because "*justice is expedited* when the issue of counsel's effectiveness can be resolved promptly at the trial level." (People v. Smith, supra, 6 Cal.4th at p. 695, 25 Cal.Rptr.2d 122, 863 P.2d 192, italics added.) But our assumption has been that courts would decide such claims in the context of a motion for new trial when the court's own observation of the trial would supply a basis for the court to act expeditiously on the motion. As we stated in People v. Fosselman, supra, 33 Cal.3d 572, 189 Cal.Rptr. 855, 659 P.2d 1144: "It is undeniable that trial judges are particularly well suited to *observe courtroom performance* and to rule on the adequacy of counsel in criminal cases tried before them. [Citation.]

166

Thus, in appropriate circumstances justice will be expedited by avoiding appellate review, or habeas corpus proceedings, in favor of presenting the issue of counsel's effectiveness to the trial court as the basis of a motion for new trial. If the court is *able* to determine the effectiveness issue on such motion, it should do so." (Id., at pp. 582-583, 189 Cal.Rptr. 855, 659 P.2d 1144, italics added.)

It is evident in the present case that, after lengthy deliberation, the trial court concluded justice would *not* be expedited by entertaining defendant's claim in a motion for new trial. The basis for this conclusion is readily apparent; the matter would have been delayed for at least six months while substitute counsel examined trial counsel's case records and performed additional investigation concerning witnesses who did not appear at trial and evidence that was not in the record, in order to decide whether to make a motion for new trial. This was *not* a case in which a motion readily could be resolved because of the circumstance that the trial judge was "particularly well suited to observe courtroom performance and to rule on the adequacy of counsel. . . ." (People v. Fosselman, supra, 33 Cal.3d at p. 582, 189 Cal.Rptr. 855, 659 P.2d 1144.) Rather, in the present case the claim of ineffective assistance of counsel at the guilt phase of trial rested primarily upon matters other than what the trial court could have observed during trial, and the court acted within its discretion in concluding the claim should be litigated in a habeas corpus proceeding.

Defendant objects that the court could have decided the merits of his claim because, by the time the court reached its conclusion, the penalty verdict had been entered and the jury discharged. He claims that any delay in the court's ruling on the automatic motion for reconsideration and in imposing sentence would not have posed any serious consequences, and observes that sentencing did not occur until several months after the trial court had ruled on the motion for new trial, further diminishing the significance of the delay anticipated by the court and by Lippsmeyer.

We remain unpersuaded that the court erred. It reasonably concluded that the volume of out-of-court material upon which defendant based his claim simply removed the case from the category of trials in which justice would be expedited by appointing substitute counsel to prepare a motion for new trial that raised an ineffective-assistance-of-counsel claim.

Defendant contends that an assertedly arbitrary violation of his state law right to consideration of this claim in the context of a motion for new trial constituted a violation of his federal constitutional due process rights, citing Hicks v. Oklahoma (1980) 447 U.S. 343, 346, 100 S. Ct. 2227, 65 L.Ed.2d 175. Defendant's claim fails at the outset, because we have concluded he has not demonstrated a violation of state law. We also note that defendant has not attempted to explain why the trial court's decision not to undertake what essentially would have been a habeas corpus hearing has prejudiced him, considering the circumstance that defendant's right to obtain consideration of his claim of ineffective assistance of counsel by way of a petition for writ of habeas corpus has not been

abridged. FN14 Finally, we note that defendant has not attempted to argue or cite any support in the appellate record for his claim that he would have or should have prevailed on this ground in a motion for new trial.

> FN14 Our review of the record has not disclosed whether the habeas corpus matter proceeded to judgment in the superior court.

Cornwell, 37 Cal. 4th at 98-99, 100-02.

### 3. Discussion

Although state law provides that an ineffective assistance of counsel claim may serve as the basis for a motion for a new trial, see Fosselman, 33 Cal. 3d at 582-83, there is no requirement that the issue be resolved in a motion for a new trial. Thus, the trial court's determination that petitioner's ineffective assistance of counsel claim was best left for habeas review did not violate state law. Because there was no violation of state law, there was no violation of petitioner's federal due process rights. See Hicks, 447 U.S. at 346. Moreover, there is no Supreme Court precedent establishing a due process right to have ineffective assistance of counsel claims heard in a particular state court proceeding, such as a hearing on a new trial motion versus a habeas proceeding. As such, the California Supreme Court's determination that the trial court acted within its discretion in determining habeas proceedings would be a more appropriate forum for any new trial motion (because of the time it would take substitute counsel to review records and perform additional investigation and because the claims involved matters outside the trial record) was not contrary to, nor an unreasonable application of, any right clearly established by the Supreme Court. In addition, petitioner does not identify what harm or prejudice resulted from the trial court addressing his ineffective assistance of counsel claims in a habeas proceeding instead of a hearing on a new trial motion. Accordingly, this court finds petitioner has failed to satisfy section 2254(d) for this claim and relief should be denied.

### N. No Finding of Intent – Claim 15

Petitioner claims that his death sentence is unconstitutional because it was imposed without a jury finding that petitioner intended to kill or acted with reckless indifference to human life. (ECF No 103 at 347.) Petitioner appears to assert that California's death penalty statute

168

violates the Eighth Amendment because eligibility is automatic for defendants convicted of a killing during a felony robbery, even if the murder is unintentional. The California Supreme Court rejected this claim on direct appeal: "The statute (§ 190.2) does not impose overbroad death eligibility, either because of the sheer number and scope of special circumstances which define a capital murder, *or because the statute permits capital exposure for an unintentional felony murder.*" Cornwell, 37 Cal. 4th at 102 (citations omitted) (emphasis added).

Despite petitioner's characterization, the California death penalty statute only allows death eligibility for "unintentional" murders if the defendant was the actual killer or acted with reckless disregard for human life. See Cal. Penal Code § 190.2(b). Petitioner's jury was instructed pursuant to this statutory requirement:

> If you find beyond a reasonable doubt that the defendant was either the actual killer or an aider and abettor, but you are unable to decide which, then before you can find the special circumstance to be proven [that the murder was committed while the defendant was engaged in the commission of a robbery], you must also find beyond a reasonable doubt that the defendant, with intent to kill aided and abetted an actor in commission of the murder in the first degree.

> On the other hand, if you find beyond a reasonable doubt that the defendant was the actual killer, you need not find that the defendant intended to kill a human being in order to find the special circumstance to be true.

(4CT 915-16.) This instruction adequately narrows the class of death-eligible murderers as it satisfies the culpability requirement under the Eighth Amendment. See Enmund v. Florida, 458 U.S. 782, 797 (1982); Tison v. Arizona, 481 U.S. 137, 157-58 (1987) (death penalty not disproportionate when a defendant either killed, intended to kill, or acted with reckless indifference to human life). Petitioner cites no Supreme Court case that clearly establishes that a death sentence cannot be imposed unless the jury finds the defendant intended to kill. Therefore, Claim 15 should be denied on the merits.

O. Impermissible Double-Counting under Cal. Penal Code § 190.3(a) and CALJIC No. 8.85 – Claim 16

Petitioner alleges that sentencing factor (a) in Cal. Penal Code § 190.3, asking the jury to consider "the circumstances of the crime of which the defendant was convicted in the present

169

proceeding," and which was incorporated into CALJIC No. 8.85, is unconstitutionally vague and impermissibly permitted the jury to double-count the same facts as both circumstances of the crime and as aggravating factors. Petitioner asserts that the jury instruction "permitted imposition of the death penalty in an arbitrary and capricious manner." (ECF No. 103 at 353.) Petitioner has failed to satisfy section 2254(d) for any this allegation.

### 1. Background

The court instructed the jury with CALJIC No. 8.85 in relevant part as follows:

> In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence and each stipulation which was received during the guilt or innocence phase of the trial of this case. In addition, further evidence or stipulations may be introduced by either side during this penalty phase which you are also to consider in determining penalty.
>
> . . . .
>
> The evidence introduced by the prosecution in this penalty phase of the case may tend to establish what the law refers to as aggravating circumstances. The evidence introduced by the defense in this phase may tend to establish what the law refers to as mitigating circumstances.
>
> . . . .
>
> You shall consider, take into account and be guided by the following four factors which, if applicable, could be either aggravating or mitigating circumstances, depending on the facts as you find them:
>
> (1) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of the special circumstance found true. In this regard, as a possible aggravating circumstance, you may consider the immediate injurious impact on the victim of the homicide and the resulting impact on his surviving family. As a possible mitigating circumstance, you may consider whether your finding of guilt beyond a reasonable doubt nevertheless leaves you with some lingering or residual doubt that the defendant is the person responsible for this homicide because the adjudication of guilt in a trial is not completely infallible and does not require absolute certainty.
>
> . . . .

(4CT 993-94.)[30]  See also Cal. Penal Code § 190.3(a).

---

[30] The transcript does not have a Bates-stamped page number on the page in which CALJIC No. 8.85 begins. The page numbers go from 992, followed by an unnumbered page, and then to page (continued)

1          2.  <u>California Supreme Court Decision</u>

2          Petitioner raised this issue on direct appeal, which the California Supreme Court denied as

3  follows:

> The giving of CALJIC No. 8.85, the pattern instruction concerning
> the factors in aggravation and mitigation to be considered by the
> jury in imposing penalty, did not violate defendant's state and
> federal constitutional rights under the Eighth Amendment or state
> and federal constitutional guaranties of due process of law or equal
> protection of the laws. We have rejected the claim that the
> instruction is unconstitutionally vague. (<u>People v. Anderson</u>, <u>supra</u>,
> 25 Cal.4th at p. 600, 106 Cal.Rptr.2d 575, 22 P.3d 347.) The court
> need not instruct sua sponte on the issue of "double counting."
> (<u>People v. Lewis</u> (2001) 25 Cal.4th 610, 669, 106 Cal.Rptr.2d 629,
> 22 P.3d 392.) There was no misleading prosecutorial argument on
> this point, and defendant does not claim otherwise. (<u>See</u> <u>ibid.</u>)

11  <u>Cornwell</u>, 37 Cal. 4th at 103.

12          3.  <u>Discussion</u>

13          Petitioner has not provided any federal case authority for his claim that the California

14  death penalty statutes are unconstitutional under federal law.  As petitioner concedes, this specific

15  claim was rejected by the United States Supreme Court in <u>Tuilaepa v. California</u>, 512 U.S. 967

16  (1994), as follows:

> At the penalty phase, the jury is instructed to consider numerous
> other factors listed in § 190.3 in deciding whether to impose the
> death penalty on a particular defendant.  Petitioners contend that
> three of those § 190.3 sentencing factors are unconstitutional and
> that, as a consequence, it was error to instruct their juries to
> consider them.  Both Proctor and Tuilaepa challenge factor (a),
> which requires the sentencer to consider the "circumstances of the
> crime of which the defendant was convicted in the present
> proceeding and the existence of any special circumstances found to
> be true."  Tuilaepa challenges two other factors as well . . . .  We
> conclude that none of the three factors is defined in terms that
> violate the Constitution.
>
> Petitioners' challenge to factor (a) is at some odds with settled
> principles, for our capital jurisprudence has established that the
> sentencer should consider the circumstances of the crime in
> deciding whether to impose the death penalty.  <u>See, e.g.</u>, <u>Woodson</u>,
> 428 U.S., at 304, 96 S. Ct., at 2991 ("consideration of . . . the

27  993, followed by another unnumbered page, and then to page 994.  CALJIC No. 8.85 begins on
    the unnumbered page immediately following page 992.

28

circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of death"). We would be hard pressed to invalidate a jury instruction that implements what we have said the law requires. In any event, this California factor instructs the jury to consider a relevant subject matter and does so in understandable terms. The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence.

Tuilaepa, 512 U.S. at 975-76. Because there is no clearly established federal law holding that duplicative aggravating circumstances violate the Eighth or Fourteenth Amendment, petitioner is not entitled to relief under 28 U.S.C. § 2254(d).

In addition, to the extent petitioner claims that the jury's selection of the death penalty violates constitutional principles set forth in Ring v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New Jersey, 530 U.S. 466 (2000), it is without merit. In Ring, the Supreme Court held that "[a] defendant may not be "expose[d] . . . to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." 536 U.S. at 602 (citing Apprendi, 530 U.S. at 483). Under California law, once a defendant is convicted beyond a reasonable doubt of first degree murder and a special circumstance, he becomes eligible for the death penalty. Tuilaepa, 512 U.S. at 975. The death penalty is thus the statutory maximum, and "the only alternative is life imprisonment without the possibility of parole." People v. Salcido, 44 Cal. 4th 93, 167 (2008). Because the jury's sentence selection cannot exceed the statutory maximum penalty, it does not run afoul of Ring and Apprendi.

This Court finds that petitioner fails to show that the state court decision was contrary to, or an unreasonable application of, clearly established Supreme Court authority. Accordingly, the claim is denied.

P. Claim Involving CALJIC No. 8.88 – Claim 17

Petitioner claims that the giving of CALJIC No. 8.88 violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. First, he contends that (1) the jury was not instructed that, to impose a death sentence, the prosecution had to prove that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt; and (2) the jury was not instructed

regarding any standard of proof to apply to the nine statutory non-aggravating sentencing factors set forth in Penal Code § 190.3. As such, petitioner argues, the jury's selection of the death penalty violates constitutional principles set forth in Apprendi and Ring. Second, petitioner argues that CALJIC No. 8.88 is defectively death-oriented because it fails to define or describe the penalty of "life without the possibility of parole."

    1. Background

CALJIC No. 8.88, as instructed in this case, provided in relevant part:

> It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant.

> You shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

> As I previously instructed you, an aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself.

> A mitigating circumstance is any fact, condition or event which as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. An extenuating circumstance is a condition or fact which lessens the seriousness or strength of the case or background of the defendant.

> The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. The presence of a single mitigating factor could be sufficient, in your judgment, to warrant a decision that the appropriate penalty is life in prison without possibility of parole. Even in the absence of mitigating evidence, you could decide that the aggravating evidence, if there be any, does not warrant the death penalty.

> You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.

> In weighing the various circumstances, you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.

> To return a judgment of death, you must have a high degree of certainty that the death penalty is appropriate. Before you may

173

return such a verdict, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.

When you consider, take into account and are guided by the applicable factors, if you individually decide that the evidence in mitigation outweighs the evidence in aggravation, or if you individually decide that the evidence in aggravation is evenly balanced with the evidence in mitigation, the law requires that you cast your ballot for life in prison without the possibility of parole.

If, on the other hand, you individually determine that the aggravating circumstances do outweigh the mitigating circumstances, you may, but are not required to, cast your ballot to impose a sentence of death. In that situation, the law permits you as a juror to cast a ballot for either the death penalty or life in prison without possibility of parole, in your sound discretion, as you feel is more appropriate in light of all of the circumstances proved in this case.

You shall now retire and select one of your number to act as presiding juror, who will preside over your deliberations. In order to make a determination as to the penalty of either death or life in prison without possibility of parole, all twelve jurors must agree.

. . . .

(4 CT 1005-07.)

### 2. California Supreme Court Decision

Petitioner raised this issue on direct appeal, which the California Supreme Court denied as follows:

Instruction pursuant to CALJIC No. 8.88, another pattern instruction concerning the weighing of aggravating and mitigating circumstances, did not deprive defendant of rights under the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution or parallel state constitutional provisions. Defendant claims the instruction is vague and is biased in favor of a death judgment, fails adequately to define circumstances in mitigation or to describe the process of weighing the circumstances in aggravation and mitigation, "and deprived defendant of the individualized consideration the Eighth Amendment requires." He claims that the instruction would permit imposition of the death penalty "whenever aggravating circumstances were merely 'of substance' or 'considerable,' even if they were outweighed by mitigating circumstances," and that the instruction "improperly reduced the prosecution's burden of proof."

Defendant concedes that his claims have been rejected in past decisions, which we decline to reconsider. (<u>People v. Boyette</u> (2002) 29 Cal.4th 381, 464-467, 127 Cal.Rptr.2d 544, 58 P.3d 391.)

174

In addition, we reject defendant's claim that the instruction misleads the jury by failing to supply a definition of life imprisonment without the possibility of parole. (See <u>People v. Arias</u>, <u>supra</u>, 13 Cal.4th at p. 172, 51 Cal.Rptr.2d 770, 913 P.2d 980; <u>see also</u> <u>People v. Hawthorne</u>, <u>supra</u>, 4 Cal.4th at pp. 75-76, 14 Cal.Rptr.2d 133, 841 P.2d 118.) Nothing in <u>Kelly v. South Carolina</u> (2002) 534 U.S. 246, 122 S. Ct. 726, 151 L.Ed.2d 670, or <u>Shafer v. South Carolina</u> (2001) 532 U.S. 36, 121 S. Ct. 1263, 149 L.Ed.2d 178, suggests the pattern instruction is inadequate; in those cases the jury was not instructed that a life sentence *was* without the possibility of parole, whereas the instruction under review did so inform the jury. (<u>People v. Martinez</u> (2003) 31 Cal.4th 673, 699, 3 Cal.Rptr.3d 648, 74 P.3d 748.)

Contrary to defendant's contention, "[t]he death penalty is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence." (<u>People v. Brown</u> (2004) 33 Cal.4th 382, 401, 15 Cal.Rptr.3d 624, 93 P.3d 244.) Nor, contrary to defendant's claim, do the high court's decisions in <u>Apprendi v. New Jersey</u> (2000) 530 U.S. 466, 120 S. Ct. 2348, 147 L.Ed.2d 435, <u>Ring v. Arizona</u> (2002) 536 U.S. 584, 122 S. Ct. 2428, 153 L.Ed.2d 556, or <u>Blakely v. Washington</u> (2004) 542 U.S. 296, 124 S. Ct. 2531, 159 L.Ed.2d 403, alter this conclusion, either with respect to the existence of an aggravating factor or, as defendant contends in his supplemental brief, as to the determination whether aggravating factors outweigh mitigating factors. (<u>People v. Morrison</u>, <u>supra</u>, 34 Cal.4th at p. 730, 21 Cal.Rptr.3d 682, 101 P.3d 568; <u>People v. Anderson</u>, <u>supra</u>, 25 Cal.4th at p. 590, fn.14, 106 Cal.Rptr.2d 575, 22 P.3d 347 ["death *is* no more than the prescribed statutory maximum for the offense. . . . Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of <u>Apprendi</u>"]; <u>see also</u> <u>People v. Monterroso</u> (2004) 34 Cal.4th 743, 796, 22 Cal.Rptr.3d 1, 101 P.3d 956; <u>People v. Griffin</u>, <u>supra</u>, 33 Cal.4th at p. 595, 15 Cal.Rptr.3d 743, 93 P.3d 344.) Nor do we find any basis for defendant's claim that if his other contentions fail, the jury still must be instructed on the *absence* of a burden of proof. (See <u>People v. Turner</u>, <u>supra</u>, 34 Cal.4th at p. 439, 20 Cal.Rptr.3d 182, 99 P.3d 505 ["The jury need not be instructed on the burden of proof during the penalty phase because the sentencing function is 'not susceptible to a burden-of-proof quantification'"].)

<u>Cornwell</u>, 37 Cal. 4th at 103-04.

### 3. <u>Discussion</u>

It is beyond dispute that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970). In California, for a defendant to

be eligible for the death penalty, the jury must, beyond a reasonable doubt, find him guilty of murder in the first degree, and must find true one of the special circumstances set forth in Cal. Penal Code § 190.2. Tuilaepa, 512 U.S. at 975. Once convicted, however, "the prosecution has no burden of proof that death is the appropriate penalty, or that one or more aggravating factors or crimes exist, in order to obtain a judgment of death." People v. Anderson, 25 Cal. 4th 543, 589 (2001).

There is no Supreme Court authority which constitutionally requires that a jury be instructed on a burden of proof in the sentence selection phase in a capital case. Further, "[t]he United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed." Harris v. Pulley, 692 F.2d 1189, 1195 (9th Cir. 1982), rev'd on other grounds, 465 U.S. 379 (1984). Nor is there any Supreme Court authority which requires a burden of proof or persuasion be assigned to any of the jury's penalty phase determinations. On the contrary, the Supreme Court has held that no "specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." Kansas v. Marsh, 548 U.S. 163, 175 (2006). And, California's death penalty sentencing scheme has been consistently upheld as constitutional by the Supreme Court. Tuilaepa, 512 U.S. at 975-80; Pulley, 465 U.S. at 53.

Under California law "neither death nor life is presumptively appropriate or inappropriate under any set of circumstances, but in all cases the determination of the appropriate penalty remains a question for each individual juror." People v. Samayoa, 15 Cal. 4th 795, 853 (1997); see also Walton v. Arizona, 497 U.S. 639, 651 (1990), overruled on other grounds by Ring, 536 U.S. at 589 (a defendant may constitutionally be required to establish by a preponderance of the evidence the existence of mitigating circumstances, a conclusion manifestly inconsistent with petitioner's assertion that the Constitution requires the jury to determine beyond a reasonable doubt that death is the appropriate penalty). The standard penalty instructions given in this case, CALJIC Nos. 8.85 and 8.88, adequately guided the jury's sentencing discretion and determination. In the final analysis, the constitutional prohibition on arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing "scheme that permits the

1  jury to exercise unbridled discretion in determining whether the death penalty should be imposed

2  after it has found that the defendant is a member of the class made eligible for that penalty by

3  statute." California v. Ramos, 463 U.S. 992, 1009 n.22 (1983).

4      "The requirement of individualized sentencing in capital cases is satisfied by allowing the

5  jury to consider all relevant mitigating evidence." Blystone v. Pennsylvania, 494 U.S. 299, 307

6  (1990); Boyde, 494 U.S. at 377. Here, the jury was specifically instructed to consider, in

7  reaching their decision regarding the appropriate penalty, "any sympathetic or other aspect of the

8  defendant's character or record that the defendant offers as a basis for a sentence less than death,

9  whether or not related to the offense for which he is on trial." (4 CT 994.) The instructions given

10 by the trial court could reasonably be seen as satisfying the Blystone and Boyde standards.

11 Additionally, the court's instruction to the jury about not "mechanical[ly] counting" the

12 aggravating and mitigating factors (4 CT 1005-06) adequately informed the jury that it could base

13 a life sentence on the existence of only one factor in mitigation. Nonetheless, a mere state law

14 instructional error, if there were one, is not a basis for federal habeas relief. See Dunckhurst v.

15 Deeds, 859 F.2d 110, 114 (9th Cir. 1988) ("a state trial court's refusal to give an instruction does

16 not alone raise a ground cognizable in a federal habeas corpus proceeding").

17      In addition, there is no merit to petitioner's claim that the jury's selection of the death

18 penalty violates constitutional principles set forth in Ring and Apprendi. In Ring, the Supreme

19 Court held that "[a] defendant may not be "expose[d] . . . to a penalty exceeding the maximum he

20 would receive if punished according to the facts reflected in the jury verdict alone." 536 U.S. at

21 602 (citing Apprendi, 530 U.S. at 483). Under California law, once a defendant is convicted

22 beyond a reasonable doubt of first degree murder and a special circumstance, he becomes eligible

23 for the death penalty. Tuilaepa, 512 U.S. at 975. The death penalty is thus the statutory

24 maximum, and "the only alternative is life imprisonment without the possibility of parole."

25 Salcido, 44 Cal. 4th at 167. Because the jury's sentence selection cannot exceed the statutory

26 maximum penalty, it does not run afoul of Ring and Apprendi.

27      This court's review is limited to a determination as to whether the California Supreme

28 Court's rejection of this claim on appeal was either contrary to, or an unreasonable application of,

177

clearly established federal law, or was based on an unreasonable determination of the facts. As

petitioner fails to demonstrate that clearly established federal law, as determined by the United

States Supreme Court, requires the burden of proof instructions asserted by petitioner, this court

cannot conclude that the state court's rejection of this claim was objectively unreasonable.

Petitioner also claims that CALJIC No. 8.88 is defectively death-oriented because it failed

to define or describe the penalty of "life without the possibility of parole." Petitioner argues that

the failure to instruct the jury on the definition of "life without the possibility of parole" violated

his constitutional rights. Petitioner asserts that the term "life without the possibility of parole" is

widely misunderstood. Petitioner argues that this instruction fails under <u>Shafer v. South Carolina</u>,

532 U.S. 36 (2001), and <u>Simmons v. South Carolina</u>, 512 U.S. 154 (1994), because it does not

provide an adequate definition of the meaning of "life without the possibility of parole."

<u>Simmons</u> and <u>Shafer</u> are inapplicable to this case.

In <u>Simmons</u>, the jury was given two sentencing options—life imprisonment and death.

Under South Carolina state law, the defendant's prior convictions rendered him ineligible for

parole. The trial court refused the defendant's requested instructions defining a life sentence and

setting forth his parole ineligibility. On appeal, the Supreme Court found in the absence of an

instruction setting forth the defendant's parole ineligibility, the jury could have reasonably

believed the defendant would be released on parole if he were not executed. The Court explained

that, to the extent that misunderstanding pervaded the jury's deliberations, it had the effect of

creating a false choice between sentencing the defendant to death and sentencing him to a limited

period of incarceration. The Supreme Court found that the failure to provide the jury with

accurate information regarding the defendant's parole ineligibility, combined with the state's

argument that the defendant would pose a future danger if not executed, denied the defendant due

process. <u>Simmons</u>, 512 U.S. at 161-62.

In <u>Shafer</u>, the jury was instructed that "life imprisonment means until death of the

offender," but the trial court, over defense objection, did not instruct "that a life sentence, if

recommended by the jury, would be without parole." 532 U.S. at 43 (internal citations omitted).

Thereafter, the jury sent a note inquiring: "'1) Is there any remote chance for someone convicted

of murder to become elig[i]ble for parole?'" and "'2) Under what conditions would someone convicted of murder be elig[i]ble?'" Id. at 44.  The trial court responded: "'Parole eligibility or ineligibility is not for your consideration.'" Id. at 45.  The Supreme Court extended Simmons to situations where the jury's choice is between life without parole and death, even if a third alternative sentence encompassing release is available to the court should the jury not unanimously agree on a statutory aggravator.  The Court held that "whenever future dangerousness is at issue in a capital sentencing proceeding under South Carolina's new scheme, due process requires that the jury be informed that the life sentence carries no possibility of parole." Id.  The Court recognized that the jury was confused by the absence of such instruction, as evidenced by its further question about parole eligibility, and firmly rejected the trial court's response that parole eligibility was not for the jury's consideration.  The Court stated that the "reality [of a life sentence without parole] was not conveyed to Shafer's jury by the court's instructions." Id. at 54.

This court fails to see any error in the trial court's failure to sua sponte instruct the jury on the definition of "life without the possibility of parole."  In Simmons and Shafer the juries were *not* instructed that a life sentence *was* without the possibility of parole, whereas the instruction in this case, CALJIC No. 8.88, did so inform the jury.  Thus, petitioner's reliance on Simmons and Shafer to support his argument is misplaced.  In addition, petitioner never sought such an instruction from the trial court.  None of the jurors impaneled in the case voiced any misperception about "life without the possibility of parole" during jury voir dire.  The jury in this case did not ask for clarification of the meaning of life without parole.  Nothing in the record suggests petitioner's jury suffered from confusion with regard to the sentencing options.  Given this state of circumstances, this court finds that the lack of an instruction defining "life without the possibility of parole" had no effect on the outcome of this case.  Thus, this court finds that the California Supreme Court's determination that it was not error for the trial court to not provide the jury with an additional instruction on the definition of "life without the possibility of parole" is not an unreasonable application of Supreme Court precedent.  Petitioner is not entitled to habeas relief on this issue.

179

Q.  Reasonable Doubt Instruction– Claim 18

Petitioner next claims that the trial court failed to properly instruct the jury regarding the burden of proof by instructing the jury with former CALJIC No. 2.90, which uses the terms "moral certainty" and "moral evidence."  Petitioner argues that these terms, coupled with other jury instructions discussing the relationship between the reasonable doubt requirement and direct and circumstantial evidence, "were reasonably likely to have led the jury to convict Petitioner on proof less than beyond a reasonable doubt in violation of the Fourteenth Amendment right to due process."  (ECF No. 103 at 369.)

1.  Background

Former CALJIC No. 2.90, as instructed in this case, provided:

> Until the contrary is proved, a defendant in the penalty phase of a murder trial where special circumstances have been proved is presumed to have not been convicted of any other crime on a prior occasion, nor to have committed any other criminal act at the time of the homicide, nor to have committed any criminal act on a previous occasion which involved the express or implied use of force or violence or the threat of force or violence.  In case of a reasonable doubt whether the fact of a prior conviction is satisfactorily shown, or whether the fact of any other criminal act is satisfactorily shown, the defendant is entitled to have the jury disregard the alleged prior conviction or the allegation of such other criminal act as an aggravating circumstance.
>
> This presumption places upon the People the burden of proving the fact of the alleged prior conviction or such other criminal act beyond a reasonable doubt.
>
> Reasonable doubt is defined as follows: It is that state of the case which, after the entire comparison and consideration of all of the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the allegation.
>
> It is not a mere possible doubt, because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt.

(4 CT 1000-01.)  The court also instructed the jury with CALJIC No. 2.01 in relevant part as follows:

> In applying any circumstantial evidence in this case, a finding that another criminal act occurred at the time of the homicide or a

180

criminal act involving express or implied used of force or violence or the threat of force or violence was committed on a previous occasion may not be based on such circumstantial evidence unless the proved circumstances are not only: (1) consistent with the theory that the defendant [] did commit such other criminal act, but (2) cannot be reconciled with any other rational conclusion.

Further, each fact which is essential to complete a set of circumstances necessary to establish that the defendant did commit such an act must be proved beyond a reasonable doubt. In other words, before an inference essential to establish such a criminal act on a previous occasion may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must first be proved beyond a reasonable doubt.

Also, if the circumstantial evidence is susceptible of two reasonable interpretations, one of which points to the commission of such other criminal act by the defendant and the other to his not having committed such an act, you must adopt that interpretation which points to the defendant not having committed such a criminal act, and reject that interpretation which points to his having committed the criminal act.

If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

(Id. at 1001-02.)

CALJIC No. 8.83, which concerns direct and circumstantial evidence, was provided to the jury in relevant part as follows:

In applying any circumstantial evidence in this case, a finding of guilt as to a crime charged, or a finding that a special circumstance alleged in this case is true, may not be based on such circumstantial evidence unless the proved circumstances are not only: (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.

Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt, or to establish the truth of a special circumstance, must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt, or to establish a special circumstance, may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must first be proved beyond a reasonable doubt.

Also, if the circumstantial evidence is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation which

181

points to the defendant's innocence, and reject that interpretation which points to his guilt.

Similarly, if the circumstantial evidence is susceptible of two reasonable interpretations, one of which points to the truth of a special circumstance and the other to its untruth, you must adopt that interpretation which points to its untruth, and reject that interpretation which points to its truth.

If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

(Id. at 918-20.)

In addition, the court gave CALJIC No. 8.83.1, which instructs the jury on the use of circumstantial evidence in proving the mental state for murder with special circumstances. The instruction reads in relevant part as follows:

The specific intent or mental state with which an act is done may be shown by the circumstances surrounding the commission of the act. However, you may not find the defendant guilty of an offense charged, nor may you find the special circumstance alleged in this case to be true, unless the proved circumstances are not only (1) consistent with the theory that the defendant had the required specific intent or mental state, but (2) cannot be reconciled with any other rational conclusion.

Also, if the evidence as to any specific intent or mental state is susceptible of two reasonable interpretations, one of which points to the existence of the specific intent or mental state and the other to the absence of the specific intent or mental state, you must adopt that interpretation which points to the absence of the specific intent or mental state.

If, on the other hand, one interpretation of the evidence as to such specific intent or mental state appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

(Id. at 920-21.)

2. California Supreme Court Decision

Petitioner raised this claim in his supplemental state habeas petition.[31] (LD No. 20 at 16-

---

[31] Petitioner contends that he also raised this claim on direct appeal as claim sixteen. However, claim sixteen in the opening brief on direct appeal does not address CALJIC No. 2.90 (LD No. 1 at 175-92), and the California Supreme Court did not reference CALJIC No. 2.90 in its opinion (continued)

18.) The California Supreme Court denied the claim on the merits, and also found that it was

barred as untimely and successive, because it could have been, but was not, raised on appeal.

(LD No. 23.)

3. Discussion[32]

The United States Supreme Court has clearly established that the Due Process Clause of

the Fourteenth Amendment requires proof of guilt beyond a reasonable doubt to secure a

conviction against a criminal defendant. In re Winship, 397 U.S. at 364. Jury instructions that

inform the jury otherwise are therefore subject to attack as unconstitutional. E.g., Cage v.

Louisiana, 498 U.S. 39 (1990) (per curiam), overruled in part on other grounds by McGuire, 502

U.S. at 72 n.4.

Petitioner raises two challenges to the instructions given here. First, he claims that

CALJIC Nos. 2.90, 2.01, 8.83, and 8.83.1, in conjunction, operated as a mandatory conclusive

presumption of guilt upon a finding that an incriminatory interpretation of the evidence appears to

be reasonable. (ECF No. 103 at 370-71.) Second, he claims that the instructions erroneously

suggested to the jury that petitioner was required to put forth evidence of innocence. (Id.)

According to petitioner, the instructions "required the jury to presume *all* elements of the crimes

supported by a reasonable interpretation of the circumstantial evidence unless the defendant

produced a reasonable interpretation of that evidence pointing to his innocence." (Id. at 371.)

While petitioner concedes that the United States Supreme Court has rejected the

contention that the term "moral certainty," taken in the context of former CALJIC NO. 2.90 as a

whole, could be misinterpreted by a jury as allowing conviction upon proof less than beyond a

---

on direct appeal. The allegations in claim sixteen on direct appeal mirror petitioner's allegations
in claim 21(B) of the federal petition.

[32] Respondent asserts that petitioner did not raise the allegations concerning "moral evidence" in
the state court. (ECF 106 at 86.) However, in claim one of petitioner's state supplemental habeas
petition, he quotes Justice Kennedy's concurrence in Victor v. Nebraska, 511 U.S. 1, 23 (1994),
which discusses the use of the term "moral evidence": "Though the reference to 'moral certainty'
is not much better, California's use of 'moral evidence' is the most troubling, and to me seems
quite indefensible." (LD No. 20 at 17.) This court deems petitioner to have sufficiently raised
the "moral evidence" argument.

reasonable doubt, <u>Victor</u>, 511 U.S. at 6, 10-17, he claims that the term "moral evidence" is the "heart" of his claim, implying that <u>Victor</u> did not address the constitutionality of the use of the term "moral evidence."  (ECF No. 114 at 216.)  However, the Court in <u>Victor</u> explicitly held that the use of the terms "moral evidence" *and* "moral certainty," although troublesome, did not improperly dilute the requirement of proof beyond a reasonable doubt.  <u>Id.</u> at 7-17.[33]  Thus, this court rejects petitioner's interpretation of <u>Victor</u>.  Moreover, the California Supreme Court has rejected a similar challenge to CALJIC No. 2.01, stating:

> The plain meaning of [this instruction] merely informs the jury to reject unreasonable interpretations of the evidence and to give the defendant the benefit of any reasonable doubt.  No reasonable juror would have interpreted these instructions to permit a criminal conviction where the evidence shows defendant was 'apparently' guilty, yet not guilty beyond a reasonable doubt.

<u>People v. Jennings</u>, 53 Cal. 3d 334, 386 (1991).

No reasonable juror could have interpreted the instructions to allow conviction on proof less than beyond a reasonable doubt merely because he or she was informed to accept reasonable interpretations of the evidence where the only other interpretation was unreasonable, especially after having been informed repeatedly that the prosecution bore the burden of proving guilt beyond a reasonable doubt.  Rather, under all the instructions given, a reasonable juror would understand that, even if all the evidence had to be interpreted as the prosecution posited, such evidence, in combination with all the other evidence, had to amount to proof beyond a reasonable doubt in order to convict.

In his second challenge to the instructions, petitioner claims that the court impermissibly placed a burden of proof on petitioner to rebut evidence proffered by the prosecution and to "prove his defense was reasonable before the jury could deem it credible."  (ECF No. 103 at 371.)  This argument fails for the same reason—even if the jury had to accept the prosecution's theory on evidence not rebutted by petitioner, the instructions still charged the jury that such evidence and the inferences therefrom had to amount to proof beyond a reasonable doubt before the jury

---

[33] Thereafter, California revised CALJIC No. 2.90 to delete all references to "moral certainty" and "moral evidence."  <u>See</u> <u>Esparza v. Lockyer</u>, No. C 99-3781 CRB (PR), 2001 WL 1528384, at *9 (N.D. Cal. Nov. 20, 2001).

could convict.  Thus, the instruction did not require petitioner to rebut the evidence and thereby deprive him of the presumption of innocence—if the evidence and inferences therefrom did not amount to proof beyond a reasonable doubt, the jury was instructed to acquit him.  Moreover, the court specifically instructed the jury that, "[i]n deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him[.]"  (4 CT 907.)

Upon review of the instructions provided by the trial court, this court finds that petitioner fails to show a reasonable likelihood that the jury did not understand the instructions, or to show an error that so infected the trial that he was deprived of the fair trial guaranteed him by the Fourteenth Amendment.  Thus, the California Supreme Court's rejection of this claim is not unreasonable.  Accordingly, petitioner has failed to establish that he is entitled to habeas relief on this issue.

R.  <u>Lethal Injection Violates Federal and International Law – Claim 19</u>[34]

Petitioner next claims that execution by lethal injection is cruel and unusual punishment and violates federal and international law.  On direct appeal, petitioner contended that the

---

[34] There is some confusion regarding whether Claim 19 has been dismissed as unexhausted.  In the findings and recommendations, the undersigned recommended that the District Judge find claim 19 unexhausted:

> [T]he California Supreme Court did not deny Claim 19 on the merits. The court denied the claim as premature and told petitioner he may raise it when an execution date is set and the claim is ripe. (Dkt. No. 76-1.)  Under the habeas statute, a claim is unexhausted if a petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c). *Accordingly, this court should find claim 19 unexhausted*. <u>See</u> <u>Martinez-Villareal v. Stewart</u>, 118 F.3d 628, 633 (9th Cir. 1997), <u>aff'd</u>, 523 U.S. 637 (1998). Petitioner should be permitted to raise this claim in federal court after it becomes ripe and, if and when, the state court has denied it.

(ECF No. 84 at 6 (emphasis added).)  This recommendation as to Claim 19, however, was not included in the conclusion section of the findings and recommendations.  (<u>Id.</u> at 8).  The District Judge then adopted the recommendations in full, but did not specifically identify Claim 19 as dismissed.  (ECF No. 85.)  Nonetheless, as discussed below, this claim should be dismissed without prejudice as premature.

methods of execution employed in California violated the federal Constitution. The California Supreme Court rejected the claim as premature:

> First, he claims that his due process rights have been or will be denied, and his execution should not be carried out, because "the state has failed to comply with the statutory requirement that standards for lethal injection be established by the Department of Corrections." Second, he claims the death judgment should be vacated and the sentence should not be carried out because "both of the statutory methods of execution constitute cruel and unusual punishment in violation of defendant's rights under the Eighth Amendment." As this court repeatedly has recognized, however, such claims are not cognizable on direct appeal, because "an imperfection in the method of execution does not affect the validity of the judgment and is not a basis for reversal of the judgment on appeal." (People v. Holt (1997) 15 Cal.4th 619, 702, 63 Cal.Rptr.2d 782, 937 P.2d 213; see also People v. Young, supra, 34 Cal.4th at p. 1234, 24 Cal.Rptr.3d 112, 105 P.3d 487; People v. Samayoa (1997) 15 Cal.4th 795, 864, 64 Cal.Rptr.2d 400, 938 P.2d 2; People v. Bradford (1997) 14 Cal.4th 1005, 1059, 60 Cal.Rptr.2d 225, 929 P.2d 544.) On direct appeal, defendant is restricted to claims "bear[ing] on the validity of the death sentence itself." (People v. Snow (2003) 30 Cal.4th 43, 128, 132 Cal.Rptr.2d 271, 65 P.3d 749.) His claim regarding the existence or nonexistence of regulations that may or may not be in effect when the judgment is to be carried out does not affect the validity of the death sentence. In essence, defendant's claim is premature. (Ibid.)

Cornwell, 37 Cal. 4th at 105-06. Petitioner also raised this claim in his state habeas petition (LD No. 10 at 221-37), which the California Supreme Court again denied as premature (LD No. 18).

This court finds that this claim is premature because no execution date has been set. See Ford v. Wainwright, 477 U.S. 399 (1986). Accordingly, Claim 19 should be dismissed without prejudice to its renewal after execution date is set.

S. Death Penalty Violates International Law – Claim 20

Petitioner also contends that his death sentence violates international law. On direct appeal, petitioner argued that "the violations of state and federal law articulated above also violate international law and the judgment must be set aside." The California Supreme Court rejected the claim as follows:

> This claim is not convincing, first because defendant has not established the premise for his argument that "violations of state and federal law" occurred during his trial. (See People v. Jenkins (2000) 22 Cal.4th 900, 1055, 95 Cal.Rptr.2d 377, 997 P.2d 1044.)

To the extent defendant alleges violations of the International Covenant on Civil and Political Rights, which he alleges incorporates the Universal Declaration of Human Rights, his claim lacks merit, even assuming he has standing to invoke this covenant. (People v. Turner, supra, 34 Cal.4th at pp. 439-440, 20 Cal.Rptr.3d 182, 99 P.3d 505; People v. Brown, supra, 33 Cal.4th at p. 404, 15 Cal.Rptr.3d 624, 93 P.3d 244 ["'International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements'"].)

Cornwell, 37 Cal. 4th at 106. Petitioner also raised this claim in his state habeas petition (LD No. 10 at 277-88), which the California Supreme Court summarily denied on the merits (LD No. 18).

This claim is meritless. To begin with, petitioner cannot demonstrate that any claim of a violation of international law is even cognizable on federal habeas review, given that such review is designed to address claims that a petitioner is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. 2254(a). International law is not United States law, and petitioner does not demonstrate that the International Covenant of Civil and Political Rights creates a form of relief enforceable in United States courts. See Rowland v. Chappell, 902 F. Supp. 2d 1296, 1339 (N.D. Cal. 2012). Petitioner notes only generally that the United States Supreme Court has looked to international "evolving standards of decency" to interpret the Eighth Amendments requirements. See Atkins, 536 U.S. at 316 n.21 (death penalty held unconstitutional for the intellectually disabled); see also Roper v. Simmons, 543 U.S. 551, 575 (2005) (in holding death penalty unconstitutional for minors, Court noted that it has "referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments'").

In addition, because there is no clearly established federal law holding that the California death penalty violates international law and that this alleged violation creates a cognizable claim on federal habeas review, petitioner's claim must also fail on the merits. See Rowland, 902 F. Supp. 2d at 1339. Without citation to any mandatory or persuasive authority in support of his argument, petitioner cannot demonstrate that the California Supreme Court's denial of this claim was contrary to, or a violation of, clearly established federal law. Therefore, this court recommends that this claim be denied.

////

1   T.  Challenges to California's Death Penalty Scheme – Claim 21

2       Petitioner raises numerous challenges to the death penalty statutes and corresponding jury

3   instructions.  Each is addressed below.  The court finds petitioner has failed to establish a prima

4   facie case for relief on any of these issues.  Further, even when the effects of each challenge are

5   considered in the aggregate, petitioner has failed to show that California's death penalty scheme

6   is unconstitutional.

7           1.  Failure to Require Written Findings of Aggravating Factors – Claim 21(A)

8       Petitioner argues that California's failure to require jurors to make written findings

9   regarding the aggravating factors found violates his due process and Eighth Amendment rights to

10  a reliable penalty verdict and meaningful appellate review.  Petitioner raised this issue on direct

11  appeal, which the California Supreme Court rejected: "Contrary to defendant's claim, written

12  findings concerning the aggravating factors used as a basis for imposing a death sentence are not

13  constitutionally required."  Cornwell, 37 Cal. 4th at 105 (citing People v. Prieto, 30 Cal. 4th 226,

14  275 (2003); People v. Boyette, 29 Cal. 4th 38, 466 (2002)).  Petitioner also raised the claim in his

15  supplemental state habeas petition.  (LD No. 20 a 45-63.)  The California Supreme Court denied

16  the claim on the merits.  (LD No. 23.)

17      The Ninth Circuit has rejected this argument.  See Harris, 692 F.2d at 1195-96, reversed

18  on other grounds, 465 U.S. 37 (1984); Williams v. Calderon, 52 F.3d 1465, 1484-85 (9th Cir.

19  1995).  Petitioner cites no controlling Supreme Court authority to the contrary.  Thus, petitioner

20  fails to establish that he is entitled to habeas relief on this claim and it should be denied.

21          2.  Burden of Proof – Claim 21(B)[35]

22      Petitioner argues that California's death penalty scheme is unconstitutional because it fails

23  to require proof beyond a reasonable doubt (a) of the existence of the aggravating factors relied

24  on; (b) that aggravating factors outweigh mitigating factors; and (c) that death is the appropriate

25  penalty.  The California Supreme Court rejected this claim on direct appeal:

26  ////

27  _____

    [35] Petitioner incorporates the arguments set forth in Claim 18 above.
28

Contrary to defendant's contention, "[t]he death penalty is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence." (People v. Brown (2004) 33 Cal.4th 382, 401, 15 Cal.Rptr.3d 624, 93 P.3d 244.) Nor, contrary to defendant's claim, do the high court's decisions in Apprendi v. New Jersey (2000) 530 U.S. 466, 120 S. Ct. 2348, 147 L.Ed.2d 435, Ring v. Arizona (2002) 536 U.S. 584, 122 S. Ct. 2428, 153 L.Ed.2d 556, or Blakely v. Washington (2004) 542 U.S. 296, 124 S. Ct. 2531, 159 L.Ed.2d 403, alter this conclusion, either with respect to the existence of an aggravating factor or, as defendant contends in his supplemental brief, as to the determination whether aggravating factors outweigh mitigating factors. (People v. Morrison, supra, 34 Cal.4th at p. 730, 21 Cal.Rptr.3d 682, 101 P.3d 568; People v. Anderson, supra, 25 Cal.4th at p. 590, fn.14, 106 Cal.Rptr.2d 575, 22 P.3d 347 ["death is no more than the prescribed statutory maximum for the offense. . . . Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of Apprendi"]; see also People v. Monterroso (2004) 34 Cal.4th 743, 796, 22 Cal.Rptr.3d 1, 101 P.3d 956; People v. Griffin, supra, 33 Cal.4th at p. 595, 15 Cal.Rptr.3d 643, 93 P.3d 344.) Nor do we find any basis for defendant's claim that if his other contentions fail, the jury still must be instructed on the absence of a burden of proof. (See People v. Turner, supra, 34 Cal.4th at p. 439, 20 Cal.Rptr.3d 182, 99 P.3d 505 ["The jury need not be instructed on the burden of proof during the penalty phase because the sentencing function is 'not susceptible to a burden-of-proof quantification'"].)

Cornwell, 37 Cal. 4th at 103-04. Petitioner also raised the claim in his supplemental state habeas petition. (LD No. 20 a 45-63.) The California Supreme Court denied the claim on the merits. (LD No. 23.)

Petitioner cites to no controlling Supreme Court authority to support his claim. And, circuit courts have rejected many of these arguments. See Harris, 692 F.2d at 1194-95 (no constitutional requirement that jury find beyond a reasonable doubt that death penalty appropriate), reversed on other grounds, 465 U.S. 37 (1984); Williams, 52 F.3d at 1485 (same); Ford v. Strickland, 696 F.2d 804, 818 (11th Cir. 1983) (en banc) (jury need not find beyond a reasonable doubt that aggravating factors outweigh mitigating factors). The Supreme Court has held generally that "the constitution does not require a state to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances." Zant v. Stephens, 462 U.S. 862, 890 (1983).

Petitioner makes an additional, creative argument. He argues that the absence of any burden of proof to guide the jury at the penalty phase violates the Eighth Amendment and the Due Process Clause. None of the cases cited control petitioner's arguments. He has failed to show the California Supreme Court's denial of these claims was an unreasonable application of clearly established federal law.

### 3. Failure to Require Unanimity on Aggravating Factors – Claim 21(C)

Petitioner further argues that the California death penalty statute is unconstitutional because it does not require the jury to find aggravating factors with unanimity. He asserts that this sentencing scheme could lead to an unreliable or arbitrary verdict. Petitioner raised this claim in his supplemental state habeas petition. (LD No. 20 at 45-63.) The California Supreme Court summarily denied the claim on the merits. (LD No. 23.)

While there is much case law concerning the unconstitutionality of requiring unanimity for finding mitigating factors,[36] there is a dearth of cases considering a unanimity requirement for aggravating factors. One court correctly noted that the United States Supreme Court has never embraced such a requirement:

> However, the Virginia Supreme Court has held that in imposing the death penalty, following a capital murder conviction, the jury's verdict is not required to be unanimous as to the aggravating factors relied upon. [Citation omitted.] Nor does the United States Constitution require that the jury be unanimous. The Supreme Court has only held that the capital sentencing proceeding is to meet some of the requirements of a criminal trial, such as the right to counsel. [Citation omitted.] It has not held jury unanimity on the sub-determination of aggravation is a constitutional requirement.

Briley v. Bass, 584 F. Supp. 807, 819 (E.D. Va. 1984), aff'd, 742 F.2d 155 (4th Cir. 1984), cert. denied, 469 U.S. 893 (1984).

////

---

[36] See, e.g., Mills v. Maryland, 486 U.S. 367, 384 (1988) ("We conclude there is a substantial probability that reasonable jurors . . . may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. . . . The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk.").

1     This court concludes that the Constitution does not require jury unanimity on aggravating

2     factors.  Unanimity plays a role in the final determination—whether aggravating factors outweigh

3     mitigating factors.  Beyond that, each juror need not agree what factors are aggravating.

4     "Constitutional concerns are met when each juror agrees that the aggravation, in toto, outweighs

5     the mitigation in toto, or vice versa."  See Bonin v. Vasquez, 807 F. Supp. 589, 623 (C.D. Cal.),

6     aff'd sub nom. Bonin, 59 F.3d 815 (1992).

7     Moreover, this court does not find any indication that such a high level of specificity is

8     mandated by any existing Supreme Court precedent.  Petitioner argues that the lack of a

9     unanimity requirement for aggravating factors violates his Sixth Amendment right as described in

10    Ring and Apprendi.  Ring is the relevant case.  In Ring, the Supreme Court held that the Sixth

11    Amendment requires a jury, not a judge, to find an aggravating circumstance necessary for

12    imposition of the death penalty.  Ring, 536 U.S. at 609.  Petitioner proposes that, in order for a

13    jury to impose the death penalty, the jury must unanimously agree as to the aggravating factors

14    warranting the death sentence.  Yet, the issue resolved in Ring was whether the judge, as opposed

15    to the jury, must find the aggravating circumstance supporting imposition of the death penalty,

16    and as such, its holding has no bearing on the considerably more limited claim raised by

17    petitioner.

18    Petitioner additionally contends that California Penal Code sections 1158 and 1158a,

19    which require special findings before a sentencing enhancement can be imposed in a non-capital

20    case, runs contrary to the fundamental tenet that "capital defendants are entitled, if anything, to

21    more rigorous protections than those afforded non-capital defendants."  (ECF No. 103 at 383-84.)

22    However, the cited statutes do not concern or relate to the consideration of aggravating factors at

23    the penalty phase of a capital trial.

24    In sum, petitioner fails to demonstrate that the California death penalty statute's lack of a

25    unanimity requirement for aggravating factors violates the federal constitution.  The California

26    Supreme Court's denial of petitioner's claim that the jury was required to unanimously agree on

27    aggravating factors was not unreasonable.  Accordingly, petitioner does not merit habeas relief on

28    Claim 21(C).

**4. Failure to Conduct Proportionality Review – Claim 21(D)**

Petitioner alleges that the "lack of any requirement of intercase or intracase proportionality review and of any such undertaking in this case at the time of trial or on appeal" violates his rights to equal protection, right against the arbitrary and capricious imposition of the death penalty, the heightened reliability requirements for capital case sentencing, and his right to meaningful appellate review under the Fifth, Sixth, Eighth and Fourteenth Amendments. (ECF No. 103 at 384.) Petitioner raised this claim on direct appeal, which the California Supreme Court rejected in a reasoned decision, stating: "Intercase proportionality review is not required by the federal Constitution, and we decline to reconsider our prior relevant holdings on this issue." Cornwell, 37 Cal. 4th at 105 (citing Prieto, 30 Cal. 4th at 276; People v. Weaver 26 Cal. 4th 876, 992 (2001)).

The Supreme Court in Pulley v. Harris, 465 U.S. 37 (1984), held that comparative proportionality review of death sentences is not constitutionally required and upheld California's death penalty statute despite the lack of such review. Id. at 42-51; see also Allen, 395 F.3d at 1018 (holding that neither due process, equal protection, nor the Eighth Amendment require proportionality review in capital sentencing).

Given that this contention has been firmly rejected by both the United States Supreme Court and the Ninth Circuit, this court cannot conclude that the California Supreme Court's denial of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or based on an unreasonable determination of the facts. Therefore, petitioner is not entitled to habeas relief on this claim.

**5. Death Penalty Scheme Fails to Narrow – Claim 21(F)[37]**

Petitioner argues that California's special circumstances are so numerous and so broad that at least one can be found in almost any first degree murder case. Therefore, his argument continues, California's special circumstances fail to narrow the class of murderers eligible for the death penalty as required by the Eighth Amendment. In state court, petitioner relied upon a study

---

[37] Claim 21(E) has been dismissed as unexhausted. (ECF No. 90.)

by law professor Steven Shatz that concluded that only approximately 11.4 percent of those murderers who are statutorily eligible for the death penalty are actually sentenced to death. (LD No. 11, Ex. 1 at 78-118 (Nov. 2002 Decl. of Steven Shatz), ¶ 29; LD No. 10 at 193-95 (citing Steven F. Shatz & Nina Rivkind, The California Death Penalty Scheme Requiem for Furman?, 72 N.Y.U. L. Rev. 1283, 1332 (1997)).) Professor Shatz determined "statutory eligibility" for the death penalty by looking at first degree murder cases in which special circumstances were found by a trier of fact or could have been found, based on Professor Shatz's own review of the facts of the case. (Id., ¶10.)

Petitioner raised this claim in his direct appeal and again in his first state habeas petition. The California Supreme Court rejected this claim both times. In its appellate decision, the California Supreme Court held:

> Specifically, "[t]he statute (§ 190.2) does not impose overbroad death eligibility, either because of the sheer number and scope of special circumstances which define a capital murder, or because the statute permits capital exposure for an unintentional felony murder." (People v. Anderson (2001) 25 Cal.4th 543, 601, 106 Cal.Rptr.2d 575, 22 P.3d 347; see also People v. Morrison (2004) 34 Cal.4th 698, 730, 21 Cal.Rptr.3d 682, 101 P.3d 568.) Our interpretation of the lying-in-wait special circumstance does not change this conclusion. (People v. Crittenden, supra, 9 Cal.4th 83 at pp. 155-156, 36 Cal.Rptr.2d 474, 885 P.2d 887.) The state death penalty scheme meets Eighth Amendment requirements through its listing of special circumstances; the aggravating and mitigating circumstances referred to in section 190.3 do not and need not perform a narrowing function. (See People v. Bacigalupo (1993) 6 Cal.4th 457, 477, 24 Cal.Rptr.2d 808, 862 P.2d 808.)

Cornwell, 37 Cal. 4th at 102. The California Supreme Court also rejected this claim summarily on habeas review.

a. Legal Standards

The Eighth Amendment's narrowing requirement is the product of a series of Supreme Court decisions beginning with Furman v. Georgia, 408 U.S. 238 (1972). In Furman, the Court held the Georgia and Texas capital sentencing statutes violated the Eighth and Fourteenth Amendments. However, there was little clear agreement among the justices on the underlying rationale for that decision. Five justices wrote separate concurring opinions. The opinions of Justices Stewart and White are considered some basis for a "majority" holding in Furman. See

408 U.S. at 401 (Burger, J., dissenting) (stating that while it is "not entirely clear" what the holding is, the Stewart and White opinions are the "two pivotal concurring opinions").  Both Justice Stewart and Justice White focused on the fact that the states' capital sentencing statutes made every murderer eligible for the death penalty but provided no guidance to assist juries in deciding when to impose that penalty.  As a result, "the death penalty is exacted with great infrequency even for the most atrocious crimes and . . . there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not."  Id. at 313 (White, J., concurring).  Justice Stewart similarly focused on the apparent arbitrariness of imposition of the death penalty:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race. But racial discrimination has not been proved, and I put it to one side. I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

Id. at 309-10 (Stewart, J., concurring) (footnotes and citations omitted).

The Supreme Court later explained that in Furman it had held that the death penalty "could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner."  Gregg v. Georgia, 428 U.S. 153, 188 (1976).  Rather, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  Id. at 189 (opinion of Stewart, Powell, and Stevens, JJ.).  In his concurring opinion in Gregg, Justice White described how a constitutionally permissible death penalty statute should work:

> As the types of murders for which the death penalty may be imposed become more narrowly defined and are limited to those which are particularly serious or for which the death penalty is peculiarly appropriate as they are in Georgia by reason of the aggravating-circumstance requirement, it becomes reasonable to

expect that juries even given discretion not to impose the death penalty will impose the death penalty in a substantial portion of the cases so defined. If they do, it can no longer be said that the penalty is being imposed wantonly and freakishly or so infrequently that it loses its usefulness as a sentencing device.

Id. at 222-23. The Court in Gregg upheld Georgia's revised death penalty statute which, at a separate penalty phase, required a jury to find at least one of ten statutory aggravating factors to be true before it imposed a death sentence. Id. at 198-205.

Thereafter, the Supreme Court examined Georgia's aggravating circumstances and held that each must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant, 462 U.S. at 877. The Court concluded that each aggravating circumstance must "provide a principled basis for distinguishing" the petitioner's case "from the many other murder cases in which the death penalty was not imposed under the statute." Id. at 878 n.16.

Subsequently, the narrowing principles described by the Court in Zant were applied to Louisiana's death penalty sentencing statute:

> To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death. By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition.

Lowenfield v. Phelps, 484 U.S. 231, 244 (1988) (internal citations omitted).

The Court of Appeals for the Ninth Circuit rejected a claim that California's statutory scheme, on its face, fails to narrow. Karis, 283 F.3d at 1141 n.11. However, Karis does not control resolution of petitioner's claim as presented here. The court in Karis ruled without considering any available evidentiary support; here, petitioner's claim relies upon the evidentiary support provided by the declaration of Professor Shatz.

////

To summarize, the goal of the Eighth Amendment's narrowing requirement is to limit the possibility of arbitrary and capricious imposition of the death penalty. States may accomplish this goal by enacting objective legislative standards to limit the pool of those eligible for the death penalty in a way that reasonably justifies imposition of a more severe sentence on them. The sentencer may then exercise discretion to determine if that sentence should be imposed in a particular case.[38] If the death eligible pool is so large that it includes persons with vastly different levels of culpability, then the discretionary decision-making at the selection stage is not sufficiently limited. Without sufficiently objective limits with respect to when that ultimate sentence is appropriately imposed, the system risks arbitrary and capricious application of the death penalty upon those who are not necessarily the most deserving of the greatest punishment.

      b. Discussion

The first question for this court is whether to determine the reasonableness of the state court's appellate decision or its decision on habeas. The claims alleged on appeal and on habeas were not the same. Petitioner presented empirical evidence to support his state habeas claim, as he has done here, which substantially changes the nature of that claim. Further, the California Supreme Court's rejection of petitioner's argument on appeal cited People v. Crittenden, 9 Cal. 4th 83, 154-56 (1994). In neither Crittenden, nor the cases cited in that decision, did the court consider extra-record evidence. In fact, the court in Crittenden noted that the defendant had made no showing that his narrowing claim was "empirically accurate." 15 Cal. 4th at 155. Because the narrowing claim petitioner made on state habeas was attempting to do just that, the undersigned will not assume that the California Supreme Court denied the habeas narrowing claim on the same grounds that it rejected petitioner's narrowing claim argument on appeal. Thus, this court considers the California Supreme Court's summary denial of that claim to be its final decision on

---

[38] The final selection process necessarily involves greater discretion because it requires "particularized consideration of relevant aspects of the character and record of each convicted defendant," Abdul-Kabir v. Quarterman, 550 U.S. 233, 247 (2007) (quoting Woodson v. North Carolina, 428 U.S. 280, 303 (1976)), and consideration of "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Id. at 247-48 (quoting Lockett v. Ohio, 438 U.S. 586, 604 (1978)).

the merits of the claim that appears in the federal petition.

The question, then, is whether petitioner established a prima facie case for relief in state court and the California Supreme Court could not have reasonably held otherwise. This court must review the state court record to "determine what arguments or theories . . . could have supported the state court's decision; and then [ask] whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrington, 562 U.S. at 102.

As discussed above, the Court of Appeals for the Ninth Circuit rejected a claim that California's statutory scheme, on its face, fails to narrow. Karis, 283 F.3d at 1141 n.11; see also Berryman v. Ayers, No. 1:95-cv-05309-AWI, 2007 WL 1991049, at **183-85 (E.D. Cal. Jul. 10, 2007). Although Karis does not control petitioner's claim here, it is instructive when considering the reasonableness of the California Supreme Court's ruling. Has the United States Supreme Court clearly established a rule that the evidentiary showing made by petitioner would, if proved, demonstrate an Eighth Amendment violation? This court does not find the law clear cut beyond all reasonable disagreement. The United States Supreme Court has not clearly established a benchmark for determining when a state's death-eligible class is so broad that it violates the Eighth Amendment. Other courts and other judges in this same district have similarly so held. See Majors v. Warden, San Quentin State Prison, No. 2:99-cv-0493 MCE KJN, 2016 WL 8731120, at *117 (E.D. Cal. May 27, 2016); Riel v. Warden, San Quentin State Prison, No. 2:01-cv-0507 MCE DAD, 2015 WL 6690127, at *64 (E.D. Cal. Oct. 30, 2015); Frye v. Warden, No. 2:99-cv-628 KJM CKD, 2015 WL 300755, at *67 (E.D. Cal. Jan. 22, 2015) (petitioner fails to show clearly established federal law compels a different result than that in Karis); Hawkins v. Wong, No. CIV S 96-1155 MCE, 2013 WL 3422701, at *3 (E.D. Cal. Jul. 8, 2013) (no clearly established federal law that only those death penalty schemes in which a large percentage of death-eligible inmates receive the death penalty adequately narrow the death-eligible class); Carter v. Chappell, No. 06-cv-1343 BEN KSC, 2013 WL 1120657, at *198-201 (S.D. Cal. Mar. 18, 2013).

////

1    Moreover, the showing petitioner made before the California Supreme Court through the

2    study conducted by Professor Shatz does not measure the same thing measured in <u>Furman</u>.  In

3    <u>Furman</u>, the Court looked to those who were in fact eligible for the death penalty because they

4    had been convicted of a death eligible crime and determined that those among them who were

5    actually sentenced to death were so few that the penalty was arbitrarily applied.  In Professor

6    Shatz's study, he examined the universe of those potentially eligible for the death penalty—a

7    number far greater than those who had in fact been convicted of a death-eligible offense—and the

8    number of those in fact sentenced to death.  The California Supreme Court could reasonably have

9    determined that this apples-to-oranges comparison was insufficient support for a prima facie

10   showing of an Eighth Amendment violation.

11       It cannot be said that the California Supreme Court's rejection of petitioner's narrowing

12   claim was unreasonable.  Because petitioner has not satisfied the requirements of 28 U.S.C.

13   § 2254(d) for this narrowing claim, it should be denied.

14            6.   <u>Prosecutorial Discretion in Seeking the Death Penalty – Claim 21(G)</u>

15       Petitioner argues that prosecutors' "unbounded" discretion in seeking the death penalty,

16   illustrated by the disparities in seeking that penalty in each county, violates the Equal Protection

17   Clause.  The California Supreme Court rejected this claim on appeal, stating:

18           Our state's death penalty law is not constitutionally flawed because
             of the assertedly excessive charging discretion afforded to
19           prosecutors.  (<u>People v. Boyette</u>, <u>supra</u>, 29 Cal.4th at p. 467, 127
             Cal.Rptr.2d 544, 58 P.3d 391; <u>People v. Weaver</u>, <u>supra</u>, 26 Cal.4th
20           at p. 992, 111 Cal.Rptr.2d 2, 29 P.3d 103.)

21   <u>Cornwell</u>, 37 Cal. 4th at 105.

22       Petitioner relies upon the United States Supreme Court's decision in <u>Bush v. Gore</u>, 531

23   U.S. 98 (2000), to argue that the state must assure uniformity in implementing a fundamental

24   right.  In <u>Bush v. Gore</u>, the Court considered specific problems stemming from the 2000

25   presidential election.  The Court explicitly limited its holding to those election process issues.

26   531 U.S. at 109 ("Our consideration is limited to the present circumstances, for the problem of

27   equal protection in election processes generally presents many complexities."); <u>see also</u> <u>Coleman</u>

28   <u>v. Quarterman</u>, 456 F.3d 537, 542-43 (5th Cir. 2006) ("<u>Bush v. Gore</u>'s utter lack of implication in

1  the criminal procedure context" is "beyond debate."); <u>Majors</u>, 2016 WL 8731120, at *121; <u>Baca</u>
2  <u>v. Scribner</u>, No. 05-cv-0506 RRB KJM P, 2008 WL 850309, at *9 (E.D. Cal. March 28, 2008),
3  <u>report and recommendation adopted</u>, 2008 WL 3992725 (E.D. Cal. August 25, 2008); <u>Nguyen v.</u>
4  <u>Runnels</u>, No. C 04-1124 SBA, 2007 WL 879008, at *18 (N.D. Cal. Mar. 21, 2007).  Therefore,
5  <u>Bush v. Gore</u> is inapplicable.

6       The United States Supreme Court has rejected equal protection challenges to death
7  penalty schemes and has refused to limit prosecutorial discretion in charging decisions absent
8  some showing that a particular decision was based on a discriminatory standard.  In rejecting a
9  petitioner's argument that the Georgia capital punishment system operated in a discriminatory
10  manner, the Supreme Court held, "absent a showing that Georgia's capital punishment system
11  operates in an arbitrary and capricious manner, [the petitioner] cannot prove a constitutional
12  violation by demonstrating that other defendants who may be similarly situated did not receive
13  the death penalty."  <u>McCleskey v. Kemp</u>, 481 U.S. 279, 306-07 (1987).  Further, the Court has
14  held that prosecutorial charging decisions are "particularly ill-suited to judicial review."  <u>Wayte v.</u>
15  <u>United States</u>, 470 U.S. 598, 607 (1985); <u>see also</u> <u>Bordenkircher v. Hayes</u>, 434 U.S. 357, 364
16  (1978) ("So long as the prosecutor has probable cause to believe that the accused committed an
17  offense defined by statute, the decision whether or not to prosecute, and what charge to file or
18  bring before a grand jury, generally rests entirely in his discretion.").  Petitioner fails to show the
19  California Supreme Court's denial of this claim was contrary to, or an unreasonable application
20  of, clearly established federal law.

21       7.  <u>Failure to Identify Certain Factors as Mitigating – Claim 21(H)</u>

22       Petitioner next argues that the California sentencing statute is unconstitutional because it
23  does not require that juries be informed that six of the sentencing factors listed in Penal Code
24  § 190.3 (factors (d)-(h), (j)) are solely mitigating.  He further asserts that the use of a unitary list
25  of factors which fails to specify whether any particular factor may be regarded as aggravating and
26  mitigating is confusing and arbitrary.  Petitioner raised this issue in his supplemental state habeas
27  ////
28  ////

petition (LD No. 20 at 39-40).  The California Supreme Court Summarily denied the claim on the merits.[39]  (LD No. 23.)

In Tuilaepa, the United States Supreme Court held that giving a penalty phase jury a unitary list of sentencing factors that does not designate which factors are mitigating and which are aggravating does not violate the Constitution.  512 U.S. at 978-79.  The Court also stated that "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."  Id. at 979.  Moreover, the Ninth Circuit has held that the Constitution does not require that juries be given specific guidance on what factors are mitigating and what are aggravating.  See Harris, 692 F.2d at 1194 (California's failure to label factors as aggravating or mitigating does not invalidate its death penalty statute because the statute "establishes factors to guide the jury's discretion and allows for consideration of particular aggravating and mitigating circumstances"); Williams, 52 F.3d at 1484 ("[California's] death penalty statute's failure to label aggravating and mitigating factors is constitutional.").  In light of this controlling authority, the California Supreme Court's denial of this claim was not unreasonable.

### 8.  Failure to Provide Penalty Phase Safeguards – Claim 21(I)

In this separate claim, petitioner repeats the claim he has already raised in Claim 21(D) – that the state's lack of intercase or intracase proportionality review violated his constitutional rights.[40]  As discussed above in Claim 21(D), the Supreme Court has held that the Constitution does not require comparative proportionality review.  Harris, 465 U.S. at 42-51.  In light of this controlling authority, the California Supreme Court's denial of this claim was not unreasonable.

### 9.  Denial of Appellate Due Process – Claim 21(J)

Claim 21(J) not only incorporates other claims and sub-claims, it also asserts new and specific allegations involving the California Supreme Court's harmless error review and

---

[39] The California Supreme Court also concluded that, to the extent the claim challenged the jury instructions, the claim was barred because it was either raised and rejected on appeal, or because it could have been but was not raised on appeal.  (LD No. 23.)

[40] Petitioner raised this claim in his supplemental state habeas petition (LD No. 20 at 34-62), and the California Supreme Court summarily rejected it (LD No. 23).

procedures. This court has previously determined that any new allegations are unexhausted (ECF Nos. 84 & 85), and those allegations have been dismissed (ECF No. 90).

Petitioner claims that the California Supreme Court does not appropriately review claims because it fails to conduct a meaningful harmless error review using federal constitutional standards. (ECF No. 103 at 406-07.) Specifically, petitioner asserts that the California Supreme Court's decision on direct appeal failed to conduct a meaningful harmless error analysis regarding: instructional error in giving CALJIC 2.11.5, prosecutorial misconduct, restriction on cross-examination, admission of evidence of petitioner's financial condition, and refusal of the trial court to consider ineffective assistance of counsel at the motion for a new trial. (Id. at 406.) To the extent he makes that argument with respect to specific claims, this court addresses it in its discussion of those claims. This court will not engage in further analysis here.

Petitioner also argues that the California Supreme Court fails to provide meaningful appellate review because of the changes in the California Supreme Court's affirmance rate in death penalty cases after a change in the court's composition. (Id.) This appears to be a new and specific allegation. As such, this court will not address it.

U. Failure to Conduct a Hearing to Determine Competency to Stand Trial – Claim 22

Petitioner claims that he was not competent to stand trial because, as a result of his mental diseases, disorders or defects, he was unable to understand the nature of the criminal proceedings or to assist counsel in planning or conducting a defense in a rational manner. Petitioner argues the trial court should have sua sponte suspended the proceedings and conducted a competency hearing. Petitioner raised this claim in both his original and supplemental state habeas petitions. The California Supreme Court denied the claim summarily on the merits on habeas review. For the reasons set forth below, petitioner has not shown that no fairminded jurist could agree with the correctness of the California Supreme Court's decision on the merits. Therefore, Claim 22 should be denied.

1. Legal Standards

The conviction of a legally incompetent defendant violates the Due Process Clause of the Fourteenth Amendment. Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); Cacoperdo v.

Demosthenes, 37 F.3d 504, 510 (9th Cir. 1994). In federal court, a defendant is incompetent to stand trial if he lacks "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding'" or "'lacks a rational as well as factual understanding of the proceedings against him.'" Indiana v. Edwards, 554 U.S. 164, 170 (2008) (quoting Dusky v. United States, 362 U.S. 402 (1960)); see also Godinez v. Moran, 509 U.S. 389, 396 (1993); McMurtrey v. Ryan, 539 F.3d 1112, 1118 (9th Cir. 2008); Douglas, 316 F.3d at 1094. In California, "[a] defendant is mentally incompetent . . . [if] the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." Cal. Penal Code § 1367.

A trial court judge must conduct a competency hearing on his own motion "[w]here the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial." Pate v. Robinson, 383 U.S. 375, 385 (1966); Stanley, 633 F.3d at 860. The question is whether a reasonable judge, "'situated as was the trial court judge,'" should have experienced a "'good faith'" or "'substantial doubt'" regarding the defendant's competence. Stanley, 633 F.3d at 860 (quoting deKaplany v. Enomoto, 540 F.2d 975, 983 (9th Cir. 1976)); Deere v. Woodford, 339 F.3d 1084, 1086 (9th Cir. 2003) (quoting Cuffle v. Goldsmith, 906 F.2d 385, 392 (9th Cir. 1990)).

In reviewing whether a state trial judge should have sua sponte conducted a competency hearing, a federal court may consider only the evidence that was before the trial judge. United States v. Lewis, 991 F.2d 524, 527 (9th Cir. 1993). Whether a defendant is capable of understanding the proceedings and assisting counsel depends on "evidence of the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on competence to stand trial." Drope v. Missouri, 420 U.S. 162, 180 (1975). None of these factors is determinative, but any one of them may be sufficient to raise a reasonable doubt regarding competence. Id.

In addition, although the opinion of the defendant's counsel certainly is not determinative, the defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings. See, e.g., Hernandez v. Ylst, 930 F.2d 714, 718 (9th Cir. 1991) ("We deem significant the fact that the trial judge, government counsel, and [the petitioner's] own attorney

did not perceive a reasonable cause to believe [the petitioner] was incompetent."); <u>United States v. Clark</u>, 617 F.2d 180, 186 (9th Cir. 1980) (fact that the defendant's attorney considered the defendant competent to stand trial was significant evidence that defendant was competent).

## 2. Background Facts

### a. Facts in the Trial Court Record

Petitioner's counsel did not raise any issues regarding petitioner's competency during trial. Further, in response to the prosecutor's concern that petitioner was going to discuss "the fact that he had a mental problem during [his] prior offenses," which, the prosecutor argued, "could leave in the mind of the jury that . . . that same emotional problem or mental problem was present in this case," petitioner's counsel advised the court that he believed Dr. Johnston (petitioner's expert) would testify that petitioner had not been on any medications since 1987 and was functioning normally. (14 RT 5116-17.) Indeed, Dr. Johnston testified that petitioner had suffered from bipolar disorder since the late 1970s, but appeared to be "largely in remission at the present time." (<u>Id.</u> at 5202.)

### b. Additional Facts Presented on Habeas

Petitioner incorporated the allegations and exhibits in claims 2, 3, 4, and 8 of his first state habeas petition into this claim. (LD No. 10 at 201.) He did not submit any additional evidence to support this claim. Rather, petitioner alleged summarily that:

- Petitioner's ability to learn, to prioritize and to organize information was compromised by his deficits. These disabilities prevented him from accumulating and organizing new information in light of the information to which he had already been exposed. In the context of the trial, this meant Mr. Cornwell had difficulty retaining and building a fund of information from one day to the next. Nor could he track the proceedings to understand how each day's events related to the trial as a whole.

- His perseverative focus on certain items and areas of evidence was also a manifestation of his impairments. He was unable to comprehend the relative significance and insignificance of different items of testimony and other evidence within the context of the trial as a whole. He was unable to control his perseverative thoughts and delusional beliefs. The combined cognitive, functional and behavioral effect of these deficits constituted a significant obstacle to Mr. Cornwell's understanding of the proceedings and to his

rational participation in his own defense.

- Mr. Cornwell's deficits and impairment, including thought disorder, paranoia and grandiosity, were apparent when he testified at the penalty phase. He was unable to adequately recall, organize and relate information. His testimony demonstrated the derailment, circumstantiality, illogicality, tangentiality, poverty of content of speech, memory impairments, loss of goal, grandiosity, paranoia, and lack of insight he suffered from throughout the litigation of his capital case. Because of his lack of insight, he testified that he was mentally ill. He testified that he was in the band in high school, but not that he was born and raised in the violent and segregated neighborhoods of Watts and Compton in the 1950s and 1960s.

- At times, Mr. Cornwell's impairments manifested through impulsive and stimulus bound behavior when he spoke out in court. At other times, he was acquiescent and apologetic. Thus at the time Mr. Cornwell testified, and through court room interactions before then, the court should have recognized that Mr. Cornwell's thought disorder was a strong clinical indication that his competency to stand trial was substantially impaired by his mental illness, neurological and thought disorders and that further clinical assessment of his competency was warranted.

(Id. at 201-03.)

### 3. California Supreme Court Decisions

In the first state habeas petition, the California Supreme Court denied this claim on the merits and as untimely, and to the extent that the claim alleged the trial court violated a duty to act on its own motion, the California Supreme Court denied the claim because it could and should have been raised on appeal. (LD No. 18.) In the supplemental state habeas petition, the California Supreme Court denied this claim on the merits and determined that it was barred as untimely and successive, and to the extent that the claim was based upon the record on appeal, it was barred because it could have been, but was not, raised on appeal. (LD No. 23.)

### 4. Discussion

Although this court determined above that defense counsel was ineffective during the penalty phase by failing to present evidence of petitioner's mental illness as a mitigating factor, this determination is distinct from the issue of petitioner's competency to stand trial. This court finds that the trial court did not err in failing to sua sponte conduct a competency proceeding.

204

Petitioner has failed to make a prima facie showing that there existed "substantial evidence" of incompetence that would have created a "bona fide doubt" that he was not competent. Pate, 383 U.S. at 385; Moran v. Godinez, 57 F.3d 690, 695 (9th Cir. 1995), superseded on other grounds by statute, AEDPA, Pub. L. No. 104-132, 110 Stat. 1214, as stated in McMurtrey, 539 F.3d at 1119.

Petitioner does not provide any expert opinion, nor does he specifically cite any instances of his behavior at trial that indicated he was unable to understand the proceedings or that he was unable to assist in his defense. To the contrary, the record reflects that petitioner understood the proceedings and was able to assist counsel with his defense. Petitioner testified during the penalty phase, and nothing about his testimony raised any issues of competency. (14 RT 5120-44.) Petitioner was able to initiate and participate in Marsden proceedings and he was able to explain his understanding of the proceedings of a possible motion for new trial (see LD No. 15 at 1171-76; Marsden Motion RT 4970-5039); he was also able to articulate his arguments during a hearing regarding a conflict of interest with counsel (15 RT at 5279-342) and during a hearing regarding alleged ineffective assistance of counsel at the guilt phase (Sealed Transcript 5416-32). Counsel did not raise any issues as to petitioner's competency even though counsel was in the best position to do so. Furthermore, Dr. Johnston testified that petitioner's bipolar disorder appeared to be in remission. (14 RT 5202, 5204-05, 5212.) Nonetheless, even assuming that petitioner was suffering from bipolar disorder at the time of trial, merely being diagnosed with a mental illness does not demonstrate that petitioner was incompetent to stand trial or that the trial court should have doubted petitioner's competence. See United States v. Garza, 751 F.3d 1130, 2014 WL 2058088, at *5 (9th Cir. 2014) ("Even a mentally deranged defendant is out of luck if there is no indication that he failed to understand or assist in his criminal proceedings."); Boyde v. Brown, 404 F.3d 1159, 1166 (9th Cir. 2005) (inmate's "major depression" and "paranoid delusions" did not raise a doubt regarding his competence to stand trial); Bassett v. McCarthy, 549 F.2d 616, 619 (9th Cir. 1977) (schizophrenia diagnosis "do[es] not necessarily imply that [petitioner] did not understand the proceeding or could not cooperate with his counsel"); Grant v. Brown, 312 F. App'x 71, 73 (9th Cir. 2009) ("[M]ental illness does not necessarily equate to incompetence.").

Petitioner asserts that his past incompetency and mental incapacity rendered him "mentally not present" and incompetent to stand trial in this case. (ECF No. 103 at 410-12.) In support of this argument, petitioner submitted records related to petitioner's competency evaluations from his 1984 trial of the 1983 robberies. (LD No. 13 at 533-84.) According to two of the three doctors who examined petitioner in 1984, petitioner was "mentally incompetent," "incompetent to stand trial," and "unable to understand the nature of the proceedings taken against him and to assist counsel in the conduct of a defense in a rational matter." (Id. at 543-45.) Without any evidentiary support, petitioner baldy concludes that "[t]here "is no indication that the situation had changed by 1993-1994." (ECF No. 103 at 410.) Furthermore, petitioner fails to mention that the third doctor *and the jury* found petitioner competent to stand trial for the 1983 robberies. (LD No. 13 at 536, 539-40.) This court finds that an approximately ten-year-old opinion (at the time of trial) regarding petitioner's incompetency—that a jury rejected—does not raise a substantial doubt as to petitioner's competency to stand trial in this case, especially in light of the expert opinion that petitioner was functioning normally.

In sum, the record is devoid of evidence of any substantial or bona fide doubt as to petitioner's competency that would warrant the trial court's sua sponte initiation of competency proceedings. Specifically, there were no indicators that petitioner could not consult with counsel or understand what was going on. Accordingly, the California Supreme Court's decision was not unreasonable under 28 U.S.C. § 2254(d).

V. Ineffective Assistance for Failure to Request Competency Hearing – Claim 23

Petitioner contends that his counsel was ineffective for failing to recognize his incompetence to stand trial and to initiate competency proceedings. The background for this claim is primarily set out above in the discussion of Claim 22 regarding the trial court's failure to conduct a competency proceeding.

1. Evidence Presented on Habeas

Petitioner submitted to the California Supreme Court a letter he had written on November 22, 1993, to Mr. Lyons expressing his dissatisfaction with Mr. King. Petitioner argues that the following statements in the letter raise a doubt as to petitioner's competency:

- Mr. King had unexpectedly, and without petitioner's permission, taken and destroyed a name tag that allegedly had the word "Klan" on it and that petitioner had been saving "to show that officers and detectives do manufacture items." This was in reference to the drug store receipt found in a bureau drawer at Juanita Washington's home that petitioner maintained the police had planted to connect him to the crime scene.

- Petitioner was not "looking for any new friends that may or may not work for the Russians."

- If Mr. Lyons decided to keep Mr. King on as counsel, petitioner did not "want to expose any hidden cards to him, you saw what he did with that last one."

    Although the letter indicates that Mr. King was concerned that the name tag would be confiscated and cause petitioner to be sent to "the hole," petitioner believed the incident demonstrated that Mr. King could not be trusted and it was necessary to keep case information from him.

(LD No. 15, Ex. 5 at 1166-69.)

Petitioner also submitted the declaration of clinical psychologist Dr. Myla Young, Ph. D. who met with and conducted tests on petitioner in 2004 and found that his intellectual functioning was in the "Average Range." (LD No. 11, Ex. 1 at 124E.) Dr. Young opined that petitioner had brain dysfunction, overall severity mild, before the capital crime that could have been caused by any of the following: major mental disorder (bipolar and/or schizophrenic disorders); dysfunctional early childhood environment; or genetic vulnerability for major mental disorder. (Id. at 124E, I-K.) Dr. Young further concluded:

> It is also reasonable to conclude that [petitioner's] brain dysfunction, as well as his major mental disorders, had a substantial impact upon his life. His intelligence would permit him to obtain employment commensurate with a high school diploma, but his ability to hold a job would be affected by his brain dysfunction and mental disorder. He would be able to work satisfactorily and under simple and clear circumstances, but he has a limited capacity of handle complexity and stress. His brain is "bruised" and damaged; it is like a rubber band with very little stretch to it. The more stressful and complex a situation becomes, the more difficulty [petitioner] would have in handling it successfully.

207

1  (Id. at 124K-L.)

2       2.  California Supreme Court Decision

3       This California Supreme Court summarily denied this claim on the merits.  (LD No. 18.)

4       3.  Discussion

5       The issue presented on habeas review is not whether petitioner was incompetent to stand

6  trial and submit to the sentence imposed.  See Lewis, 991 F.2d at 527.  Instead, the issue is

7  whether petitioner was denied the effective assistance of trial counsel for counsel's failure to

8  express a doubt as to petitioner's competence and to request a hearing regarding petitioner's

9  competency, which, in turn, would be required only if the state trial court had information before

10 it which should have caused the court to have a bona fide doubt as to petitioner's competency.

11 See id.  As discussed above in Claim 22, the trial court did not err in failing sua sponte to conduct

12 a competency proceeding.  Furthermore, nothing petitioner presents in support of this ineffective

13 assistance of counsel claim changes this court's opinion that petitioner has failed to make a prima

14 facie showing that he was in fact incompetent to stand trial or that there existed "substantial

15 evidence" of incompetence that would have created a "bona fide doubt" that he was not

16 competent.  See Pate, 383 U.S. at 385; Moran, 57 F.3d at 695.  Although petitioner's comment

17 about the Russians is odd, the remainder of the letter reflects that petitioner understood the

18 proceedings against him and was simply expressing to Mr. Lyons his thoughts and ideas about his

19 defense and his concern with Mr. King's involvement in the case.  In addition, Dr. Young's

20 evaluation of petitioner does not support petitioner's argument that his counsel should have

21 initiated competency proceedings.  First, Dr. Young's report was made after the trial, and

22 therefore, counsel cannot be faulted for failing to initiate competency proceedings based upon it.

23 And, second, although Dr. Young's report indicates that it may be difficult for petitioner to

24 handle successfully stressful and complex situations, the report does not opine that petitioner, at

25 the time of the trial, was incompetent or unable to understand the proceedings.  The fact that

26 petitioner might have been experiencing significant stress is unsurprising and would be natural for

27 someone facing the death penalty.  Based on the state of the record on habeas review, the

28 California Supreme Court's denial of this claim was not unreasonable.

1    W. Purposeful Discrimination – Claim 24

2         Petitioner claims that his death sentence is unconstitutional because the Sacramento

3    County District Attorney's Office engaged in discriminatory practices from 1980-1995, seeking

4    the death penalty in cases based on the defendant's race, gender, and economic status.  Petitioner

5    raised this claim in his first state habeas petition.  (LD No. 10 at 215-20.)  The California

6    Supreme Court denied the claim on the merits and also found that it was barred as untimely, and,

7    except to the extent it alleged ineffective assistance of counsel, it should have been raised in the

8    trial court.  (LD No. 18.)

9         Clearly established federal law holds that "a defendant who alleges an equal protection

10   violation has the burden of proving 'the existence of purposeful discrimination'" and must

11   demonstrate that the purposeful discrimination "had a discriminatory effect" on him.  McCleskey,

12   481 U.S. at 292 (quoting Whitus v. Georgia, 385 U.S. 545, 550 (1967)).  Therefore, to prevail on

13   this claim, petitioner "must prove that the decisionmakers in his case acted with discriminatory

14   purpose."  Id.  Petitioner does not attempt to meet this burden.  He offers no evidence specific to

15   his case that would support an inference that his race, gender, or economic status or the victim's

16   race or gender played a part in his sentence.  Cf. Richmond v. Lewis, 948 F.2d 1473, 1490-91

17   (9th Cir. 1990) (holding that statistical evidence that Arizona's death penalty is discriminatorily

18   imposed based on race, sex, and socio-economic background is insufficient to prove that

19   decision-makers in the petitioner's case acted with discriminatory purpose), vacated on other

20   grounds, 986 F.2d 1583 (9th Cir. 1993).   The California Supreme Court's rejection of this claim

21   was neither contrary to, nor an unreasonable application of, controlling Supreme Court law.

22        Petitioner also claims that trial counsel was ineffective for failing "to present appropriate

23   challenges to the California statutory scheme in general" and "to challenge the charging decisions

24   in [his] case based on the grounds that said decisions in California, and in Sacramento County in

25   particular are disproportionately determined by the race and gender of the victim, the race and

26   gender of the accused, and the economic status of the accused."  (ECF No. 103 at 425-26.)  The

27   claim fails for lack of prejudice because his underlying challenge fails for lack of evidentiary

28   support.  See Strickland, 466 U.S. at 688.

X.  Execution of Mentally Ill Offenders – Claim 25

Petitioner contends that, because he is mentally ill, his death sentence violates the Eighth Amendment, the Fourteenth Amendment, and international law.  The claim was raised in the first state petition (LD No. 10 at 238-66) and was summarily denied on the merits (LD No. 18).  For the reasons stated below, this court finds that petitioner is not entitled to habeas relief on claim 25.

Petitioner argues that his mental impairments and mental illness are similar to the mentally retarded persons and children protected from execution by Atkins, 536 U.S. at 320-21, and Roper, 543 U.S. at 568-69.  Although the Constitution prohibits the execution of children and persons whose mental illness renders them insane or incompetent, it does not prohibit the execution of defendants like petitioner.  See Roper, 543 U.S. at 568-69; Atkins, 536 U.S. at 320-21; Ford, 477 U.S. at 410 (establishing that the Eighth Amendment prohibits the execution of the insane).  Further, neither the Supreme Court nor this circuit has extended the Atkins/Roper protections to the mentally ill whose illness does not reach that of incompetency or insanity.  Nonetheless, petitioner requests that this court extend Atkins and Roper to prohibit the execution of the mentally ill.

To support his claim of extending a ban on capital punishment to those with mental illness, petitioner argues that national public consensus generally opposes use of the death penalty against defendants suffering from mental illness.  (ECF No. 103 at 435.).  He also contends that norms of international law and several American legal and medical organizations support a prohibition against capital punishment for severally mentally ill defendants.  (Id. at 434-40.)  He cites various studies and reports to support these assertions.  (Id. at 434-35, 439-40.)  Petitioner also cites Trop v. Dulles, 356 U.S. 86, 101 (1958), to argue that the "evolving standards of decency" in society require the court not to subject the mentally ill to the death penalty.  (Id. at 431.)

Although petitioner's references to international law, public opinion data, and various other reports and studies are instructive, this court must follow Supreme Court authority.  To extend Atkins and Roper to prohibit the execution of the mentally ill would constitute a new rule

of constitutional law.  See White v. Woodall, 134 S. Ct. 1697, 1706 (2014) ("AEDPA's carefully

constructed framework 'would be undermined if habeas courts introduced rules not clearly

established under the guise of extensions to existing law.'" (citations omitted)).  Under AEDPA,

however, this court cannot create new rules of constitutional law within the context of a habeas

petition by a state prisoner.  See 28 U.S.C. § 2254(d)(1) (stating a federal court may not grant

habeas relief to a state prisoner unless the adjudication of his claim in state court "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States").  Accordingly, sans a

decision from the Supreme Court barring the execution of mentally ill prisoners, this court rejects

petitioner's claim that he is exempt from execution because he is mentally ill.  Moreover,

incompetency-to-be-executed claims do not become justiciable until an execution becomes

imminent, and no execution date has yet been set for petitioner.  See Panetti, 551 U.S. at 947;

Stewart v. Martinez-Villareal, 523 U.S. 637, 644-45 (1998).

Additionally, to the extent petitioner asserts that customary international law, also known

as jus cogens, would prohibit the application of the death penalty in petitioner's case, it does not

create a private right of action.  In Buell v. Mitchell, 274 F.3d 337 (6th Cir. 2001), the Sixth

Circuit explained:

> We hold that the determination of whether customary international
> law prevents a State from carrying out the death penalty, when the
> State otherwise is acting in full compliance with the Constitution, is
> a question that is reserved to the executive and legislative branches
> of the United States government, as it is their constitutional role to
> determine the extent of this country's international obligations and
> how best to carry them out.

Id. at 376.

In evident agreement with the Sixth Circuit's reasoning, the Ninth Circuit has held that

"customary international law is not a source of judicially enforceable private rights in the absence

of a statute conferring jurisdiction over such claims."  Serra v. Lappin, 600 F.3d 1191, 1197 (9th

Cir. 2010) (declining to imply a private right of action in favor of prisoners alleging government's

payment of low wages violated jus cogens norms of international law).  As such, petitioner's

claim must fail, for he "can point to no statute that brings [his] claim within [this Court's]

211

purview." Id.  Furthermore, while the United States is clearly in the minority among nations of the world in its retention of capital punishment, petitioner fails to provide persuasive evidence demonstrating that the abolition of capital punishment has "risen to the level that the international community as a whole recognizes it as jus cogens, or a norm from which no derogation is permitted." Buell, 274 F.3d at 373; see also Carter, 2013 WL 1120657, at *204-05.

Accordingly, based on an independent review of the record, this court must conclude that the California Supreme Court's rejection of this claim on state habeas review was objectively reasonable, and that the state court did not clearly err in its application of controlling federal law in denying this claim.

Y.  Prolonged Confinement on Death Row – Claim 26

Petitioner next argues that his prolonged confinement on death row, made worse by the delay in the appellate and post-conviction process, amounts to cruel and unusual punishment under the Eighth Amendment.  The California Supreme Court summarily denied this habeas claim (LD No. 10 at 238-66) on the merits.  (Lodged Doc No. 18.)

Petitioner contends that authority from the Ninth Circuit Court of Appeals rejecting similar claims does not bar his arguments because the "factual considerations" he raises go well beyond those raised before that court previously.  See Smith v. Mahoney, 611 F.3d 978, 997-98 (9th Cir. 2010); Allen v. Ornoski, 435 F.3d 946, 958-59 (9th Cir. 2006); McKenzie v. Day, 57 F.3d 1461, 1466-67 (9th Cir. 1995); see also Andrews v. Davis, 866 F.3d 994, 1039 (9th Cir. 2017).   However, petitioner does not describe just how his claim differs from those considered, and rejected, previously.  Further, the cases petitioner cites in support of his claim do not necessarily support it.  They either make broad statements about the purposes of the Eighth Amendment protections, often within the context of claims in different procedural postures than the claims in petitioner's present habeas petition, and/or they address issues that bear no resemblance to the arguments petitioner makes here.  See Farmer v. Brennan, 511 U.S. 825, 833 (1994) (in civil action for damages, Court cites rule that prison official violates the Eighth Amendment where the deprivation of a right is sufficiently serious, the infliction of pain is "unnecessary and wanton," serving no "legitimate penological objective," and the official is at

212

least deliberately indifferent to the inmate's health or safety); Helling v. McKinney, 509 U.S. 25, 35 (1993) (prisoner's exposure to second-hand tobacco smoke states a viable Eighth Amendment claim); Estelle v. Gamble, 429 U.S. 97, 102 (1976) (Eighth Amendment violation can be based on inadequate prison medical care); Gregg, 428 U.S. at 182 (Eighth Amendment requires that "the sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering"); Trop, 356 U.S. at 101 ("denationalization" as punishment for desertion from the military violates the Eighth Amendment); Weems v. United States, 217 U.S. 349 (1910) (punishment of fifteen years in leg irons at hard labor imposed for crime of falsifying public records was cruel and unusual); In re Kemmler, 136 U.S. 436, 447 (1890) (in challenge to death by electrocution, Court notes that death itself is not a cruel punishment; rather, punishments are cruel when there is "something inhuman and barbarous, something more than the mere extinguishment of life"); In re Medley, 134 U.S. 160, 172 (1890) (change in statute to require condemned prisoner to be held in solitary confinement and not to be informed of time of execution were additional punishments inflicted on him in violation of the Ex Post Facto Clause); Wilkerson v. Utah, 99 U.S. 130, 136 (1878) (explaining that while the Constitution permits execution by various means, including by firing squad, none may involve the infliction of torture).

Interestingly, petitioner also complains that the lengthy appellate and collateral review procedures implicated in death penalty cases violate the cruel and unusual punishment under the Eighth Amendment. However, these appellate and collateral review procedures at the state and federal levels are designed to *protect* defendants, like petitioner, who are sentenced to death. To the extent petitioner's argument is based simply on his belief that the state courts were unwilling for many years to reverse his original conviction, this does not establish, in any way, that "there is an absence of available state corrective process" or that "circumstances exist that render such process ineffective to protect [petitioner's] rights." See 28 U.S.C. § 2254(b)(1)(B)(i)-(ii). Furthermore, there is not Supreme Court authority holding that the appellate and collateral review procedures at the state and federal levels violate the Eighth Amendment. Thus, petitioner's allegation is not well-taken.

Petitioner has failed to show the California Supreme Court's rejection of Claim 26 flies in the face of clearly established federal law.  See Van Patten, 552 U.S. at 125 (state court did not unreasonably apply clearly established federal law where "our cases give no clear answer to the question presented").  The California Supreme Court did not act unreasonably in holding that petitioner had failed to state a prima facie claim for relief.

Z.  State Misconduct – Claim 27

The instant claim presents the following grounds for relief:  (1) the live lineup employed in Robert Young's eyewitness identification of the shooter was unduly suggestive and violated his due process rights; (2) the police and the prosecution attempted to coerce alibi witness Bill Mackey to change his testimony; (3) the police and the prosecution intimidated and coerced Michael Johnson, who initially was a co-defendant; and (4) the prosecutor committed misconduct by stating in closing argument that the jury could not consider petitioner's background and that only actual insanity was a mitigating mental health factor.  Petitioner also alleges that trial counsel was ineffective for failing to properly challenge the above misconduct.

In addition to the ineffective assistance claim, petitioner raised only two of the allegations in his first state habeas petition—the allegations relating to the tainted lineup in which Robert Young participated and the prosecutor's improper closing argument. (LD No. 10 at 289-91.)  The California Supreme Court summarily denied the claim on the merits and also as untimely.  (LD No. 18.)

1.  Suggestive Lineup

Petitioner claims that the live lineup employed in Robert Young's eyewitness identification of the shooter was unduly suggestive in violation of petitioner's due process rights and, if disclosed, would have "cast a pall of doubt" over the entire identification process, including those eyewitnesses who identified petitioner in similar lineups.

a.  Evidence Presented to the California Supreme Court

Robert Young was working at Cashland the day of the robbery/murder.  Petitioner submitted Young's declaration on habeas review.  It states in relevant part as follows:

////

214

The next day, June 1st, Bill was killed on the sidewalk in front of Cashland. I had the best view of everyone inside the store when it happened because I worked right next to the window.

When the police had me look at a line-up, I picked the guy who I thought looked most like the shooter. The police told me I picked the wrong guy, and kept asking me if I was sure. I told them I picked the guy I picked, and if that wasn't him, then I didn't know who it was. I [had] never seen the guy before in my life. I was the closest person to him, if I couldn't tell who he was, how could anyone?

(LD No. 11 at 125.) Young never identified petitioner as the shooter.

### b. Legal Standard

To determine whether a pre-trial identification violates a defendant's right to due process, the United States Supreme Court has essentially created a two-step test whereby a reviewing court first determines whether the identification procedure was unnecessarily suggestive and, if so, whether the identification itself is nonetheless "reliable" under the totality of the circumstances. Neil v. Biggers, 409 U.S. 188, 197 (1972); Manson v. Brathwaite, 432 U.S. 98, 114 (1977); see Ponce v. Cupp, 735 F.2d 333, 336 (1984) ("Biggers implies a two-step test: first, whether the identification procedure was unnecessarily suggestive; and second, whether the identification was nonetheless reliable."). Under Biggers and Manson, a pretrial identification procedure violates due process where it: (1) is impermissibly suggestive; and (2) gives rise to a very substantial likelihood of misidentification. Biggers, 409 U.S. at 197; Manson, 432 U.S. at 114. However, even if an identification procedure is impermissibly suggestive, it still does not violate due process if it is nevertheless reliable under the totality of the circumstances, which is examined against five factors identified in Biggers. Manson, 432 U.S. at 114-15. These factors include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Id. at 114; Biggers, 409 U.S. at 199-200. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." Manson, 432 U.S. at 114.

////

////

c. <u>Discussion</u>

Even if the lineup used in Young's identification was improperly suggestive, petitioner suffered no prejudice because Young did not identify petitioner as the shooter. Although Young had identified someone at the live lineup other than petitioner as the perpetrator, at trial Young testified he was unable to say whether or not petitioner was involved. Petitioner asserts that evidence of Young's live lineup identification "would have cast a pall of doubt over the entire eyewitness identification process, as it would have been reasonable for the jury to assume the overly suggestive misconduct was not limited to Mr. Young." (ECF No. 103 at 448.) Yet petitioner offers no evidence of any other eyewitness identification of petitioner that resulted from improper or tainted procedures. In any event, petitioner's counsel cross-examined the eyewitnesses concerning their positive identifications of petitioner. And, as noted previously, four witnesses who stood in front of or near Cashland and witnessed the crime testified at trial that petitioner was *not* the shooter. Thus, defense counsel presented evidence supporting the defense theory of mistaken identity, and it was for the jury to evaluate the witnesses' conflicting testimony regarding those identifications.

This court finds that petitioner has not shown that no fairminded jurist could agree with the correctness of the California Supreme Court's denial of this claim. Accordingly, petitioner's request for habeas relief on this ground is denied.

2. <u>Prosecutor's Improper Closing Argument</u>

Next, petitioner argues that the prosecutor committed misconduct during the penalty phase closing argument when he stated that the jury could not consider petitioner's background and that only actual insanity was a mitigating mental health factor.

a. <u>Legal Standards</u>

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. <u>Darden</u>, 477 U.S. at 181. However, such misconduct does not, per se, violate a petitioner's constitutional rights. <u>Jeffries</u>, 5 F.3d at 1191 (citing <u>Darden</u>, 477 U.S. at 181, and <u>Campbell v. Kincheloe</u>, 829 F.2d 1453, 1457 (9th Cir. 1987)). Rather, claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to

determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Johnson, 63 F.3d at 929; see also Miller, 483 U.S. at 765; DeChristoforo, 416 U.S. at 643; Turner, 281 F.3d at 868. Relief is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice. Johnson, 63 F.3d at 930 (citing Brecht, 507 U.S. at 637-38); see also Darden, 477 U.S. at 181-83; Turner, 281 F.3d at 868. Put another way, prosecutorial misconduct violates due process when it has a substantial and injurious effect or influence in determining the jury's verdict. See Ortiz-Sandoval, 81 F.3d at 899.

In considering claims of prosecutorial misconduct involving allegations of improper argument, the court must examine the likely effect of the statements in the context in which they were made and determine whether the comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. Turner, 281 F.3d at 868; Sandoval, 241 F.3d at 778; see also Donnelly, 416 U.S. at 643; Darden, 477 U.S. at 181-83. In fashioning closing arguments, prosecutors are allowed "reasonably wide latitude," Birges, 723 F.2d at 671-72, and are free to argue "reasonable inferences from the evidence." Gray, 876 F.2d at 1417. See also Duckett, 67 F.3d at 742. "[Prosecutors] may strike 'hard blows,' based upon the testimony and its inferences, although they may not, of course, employ argument which could be fairly characterized as foul or unfair." Gorostiza, 468 F.2d at 916.

b. Background

During closing argument in the penalty phase, the prosecutor argued:

> [A]s I mentioned in the guilt phase, it's not about what makes one person a criminal or . . . makes another person lead a productive life.

> This is debated throughout universities, colleges every day, and nobody really has an answer to that. It's too late for that question here. So we're not going to talk about why [petitioner] committed this crime in the sense of his background or his childhood. Based on what we've heard over a couple of days, there's nothing in his childhood that would really indicate that he would end up where he is.

> But that's not why we're here. . . .

(14 RT 5237.) Petitioner's counsel did not object.

1          c.  Discussion

2          As an initial matter, in the passage petitioner cites above, the prosecutor does not, as

3   petitioner alleges, state that only actual insanity was a mitigating mental health factor.  In

4   addition, the prosecutor did not tell the jury it could not consider petitioner's background when

5   deciding whether to impose the death penalty; rather, the prosecutor urged that petitioner's

6   background was not relevant to why he committed the homicide/robbery.  In other words, the

7   prosecutor argued the inapplicability of statutory mitigating factors.  Petitioner cites Eddings v.

8   Oklahoma, 455 U.S. 104 (1982), for the proposition that "a jury must be allowed to consider any

9   aspect of a defendant's character or background that the defendant proffers as a basis for a

10  sentence less than death."  Id. at 114-15 (trial court erred in instructing jury it could not, as a

11  matter of law, consider evidence of defendant's emotional disturbance).  He cites another

12  Supreme Court case for the proposition that a jury must be allowed to consider evidence

13  presented in mitigation.  See Tennard v. Dretke, 542 U.S. 274, 285 (2004) (once the low

14  threshold for relevance is met, the "Eighth Amendment requires that the jury be able to consider

15  and give effect to" a capital defendant's mitigating evidence).  None of these federal cases

16  establishes any sort of rule that a prosecutor may not argue the inapplicability of statutory

17  mitigating factors.  Even construing the prosecutor's comments as petitioner proposes, the

18  comments were brief and, thus, any prejudice was mitigated by the trial court's proper

19  instructions to the jury regarding the aggravating and mitigating factors in the case.  Juries are

20  presumed to follow instructions.  Weeks, 528 U.S. at 234.  Moreover, the prosecutor here was

21  careful not to argue that the lack of a mitigating factor amounted to an aggravating factor.

22  Accordingly, petitioner has failed to show the California Supreme Court's rejection of this claim

23  was unreasonable under 28 U.S.C. § 2254(d).

24          3.  Ineffective Assistance of Counsel

25          Petitioner also alleges that trial counsel was ineffective for failing to properly challenge

26  the State's alleged misconduct.  Because this court rejected the underlying misconduct claims,

27  trial counsel did not render ineffective assistance by failing to object to these meritless issues.

28  See James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994).  Thus, this claim should be denied.

This court notes, however, that denial of this claim does not in any way alter this court's earlier determination in Claim 3 that trial counsel was ineffective for failing to adequately present mitigating evidence of petitioner's adverse childhood experiences, social and family history, and mental illness during the penalty phase. Indeed, this court determined in Claim 3 that trial counsel was ineffective for failing to rebut (with proper evidence and argument) the prosecution's argument that petitioner had a functional and stable childhood and did not suffer from mental illness. Thus, this court has already recommended granting petitioner his requested relief regarding ineffective assistance of counsel at the penalty phase.

4. <u>Intimidation and Coercion of Billy Mackey and Michael Johnson</u>

The allegations relating to Billy Mackey and Michael Johnson are not exhausted because they were not raised in the state habeas petitions and should therefore be dismissed.

AA. <u>Denial of Funds for Adequate Defense – Claim 28</u>

Petitioner claims that the trial court unreasonably refused to pay large portions of the defense investigator's bills and unreasonably impeded the defense's ability to put on witnesses by refusing to pay travel expenses for witnesses who lived outside Sacramento. Petitioner raised this claim in his first state habeas petition. (LD No. 10 at 294-95.) The California Supreme Court denied the claim on the merits and, except to the extent it alleged ineffective assistance of counsel, denied the claim on the ground that it should have been raised in the trial court and as untimely. (LD No. 18.) Petitioner raised the claim again in his supplemental state habeas petition. (LD No. 20 at 82-85.) The California Supreme Court denied the claim on the merits; it also barred the claim to the extent it repeated claims made in petitioner's first state habeas petition and barred the claim as untimely and successive to the extent it asserted ineffective assistance of appellate counsel. (LD No. 23.)

1. <u>Background</u>

Petitioner's counsel requested funds for the defense investigator to drive to Los Angeles to pick up petitioner's family members so they could testify, but the court only authorized payment "for the tourist rate air fare" of the witnesses. (14 RT 5102-03.) On habeas review, petitioner submitted the declaration of defense investigator Charles Pacheco. Mr. Pacheco stated:

219

3. I was . . . frustrated because the court administrator in charge of reviewing attorney and investigator bills would routinely cut my bill when I billed for the time required to find these witnesses. He would also cut my bill for time I spent reviewing the discovery, meeting with [petitioner] in jail and waiting for witnesses to show up. It was his opinion that discovery only needed to be read one time, that an investigator should not spend time waiting for a witness, and that an investigator should only work a certain amount of hours per day. Out of a $2,500 bill, I would often be cut $400 or $500, and then an additional two percent was taken, which was supposed to go back to the panel. It was unclear as to what that money was used for.

4. It was hard not to let these billing problems affect my work. It's only reasonable that an investigator is not going to bust his ass to find a witness when he knows that he's not even going to get paid for it.

(LD No. 11 at 67-68.)

2. Discussion

Petitioner argues that relief is warranted under Ake v. Oklahoma, 470 U.S. 68 (1985). That case simply cannot be stretched far enough to encompass the right petitioner asserts here. Ake addressed the issue whether an indigent defendant who had exhibited signs of severe mental illness had a right to psychiatric examination and assistance to prepare a defense when his sanity was in question. The Supreme Court held that, "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." Id. at 74. The centrality of the defendant's mental state to the issues of his criminal culpability and punishment was critical to the Supreme Court's determination that the indigent defendant must be provided access to a competent psychiatrist upon an adequate showing. See id. at 80-83. "[A]s in the case of the provision of counsel," the Supreme Court left "to the State the decision on how to implement this right." Id. at 83. Ake would have to be greatly extended to apply to petitioner's facts: petitioner's claim did not pertain to any sanity/competence at trial, did not pertain to access to a defense investigator, and instead pertained to the amount paid to the defense investigator for submitted expenses. The question is not whether this court might think Ake should be extended to cover in full any funding request in any context, but rather whether the state court's failure to do so was contrary to, or an

1  unreasonable application of, <u>Ake</u>.  The Supreme Court has made clear that a state court's failure

2  to extend a Supreme Court rule to a new context does not support relief under § 2254(d)(1).

3  "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies*

4  this Court's precedent; it does not require state courts to *extend* that precedent or license federal

5  courts to treat the failure to do so as error."  <u>White</u>, 134 S. Ct. at 1706.  Because the Supreme

6  Court has not explicitly extended <u>Ake</u> to require the appointment of non-psychiatric experts,

7  petitioner cannot show that the failure to provide all funds requested by defense for investigative

8  purposes was contrary to, or an unreasonable application of, clearly established Supreme Court

9  precedent.

10       Assuming that <u>Ake</u> applies, this court is not persuaded that petitioner is entitled to relief.

11  Petitioner alleges that the defense investigators had to "forego certain investigation," but fails to

12  identify what investigation the defense had to forego and how it would have assisted the defense.

13  This court notes that this claim is distinct from Claim 3 regarding defense counsel's ineffective

14  assistance during the penalty phase investigation and presentation of evidence.  Petitioner further

15  alleges that he was not able to put on witnesses because the trial court refused to pay travel

16  expenses.  Again, petitioner fails to identify which witnesses he was unable to secure and how

17  their testimony would have assisted the defense.  Furthermore, the trial court refused to pay for

18  the investigator to drive to Los Angeles to pick up the witnesses and drive them to Sacramento

19  because of the amount of the expenditure.  The trial court, however, approved funds to fly those

20  witnesses from Los Angeles.  (14 RT 5102-03.)  Thus, the court did not deny petitioner the right

21  to present witnesses.  Accordingly, Claim 28 should be denied.

22       BB.    <u>Failure to Give CALJIC No. 3.18 – Claim 29</u>

23       Petitioner contends that the trial court failed to instruct the jury to view Roland Johnson's

24  testimony with caution.  Specifically, petitioner argues that the trial court failed to instruct the

25  jury with a version of CALJIC No. 3.18 that included Johnson.  Petitioner raised this claim in his

26  supplemental state habeas petition (LD No. 20 at 18-23.)  The California Supreme Court denied

27  the claim on the merits and also determined that it was barred because it was untimely,

28  successive, and could have been but was not raised on appeal.  (LD No. 23.)

As an initial matter, contrary to petitioner's assertion, the trial court did instruct the jury (CALJIC No. 3.16) that "Roland Johnson was an accomplice as a matter of law and his testimony is subject to the rule requiring corroboration." (13 RT 4736; 4 CT 924.) The trial court also defined "accomplice" for the jury (CALJIC No. 3.10), instructed the jury that the testimony of an accomplice should be viewed with distrust and cannot establish a defendant's guilt unless "corroborated by other evidence which tends to connect such defendant with the commission of the offense" (CALJIC Nos. 3.11, 3.18), and described the type of evidence sufficient to corroborate an accomplice's testimony (CALJIC No. 3.12). (13 RT 4736-37; 4 CT 923-25.) Furthermore, the trial court instructed the jury with CALJIC No. F3.20a, which provided:

> In evaluating the testimony of a witness who has received a favorable disposition of a sentence upon the recommendation of the prosecution or law enforcement, you should consider the extent to which that testimony may have been influenced by the receipt of any benefits from the party calling that witness. This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in light of all the evidence in this case.

(13 RT 4737; 4 CT 925.)

Additionally, the trial court provided the jury with other instructions designed to describe the general standards for evaluating witness credibility, including CALJIC No. 2.13 (prior consistent or inconsistent statement as evidence), CALJIC No. 2.20 (weighing the credibility of a witness and considering such factors as the existence of bias, interest, or other motive to lie), CALJIC No. 2.21.1 (discrepancies in testimony), CALJIC No. 2.21.2 (witness willfully false), CALJIC No. 2.22 (weighing conflicting testimony), CALJIC No. 2.23 (believability of witness-conviction of a felony), and CALJIC No. 2.27 (sufficiency of testimony of one witness). (3 CT 897-99; 4 CT 902, 925-26.)

This court finds that the combined instructions concerning accomplices adequately informed the jury to carefully examine such testimony. The jury was properly instructed on how to evaluate the testimony of Roland Johnson, and there was no due process violation. See Solis v. Garcia, 219 F.3d 922, 927 (9th Cir. 2000), cert. denied, 534 U.S. 839 (2001); Duckett, 67 F.3d at 745; see also People v. Echevarria, 11 Cal. App. 4th 444, 450-51 (1992) (trial court properly

222

instructed jury it may consider "'[w]hether the witness is testifying under a grant of immunity' in assessing her credibility and if, as defendant maintains, the witness was an accomplice, "then he effectively received the instruction that the jury should view [the witness'] testimony with distrust" when the jury was instructed with CALJIC No. 3.18). Thus, petitioner's argument that the trial court failed to instruct the jury to view Roland Johnson's testimony with caution is without merit.

In any event, petitioner has not stated a constitutional claim as recognized by the United States Supreme Court. It is elementary to federal habeas corpus jurisprudence that relief will not lie for alleged errors of state law in conducting a trial. McGuire, 502 U.S. at 71-72. Only in situations where the error touches upon matters of fundamental fairness can relief be given, and those instances where fundamental fairness is at stake have been interpreted very narrowly. Id. at 72-73. A cautionary instruction regarding an accomplice's testimony cannot be a fundamental due process requirement. United States v. Fritts, 505 F.2d 168, 169 (9th Cir. 1974); see also Barco v. Tilton, 694 F. Supp. 2d 1122, 1136 (C.D. Cal. 2010) (accomplice instruction in state criminal case is strictly a matter of state law). Accordingly, Claim 29 should be denied.

CC.   Uncorroborated Accomplice Testimony – Claim 30

Petitioner claims that the evidence was insufficient to support his convictions because the primary evidence against him came from accomplice Roland Johnson whose testimony was not sufficiently corroborated. Under California law, uncorroborated accomplice testimony cannot support a criminal conviction. Cal. Penal Code § 1111. Petitioner raised this claim in his supplemental state habeas petition (LD No. 20 at 30-32), and the California Supreme Court denied the claim on the merits and also determined that it was barred because it was untimely, successive, and could have been but was not raised on appeal, and because insufficiency of the evidence is not cognizable on habeas corpus. (LD No. 23.)

The United States Supreme Court has held that "there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them." Caminetti v. United States, 242 U.S. 470, 495 (1917); see United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993) ("The uncorroborated testimony of an accomplice is sufficient to sustain a

conviction unless it is incredible or insubstantial on its face."). "When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions." United States v. Augenblick, 393 U.S. 348, 352 (1969). Therefore, the requirement of California Penal Code § 1111 that "'a conviction cannot be had upon the testimony of an accomplice unless it be corroborated' is a matter of state law, which does not implicate a federal constitutional right" and cannot be the basis of federal habeas relief. Barco, 694 F. Supp. 2d at 1136.

As the Ninth Circuit has explained, California's statutory law prohibiting convictions based solely on uncorroborated accomplice testimony is only a state law rule: it is not required by Constitution or federal law. See Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000). Thus, because petitioner's claim is grounded in the state law requirement that accomplice testimony be corroborated, he can show no constitutional violation based on the alleged inadequate corroboration. Takacs v. Engle, 768 F.2d 122, 127 (6th Cir. 1985) ("If uncorroborated accomplice testimony is sufficient to support a conviction under the Constitution, there can be no constitutional right to instruct the jury that it must find corroboration for an accomplice's testimony."); see also Fritts, 505 F.2d at 169 (holding on direct review that trial court's failure sua sponte to give cautionary instruction on accomplice testimony did not warrant reversal).

In any event, the corroborative evidence, in fact, was adequate to connect petitioner with the crimes. Notably, the corroborative evidence required by California Penal Code § 1111 "need not corroborate every fact to which the accomplice testified or establish the corpus delicti, but is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy a fact finder the accomplice is telling the truth." People v. Williams, 16 Cal. 4th 153, 246 (1997) (amended Sept. 24, 1997).

Here, a mélange of evidence connects petitioner with the robbery and murder. To begin with, the accomplice testimony of Roland Johnson established that petitioner orchestrated the robbery/murder, including that:

- on the day before the crime petitioner asked to borrow Johnson's handgun in order "to try to make a move on something," which Johnson understood to mean that

petitioner planned to commit a robbery (11 RT 4240-43); petitioner claimed to have "eyes," meaning you have "somebody watching the place for you or scoping it out" (id. at 4244); Johnson gave petitioner a fully-loaded .357 magnum revolver (id. at 4241-42); and

- on the day after the crime, petitioner drove to Johnson's place in a white Camaro, and when Johnson asked for his gun, petitioner stated he used it and did not have it and instead gave Johnson approximately $500 in cash (id. at 4244-45, 4257); petitioner told Johnson that he committed a robbery and had to "smoke" the guy (id. at 4268).

As set forth in Claim 29, the trial court's instructions concerning accomplices adequately informed the jury to carefully examine such testimony. This court presumes the jury followed the court's instructions when evaluating Roland Johnson's testimony. See Marsh, 481 U.S. at 206.

Other evidence at trial corroborated Johnson's testimony. The victim's fatal wound was consistent with bullets from a .357 magnum (10 RT 4016); a bullet and jacket from a .357 magnum revolver were found at the scene (11 RT 4181-90); five eyewitnesses identified petitioner as the shooter (10 RT 3977 (Robert Blair), 10 RT 3995 (Maria Ramos), 11 RT 4125-26 (Francis Rivers), 11 RT 4225 (Cassandra Henderson), and 11 RT 4153 (Susan Erickson)). Juanita Washington testified that, on the day of the crime, petitioner had borrowed her car, and the car was found parked near the scene of the crime. (11 RT 4043-45, 4047, 4104, 4106.) Two employees of Pick-N-Pull further testified that, on the day of the crime, petitioner purchased a white Camaro. (11 RT 4068-71, 4074-75, 4278-81.)

All told, there was ample corroborative evidence that "tend[ed] to connect [petitioner] with the commission of the offense[s.]" Cal. Penal Code § 1111; see also Williams, 16 Cal. 4th at 681 ("[E]vidence of corroboration is sufficient if it connects defendant with the crime, although such evidence is slight and entitled, when standing by itself, to but little consideration.") (internal quotation marks and citation omitted).

Accordingly, the California Supreme Court was not unreasonable in denying petitioner's claim.

DD.    Constitutionality of California Penal Code § 190.3(a) – Claim 31

Petitioner argues that his death penalty is invalid because California Penal Code § 190.3(a), as applied, is impermissibly vague. This claim appears duplicative of Claim 16,[41] which the California Supreme Court rejected on direct appeal (see supra claim 16). See Cornwell, 37 Cal. 4th at 103. Petitioner also raised this claim in his supplemental habeas petition (LD No. 20 at 35-39), and the California Supreme Court denied it summarily on the merits and, to the extent the claim challenged the jury instructions, the California Supreme Court concluded the claim was barred because it was raised and rejected on appeal (LD No. 23). For the following reasons, this court finds that petitioner is not entitled to habeas relief on Claim 31.

Under § 190.3(a), "the trier of fact shall take into account . . . [t]he circumstances of the crime of which the defendant was convicted in the present proceeding." Cal. Penal Code § 190.3(a). Petitioner argues that § 190.3(a) is unconstitutionally vague because a jury may, under this subsection, weigh "every conceivable circumstance of the crime." (ECF No. 103 at 462.) Prosecutors, for instance, have allegedly relied upon § 190.3(a) in "starkly opposite circumstances": to advocate for the death penalty where "the defendant had a prior relationship with the victim," and to request the death penalty where "the victim was a complete stranger to the defendant." (ECF No. 103 at 462-63.). Thus, petitioner argues, § 190.3(a) "has been used in ways so arbitrary and contradictory as to violate the federal guarantee of due process of law and the Eighth Amendment requirement of reliable, non-arbitrary sentencing." (Id. at 462.)

In Tuilaepa, the United States Supreme Court considered and rejected a nearly identical § 190.3(a) challenge. As the Tuilaepa Court explained, "[p]etitioners' challenge to factor (a) is at some odds with [our] settled principles, for our capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty." 512 U.S. at 976. "We would be hard pressed to invalidate a jury instruction that implements what we have said the law requires." Id. The purpose of § 190.3(a) is to provide the

---

[41] Petitioner's assertion that the trial court violated his constitutional rights by instructing the jury with CALJIC No. 8.85, which mirrored Cal. Penal Code § 190.3, was raised and addressed in connection with Claim 16. See supra Claim 16.

jury with discretion to consider the specific context behind a particular case when making its

sentencing decision. That discretion results in sentencing decisions that are necessarily

individualized: "[o]nce the jury finds that the defendant falls within the legislatively defined

category of persons eligible for the death penalty, the jury then is free to consider a myriad of

factors to determine whether death is the appropriate punishment." Id. at 979 (ellipses omitted).

Thus, the Tuilaepa Court held that § 190.3(a) "instructs the jury to consider a relevant subject

matter and does so in understandable terms. The circumstances of the crime are a traditional

subject for consideration by the sentencer, and an instruction to consider the circumstances is

neither vague nor otherwise improper under [the] Eighth Amendment." Id. at 976.

Petitioner has not cited any U.S. Supreme Court authority to suggest that Tuilaepa is no

longer good law. In fact, the only decision upon which petitioner relies is Maynard v. Cartwright,

486 U.S. 356 (1988)—a case decided six years before Tuilaepa. In Maynard, an Oklahoma death

penalty case, the United States Supreme Court found an aggravating circumstance which required

a jury to find a murder to be "especially heinous, atrocious, or cruel" to be unconstitutionally

vague. 486 U.S. at 359.

The United States Supreme Court, however, specifically distinguished Maynard in

Tuilaepa: "In our decisions holding a death sentence unconstitutional because of a vague

sentencing factor, the State had presented a specific proposition that the sentencer had to find true

or false (e.g., whether the crime was especially heinous, atrocious, or cruel)." Tuilaepa, 512 U.S.

at 974. "We have held, under certain sentencing schemes, that [such] a vague propositional factor

used in the sentencing decision creates an unacceptable risk of randomness, the mark of [an]

arbitrary and capricious sentencing process." Id. Those concerns, however, "are mitigated when

a factor does not require a yes or a no answer to a specific question, but instead only points the

sentencer to a subject matter." Id. at 975. As the Tuilaepa Court went on to point out, § 190.3

does not require the jury to provide a yes or no answer. Instead, § 190.3 directs the jury to

consider the subject matter and circumstances behind the crime at issue, and is thus not void for

vagueness.

////

Petitioner's reliance upon <u>Maynard</u> is therefore unavailing. Consistent with <u>Tuilaepa</u>, this court finds petitioner's vagueness arguments as to § 190.3 to be without merit. Thus, this claim should be denied.

EE.  <u>Cumulative Prejudice – Claim 32</u>

Petitioner argues that the combined effect of the errors in the guilt phase and penalty phase resulted in an unconstitutional conviction and sentence. On direct appeal, the California Supreme Court rejected petitioner's contentions that the cumulative effect of a singular error at the guilt phase (giving of an unmodified instruction pursuant to CALJIC No. 2.11.5) was prejudicial at that stage of the proceedings and that the same asserted error was prejudicial at the penalty phase. <u>Cornwell</u>, 37 Cal. 4th at 105. The California Supreme Court also rejected petitioner's claims that there were errors at the penalty phase of his trial "whose cumulative effect was prejudicial." <u>Id.</u> at 106. Petitioner also raised this cumulative error claim in his state habeas petitions (LD No. 10 at 292-93; LD No. 20 at 77-80), which the California Supreme Court summarily denied on the merits and on procedural grounds (LD Nos. 18 & 23).

It is possible that the "cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." <u>Parle</u>, 505 F.3d at 927 (citing <u>Chambers</u>, 410 U.S. at 290 n. 3, 302-03). As discussed in the adjudication of the other claims contained in the amended petition, petitioner has failed to demonstrate that error of a constitutional dimension occurred in the guilt phase of his trial. With no other constitutional errors to aggregate, this court found no basis upon which to conclude that cumulative error had a substantial and injurious effect or influence in determining the jury's verdict in the guilt phase. With respect to the penalty phase of petitioner's trial, this court found, as discussed above in Claim 3, that petitioner has made a clear prima facie case that counsel acted unreasonably in failing to investigate and present mitigating evidence of petitioner's adverse childhood experiences, mental illness, and social and family history. This court further found above that had counsel acted reasonably, the result of the penalty phase may have been different. Thus, by determining that petitioner has satisfied section 2254(d) for this penalty phase claim, this court has already recommended granting the relief petitioner requested

228

with respect to his sentencing.  It is difficult to conceive how the penalty phase error could have had any impact on a preceding guilt determination.  Furthermore, as there is only one finding of error in the penalty phase but no finding of error in the guilt phase, "there is nothing to accumulate to a level of a constitutional violation" that would warrant setting aside petitioner's conviction.  See Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (as amended) (citing Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999), overruled on other grounds by Slack v. McDaniel, 529 U.S. 473, 482 (2000)).

This court cannot conclude that the California Supreme Court's rejection of this claim was objectively unreasonable or contrary to established federal law, and petitioner is not entitled to habeas relief or evidentiary development of this claim.  Accordingly, Claim 32 should be denied.

FF. California's Timeliness Rule – Claim 33

Petitioner claims that California Supreme Court's Policies Regarding Cases Arising from Judgments of Death ("state court review policies")[42] are unconstitutional because they are

---

[42]    "California does not employ fixed statutory deadlines to determine the timeliness of a state prisoner's petition for habeas corpus.  Instead, California directs petitioners to file known claims as promptly as the circumstances allow."  Walker v. Martin, 562 U.S. 307, 310 (2011) (internal quotations omitted).  Under the California Supreme Court's Policies Regarding Cases Arising from Judgments of Death ("Policies"), a habeas corpus petition is presumed to be filed without substantial delay if it is filed within 180 days from the due date of the reply brief on direct appeal, or within 36 months after the appointment of habeas counsel, whichever is later.
In 1993, the California Supreme Court decided Clark, 5 Cal. 4th 750, clarifying the law regarding untimeliness.  Prior to that time, the untimeliness bar was not firmly established or consistently applied, and thus was found to be inadequate to bar federal review.  See Fields v. Calderon, 125 F.3d 757, 763-64 (9th Cir. 1997).  In 1998, the California Supreme Court decided In re Robbins, 18 Cal. 4th at 811-12, declaring that it would no longer consider federal law when denying a habeas claim as procedurally barred for untimeliness, and thus establishing the independence of California's untimeliness bar.  Even for defaults occurring after Clark and Robbins, however, district courts within the Ninth Circuit continued to hold California's timeliness bar inadequate, based on its inconsistent application.  See, e.g., Dennis v. Brown, 361 F. Supp. 2d 1124, 1130-34 (N.D. Cal. 2005).
In Martin, the United States Supreme Court held that California's timeliness rule is adequate to bar federal habeas review.  562 U.S. at 321.  Specifically, the Supreme Court held that California's untimeliness bar was "firmly established and regularly followed," id. at 316, and thus adequate to trigger a procedural bar to federal habeas review, id. at 316-21.  In addition, Ninth Circuit authority has long held that "because the California timeliness rule is not interwoven with federal law, it is an independent state procedural ground, as expressed in Clark/Robbins."  Bennett v. Mueller, 322 F.3d 573, 581 (9th Cir. 2003).

1    "inadequate, insufficient, arbitrary, capricious and unfair." (ECF No. 103 at 468.)  He asserts that

2    this claim "basically considers the timeliness of the claims that the California Supreme Court held

3    to be untimely." (Id.)  Petitioner raised this claim in his supplemental state habeas petition. (LD

4    No. 20 at 80-82).  The California Supreme Court denied the claim on the merits and also

5    concluded that it was barred as untimely and successive.  (LD No. 23.)  This court finds that the

6    California Supreme Court's summary denial of this claim was reasonable.

7        Petitioner cites no federal law holding that the state court review policies are

8    unconstitutional or that the California Supreme Court's application of the state court review

9    policies to bar certain of petitioner's claims on grounds of untimeliness is unconstitutional.  In

10   any event, in addition to denying certain claims as untimely, the California Supreme Court also

11   denied the claims summarily on the merits.  This court has addressed the merits of petitioner's

12   claims in the amended petition.  As such, it is unnecessary to further discuss the reasonableness of

13   the California Supreme Court's determination that certain claims are barred as untimely under the

14   state court review policies.  Stated differently, even if this court concludes that the California

15   Supreme Court violated federal law by applying the state court review policies to bar certain

16   claims as untimely, the California Supreme Court and this court nonetheless addressed the merits

17   of those claims.  This court has not found that the California Supreme Court's denial of certain of

18   petitioner's claims on grounds of untimeliness prohibited federal review of those claims. Cf.

19   Martin, 562 U.S. at 321(California's timeliness rule is adequate to bar federal habeas review);

20   Bennett, 322 F.3d at 581 ("[B]ecause the California timeliness rule is not interwoven with federal

21   law, it is an independent state procedural ground, as expressed in Clark/Robbins.").  Therefore,

22   this court finds that petitioner is not entitled to habeas relief on this claim.

23        GG.    Ineffective Assistance of State Appellate and Habeas Counsel – Claim 34

24        Petitioner argues that his state appellate and habeas counsel rendered ineffective

25   assistance of counsel by failing to preserve evidence, investigate relevant issues, adequately

26   consult with petitioner, present to the California Supreme Court all issues of which he was, or

27   should have been aware, and adequately research issues.  Petitioner raised this claim in his

28   supplemental state habeas petition (LD No. 20 at 82-85), which the California Supreme Court

summarily denied on the merits and deemed barred as successive and untimely (LD No. 23).

Robert Derham represented petitioner both on direct appeal and in the state habeas proceedings.

### 1. Ineffective Assistance of State Appellate Counsel

Petitioner claims appellate counsel's failure to investigate, research, prepare or raise numerous issues on appeal violated his Sixth Amendment right to effective assistance of counsel. Petitioner also argues that appellate counsel inadequately presented and argued issues and failed to recognize and raise several valid constitutional issues apparent from the record or apparent with a reasonable and adequate investigation.

It is well-established that petitioner had a right to the effective assistance of counsel on appeal. See Evitts v. Lucey, 469 U.S. 387, 396-97 (1985). To prevail on a claim that appellate counsel was ineffective, a petitioner must meet the Strickland standards by showing counsel acted unreasonably and that there is a reasonable probability that had counsel acted reasonably, the result of the proceeding would have been different. Smith v. Robbins, 528 U.S. 259, 285 (2000). Reasonably effective appellate counsel should raise all "arguably meritorious issues." 1989 ABA Guidelines, Guideline 11.9.2.E.

Petitioner does not identify specifically which issues counsel should have, but did not, raise on appeal. Instead, he refers generally to "any issue" in this federal petition that was not raised on appeal. (ECF No. 103 at 484.) Nor does petitioner establish that he was prejudiced by counsel's failure to raise any of these claims, because he has failed to show a reasonable probability that any of them would have been successful. Moreover, petitioner presented claims not raised on appeal in collateral proceedings, and the California Supreme Court considered and denied those claims on the merits. Thus, petitioner fails to establish his claim for ineffective assistance of appellate counsel. Therefore, the California Supreme Court was not unreasonable in denying Claim 34.

### 2. Ineffective Assistance of State Habeas Counsel

Petitioner acknowledges that this is not a stand-alone claim but has been raised only to establish "cause" to overcome procedural bars under Martinez v. Ryan, 566 U.S. 1 (2012). Because this court will consider any procedural default arguments after resolution of the section

2254(d) issues, there is no need to consider petitioner's ineffective assistance of habeas counsel arguments at this time.

CONCLUSION

Based on the foregoing findings, and good cause appearing, IT IS HEREBY RECOMMENDED that:

1. The court finds petitioner has satisfied 28 U.S.C. § 2254(d) for Claim 3.

2. The court finds Claim 19 is premature and should be dismissed without prejudice to its renewal after an execution date is set.

3. The court finds the allegations in Claim 27 relating to Billy Mackey and Michael Johnson are not exhausted and should be dismissed.

4. The court finds consideration of the allegation in Claim 34 that state habeas counsel was ineffective should be deferred until the consideration of any procedural default issues.

5. The court finds petitioner has failed to satisfy section 2254(d) for the remaining claims and subclaims in the amended petition and recommends denial of habeas relief on those claims and subclaims.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within sixty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 14, 2018

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

cornwell.2254d.fr.draft.kjn